UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DR. JOHN A. REPICCI AND LORRAINE REPICCI, individually, and JULIE STONE as Trustee of the JOHN A. REPICCI IRREVOCABLE LIFE INSURANCE TRUST and the REPICCI IRREVOCABLE FAMILY TRUST,

                                                *Plaintiffs,*

v.

CHRISTOPHER R. JARVIS and
OJM GROUP LLC,

                                                *Defendants.*

**AFFIDAVIT OF PLAINTIFF
DR. JOHN A. REPICCI**

Case No. 1:17-cv-132-WMS

---

STATE OF NEW YORK    )
COUNTY OF ERIE        ) ss.:

    **Dr. John A. Repicci** being duly sworn states:

    1.    I am one of the Plaintiffs in this matter along with my wife, Lorraine. I reside at 120 Deer Run, Williamsville, New York. I make this Affidavit in response to Defendant Jarvis' Motion to Dismiss the Complaint.

    2.    I am an Orthopedic Surgeon with a longstanding and successful practice based in Western New York. I believe I first became acquainted with Defendant Christopher Jarvis at a medical convention sometime prior to the year 2002. I believe I heard him give a presentation regarding wealth preservation and financial and estate planning geared to medical professionals. I recall that he expressed particular and specialized expertise in this area and he gave me a book that he had co-written on the subject. I read his book and being impressed, I agreed to meet with him.

3. Over many months we met and spoke by phone numerous times. We discussed in great detail our family financial status and our long term goals. Jarvis repeatedly assured me of his expertise and competency as a wealth advisor, financial advisor and estate planning advisor. He also assured me that he would oversee and monitor any plan we put into place and that he would continue to advise us throughout the duration of any plan as demonstrated by the various correspondences appended hereto.

4. By letter dated October 1, 2002, Jarvis represented that he was advising my wife and I with regard to an overall financial and estate planning strategy that would, in part, move assets from retirement accounts to life insurance plans in order to obtain greater financial benefits for our family and reduce our tax liabilities. A copy of the letter is annexed hereto as **Exhibit A**. Jarvis represented:

> If you look at the accompanying spreadsheets, you will see that this strategy will increase the after tax estate you leave your children by roughly **$10,000,000 to 12,000,000** in the years you and Lorraine are most likely to pass away (ages 7-25). *Even if you or Lorraine live for 30 more years, the benefit of this strategy to your family is still over 9.1 million*. Furthermore, from now until beyond your ages of 100, **your family is better off at each point in time by utilizing this strategy**. (Ex A, at 2).

5. On October 1, 2002, Jarvis also provided me a document providing that if we instituted his estate strategy, "When you are [sic] pass away, your heirs will receive $14,000,000 tax-free (compared to nearly $4,000,000 if you do not do this plan). (Ex A, at 2).

6. By letter dated October 2, 2002, Jarvis advised us, "The policies are designed to last to age 100. If there is $1 of cash value at age 100, the policies will last until the two of you pass away—even if you do live to 150. A copy of the Letter is annexed hereto as **Exhibit B**.

7.      By letter dated October 9, 2002, Jarvis sent a letter (shared with me) to Hy Polakoff —our accountant—to address concerns about the investment, including "to give an explanation of the different numbers in the illustrations." (Ex. C, at 1). In particular, Jarvis addressed my and Polakoff's concern that the representations and illustrations that Jarvis provided with regard to the insurance policies were inconsistent with some of the insurance company's illustrations. A copy of the Letter is annexed hereto as **Exhibit C**. On that point, Jarvis explained:

> **Legal Disclosure**
> In the *Guaranteed* portions of the illustrations, the insurance companies have to, by law, show what the highest possible mortality expenses and administrative expenses could be (under the law) AND they have to show the lowest interest: crediting rate – even if the company has never credited that low. It is a "Worst-Case Scenario" illustration that shows the client what could happen if every element of the policy resulted in the worst possible results for the insured in EVERY year of the policy.
> . . . .
> Lastly, **it would be impossible for 15 years of minimum crediting and maximum mortality charges to sneak up on us.** We see what happens every year. John, Lorraine, and l will know each and every year what their policy is being credited. If we see two or three bad years in a row, then we will address the problem immediately so no major problem arises for them or their children. [Ex C, at 2 (bold and underline added, capitalization and italics in original)].

8.      Thus, Jarvis specifically advised that we should not worry about any numbers in the insurance company illustrations that appeared inconsistent with his representations because they were legally-required worst-case scenarios that would not happen. Moreover, and importantly, Jarvis specifically promised that he would be actively monitoring our investments during their life and that he would take action to address any problems in the future. These same

representations were stated directly to me on multiple occasions. The October 9, 2002, letter also provided:

> **Conclusion**
> I understand why you and John were concerned with an illustration that shows the policies running out in 12-15 years. I am comfortable that the illustration is based on current assumptions that show John and Lorraine's policies last beyond Age 100, are a very accurate depiction of what is likely to happen to this policy. Further, in the unlikely event of minimum returns and maximum mortality and administrative expenses, there are options that can protect John and Lorraine's cash flow and their children's estate." (Ex C, at 3).

