# EXHIBIT C



**JARVIS & MANDELL LLC**
INTEGRATED PLANNING SOLUTIONS

1875 CENTURY PARK EAST, SUITE 1550
LOS ANGELES, CA 90067
TEL: (310) 407-2850
FAX: (310) 407-2801
WWW.JARVISANDMANDELL.COM

October 9, 2002

Hy Polakoff
Brock, Schechter & Polakoff, LLP
135 Delaware Avenue
Buffalo, NY 14202

Dear Hy:

Thanks for all of your help so far. We are still awaiting the financial information, including profit and loss statements for the businesses and verified values of some of his assets. If you can fax that information to us today at (310) 203-9240, that would be a big help.

I am also writing you to give an explanation of the different numbers in the illustrations that John is getting ready to sign. I spoke with John today and, even though I think he understands what we told him, I want to make sure that I get you copies of some of the supporting information. This way, you can review the situation and we can go over all of the possible outcomes.

First, each company uses three elements to the design its insurance illustrations:

- **Mortality Charges** (in layman terms, the term cost of the insurance)
- **Administrative Expenses** (they are allowed a reasonable profit margin)
- **Interest Credited** (the growth in the cash account value)

The combination of premiums paid, plus interest credited minus the mortality and administrative charges over the years impact the policy's cash. As long as there is $1 of cash in the account at the time of the second death, the policy is paid in full. If the client lives to be 100, then no further mortality charges are withdrawn, yet interest is still credited.

**Mortality Charges**
Companies have filed their mortality charges with the insurance department. If they change the mortality table, they need to document that and submit that with the insurance department. The insurance department will need to see a significant change in life expectancies to warrant such a change. Incidentally, Mass Mutual has NEVER increased its mortality charges in its 150 year history. In fact, they have actually reduced their mortality charges twice. The attached article confirms this. This should give John additional comfort.

Registered Representative of, and securities and services offered through MML Investors Services, Inc. 1875 Century Park East Suite 1550 Los Angeles, CA 90067 (310) 407-2800
Jarvis & Mandell, LLC has no affiliation with MML Investors Services, Inc., Christopher Jarvis' California Insurance License is License #0C24276

**Administrative Expenses**
As a former actuary who dealt with insurance departments, I can tell you that the insurance industry generally allows for a reasonable return and the insurance department monitors this number for every company every year. I know that companies can NOT arbitrarily decide to make a 20% rate of return. The insurance department would not allow it. For what it is worth, New York is the most protective (California is probably second most protective) insurance regulatory body when it comes to the customers.

**Interest Credited**
The third component of insurance policy calculation is the interest crediting rate. Mass Mutual guarantees its policyholders no less than 3% in any one year. At present, despite the stagnant economy and very low interest rates, they are crediting 6.70% per year on the policy that John and Lorraine are buying. Lincoln guarantees its policyholders no less than 4% in any one year and is currently crediting 5.85% in today's low interest rate environment.

I have also attached some documentation of what Mass Mutual and Lincoln have credited over the past 10-20 years on their products. Mass Mutual has never credited less than 5.50% and Lincoln has never credited less than 5.2%. This should give you and John a great deal of confidence that 3% and 4% returns for one year, let alone the entire life of the policy, are highly unlikely.

**Legal Disclosure**
In the *Guaranteed* portions of the illustrations, the insurance companies have to, by law, show what the highest possible mortality expenses and administrative expenses could be (under the law) AND they have to show the lowest interest crediting rate – even if the company has never credited that low. It is a "Worst-Case Scenario" illustration that shows the client what could happen if every element of the policy resulted in the worst possible results for the insured in EVERY year of the policy.

Practically, I believe that interest rates can't drop much further, so I would expect interest crediting rates to go up, not down, in the future. Further, if an insurance company gave its lowest guaranteed interest rate to its policyholders (this information is disclosed every year), they would have a very difficult time selling any product the following year because the competition would say "They gave 3% last year and we credited 6%. Which company do you think is stronger?" If Mass Mutual, for example, has never given less than 5.5% for any one year, how realistic is it that they will credit only 3% for 15 straight years?

Lastly, it would be impossible for 15 years of minimum crediting and maximum mortality charges to sneak up on us. We see what happens every year. John, Lorraine and I will know each and every year what their policy is being credited. If we see two or three bad years in a row, then we will address the problem immediately so no major problem arises for them or their children.

**Options**
If we noticed bad returns for a few years, we would look at a number of options:
1.) Change insurance companies
2.) Reduce the face amount of insurance to reduce mortality expenses. (However unlikely, even if the policy had to be reduced significantly to, for example, $7 million, the strategy would still be a windfall for John's family because the proceeds would pay out through the insurance trust income and estate tax-free, rather than be hit with BOTH sets of onerous taxes).
3.) Calculate how much additional premium would have to be paid to continue with the $10+ million of death benefit to offset the bad years we had.
4.) See how many years we are losing from 2 or 3 bad years. It is possible that 2 or 3 bad years only reduce the coverage to end at age 95. We can recalculate how we are doing every year. In fact, every annual policy statement shows you where you are relative to your initial purchase and projects what you might expect – given the conditions at that time.

**Conclusion**
I understand why you and John were concerned with an illustration that shows the policies running out in 12-15 years. I am comfortable that the illustrations based on current assumptions that show John and Lorraine's policies lasting beyond Age 100, are a very accurate depiction of what is likely to happen to this policy. Further, in the unlikely event of minimum returns and maximum mortality and administrative expenses, there are options that can protect John and Lorraine's cash flow and their children's estate.

Please call me with any questions that you might have at (310) 407-2850. I am hoping to complete and pay for this policy by some time next week.

I appreciate all of your assistance.

Sincerely,

Christopher R. Jarvis, MBA