UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| DR. JOHN A. REPICCI and LORRAINE REPICCI, Individually, and JULIE STONE as Trustee of the JOHN A. REPICCI IRREVOCABLE LIFE INSURANCE TRUST and THE REPICCI IRREVOCABLE FAMILY TRUST,<br><br>                   Plaintiffs,<br><br>    v.<br><br>CHRISTOPHER R. JARVIS and OJM Group LLC,<br><br>                   Defendants. | **LOCAL RULE 56(A)(1) STATEMENT OF DEFENDANT CHRISTOPHER R. JARVIS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.: 1:17-cv-132 |

_____

Defendants Christopher R. Jarvis, through his counsel, Winget, Spadafora & Schwartzberg, LLP, as and for his Statement pursuant to Local Rule 56(a)(1) of the United States District Court for the Western District of New York alleges as follows:

### A. The Parties

1.     Dr. John Repicci is a very successful orthopedic surgeon and the inventor of a non-invasive knee procedure. (Deposition of John Repicci dated July 26, 2021 at p. 6). The deposition transcript of Dr. John Repicci is annexed as Exhibit "A" to the Declaration of Matthew Tracy dated February 11, 2022 (the "Tracy Declaration").

2.     In 2002, Dr. Repicci was 66 years old and had a net worth of $20 million. (Repicci Tr. p. 22 lines 5-16 ). He was interested in saving on taxes and leaving as much money to his heirs as possible. (Repicci Tr. p. 19). Lorraine Repicci is his wife and handled the books for Dr. Repicci's medical practice. (Repicci Tr. p. 16). Julie Stone is his daughter and acted as

1

office manager. (Deposition of Julie Stone, dated July 27, 2021 at p. 7, lines 1-10). The deposition transcript of Julie Stone is annexed as Exhibit "B" to the Tracy Declaration").

3. Dr. Repicci testified that he made all of the financial decisions for the practice. (Repicci Dep. p. 16, line 25- p. 17 line 1.).

4. Mr. Jarvis received his bachelor of science in Mathematics from the University of Rhode Island in 1992 and his Masters in Business Administration in 1998. In or about 1997, he started a consulting firm called Jarvis & Mandell. That firm provided consulting services primarily to physicians in a variety of areas, including wealth management and insurance. Affidavit of Christopher R. Jarvis, sworn to on February 9, 2022 (the "Jarvis Aff.") at ¶2.

**B.      The Rescue Plan**

5. In or about 2000, Mr. Jarvis received a telephone call from Plaintiff, Dr. John Repicci. Dr. Repicci was a very successful orthopedic surgeon in Buffalo, New York. He informed Mr. Jarvis that he had millions of dollars in retirement assets. Because of his significant net worth, he no longer needed these assets, so he asked if Mr. Jarvis could assist him in transferring these assets to his heirs without incurring income taxes or estate taxes. Jarvis Aff. ¶3.

6. In particular, Dr. Repicci had individual retirement plans (the "IRAs") worth $4 million. At the time, the exemption for estate and gift taxes was $600,000 so most of the IRA would be subject to estate taxation upon his death. At this time, the marginal estate tax rate was 60%. In addition, all of the withdrawals from these accounts would also be subject to income taxes. In New York, the combined federal and state income tax rates were close to 50%. The plan that was agreed to by the plaintiff, his lawyers, a pension consultant, and his accountants, was to have the plaintiff create a new Profit Sharing Plan ("PSP) that would allow for the purchase of life insurance (IRAs are not allowed to purchase life insurance). Jarvis Aff. ¶4.

7. The IRA assets constituted approximately 20% of Dr. Repicci's overall net worth. (Repicci Tr. p. 22).

8. The remaining 80% (i.e. $16 million) was controlled by Dr. Repicci and his advisers, accountant Hy Polakoff, attorney Celia Clark, as well as financial advisors at Merrill Lynch and Marine Midland Bank. *Id.*

9. Dr. Repicci's lawyer created a new legal entity to be the sponsor of the new PSP. Then, Dr. Repicci transferred the IRA assets into the PSP. The PSP would then invest most, if not all, of its assets on two separate life insurance policies. Though these policies were purchased with $3,000,000 of pretax dollars, Dr. Repicci would later sell these policies to a trust for his heirs (which was not part of his estate for estate tax purposes) for considerably less than $500,000. By doing so, Dr. Repicci would remove $2,500,000 of value from his taxable estate and would eliminate taxable retirement plan withdrawals by the same amount. Dr. Repicci's estimated savings from such a plan was approximately $1 million in income taxes and $1 million in estate taxes. Jarvis Aff. ¶¶4-5.

**C. The Policies**

10. Mr. Jarvis submitted Dr. and Mrs. Repicci for medical and financial underwriting with various insurance carriers. One of the carriers, Massachusetts Mutual Life Insurance Company of New York ("Mass Mutual"), was able to issue Plaintiffs a policy with an initial death benefit of $17.5 million. The policy illustrations contemplated a future reduction in death benefit. The ultimate death benefit for this particular product was guaranteed. Jarvis Aff. ¶6.

