# EXHIBIT A

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   WESTERN DISTRICT OF NEW YORK
 3   -------------------------------------------
 4   DR. JOHN A. REPICCI and LORRAINE REPICCI,
     Individually, and JULIE STONE as Trustee of
 5   the JOHN A. REPICCI IRREVOCABLE LIFE INSURANCE
     TRUST and THE REPICCI IRREVOCABLE FAMILY
 6   TRUST,
 7          Plaintiffs,    Case No. 1:17-cv-132
 8   -vs-
 9   CHRISTOPHER R. JARVIS and OJM GROUP, LLC,
10          Defendants.
     -------------------------------------------
11             Examination Before Trial of DR.
12   JOHN A. REPICCI, held before Brooklyn Morton,
13   Notary Public, at MAGAVERN, MAGAVERN & GRIMM,
14   LLP, 1100 Rand Building, 14 Lafayette Square,
15   Buffalo, New York, on July 26th, 2021,
16   commencing at 10:20 a.m., and ending at 12:30
17   p.m., pursuant to notice.
```

Page 3

```
 1              W I T N E S S E S
 2   WITNESS           EXAMINATION          PAGE
 3
 4   DR. JOHN A. REPICCI
 5            BY MR. TRACY         5
 6
 7
 8
 9              E X H I B I T S
10   EXHIBIT      DESCRIPTION          PAGE
11   A        Affidavit              13
12   B        Letter                 21
13   C        Letter                 23
14   D        Letter                 30
15   E        Letter                 43
16   F        Letter                 45
17   G        In-force illustrations 53
18   H        Premiums               53
19
20       (Mr. Grimm retained exhibits.)
```

Page 2

```
 1   A P P E A R A N C E S
 2   APPEARING FOR THE PLAINTIFFS:
 3            MAGAVERN, MAGAVERN & GRIMM, LLP
              BY: RICHARD A. GRIMM, ESQ.
 4            1100 Rand Building
              14 Lafayette Square
 5            Buffalo, New York 14203
              (716) 856-3500
 6
     APPEARING REMOTELY FOR THE DEFENDANT
 7   CHRISTOPHER R. JARVIS:
 8            WINGET, SPADAFORA &
              SCHWARTZBERG, LLP
 9            BY: MATTHEW TRACY, ESQ.
              45 Broadway
10            32nd Floor
              New York, New York 10006
11            (212) 221-6900
```

Page 4

```
 1          DR. JOHN A. REPICCI
 2       MR. TRACY:  Good morning.  We are
 3   attending the deposition of Dr. John Repicci.
 4   My name is Matthew Tracy.  We just met.
 5       I just wanted to note for the record, and
 6   I have discussed this with counsel, we had had
 7   some outstanding document discovery and
 8   interrogatories.  Some of it has been
 9   responded to, some has not.
10       We are going to reserve our right to
11   recall Dr. Repicci after we have an
12   opportunity to review the documents that were
13   produced on Friday and obtain some additional
14   outstanding discovery.  I just wanted to make
15   that clear.  I think the best thing to do, as
16   I indicated to counsel, is go forward today.
17   Get as much done as we can, but with the
18   understanding that I will likely be recalling
19   Dr. Repicci.
20
21   J O H N  A.  R E P I C C I,
22   120 Deer Run, Williamsville, New York 14221,
23   having been first duly sworn, was examined and
24   testified as follows:
25
```



Page 5

1      DR. JOHN A. REPICCI
2    EXAMINATION BY MR. TRACY:
3  Q. Dr. Repicci, again my name is Matthew Tracy.
4     Have you ever had your deposition taken
5     before?
6  A. Probably, yes.  I don't recall.
7  Q. Okay.  Just let me go over a couple of initial
8     instructions.  This is just basically I will
9     be asking you a series of questions.  I would
10    ask that you answer them verbally because the
11    court reporter cannot get down nonverbal
12    gestures and the like.
13       I would also ask when possible if you
14    could just wait for me to finish my question
15    before answering.  A lot of times in
16    conversation you will anticipate what I am
17    going to say and then we end up talking over
18    each other.  And I will extend the same
19    courtesy to you.
20       Do you understand that so far?
21  A. Yes.
22  Q. And what did you do today in preparation for
23    today's deposition?
24  A. Nothing.
25  Q. Did you review any documents?

Page 6

1      DR. JOHN A. REPICCI
2  A. No.
3  Q. Okay.  Can you then just briefly describe your
4    educational employment background?
5  A. I have a degrees in dentistry and a degree in
6    medicine and I practiced in orthopedic surgery
7    for a number of years until three years ago.
8  Q. And so your retirement was in 2018; is that
9    correct?
10  A. I believe so, yes.
11  Q. Okay.  And what year did you obtain your
12    degree in dentistry?
13  A. My medical degree?
14  Q. Yes.
15  A. 1963.
16  Q. And just fast forwarding a little bit, when
17    did you become involved in orthopedic surgery?
18  A. Well, I took an orthopedic residency and I
19    finished that, I believe, in 1969 and I have
20    been practicing orthopedic surgery since 1969.
21  Q. Okay.  Just before your retirement in 2018 did
22    you have a medical practice of your own or
23    were you affiliated with someone else, or
24    something different?
25  A. I had a practice of my own with my son-in-law

Page 7

1      DR. JOHN A. REPICCI
2    and my daughter in my practice.
3  Q. And for how long had you been practicing in
4    that fashion?
5  A. Probably 15 years or so.
6  Q. And I guess down to about 2003.  Am I correct
7    in that?
8  A. Probably given the age of my daughter and
9    son-in-law.
10  Q. Okay.  Prior to practicing with your daughter
11    and son-in-law, where had you been practicing?
12  A. Orthopedic surgery in Buffalo, New York.
13  Q. And when you say orthopedic surgery, was that
14    just yourself or were there other physicians
15    or something else?
16  A. It was just myself.
17  Q. And for how long did you do that?
18  A. Well, I practiced general orthopedic surgery
19    for probably about 20 years and then I did
20    joint replacements primarily for the last 20,
21    25 years.
22  Q. Okay.  And when you did your practice -- and
23    this is before practicing with your son-in-law
24    and daughter, did you have your own separate
25    office or did you work with a hospital?

Page 8

1      DR. JOHN A. REPICCI
2  A. I had my own office and worked at various
3    hospitals.
4  Q. And in your own office, did you have any
5    employees?
6  A. Yes.
7  Q. How many employees did you have?
8  A. I don't really recall, but I probably had at
9    least 10 or 12.
10  Q. And did you operate the business as a sole
11    proprietorship, as an LLC, an LLP, or
12    something different?
13  A. LLC.
14  Q. I am sorry?
15  A. An LLC.
16  Q. And other than yourself, were there any other
17    members of the LLC?
18  A. I don't recall the total organization.  I was
19    the LLC by myself when I started and I believe
20    that my son-in-law and daughter were part of
21    it as we continued.
22  Q. And to the best of your recollection, when did
23    you start your LLC?
24  A. I don't recall.
25  Q. And if you can recall, do you recall who did



Page 9

1      DR. JOHN A. REPICCI
2   the paperwork to form the LLC?
3   A. I would have had our attorneys and our
4      accountants take care of all of that.
5   Q. Sure.  And to the best of your recollection,
6      who were your attorneys and accountants?
7   A. You know, I hate to say this, but I really
8      didn't really deal in the legal and monetary
9      aspects.  My wife did that type of stuff.  I
10     just dealt with the professional type of
11     things.
12  Q. And your wife was Lorraine Repicci; is that
13     correct?
14  A. Right.
15  Q. And what role did she have with your practice?
16  A. Basically she handled the finances in terms of
17     deposits and all of that type of stuff with my
18     accountant and she actually -- any checks that
19     had to be written were handled by her.
20  Q. And who was your accountant?
21  A. Hy Polakoff and his group.
22  Q. And for approximately how long was Hy Polakoff
23     your accountant?
24  A. My life time.
25  Q. And do you recall, as best as you can, it

Page 10

1      DR. JOHN A. REPICCI
2   sounds like it has been a 50-year
3   relationship, how you came to work with Hy
4   Polakoff?
5   A. Yes.  My father-in-law was a local executive
6      and he used that law firm for his purposes and
7      so he signed me up with that law firm and I
8      continued.
9   Q. And what was your father-in-law's name?
10  A. Hubert, Norbert Hubert.
11  Q. And he was an executive where, if you can
12     recall?
13  A. It was a clothing company in Buffalo and he
14     was the executive there.
15  Q. And I am going to try to narrow down the
16     timeframe to approximately the early 2000s.
17     How frequent would you meet with Hy Polakoff,
18     if at all?
19  A. If I met him, it was maybe once a year.  My
20     wife did all that stuff.  I didn't deal with
21     the financial aspects of the business.