9. By letter dated November 12, 2002, to me entitled "How to Get Guaranteed Death Benefits with Lincoln," A copy of which is annexed hereto as **Exhibit D,** Jarvis explained:

> As you will see, $1,624,933 of fund value will GUARANTEE $5,896,329 of death benefit for as long you or Lorraine live (Exhibit C). This is only a reduction of death benefit from $6.2 – 6.4 million to $5.89 million, but it removes all risk. I think this should be our plan. When you combine this with the Mass Mutual policy with $4 million guaranteed, we will take $3 million of 80% taxable pension money an convert it to nearly $10 million guaranteed. I think this is a very desirable position and it should alleviate some of your fears. (Ex D, at 1).

10. Relying on Jarvis' representations we agreed to purchase the first Lincoln policy and put the plan in place. Afterwards, Jarvis continued to monitor our investments and provide advice and strategies. For example, Jarvis sent us a letter dated December 7, 2004, to "confirm the status of the insurance policy your trust owns," "recommend a strategy to transfer more of your pension to your heirs," "renew our discussion about the need for Long Term Care Insurance," and "to initiate a discussion about the most tax-efficient strategy for transferring wealth to your heirs AND to your grandchildren." A copy of the aforementioned Letter is annexed hereto as **Exhibit E**

11. Similarly, in March 2006, Jarvis provided a strategy for "Repicci Family Estate Planning" that included various advice and recommendations concerning wealth management, taxes, gifting, investments, insurance, the use of an investment LLC, and IRS rules and regulations. A copy of the aforementioned is annexed hereto as **Exhibit F**.

12. By letter dated April 14, 2006, Jarvis wrote me to discuss a "planning opportunity." A copy of the Letter is annexed hereto as **Exhibit G.** Jarvis advised, among other things:

> With this plan, you can leave the kids 3.5 million or more TAX FREE to the heirs. We would ONLY use insurance policies that are GURANTEED and not take any investment risk. The economics of this plan are very similar to what we did successfully a few years ago.
> . . . .
> Policy for your family – we would only use highly rated companies with polices that are guaranteed. We know you liked these in the past. This will reduce some risk for you. [Ex G, at 4).]

13. As discussed above, pursuant to this and related solicitations, we purchased the second Lincoln "guaranteed" policy in late 2006.

14. By letter dated December 21, 2007, Jarvis provided advice and recommendation specifically related to the Lincoln policy. In particular, Jarvis presented options, including the following Option A:

> **Option A – Pay $240,000 before 12/31/07 and $240,000 on January 2, 2008.**
> Lincoln will guarantee $3,100,000 of death benefit if the tow of you die now, in 10 years or 45 years from now. This is level and there is no investment risk whatsoever. Jarvis went on to "recommend either A or B." We followed Jarvis's advice and took Option A by providing $240,000 before December 31, 2007, and $240,000 on January 2, 2008. A copy of the aforementioned Letter is annexed hereto as **Exhibit H** (Id.).

15. By letter dated January 7, 2014, I expressed concerns to Jarvis regarding difficulties with the IRS over the insurance policies we purchased from Lincoln and Mass Mutual. I asked for clarification on several issues including his representation that "the insurance would be in force until over age 100." A copy of the letter is annexed hereto as **Exhibit I**.

16. In response, Jarvis sent a letter to Hyman, providing:

> "The Mass Mutual Policy is guaranteed. The other two Lincoln policies are not. I have created a gird to show what we have and what we recommend he do. By paying about $50k/per year, he can lock in the death benefits for Lincoln on both policies until age 90 . . . . My recommendation is to pay the $50K per year per policy for the next 5 to 7 years and then see where the policies are under different assumptions and economic conditions." A copy of Jarvis's Response is annexed hereto as **Exhibit J**

17. This is the first time that Jarvis advised that the Lincoln policies were not guaranteed and would not last until my wife and I were at least 100, or that there were material differences between the Mass Mutual policy, which was guaranteed, and the Lincoln policies, which were not.

*Dr. John A. Repicci*
Dr. John A. Repicci

Sworn to before me this
11th day of May, 2017.

*Jennifer S. Mondavi*
Notary Public

JENNIFER S MONDAVI
NOTARY PUBLIC STATE OF NEW YORK
ERIE COUNTY
LIC. #01MO6195422
COMM. EXP. 10/20/2020