11. As Mr. Jarvis was a career agent at Mass Mutual, with subsidized office space and various employee benefits based on sales of Mass Mutual products, he had every incentive to purchase as much insurance from Mass Mutual as possible. However, the underwriters would

3

only offer $17.5 million in death benefit because of the prior health conditions of Dr. Repicci and his wife, Lorraine Repicci. This necessitated them going to another insurance carrier. Jarvis Aff. ¶7.

12. They ultimately went to Lincoln Life & Annuity Company of New York ("Lincoln") which offered a policy with $25 million in death benefit – in addition to the $17.5 million Mass Mutual was offering. However, the difference in this policy was that the death benefit was not guaranteed for more than 13 years. While the current assumptions used in the compliance approved illustrations in 2002 projected that the policy would last until the plaintiff turned 100 years of age, Lincoln would not guarantee it. This was made clear to Dr. Repicci and his accountant, Hy Polakoff at the time. Jarvis Aff. ¶6.

13. In an October 9, 2002 letter to Hy Polakoff, Plaintiff's accountant (annexed as Exhibit "A" to the Jarvis Aff.), Mr. Jarvis went through the fact that the Lincoln Policy was not guaranteed. He raised three future options in the event of future economic changes that would cause the policy to perform below the current assumptions, including: (a) reduce the death benefit; (b) do nothing if the changes only minimally reduced the projected coverage period; (c) add more premium to the policy. Thus, adding more premium was always a possibility and the Plaintiffs knew this in 2002. Jarvis Aff. ¶7.

14. For the Lincoln policy, the Plaintiffs paid $600,000 in premium in both 2002 and 2003, but did not pay another $600,000 in 2004. This is significant as the plan was based on Plaintiffs paying $1.8 million in premium and not $1.2 million. The $600,000 shortfall, together with much lower interest rates changed the projections of the Lincoln Policy. Jarvis Aff. ¶8.

15. In 2003, the expectation was that in 2005 they could exchange the Lincoln Policy for a guaranteed product. However, in or about 2005, Lincoln changed its policy and that was no

4

longer possible. Dr. Repicci was well aware of this and the annual statements that he received (Annexed as Exhibit "D" to the Tracy Declaration) would show when the guaranteed provision in the Lincoln Policy was set to expire well before his 100th birthday. Upon information and belief, it is set to expire in or about November 2022 unless additional funds are put in. Jarvis Aff. ¶9.

16. In or about 2006, Mr. Jarvis had discussions with Dr. Repicci about the purchase of a second policy from Lincoln (referenced in the Complaint as the "144 Policy"). However, Mr. Jarvis did not sell that policy to Plaintiffs and from 2007 to 2011 the broker of record was David Mandell. Jarvis Aff. ¶10. Furthermore, Mr. Jarvis received no compensation in connection wth the Plaintiffs other than commissions.

17. From 2007 to 2011, Mr. Jarvis had no contact with Dr. Repicci. For two of those years, Mr. Jarvis was in a business dispute with my former partners and was prohibited from communicating with Dr. Repicci. Jarvis Aff. ¶11.

18. However, in August 2011, Mr. Jarvis was contacted by Plaintiffs' accountant, Hy Polakoff, and his attorney, Celia Clark. They asked Mr. Jarvis for assistance with issues that arose with the 144 Policy. Initially Mr. Jarvis could not help because he was not the agent of record. However, in order to allow him to service this policy, the Plaintiffs appointed him agent of record in late 2011. Jarvis ¶11.

19. Mr. Jarvis was asked to see what would it take for the 144 Policy to last until Dr. Repicci was 100. Mr. Jarvis had projections run in October 2011 that showed a number of scenarios of adding premium to have the second policy last longer. (A copy of such communications are annexed to the Tracy Declaration as Exhibit "E"). Mr. Jarvis had numerous conversations with Mr. Polakoff and Ms. Clark about this. Notably, at no time was Mr. Jarvis asked to conduct a similar analysis of the first Lincoln Policy. Jarvis ¶12.

20. In January 2014, Dr. Repicci asked Mr. Jarvis about the status of the policies. A copy of the letter is attached to the Tracy Declaration as Exhibit "F". In March 2014, Mr. Jarvis wrote Dr. Repicci and informed him that while the Mass Mutual policy was guaranteed, the Lincoln policies were not. Mr. Jarvis recommended that Dr. Repicci put $50,000 in each policy for 5-6 years and they would then review. A copy of the March 2014 communication is attached to the Tracy Declaration as Exhibit "G". Dr. Repicci rejected this recommendation and no premium was paid into these policies until 2020.

Dated:  New York, New York
        February 11, 2022

                                              WINGET, SPADAFORA &
                                              SCHWARTZBERG, LLP

                                              By: *Matthew Tracy*
                                                   Matthew Tracy
                                            45 Broadway, 32nd Floor
                                            New York, New York 10006
                                            Telephone:  (212) 221-6900
                                            Facsimile:   (212) 221-6989
                                            Tracy.M@wssllp.com
                                            *Attorneys for Defendant*
                                            *Christopher R. Jarvis*