22  Q. In that timeframe, just around the early
23     2000s, had you utilized any estate planning,
24     prior to meeting Mr. Polakoff?
25  A. I don't recall.  No.

Page 11

1      DR. JOHN A. REPICCI
2   Q. And did you have -- in the early 2000s did you
3      have at least informally any plan on when you
4      were going to retire?
5   A. I never planned on retiring.
6   Q. In the early 2000s did you have any brokerage
7      accounts?
8   A. Yes.
9   Q. Who did you have brokerage accounts with?
10  A. Merrill Lynch.
11  Q. Did you have a particular representative at
12     Merrill Lynch that you utilized?
13  A. I can't recall at this time.
14  Q. Did you ever have a stockbroker that you can
15     recall using on a regular basis?
16  A. I didn't buy individual stocks.
17  Q. What kind of stocks did you buy, if any?
18  A. Basically the -- Marine Midland ran one and
19     Fisher Investments ran the other account and
20     that is basically my investment accounts.
21        MR. TRACY:  Can you just read that part
22     back?  I just want to make sure I understood
23     it.
24  A. Pardon me?  Marine Midland Bank did one of my
25     -- runs one of my accounts and Fisher

Page 12

1      DR. JOHN A. REPICCI
2   Investments runs the other account.
3   Q. Thank you.  And did you have a particular
4      contact person at Marine Midland Bank that you
5      would deal with on those investments?
6   A. My wife did all of the financial things so I
7      don't really recall the individuals by name.
8   Q. And how about Fisher Investments, if you
9      recall?
10  A. Well, that is pretty much the same way.
11     Somebody at Fisher manages it and communicates
12     with my wife.
13        MR. TRACY:  Richard, could you show
14     Dr. Repicci his affidavit, which is one of the
15     documents I uploaded?  And we will mark it.
16        MR. GRIMM:  Are you referring to the
17     affidavit that was filed in this case, so
18     Document 13 in this case?
19        MR. TRACY:  That would be correct.
20        MR. GRIMM:  Okay.  You want me to mark
21     it as one exhibit together with the exhibits?
22        MR. TRACY:  Just make it a stand alone.
23        MR. GRIMM:  Okay.
24        MR. TRACY:  You can hand that to the
25     court reporter.  This will be Defendant's A.



Page 13

1      DR. JOHN A. REPICCI
2
3    The following were marked for identification:
4    Exhibit A  -  Affidavit
5
6    BY MR. TRACY:
7  Q. Dr. Repicci, I would just ask you to take a
8     quick look at this document.  You don't have
9     to memorize it, but just look it over quickly.
10  A. I looked it over.
11  Q. Okay.  Do you recall seeing this document?
12  A. I recall seeing it, yes.
13  Q. And while it has an electronic signature, do
14     you recall approving of this document and
15     signing it?
16  A. Yes.
17  Q. Okay.  If you look at paragraph 2, second
18     sentence.  It states, "I believe I first
19     became acquainted with Defendant Christopher
20     Jarvis at a medical convention sometime prior
21     to the year 2002."
22       Do you have any recollection of what
23     particular medical convention that was at or
24     more of the circumstances behind it?
25  A. No, I do not.

Page 14

1      DR. JOHN A. REPICCI
2  Q. Okay.  And do you recall -- he gave you a book
3     that he had co-written on the summary.  Do you
4     still have that book?
5  A. I probably have it, yes.
6  Q. Okay.  I will put this in writing.  I would
7     ask for a copy of it to the extent you still
8     have it.
9       And you agreed to meet with him.  This was
10     in paragraph 2.  Where did you -- did you
11     agree at the conference or were you going to
12     meet him at a later date, or something else?
13  A. This was 20 years ago, but I did meet with him
14     personally and I forgot exactly where.
15     Whether it was at the conference or in
16     Buffalo, I don't recall.
17  Q. Did you ever travel anywhere yourself to meet
18     with him?
19  A. Not that I recall, no.
20  Q. And if you look at paragraph 3, it indicates,
21     "Over many months we met and spoke by phone
22     numerous times."  And would you say those
23     meetings took place in Buffalo?  Is that what
24     you're saying?
25  A. I don't really recall specifically, but I

Page 15

1      DR. JOHN A. REPICCI
2     would assume that meetings did occur in
3     Buffalo.
4  Q. And if they occurred in Buffalo, to the best
5     of your recollection, would they be in your
6     office, at a restaurant, or something else?
7  A. Probably a restaurant or something of that
8     category.  I don't really meet people in the
9     office or in my home anymore than necessary.
10  Q. Okay.  Fair enough.  It says, "Spoke by
11     phone."  Would you say it is fair to say you
12     spoke by phone with Mr. Jarvis more or met him
13     in person more?
14  A. More by phone.
15  Q. Okay.  The next sentence is:  "We discussed in
16     great detail our family financial status and
17     our long term goals."  What was at the time --
18     this is late 2001, early 2002.  What was your
19     family and financial status?
20  A. Well, I was, you know, making a decent living
21     and I had some financial assets and I would
22     like to leave them to my children, if at all
23     possible.
24       MR. TRACY:  Excuse me.  Just give me one
25     second.  My phone is ringing.

Page 16

1      DR. JOHN A. REPICCI
2       THE WITNESS:  Sure.
3
4         (Off the record.)
5
6    BY MR. TRACY:
7  Q. Okay.  Did you have any retirement type of
8     goals that you discussed with him?
9  A. Retirement goals, we had a retirement plan and
10     we discussed whatever the plan was with him,
11     yes.
12  Q. When you say that you had a retirement plan,
13     did you have something that predated
14     Mr. Jarvis, or was that something you were
15     discussing with him?
16  A. No.  We were just saving funds for retirement
17     and he was going to run this program for us
18     and we had an IRA, I believe.
19  Q. Okay.  And did your wife have discussions with
20     Mr. Jarvis at this time?
21  A. I am sure she did.  My wife functioned not so
22     much on the decision basis, but as a record
23     keeping basis.  She wrote all the checks and
24     took care of all the paperwork.
25  Q. But, the decisions would be made by you?



Page 17

1   DR. JOHN A. REPICCI
2   A. I made the decisions, yes.
3   Q. And going back to the affidavit for a second,
4     it says, "Jarvis repeatedly assured me of his
5     expertise and competency as a wealth advisor."
6       How did he repeatedly assure you? Would
7     he do that on the phone, in writing, or how
8     did that --
9   A. Well, I think he initially presented at a
10    medical conference of some sort where I heard
11    him speak and then I heard him before and I
12    was very impressed with his overall
13    presentations and so forth. And we are
14    talking 20 years ago, but I was very impressed
15    with his organization and with his
16    presentations and also with his associates,
17    who I also discussed things with.
18  Q. Okay. And when you say "associates," who
19    would that be, if you recall?
20  A. I think it was Mandell and there was also a
21    lawyer involved. A female lawyer.
22  Q. Would that be Celia Clark?
23  A. Celia Clark, yes.
24  Q. Okay. And he -- I am going back to the
25    affidavit again. "He also assured me that he

Page 18

1   DR. JOHN A. REPICCI
2   would oversee and monitor any plan we put in
3   place and that he would continue to advise us
4   throughout the duration of any plan as
5   demonstrated by the various correspondence."
6       My question is: Other than the
7   correspondence, did he give you any other oral
8   assurances that he was going to oversee and
9   monitor any planning of yours?
10  A. Yeah. He was a very impressive person and he
11    had great recommendations. The book looked
12    good and his partner, Mandell, and that lawyer
13    were quite good and I was very impressed.
14  Q. Not exactly my question. I understand that,
15    but my question is: Did he orally assure you
16    at any time that he was going to oversee and
17    monitor a retirement plan?
18  A. Yes. That was all part of the program.
19  Q. When did he orally --
20  A. When he initiated this program, he assured me
21    that he would take care of this corner.
22  Q. He would take care of this corner. What did
23    you understand that to be?
24  A. These life insurance policies that we were
25    dealing with and he was also discussing

Page 19

1   DR. JOHN A. REPICCI
2   various estate plan issues, but he was
3   supposed to be taking care of the life
4   insurance.
5   Q. Okay. He is taking care of the life
6     insurance. And it is fair to state that the
7     -- well, let me ask you this. I will ask it
8     this way, and correct me if I am wrong. My
9     understanding of this is they were going to
10    take approximately $4 million of your IRA, put
11    that into insurance and take it out of your
12    estate and your heirs would receive about
13    approximately $14 million in tax free
14    benefits. Is that the basis part of the plan?
15  A. I don't recall all of those details, but that
16    sounds like the basis, yes.
17  Q. And was one of the goals to reduce your income
18    tax on the IRA?
19  A. The number one goal was to provide assets to
20    my heirs and reduce the tax, yes.
21  Q. Okay. And were your taxes reduced as a result
22    of this?
23  A. I think so, but I don't really follow the
24    taxes. I am a doctor. I don't do that.
25  Q. Who would know that?

Page 20

1   DR. JOHN A. REPICCI
2   A. Hy Polakoff and my wife would know the
3     financial aspects.
4   Q. Now, to the best of your recollection, we are
5     now into 2002 and Chris Jarvis is trying to
6     obtain insurance for you did you -- strike
7     that.
8       How many times in 2002 do you think you
9     physically met with Chris Jarvis?
10  A. I don't really recall, but I did meet with him
11    several times and I was impressed.
12  Q. Okay. At those meetings, to the best of your
13    recollection, was either your wife or Hy
14    Polakoff present at any of those meetings?
15  A. I don't recall. Hy Polakoff would not be, to
16    my understanding. My wife might be
17    incidentally.
18      MR. TRACY: Okay. Richard, if you could
19    show Dr. Repicci, it is the October 1, 2002,
20    letter. It is with Exhibit A to the
21    affidavit. It is Document 13-1. It was filed
22    on 5/12/17. We will mark this as Exhibit B.
23      MR. GRIMM: I have this as -- mine has
24    Exhibit A from the affidavit on it. Is it
25    okay if I mark it with that Exhibit A on it or



Page 21

1      DR. JOHN A. REPICCI
2   do you want me to take that off?
3      MR. TRACY:  No.  You can leave that on.
4      MR. GRIMM:  Okay.  And it is a four or
5   five-page document, right?
6      MR. TRACY:  This one is nine, yeah.
7      MR. GRIMM:  Nine?  Okay.  Hold on.
8
9   The following were marked for identification:
10  Exhibit B  -  Letter
11
12   BY MR. TRACY:
13  Q. All right.  Could you look at the last page on
14    this document, which is an outline of plan for
15    IRA assets?
16  A. Okay.
17  Q. Do you recognize any of that handwritten
18    writing?
19  A. I don't really recall any of that specific
20    information.
21  Q. But, I am just asking if you recognize any of
22    the -- there is like, "3,000,000 paid."
23    "1,100,000 private money."  I mean --
24  A. Yeah.  That is my handwriting basically.  So I
25    did write that at that time.  "3,000,000

Page 22

1      DR. JOHN A. REPICCI
2   paid."  "1,100,000 private money."  And then
3   -- so that is my handwriting so I did do that,
4   but I don't really recall specifically.
5  Q. In 2002 in addition to your IRA, roughly what
6    other assets did you have?
7  A. 2002, I would find it difficult to get back in
8    that time, but I would imagine maybe
9    $20,000,000.  I am guessing, but I would
10   imagine $20,000,000.
11 Q. And roughly of that $20,000,000, you said 4
12   would be in an IRA.  How much would be in a
13   brokerage account?
14 A. Well, 4 in an IRA, then probably 2 or 3 in
15   property and the rest would be in brokerage
16   accounts.
17 Q. Got it.  Okay.  And you had discussed that
18   with Mr. Jarvis, correct?
19 A. I am sure.  Yes.
20 Q. And so Mr. Jarvis' role was with respect to
21   the IRA.  Is that fair to say?
22 A. IRA and life insurance.  That was his era.
23     MR. TRACY:  Okay.  Richard, if you could
24   show Dr. Repicci, this would be Exhibit C, is
25   the October 9th, 2002, document to Hy Polakoff

Page 23

1      DR. JOHN A. REPICCI
2   from Chris Jarvis.
3
4   The following were marked for identification:
5   Exhibit C  -  Letter
6
7   BY MR. TRACY:
8  Q. Do you recall seeing this document?
9  A. I recall seeing it now, but not in the past,
10   no.
11 Q. Okay.  Do you recall having discussions with
12   Hy Polakoff or anybody about the fact that the
13   Lincoln life insurance policy was not
14   guaranteed past about 15 years?
15 A. I don't recall discussing it with anyone.  I
16   do remember that Chris assured me that there
17   would be no problems.  This insurance would
18   cover for 100 years.  That is all I recall.
19 Q. So you don't recall having any discussion with
20   Hy Polakoff about that?
21 A. No.  Not at all.
22 Q. And do you recall -- well, let me ask you
23   this:  What was your goal with the life
24   insurance policy of Lincoln?  How long did you
25   want it to last?

Page 24

1      DR. JOHN A. REPICCI
2  A. I wanted it to last until after I died.
3  Q. Always fair.  Was that age 100?  Would age 95
4    be okay or what --
5  A. I think that when I looked at whatever
6    documents there were it was sort of, like, 95,
7    but Chris assured me that even if I lived to
8    be 100, that they would take care of it.
9  Q. And how did he make those assurances?
10 A. Pardon?
11 Q. How did he make those assurances?
12 A. We talked on the telephone repeatedly.
13 Q. And when you talked on the telephone
14   repeatedly, what assurances, if any, did he
15   make to you?
16 A. Well, he just said these policies, you know,
17   don't worry about them, they last until 95.
18   And that is all I was concerned about.  I
19   assumed that he knew what he was talking
20   about.
21 Q. They would last to 95 or to 100 or something
22   else?
23 A. Well, the papers say 100, but my thoughts were
24   -- I thought in other areas I saw 95, but my
25   thoughts were 95 to 100, but the papers that



Page 25

1  DR. JOHN A. REPICCI
2  my assurance from him were that I would have
3  no concerns about these -- I never planned to
4  live to be 95.
5  Q. So far so good. And let me ask you this:
6  Then is -- on the last page of this document,
7  I know you didn't see it. It says, "I
8  understand why you and John were concerned
9  with an illustration that shows the policies
10  running out in 12 to 15 years."
11      Does this refresh your recollection that
12  sometime in October of 2002 that you were made
13  aware of an illustration showing that the
14  policy would run out in 12 to 15 years?
15  A. No. I wasn't aware of that. No.
16  Q. And did you ever express any concern to Hy
17  Polakoff or to Chris about that?
18  A. I don't recall. No. I had no concerns about
19  it so I would never express them to anyone.
20  Q. Let me ask you this: After 2002 how frequent
21  would you be in contact with Chris Jarvis?
22  A. I don't recall specifically.
23  Q. Did you ever -- after 2002 did you ever meet
24  with him in person?
25  A. We had conversations and I had discussed

Page 26

1  DR. JOHN A. REPICCI
2  things with Mandell and with that female
3  lawyer, as it may be. I know I met with him
4  several times, but I can't give you the years,
5  no.
6  Q. So you met with him several times, but would
7  those meetings have taken place before or
8  after the insurance policies were sold?
9  A. I don't recall.
10  Q. And in looking at this letter above the
11  conclusion, this is on page 4 of 4. It is
12  listed under options and it says, "If we
13  noticed bad returns for a few years, we would
14  look at a number of options: One, change
15  insurance companies."
16      Do you recall having any discussions with
17  anybody regarding the possibility that you
18  might have to change insurance companies if
19  you had bad returns for a few years?
20  A. All I recall is the conclusion of the letter,
21  which says -- Chris Jarvis says: "I am
22  comfortable that the illustrations based on
23  current assumptions that show John and
24  Lorraine's policies lasting beyond age 100,
25  are a very accurate depiction of what is

Page 27

1  DR. JOHN A. REPICCI
2  likely to happen."
3      So that was my understanding and that is
4  all I cared about. He said it. That is all
5  it meant to me.
6  Q. So it was likely to happen, but he wasn't
7  guaranteeing it; is that correct?
8  A. According to him, he said don't worry about it
9  so I didn't worry about it.
10  Q. Well, where does he say don't worry about it?
11  He said he is comfortable with the
12  illustrations and, you know, it is a likely
13  outcome and it also goes on. I mean,
14  "Further, in the unlikely event of minimum
15  returns and maximum morality and" --
16  A. My understanding is he was running these
17  policies and taking care of it. He is a world
18  expert. He was taking care of it and I didn't
19  have anything to worry about.
20  Q. You said you looked at the conclusion.
21  "Further, in the unlikely event of minimum
22  returns and maximum mortality and
23  administrative expenses, there are options
24  that can protect John and Lorraine's cash flow
25  and their children's estate."

Page 28

1  DR. JOHN A. REPICCI
2      Did you at that time with Hy Polakoff
3  discuss any of those options?
4  A. No.
5  Q. Did you discuss with anybody --
6  A. No.
7  Q. -- any of those options?
8  A. No. I just assumed Chris Jarvis knew what he
9  was doing and he was taking care of this.
10  Q. And did you have any discussions with Hy
11  Polakoff about the policies and how they were
12  doing at any time?
13  A. I don't believe so. No. Hy Polakoff did my
14  accounting and he and my wife would deal with
15  the final accounting numbers and my insurance
16  was with Chris. I don't recall discussing it
17  with Hy Polakoff at all, the insurance.
18  Q. Then let me ask you this: Then why is Hy
19  getting a letter from Chris Jarvis on
20  October 9th, 2002, you know, laying out the
21  Lincoln policy?
22      MR. GRIMM: Objection. Go ahead. You
23  can answer.
24  A. I don't know.
25  Q. Did you mention to Chris Jarvis at any time



Page 29

1              DR. JOHN A. REPICCI
2     that Hy Polakoff would have to review certain
3     things?
4  A. No.
5  Q. Do you recall giving Chris Jarvis Hy
6     Polakoff's contact information?
7  A. Not specifically, no.
8  Q. Do you recall talking to your wife that we
9     needed to refer Chris Jarvis over to Hy
10    Polakoff for any reason?
11 A. No.
12 Q. Do you recall how much money was supposed to
13    be -- premium was supposed to be paid into the
14    Lincoln policy?
15 A. No.
16        MR. TRACY:  Richard, I don't know if you
17    have this document yet.  It kind of came in
18    late.  What I will do is send it to you.  If
19    it hasn't been printed out yet, let me know.
20    It is a production from Friday.  I printed out
21    pages 26, 27, 28, and 29.
22        MR. GRIMM:  Yeah.  I didn't see that
23    production from Friday.  Rick was doing that.
24    Can you tell me, did you send it to me?
25        MR. TRACY:  I am sending it to you right

Page 30

1              DR. JOHN A. REPICCI
2     now.  I sent it to Richard this morning.
3         MR. GRIMM:  Okay.  It was not in the
4     uploaded documents, was it?
5         MR. TRACY:  I think it was late.
6         MR. GRIMM:  Can we go off?
7         MR. TRACY:  Yeah.  Let's go off.  It is
8     a good time for a break anyway.
9
10        (Recess was taken.)
11     (Exhibit D was marked for identification.)
12
13     BY MR. TRACY:
14 Q. And, Doctor, do you recall this document?
15 A. I believe I did see this.  Yes.
16 Q. Okay.  And if you can, for a second, go back
17    to your affidavit, which is Exhibit A, I
18    believe.
19        If you can show the witness his affidavit.
20    And if you go to paragraph 7 and if you read
21    it, it says: "By letter dated October 9,
22    2002, Jarvis sent a letter (shared with me) to
23    Hy Polakoff, our accountant, to address
24    concerns about the investment, including to
25    give an explanation of the different numbers

Page 31

1              DR. JOHN A. REPICCI
2     in the illustrations."  And then the next
3     sentence is:  "In particular, Jarvis addressed
4     my and Polakoff's concerns that the
5     representations and illustrations that Jarvis
6     provided with regard to the insurance policies
7     were inconsistent with some of the insurance
8     company's illustrations."
9         Do you recall what those inconsistencies
10    were?
11 A. Yeah.  My understanding was the policy was
12    lasting until I was 95 years old and it looked
13    like the policy wasn't going to last to 95
14    years of age.
15 Q. How did you reach that conclusion?
16 A. Looking at these numbers and your exhibit
17    showing 14 years or something, that I had a
18    problem.
19 Q. Okay.  And when did you review these
20    illustrations?
21 A. I don't recall specifically.
22 Q. Prior to 2002 had you ever purchased life
23    insurance before?
24 A. No.
25 Q. Prior to 2002 had you purchased any type of

Page 32

1              DR. JOHN A. REPICCI
2     insurance?
3  A. Not that I recall, other than the liability
4     insurance for vehicles and things.
5  Q. And what was your understanding based on the
6     illustration of how much premium was supposed
7     to go into the policy?
8  A. I really didn't deal with the premiums.  I
9     didn't write checks to do that.  Whenever
10    these would come, I would just give it to my
11    wife and say, take care of it and then it
12    would be paid.  So the exact payments I
13    wouldn't know, but I did have an issue with
14    these things and Chris Jarvis assured me that
15    this was not a problem and so that was all I
16    was concerned about.
17 Q. Okay.  Let's me ask you this:  If you look at
18    the first page, it seems to indicate to me it
19    would be $600,000 for the first three years of
20    the policy.  Does that refresh your
21    recollection?
22 A. I would have -- no.  Whatever would be in
23    terms of financial payments, I would just say
24    yes and give it to my wife and she would take
25    care of the payments.  The numbers, I wouldn't



Page 33

1　　　　DR. JOHN A. REPICCI
2　know.
3　Q. You would not be interested in, you know,
4　　whether it is $1.2 versus $1.8 million of your
5　　money?
6　　　MR. GRIMM: Object to the form. You can
7　　answer.
8　A. I don't deal with the writing of checks and
9　　money and so forth. My understanding was I
10　 got a life insurance policy that has a benefit
11　 when I die and it costs money and they told me
12　 a certain amount of money and I would say,
13　 just pay it and my wife would pay it.
14　Q. Okay. I am sorry. I didn't mean to
15　 interrupt. What was that certain amount of
16　 money that you were supposed to pay?
17　A. I have no idea. I mean, whatever it was at
18　 that time, but I don't recall.
19　Q. Would you have known then?
20　A. She would have told me, yes, at that time, but
21　 I -- it had to be --
22　Q. Do you recall discussing how much money was
23　 going to go into the Lincoln policy?
24　A. No. I don't recall discussing that.
25　Q. At any time?

Page 34

1　　　　DR. JOHN A. REPICCI
2　A. No.
3　Q. And I am going to represent that you,
4　　Dr. Repicci, instead of $1.8 million,
5　　$1.2 million of premium was paid into the
6　　policy. Do you recall discussing that with
7　　your wife or Chris Jarvis or anybody?
8　A. I don't recall specifically. No.
9　Q. Now, you had indicated that you were, for lack
10　 of a better word, the ultimate decision maker
11　 on these policies?
12　A. I couldn't hear you. What did you say?
13　Q. Okay. Sure. I believe you had indicated
14　 earlier that you were the decision maker on
15　 financial matters. Is that fair?
16　A. That's correct.
17　Q. And to do that -- I mean, for you as the
18　 decision maker, would you want to know whether
19　 a policy is going to be illustrated with
20　 $1.2 million verus $1.8 million? A $600,000
21　 difference, that would be important to you,
22　 would it not?
23　A. Not really. What was important is I had a
24　 life insurance policy, which had a certain
25　 face value outside of my estate. The other

Page 35

1　　　　DR. JOHN A. REPICCI
2　　numbers didn't mean anything to me.
3　Q. To the best of your recollection, would -- if
4　　you were putting $600,000 less into a policy,
5　　would that -- for a lay person, would that
6　　effect the performance of the policy?
7　A. I don't know.
8　Q. Did you ever have a discussion with Chris
9　　Jarvis about that?
10　A. I don't recall. No.
11　Q. Okay. Now, let's move ahead. When did you
12　 find out that there was an issue with the
13　 policy?
14　A. I don't recall specifically, but I think about
15　 three or four years ago. I don't recall.
16　Q. And how did you -- how did that come to your
17　 attention?
18　A. I don't recall specifically.
19　Q. Were there any type of tax issues that you
20　 encountered with the policies?
21　A. Tax?
22　Q. Yes. Tax.
23　A. No. Not that I know of.
24　Q. And when -- strike that. At some point --
25　 strike that.

Page 36

1　　　　DR. JOHN A. REPICCI
2　　Did there come a time when the policy was
3　　put into an insurance trust?
4　A. Yes, but I don't recall exactly when.
5　Q. And who was the trustee of the insurance
6　　trust?
7　A. I don't recall.
8　Q. Would it refresh your recollection that Julie
9　　Stone is the trustee of the insurance trust?
10　A. That's fine. Yes.
11　Q. Okay. I figured. And who is Julie Stone?
12　A. My daughter.
13　Q. Okay. And do you recall who would have made
14　 the decision to name Julie Stone the trustee
15　 of the trust?
16　A. I would have made that decision.
17　Q. And what did you base that decision on?
18　A. Someone has to do this and she is a
19　 responsibile relative.
20　Q. Fair enough. And what is Julie Stone's
21　 financial background?
22　A. She was an engineer with Bell Aircraft and she
23　 has had various jobs since that time.
24　Q. Okay. To your recollection, does she have any
25　 experience in insurance matters?



Page 37

1       DR. JOHN A. REPICCI
2  A. I don't know about her insurance policy
3     experience, no.
4  Q. Now, do you recall an LLC called EBI-Repicci,
5     LLC?
6  A. I recall it, yes.
7  Q. And what was it?
8  A. I don't understand it. I don't know.
9  Q. Best you can. What was it supposed to do, the
10    best you can tell us?
11 A. I think one of the things was to protect
12    against malpractice insurance and aid and
13    transfer to my children, the best I can
14    understand.
15 Q. Do you recall buying a second policy of
16    insurance from Lincoln in or about 2006?
17 A. I don't recall when I bought it, no. I know I
18    bought one, but when, I don't know.
19 Q. Fair enough. And what was -- you know, it was
20    awhile ago. I will represent to you it was
21    the end of 2006, but that being said, what
22    were the facts and circumstances behind buying
23    that policy?
24 A. Well, I was buying policies with Chris Jarvis
25    to basically protect my estate. We bought one

Page 38

1       DR. JOHN A. REPICCI
2     policy, which I believe was Mass Mutual and we
3     were continuing to buy and then he had bought
4     these other policies through, I believe,
5     Lincoln Life and he was handling the
6     purchasing of policies and I don't recall
7     anything other than that.
8  Q. Was there a separate purpose for this -- I
9     will call it the 2006 Lincoln policy, versus
10    the earlier one?
11 A. Not that I know of, no.
12 Q. Were there going to be on the second Lincoln
13    policy any tax savings or the like for that?
14 A. I don't know.
15 Q. And did you deal at all with Mr. Mandell on
16    the second Lincoln policy?
17 A. I dealt with Mandell, but exactly when and
18    what, I don't recall.
19 Q. Now, I am going to represent to you that over
20    the years Lincoln would send annual statements
21    on their policies. Do you recall ever
22    reviewing any of them?
23 A. No.
24 Q. Who, if anyone, would review that type of
25    documentation? If you got a paper from

Page 39

1       DR. JOHN A. REPICCI
2     Lincoln or Mass Mutual or what have you --
3  A. They might just accumulate. I am not sure
4     anybody reviewed them. Once I bought the
5     policy -- the Mass Mutual policy, we bought
6     and it was sort of a settled issue and then
7     the issues arose with the Lincoln policy,
8     which I never truly understood and EBI, I
9     never understood either.
10 Q. And who, if you recall, suggested forming EBI,
11    if you recall?
12 A. I believe these were with Mandell and Jarvis,
13    I believe. I don't recall specifically.
14 Q. Okay. Did there come a time when you needed
15    to unwind EBI?
16 A. I didn't understand it and I couldn't
17    communicate with Jarvis and I just finally
18    gave up on it.
19 Q. When you say that you couldn't communicate
20    with Jarvis, would do you mean by that?
21 A. I tried to contact him and I couldn't get a
22    hold of him. Originally I was talking to him
23    in California and then he left California and
24    I don't know what happened.
25 Q. And for how long a period could you not get a

Page 40

1       DR. JOHN A. REPICCI
2     hold of Mr. Jarvis?
3  A. I dont know. There was a big gap period there
4     and EBI sort of fell through the cracks. I
5     don't even truly understand it. So I had a
6     problem with EBI and with these two Lincoln
7     policies and I don't know what happened to
8     either one of them.
9  Q. Well, that is a good point. If we go back to
10    your affidavit, it looks like -- give me one
11    second. Bear with me.
12        If you go to page 5, it talks about, "By
13    letter dated December 21st, 2007, Jarvis
14    provided advice and recommendations." And
15    then if you go to the next page: "By letter
16    dated January 7th, 2014, I expressed
17    concerns."
18        Between 2007 and 2014, what, if any,
19    communications were you having with
20    Mr. Jarvis?
21 A. I don't remember any specific communications.
22 Q. And so is it fair to say you were not having
23    any type of annual meeting with Mr. Jarvis
24    between 2007 and 2014?
25 A. No. The meetings dropped off at a certain



Page 41

1  DR. JOHN A. REPICCI
2  time. I don't know when they all occurred. I
3  know I had issues with the Lincoln policies
4  and the EBI I never truly understood and that
5  finally faded away.
6  Q. Okay. Right now I just want to focus on the
7  communication aspect. Did you have any
8  communications with Mr. Jarvis between 2007
9  and 2014?
10 A. I don't remember specifically, but I do know I
11  was having great difficulty with contacting
12  information and no information was coming. I
13  had difficulty getting a hold of him for one
14  reason or another.
15 Q. Okay. And what were you trying to get a hold
16  of him for?
17 A. Well, the issues with these insurance policies
18  and the IB -- what is it?
19 Q. EBI.
20 A. The EBI. I don't understand the EBI so I was
21  trying to get in contact with these people.
22 Q. And did you say you had issues with the
23  insurance between 2007 and 2014?
24 A. I don't know. No. I mean, the years, I don't
25  recall. I know we took out these policies and

Page 42

1  DR. JOHN A. REPICCI
2  you are giving me years, but I don't know
3  which years are which.
4  Q. Okay. Would you with Hy Polakoff or with
5  anyone review the polices on any kind of
6  regular basis after 2007?
7  A. No. They were insurance policies and I would
8  deal with the insurance people. I wouldn't
9  keep up with my accountant for those purposes.
10 Q. Okay. And if you got in a statement or --
11  well, I think you previously testified that
12  you didn't review the statements as they came
13  in; is that correct?
14 A. No.
15 Q. Is that correct, you didn't review it?
16 A. No. I just don't review financial things. I
17  just don't do it, period.
18 Q. Who would?
19 A. The mail would come in, I hand it to my wife.
20  My wife dealt with the necessary people and I
21  don't really -- surprisingly, I don't deal
22  with financial issues.
23     MR. TRACY: Okay. If you could hand
24  him, Richard, I believe it has been uploaded,
25  his January 7, 2014, letter.

Page 43

1  DR. JOHN A. REPICCI
2
3  The following were marked for identification:
4  Exhibit E  -  Letter
5
6  BY MR. TRACY:
7  Q. And do you recognize this letter, Dr. Repicci?
8  A. I don't recognize it specifically, but it is a
9  letter, yes.
10 Q. Okay. Would this be something you would have
11  written or would someone have written it on
12  your behalf?
13 A. Whether I wrote it or someone else wrote it, I
14  don't really recall specifically. I agree
15  with the information and I did sign the paper
16  behind it, yes.
17 Q. Okay. And it says: "Dear, Chris. As you are
18  well aware, I am having great difficulties
19  with the IRS over the insurance policies I
20  purchased from Lincoln and Mass Mutual."
21     What kind of difficulties were you having
22  with the IRS, if you recall?
23 A. I don't really recall.
24 Q. And did there come a point in time when you
25  retained an insurance consultant?

Page 44

1  DR. JOHN A. REPICCI
2  A. I don't think so, no.
3  Q. Does the name -- I believe it is Neill
4  Finestone. Does that refresh your
5  recollection about that?
6  A. It doesn't refresh my recollection, no.
7  Q. All right. Well, have you had anyone tell you
8  that your insurance policies are worthless?
9  A. I don't recall, no. Well, I noticed if they
10  expire at age 85, they are worthless. That is
11  my conclusion.
12 Q. Other than your conclusion, have you discussed
13  that with anybody with an insurance
14  background?
15 A. Not that I recall, no. I may -- maybe Celia
16  Clark, but I don't recall.
17    MR. TRACY: I will send it to you,
18  Richard.
19    MR. GRIMM: Yes. Which one is it?
20    MR. TRACY: It is a 2015 letter.
21    MR. GRIMM: This was in the uploaded
22  documents or no?
23    MR. TRACY: I don't think it is. I
24  think I have 2014, but I don't think I have
25  2015. We will have to take a break for a



Page 45

1       DR. JOHN A. REPICCI
2    second.
3
4         (Recess was taken.)
5    (Exhibit F was marked for identification.)
6
7    BY MR. TRACY:
8  Q. Do you recognize this document, Dr. Repicci?
9  A. I don't recognize it, but I see it now.  Yes.
10 Q. Is that your signature?
11 A. Yes, it is.
12 Q. Okay.  And does this refresh your recollection
13    that you retained an insurance policy
14    consultant?
15 A. Yes.
16 Q. And who was that insurance consultant?
17 A. I don't know.
18 Q. Have you ever spoke to that insurance
19    consultant?
20 A. I don't recall specifically.
21 Q. Do you know if Julie Stone has spoken to that
22    insurance consultant?
23 A. I don't know.
24 Q. Has your wife spoken to that insurance
25    consultant?

Page 46

1       DR. JOHN A. REPICCI
2  A. She may have on a superficial basis, but I
3    don't know.
4  Q. The company Policy Guard, LLC, does that
5    refresh your recollection?
6  A. No.
7  Q. Does the name Casey Repkin refresh your
8    recollection?
9  A. The name sounds familiar, but it doesn't
10    refresh anything, no.
11 Q. Okay.  It says in this letter, "In the course
12    of the review the consultant has looked at
13    several illustrations prepared by Lincoln Life
14    over the years and forwarded to me by you, as
15    well as several letters and e-mails from you
16    to me describing the benefits under these
17    policies.  The consultant has determined that
18    neither of these policies provides insurance
19    protection I understand I was getting."
20       How did you learn that the consultant had
21    made that determination?
22 A. Well, that is when we find out that it doesn't
23    cover me to age 95.  We had three policies.
24    Mass Mutual was 95 and these two were not.  I
25    never did understand it.

Page 47

1       DR. JOHN A. REPICCI
2  Q. That's fine, but my question is:  The
3    consultant has made that determination and how
4    did you learn that the consultant had made
5    that determination?
6  A. He must have given us information somewhere,
7    but I don't recall him specifically.
8  Q. Did you, to the best of your recollection,
9    correspond with the consultant?
10 A. I don't recall corresponding, no.
11 Q. Do you ever recall getting a report from the
12    consultant?
13 A. I don't recall specifically, no.
14 Q. Okay.  In response -- strike that.
15       What, if anything, did Mr. Jarvis do in
16    response to your letters in 2014 and 2015?
17 A. Nothing, I recall.
18 Q. Let me ask you this:  Did you ever -- after
19    you sent the letter in 2014 asking for more
20    information about the policy, did Mr. Jarvis
21    give you that information?
22 A. I don't think so, no.
23 Q. Did Mr. Jarvis give you any in-force
24    illustrations to show you what could be done
25    about the policies?

Page 48

1       DR. JOHN A. REPICCI
2  A. I don't recall.  No.
3  Q. Do you recall that certain options were given
4    to put more money into the policies?
5  A. No.  Oh, wait.  One second.  Yes.  I did
6    through some sorts.  I don't know exactly
7    where.  I found that I could continue these
8    policies with a certain payment of a very
9    large amount of money.  I did find that the
10    policies could be continued.  This was a major
11    concern of mine.  I thought one, would the
12    policy die, you know, when it expired?  And
13    then I found through some source that it could
14    be continued at a certain amount of money.  I
15    did find that out.  Exactly how I found that
16    out, I don't know.
17 Q. Okay.  Well, let's take a look at the January
18    2015 letter.  If you go to bullet point two,
19    it says:  "On March 5th, 2014, you sent an
20    e-mail," -- you, being Chris Jarvis.  "Sent an
21    e-mail to my advisors stating that by paying
22    additional amounts of about $50,000 a year I
23    could lock in the death benefit for this
24    policy, which is the early 2002 policy, until
25    age 90."



Page 49

 1        DR. JOHN A. REPICCI
 2        MR. GRIMM:  Matthew, can I stop you?
 3    Tell me what you are referencing.
 4        MR. TRACY:  Okay.  Yeah.  We are in the
 5    January -- this will be, I believe, E.  This
 6    is the May 6th, 2015, letter.
 7        MR. GRIMM:  So this is Exhibit E?
 8        MR. TRACY:  Yes.  E and this is on
 9    page 2.
10        MR. GRIMM:  Page 2 of Exhibit E?
11        MR. TRACY:  Yes.  It should start on
12    March 5th, 2014.
13        MR. GRIMM:  That's not E.
14        MR. TRACY:  Do we have an F?  There is a
15    letter May 6th, 2015.  Do you not have a copy
16    of it?  Off the record.
17
18            (Off the record.)
19
20    BY MR. TRACY:
21  Q. On page 2 of Exhibit F in paragraph 2, it
22     states: "On March 5th, 2014, you sent an
23     e-mail to my advisor stating that by paying
24     additional amounts of $50,000 per year I could
25     lock in the death benefit for this policy (as

Page 50

 1        DR. JOHN A. REPICCI
 2    well as Policy No. 7317144) until age 90."
 3        And my question is:  What, if anything,
 4    did you do in response to that?
 5  A. Nothing, that I recall.
 6  Q. Why not?
 7  A. Well, the line above it says, "These are
 8     misrepresentations you have made."  And so
 9     since they are misrepresentations, I wouldn't
10     act on them.
11  Q. But, why is this a misrepresentation about a
12     $50,000 a year -- strike that.  Did there come
13     a time when Mr. Jarvis said that you would
14     have to put more -- strike that.
15        Did there come a time in or about 2014
16     when Mr. Jarvis said to keep these policies in
17     place until age 90, you were going to have to
18     put in about $50,000 more a year in premium?
19  A. Apparently these were conversations with my
20     advisor, not to me, whoever the advisor was.
21     And basically the advisor eventually said I
22     should file a lawsuit.  So that is all I know.
23  Q. Now who was your advisor?
24  A. I don't recall.
25  Q. Your attorney, I don't want to know about it,

Page 51

 1        DR. JOHN A. REPICCI
 2    but if it is an insurance consultant, I do.
 3  A. I don't recall.
 4  Q. Did you have -- well, you said your advisor
 5     said to file a lawsuit.  Were there any
 6     discussions -- again, not with your attorney,
 7     but with anyone else who is not an attorney
 8     that you should start putting more money into
 9     these policies?
10  A. No.  I realized it would probably be more
11     money, but with the issues of
12     misrepresentation, I had no one to represent
13     me, is what it boiled down to.  I knew it was
14     going to cost me some -- I had two concerns;
15     one, it would cost me money, which wasn't a
16     big concern, but number two, that the policy
17     would expire at 85, 86.  That was my biggest
18     concern.  Finding out it didn't expire at 86
19     was a positive, but then how to continue it, I
20     didn't know how.
21  Q. What, if anything, did the insurance
22     consultant discuss with you about continuing
23     these polices?
24  A. I don't remember any further discussions.  He
25     just said, take legal action.  That is all I

Page 52

 1        DR. JOHN A. REPICCI
 2    remember.
 3  Q. Well, as of today what is your understanding
 4     of when these policies were set to expire?
 5  A. Pardon?
 6  Q. As we sit here today, when are these policies
 7     set to expire, if you don't do anything?
 8  A. I think the first one expires in two years,
 9     and the other one a little after that.
10  Q. And what -- how do you know that?
11  A. That is what they tell me, whoever my advisors
12     are looking at the insurance policies.  What I
13     discussed is to pay these premiums to extend
14     these policies, but I don't have to do it for
15     two years, apparently.  My goal is to pay the
16     premiums, continue the policies at some cost,
17     whatever it may be.  And the insurance company
18     won't deal with me because I don't have an
19     agent.  They refuse to talk to me, the
20     insurance company.
21        MR. TRACY:  Richard, I think I sent
22     these this morning.  I definitely uploaded
23     them this morning.  These are the in-force
24     illustrations and the history of payments.
25        MR. GRIMM:  So I have an in-force



Page 53

1    DR. JOHN A. REPICCI
2  illustration. Are there two of them, one for
3  each policy?
4        MR. TRACY: Yes.
5        MR. GRIMM: Yes. There is one for each
6  policy?
7        MR. TRACY: Yes. Exactly.
8        MR. GRIMM: Okay.
9        MR. TRACY: Are we up to G?
10       MR. GRIMM: Yeah. How do you want them
11 marked? Which one first?
12       MR. TRACY: Why don't we do the
13 illustrations as G and the payment as H? That
14 way we don't have to do four.
15       MR. GRIMM: Which policy first?
16       MR. TRACY: Put the 26 on top of the
17 144.
18       MR. GRIMM: Okay. So you want the two
19 in-force illustrations as one exhibit?
20       MR. TRACY: Yes.
21       MR. GRIMM: Okay.
22
23 The following were marked for identification:
24 Exhibit G  -  In-force illustrations
25 Exhibit H  -  Premiums

Page 54

1    DR. JOHN A. REPICCI
2
3  BY MR. TRACY:
4  Q. If you go to page 6.
5  A. Page 6?
6  Q. Yeah. Illustrated values as of October 2020
7     for policy issued in October of 2002.
8  A. Yes.
9  Q. And it indicates annual premium outlay
10    starting in the year 2018 of $149,880 and that
11    would continue through the year 31, which
12    would --
13 A. What year would year 31 be?
14 Q. That would be -- 31 would be year 2033.
15 A. 2033?
16 Q. Yes. That would be approximately your 95th
17    birthday.
18 A. Yes. I have an understanding that to continue
19    this policy it would cost me over a million
20    dollars. I know that.
21 Q. And it would cost you $149,880 a year, is that
22    how that would be --
23 A. Well, they give me one specific price for the
24    entire period of time. I didn't look at it on
25    an individual year basis.

Page 55

1    DR. JOHN A. REPICCI
2  Q. And what price did they give you?
3  A. I can't recall. I think it was, like, $1.5
4     million or something like that.
5  Q. And how was that relayed to you?
6  A. Pardon?
7  Q. How did you find that out?
8  A. Well, I had people dealing with Lincoln to
9     find out two things; number one, I was
10    concerned that the policy ended and was
11    absolutely worthless when it ran out and that
12    was a concern. I found that no, it could be
13    continued, but there was a major fee to do
14    this. I thought I paid significantly for this
15    policy, like I did for the Mass Mutual policy,
16    but now my understanding is it would cost me
17    another 1 point something million dollars to
18    continue it and the other policy as well,
19    which I was willing to do if I have to do it.
20    I mean, it is one of those things.
21       The issue is no one has ever told me where
22    I can pull the money from to do that in order
23    to pay this account. No one had told me. I
24    have no agent. No one told me.
25 Q. Okay. Let me ask you a couple of things. Who

Page 56

1    DR. JOHN A. REPICCI
2  specifically did you talk to that you were
3  going to have to pay Lincoln $1.5 million,
4  other than your attorneys?
5  A. There was communication some place and I
6     believe my wife and my daughter had some
7     numbers and so forth, but my understanding was
8     that, like, it was 1 point something million
9     dollars that had to be paid. And the question
10    was: Why is it so much money? Since I
11    already had a policy from Mass Mutual that
12    covered this and this one doesn't, why is it
13    so much money? And number two, when I go to
14    pay it, where do I -- I can take the money
15    from what kind of account to do this? I still
16    have no idea.
17 Q. Okay. I understand that. And I appreciate
18    it. What I am trying to understand is: Who
19    told you about the 1.5 million? Your wife,
20    your daughter?
21 A. Well, my wife would have informed me of the
22    numbers, but where she got it, I don't know.
23 Q. Okay. Now, do you recall talking to your
24    insurance consultant about any of this about
25    these numbers?



Page 57

1         DR. JOHN A. REPICCI
2  A. I don't recall specifically, no.
3  Q. Do you recall talking to Hy Polakoff about
4     these numbers?
5  A. No.
6  Q. Have you discussed these numbers with Chris
7     Jarvis?
8  A. No.  That is my problem.
9  Q. Okay.  All right.  Now, I am going to have
10    similar questions for the second illustration,
11    which that will be page -- it should be
12    page 16.  It will say 5 of 9 towards the back.
13        THE WITNESS:  Show me what he wants.
14        MR. GRIMM:  I will.  Sure.  Chris, you
15    are on the in-force illustration that shows
16    the death benefit of 4,873,216 as of September
17    of 2020?
18        MR. TRACY:  Yes.  Policy issued December
19    of 2006.
20        MR. GRIMM:  Yes.
21
22    BY MR. TRACY:
23  Q. And this is indicating that you would be
24    paying a premium of $142,188 through year 26,
25    which would be again 2032.  I just want to

Page 58

1         DR. JOHN A. REPICCI
2    confirm that it was your understanding that if
3    you paid this, the policy would remain
4    enforced; is that correct?
5  A. That's my understanding, yes.
6  Q. Now, the next exhibit are the total payments
7    to date and that is short enough.  I would
8    have that as a -- you know what, let's make
9    these two separate ones.  That will be easier.
10    Are we up to exhibit I?
11        MR. GRIMM:  We had marked as Exhibit H
12    the premiums on both.
13        MR. TRACY:  That's fine.  You know, in
14    retrospect, I probably would have split them,
15    but that's fine.
16        MR. GRIMM:  Okay.
17
18    BY MR. TRACY:
19  Q. Looking at exhibit H, Dr. Repicci, looking at
20    page 1 of this document.
21  A. Yes.
22  Q. It's addressed to Repicci Irrevocable Family
23    Trust, Julies Stone, Trustee, Hy Polakoff,
24    Trustee.  Did there come a time when Hy
25    Polakoff was named trustee of the insurance

Page 59

1         DR. JOHN A. REPICCI
2    trust?
3  A. I believe he had various rolls in our estate
4    planning until he retired and so he retired to
5    Florida and I haven't heard from him in years
6    other than social contact.  And his firm
7    continues, but he had nothing more to do with
8    it after he retired to Florida.  In fact, he
9    sent me letters that he would like to get out
10    of this trust relationship that he has with
11    the insurance policy.
12  Q. Okay.  And when did he send those letters?
13  A. I don't recall, but we left him there, but he
14    did express, you know, interest in stopping
15    that in the past.
16  Q. Okay.  And when was the last time you spoke to
17    Mr. Polakoff?
18  A. Polakoff, I probably talked to him -- I think
19    I called him a month ago.  I didn't discuss
20    anything with him, but I forget what I called
21    him about.  Something, though -- or did he
22    call me?  I am not sure which.
23  Q. And prior to that, when was the last time you
24    had spoken to him?
25  A. Really several years ago because his agency

Page 60

1         DR. JOHN A. REPICCI
2    handles the business and they may talk to him,
3    I suppose, but I still have his agency that
4    runs my stuff.
5  Q. Okay.  Now, going to -- this will be the third
6    page and this is on the policy 144 and it
7    indicates, premium was paid on 12/21/2006 of
8    $488,842 and then 11 years later on 11/6/2017
9    payment was made of $109,167.  And then even
10    though it is split up, on 8/6/2018 another
11    payment of $109,167 was made.
12        With respect to the 2017 and 2018
13    payments, what were the circumstances behind
14    making those payments, if you know?
15  A. Now, these were paid?
16  Q. Yes.
17  A. I don't know.  My wife paid them.  It probably
18    came as a bill and she paid it.  I don't know.
19  Q. And when you say she would have paid it, who
20    are you referring to?
21  A. My wife.  My wife or maybe my daughter.  In
22    2018 probably my wife.
23  Q. Did there come a time when your wife stopped
24    making payments?
25  A. No.  She still makes payments, but my daughter



Page 61

1          DR. JOHN A. REPICCI
2    is running some things as well.
3  Q. And what -- to the best of your recollection,
4    what does your daughter run and what does your
5    wife run?
6  A. When a bill comes in, my wife looks at it and
7    pays accordingly and if it is something that,
8    you know, is in my daughter's category, she
9    pays it and I rely totally on them in terms of
10   payments.
11 Q. Okay.  And then with respect to -- it would be
12   on page 6.
13 A. Page 6 of which one?
14 Q. There should be three more pages.
15 A. There are only three pages.
16        MR. GRIMM:  Are you back on G?
17        MR. TRACY:  This is on the premium
18   payments.  I thought you combined those two.
19        MR. GRIMM:  I only have two pages on the
20   premium payments.
21        MR. TRACY:  Oh, that's fine then.  Let
22   me see what it looks like, if you can just
23   show me on the camera.  Oh, fine.  That's
24   fine.  Page 2.
25

Page 62

1          DR. JOHN A. REPICCI
2    BY MR. TRACY:
3  Q. And that is the $1.2 million in total premium
4    on 10/10/2002, 10/30/2003.
5        To your knowledge, is that an accurate
6    depiction of what you paid in premium on
7    policy 7146026?
8  A. If she says she paid it, she paid it.  I don't
9    really know.
10 Q. Now --
11 A. We have no communication with Lincoln.  They
12   won't communicate with us so I have no idea
13   what all of this is.
14        MR. TRACY:  Excuse me one second.  I am
15   going to mute myself for one second.
16        (Off the record.)
17        MR. TRACY:  Sorry about that.
18
19   BY MR. TRACY:
20 Q. Okay.  Other than Hy Polakoff and his firm,
21   have you utilized any other accounting firms
22   in the last 20 years?
23 A. No.
24 Q. Other than Merrill Lynch, have you -- and
25   Fisher Investments and Marine Midland, have

Page 63

1          DR. JOHN A. REPICCI
2    you utilized any other stock brokers?
3  A. None.
4  Q. And have you -- other than the Mass Mutual and
5    the two Lincoln policies, have you purchased
6    any other life insurance policies in the last
7    20 years?
8  A. No.
9  Q. Do you recall being the plaintiff in a
10   litigation with a Roy Porter doing business as
11   Roy's Diner?
12 A. No.
13 Q. It would have been in Supreme Erie.
14 A. What was this?
15 Q. For the record, it was yourself versus a Roy
16   Porter doing business as Roy's Diner?
17 A. I don't recall.
18 Q. It was awhile ago.  I will represent that as
19   well.  It was the early 2000s.
20        And I may have asked this, I apologize.
21   Who formulated the investment trust?  Was that
22   Celia Clark or someone else?
23 A. I don't recall specifically.  It may be --
24   probably very well Clark, but I don't recall
25   specifically.

Page 64

1          DR. JOHN A. REPICCI
2  Q. And would there be somebody who would know
3    that for certain?
4  A. My wife might know.
5  Q. In or about 2002 when you were discussing the
6    insurance with Mr. Jarvis, did you communicate
7    his ideas with anybody else?
8  A. Not that I recall, no.
9  Q. Would you have discussed it with anyone at
10   Merrill Lynch, for example?
11 A. No.
12 Q. How about Marine Midland or Fisher
13   Investments?
14 A. No.
15 Q. Would your wife have communicated those ideas
16   with anybody else?
17 A. No.
18 Q. From 2002 to 2007 did you recommend Mr. Jarvis
19   to any of your friends or colleagues?
20 A. From time to time there -- he would be at
21   periodic places and at any time I would
22   mention that I recommend him highly.
23 Q. When you say at periodic places, do you mean
24   medical conferences, things of that nature?
25 A. Yeah.  He was visible in a lot of ways at that



Page 65

1   DR. JOHN A. REPICCI
2   time and I may or may not have discussed it
3   with friends of mine.  I don't recall, but if
4   I did it was always on a positive basis.  I
5   was impressed with him.
6   Q. What was -- to your recollection, what was
7   Mr. Polakoff's impression of him?
8   A. I don't really -- Mr. Polakoff did the
9   accounting at a distance.  I had very little
10  contact with him.  We sent him the papers, he
11  filled them out, and that was about it.  As I
12  said, we started our original accounting with
13  his firm before his time.  That was my
14  father-in-law's company and -- my
15  father-in-law's company did business with him
16  and my wife continued and I don't have much to
17  do with accounting or finances.  My wife
18  handles all of that.
19  Q. With respect to the medical practice you had
20  with your daughter and son-in-law, was that
21  done through an LLC or some other kind of
22  business entity?
23  A. I believe it was an LLC, yes.
24  Q. And what was the name of that LLC?
25  A. Probably Repicci Romanowski.

Page 66

1   DR. JOHN A. REPICCI
2   Q. Is it still in existence or --
3   A. No.  We sold the practice.
4   Q. And when was it sold?
5   A. Two years ago.
6   Q. Okay.  And prior to 2002, had you ever met
7   with a certified financial planner?
8   A. No.
9   Q. Had you had a will prepared as of 2002?
10  A. I have had wills, yes.
11  Q. And who would have prepared those?
12  A. I don't know.  I would have to ask my wife.  I
13  have forgotten.
14      MR. TRACY:  And for today -- I just want
15  to look at this for about -- Richard, I just
16  want to look my notes over for about five
17  minuets and then for today I think we are
18  finished.
19      MR. GRIMM:  Sure.  We will take five and
20  then give me the sign when you are ready.
21
22      (Recess was taken.)
23
24  BY MR. TRACY:
25  Q. Okay.  Just a couple follow-up things for

Page 67

1   DR. JOHN A. REPICCI
2   today.
3   A. Okay.
4   Q. I just wanted to know, the insurance trust
5   initially had an address in the Virgin
6   Islands.  Do you know what that was about?
7   A. I never really understood all of that.
8   Basically, that was set up by these people as
9   it may be.  I never truly understood it.  It
10  got to the point where I was supposed to pay a
11  payment to the Virgin Islands to maintain it
12  and they wouldn't accept a bank check and so I
13  couldn't get any information on it.  And so it
14  more or less faded away.  I never understood
15  it.
16  Q. Did you have a residence in the Virgin
17  Islands?
18  A. No.  I had this account in the Virgin Islands
19  and I was supposed to be paying something like
20  $300 a year to maintain it and they would not
21  accept the check from the bank.  And so one
22  time I paid for it on a credit card and then I
23  had this account in Las Vegas that I never
24  truly understood and basically, it just sort
25  of faded away.  I never utilized it in any

Page 68

1   DR. JOHN A. REPICCI
2   way.  I never understood it and I couldn't get
3   any information.
4   Q. Okay.  Also, if you could look at the
5   affidavit, Exhibit A, real quick.  If you look
6   at paragraph 16 -- actually, I will back up to
7   15.  It is a letter dated January 17, 2014.
8   "I expressed concerns to Jarvis regarding
9   difficulties with the IRS over the insurance
10  policies we purchased form Lincoln and Mass
11  Mutual.  I asked for clarification on several
12  issues, including representation that "the
13  insurance would be enforced until over age
14  100."  A copy of that letter is annexed hereto
15  as Exhibit I."  We have already looked at
16  that.
17      In response Jarvis sent a letter providing
18  "The Mass Mutual's policy is guaranteed.  The
19  other two Lincoln polices are not.  I have
20  created a grid to show what we have and what
21  we recommend you do.  By paying about $50,000
22  per year he can lock in the death benefits for
23  Lincoln on both policies until age 90.  My
24  recommendation is to pay the $50,000 per year
25  per policy for the next five to seven years



Page 69

1     DR. JOHN A. REPICCI
2  and see where the policies are under different
3  assumptions and economic conditions."
4       Do you recall having any discussion with
5  Hy Polakoff about that?
6  A. No.
7  Q. Did you come to learn that Mr. Jarvis had
8     recommended paying $50,000 a year per policy
9     in 2014?
10 A. I don't recall specifically, but I also had
11    concerns in that the Mass Mutual policy was
12    okay.  The other two were not.  I didn't
13    understand it and I can't communicate with
14    Mr. Jarvis and so it sort of dangled at that
15    pint.
16 Q. And why couldn't you communicate with
17    Mr. Jarvis?
18 A. I couldn't get in contact with him for one
19    reason or another.  I don't know exactly why.
20    I tried, I believe, California and then Texas
21    and finally I called Celia Clark and that is
22    about all I could find.  And since then I have
23    been dangling and picking up little
24    information here and there, but I had no kind
25    of communication with my agent and I need an

Page 70

1     DR. JOHN A. REPICCI
2  agent.
3       MR. TRACY:  Like I said, subject to what
4  I am going to review on the additional
5  discovery, and like I said, I am reserving the
6  right to call you back.  I am going to have no
7  further questions for the witness today.  We
8  are done for today.
9       THE WITNESS:  Okay.  Thank you.
10      THE REPORTER:  Can you please state your
11 orders for the record and obligation for the
12 same?
13      MR. GRIMM:  PDF is fine.
14      MR. TRACY:  PDF is fine.
15
16      (Deposition concluded at 12:30 p.m.)

Page 71

1  STATE OF NEW YORK)
2            ) ss.
3  COUNTY OF ERIE   )
4
5
6    I, Brooklyn Morton, Notary Public, in and for
   the County of Erie, State of New York, do
   hereby certify:
7
8    That the witness whose testimony appears
   hereinbefore was, before the commencement of
9  their testimony, duly sworn to testify the
   truth, the whole truth and nothing but the
10 truth; that said testimony was taken pursuant
   to notice at the time and place as herein set
11 forth; that said testimony was taken down by
   me and thereafter transcribed into
12 typewriting, and I hereby certify the
   foregoing testimony is a full, true and
13 correct transcription of my shorthand notes so
   taken.
14
15   I further certify that I am neither counsel
   for nor related to any party to said action,
16 nor in anyway interested in the outcome
   thereof.
17
18   IN WITNESS WHEREOF, I have hereunto
   subscribed my name and affixed my seal on this
19 2nd day of August, 2021.
20
                Brooklyn Morton
22              Brooklyn Morton

Page 72

1        E R R A T A   S H E E T
   Case Caption:
2  DEPONENT:_____DATE TAKEN:_____
3  I wish to make the following changes, for the
   following reasons:
4  PAGE    LINE     CHANGE:
   _
5  REASON:
   PAGE    LINE     CHANGE:
6  _
   REASON:
7  PAGE    LINE     CHANGE:
   _
8  REASON:
9  PAGE    LINE     CHANGE:
   _
10 REASON:
11 PAGE    LINE     CHANGE:
   _
12 REASON:
13 PAGE    LINE     CHANGE:
   _
14 REASON:
15 PAGE    LINE     CHANGE:
   _
16 REASON:
17 PAGE    LINE     CHANGE:
   _
18 REASON:
19 PAGE    LINE     CHANGE:
   _
20 REASON:
21
   Signature:_____
22 Subscribed and sworn to before me this
   ____day of _____2021.
23
   _____ Notary Public
24
25



Page 73

```
 1            CERTIFICATE OF WITNESS
 2
 3        I, the undersigned, have read the
 4   foregoing transcript, and the same is true and
 5   correct, save and except for the changes
 6   and/or corrections, if any, as indicated to by
 7   me on the errata sheet attached hereto.
 8
 9
        (Signed):_____
10
        Dated:_____
11
12
13
        Subscribed and sworn to me before this
14   ____day of _____, 20__.
15
16   _____
     Notary Public
17   My commission expires_____
18
19
20
21
22
23
24
25
```

