EXHIBIT B

JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
1–4

**Page 1**

```
1
2    UNITED STATES DISTRICT COURT YORK
3    WESTERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - - - - - - -x
4    DR. JOHN A. REPICCI and LORRAINE REPICCI,
     Individually, and JULIE STONE as Trustee
5    of the JOHN A. REPICCI IRREVOCABLE LIFE
     INSURANCE TRUST and THE REPICCI
6    IRREVOCABLE FAMILY TRUST,
7            Plaintiffs,
8        v.                        Case No.:
                                   1:17-cv-132
9    CHRISTOPHER R. JARVIS and
     OJM GROUP LLC,
10
            Defendants.
11   - - - - - - - - - - - - - - - - - - - -x
12
13            DEPOSITION OF JULIE STONE
14             APPEARING REMOTELY FROM
15                 BUFFALO, NEW YORK
16
17        TRANSCRIPT of the stenographic notes of the
18   proceedings in the above-entitled matter, as taken by
19   and before Leah Allbee, a Certified Court Reporter
20   (CCR# 30X100234500), Registered Professional Reporter
21   and Notary Public of the State of New Jersey and New
22   York, taken remotely from Metuchen, New Jersey, on
23   Tuesday, July 27, 2021, at 10:04 a.m.
24
25
```

**Page 2**

```
1
2    REMOTE APPEARANCES:
3
4    MAGAVERN MAGAVERN GRIMM, LLP
     Attorneys for Plaintiffs
5    1100 Rand Building
     14 Lafayette Square
6    Buffalo, New York 14203
     716-856-3500
7    BY:  RICHARD GRIMM, ESQ.
             rgrimm@magavern.com
8
9
10   WINGET, SPADAFORA & SCHWARTZBERG, LLP
     Attorneys for the Defendant Christopher R. Jarvis
11   45 Broadway, 32nd Floor
     New York, New York 10006
12   212-221-6900
     BY:  MATTHEW TRACY, ESQ.
13           tracy.m@wssllp.com
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            JULIE STONE
2    REPORTED REMOTELY FROM METUCHEN, NEW JERSEY
3    TUESDAY, JULY 27, 2021, 10:04 a.m.
4
5        THE REPORTER:  My name is Leah
6    Allbee, a Certified Shorthand Reporter and
7    Notary Public of the State of New Jersey
8    and New York.  This deposition is being
9    held via videoconference equipment.
10       The witness and reporter are not
11   in the same room.  The witness will be
12   sworn in remotely, pursuant to agreement
13   of all parties.  The parties stipulate
14   that the testimony is being given as if
15   the witness was sworn in person.
16   JULIE STONE, called as a witness, having been
17   first duly sworn by Leah Allbee, a Notary
18   Public within and for the State of New
19   Jersey and New York, was examined and
20   testified as follows:
21       THE REPORTER:  Thank you very
22   much.  We are all set.
23   EXAMINATION
24   BY MR. TRACY:
25       Q   Good morning, Ms. Stone.
```

**Page 4**

```
1            JULIE STONE
2        A   Good morning.
3        Q   As you know, my name is Matt Tracy.  I
4    am counsel for Christopher Jarvis in a lawsuit
5    brought by Dr. John Repicci, John Repicci Trust, and
6    Lorraine Repicci.
7        Have you ever had your deposition taken
8    before?
9        A   Yes.
10       Q   And in what context did you have it
11   taken?
12       A   Oh, you mean for this case or in other
13   cases?
14       Q   Other cases.
15       A   I run a hotel and somebody claimed
16   that they slipped in the bathroom, and so I had to
17   testify.
18       Q   Fine.  You are familiar with the
19   process.  I will be asking you a series of
20   questions.  I would ask that you just respond
21   verbally.  If you don't understand a question, I
22   will be happy to rephrase it.  And just let me
23   stop -- let me finish speaking before you start your
24   answer, and I will do likewise, so we don't talk
25   over each other.
```



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
5–8

Page 5

JULIE STONE

1
2       Are you with me so far?
3    A   Sure.  Okay.
4       Q   Okay.  Great.  What, if anything, did
5  you do to prepare for today's deposition?
6    A   I read a bunch of documents that the
7  lawyer had given me and I made some phone calls to
8  Lincoln Financial Group.
9       Q   What documents did your lawyers give
10  you to review?
11    A   There are two documents in front of me
12  that look like how many payments were made on each
13  policy.
14       Q   Other than those two documents, were
15  any other documents given to you to review?
16    A   Not today.
17       Q   At any time in preparation for today?
18    A   There was a folder full of all kinds
19  of documents.
20       Q   And in general, can you describe what
21  those documents were?
22    A   Communications, some of which I
23  supplied, faxes from Jarvis.  Maybe some faxes or
24  communications from Celia Clark.
25       Q   And okay.  Other than those faxes,

Page 6

JULIE STONE

1
2  were there any other documents that you reviewed in
3  preparation for today?
4    A   I don't think so.
5       Q   Just briefly, as an overview as your
6  father did yesterday, can you just briefly give me
7  your employment and educational background since
8  college?
9    A   Okay.  So I have a master's degree in
10  electrical engineering.  I worked for Kodak for ten
11  years.  After that, I quit and started working in
12  the family business which is a hotel.  And I also
13  worked for my father as the office manager in his
14  medical practice.
15       Q   And approximately what years did you
16  work for Kodak?
17    A   1988 to 1999.
18       Q   And as you indicated, the family
19  business is a hotel?
20    A   Right.
21    Q   What's the name of that hotel?
22    A   Darien Lakes Econo Lodge.
23    Q   How long did you work there?
24    A   I am still working there.  It's been
25  about 20 years.

Page 7

JULIE STONE

1
2       Q   When did you become your father's
3  office manager, approximately?
4    A   I started in 1998.  I was doing the
5  books.  After which time we decided to computerize
6  the office and put electronic medical records, and I
7  was in charge of that project.  I trained all of the
8  people.  That may have been in like 2003, '4, '5,
9  something like that.  And then I stayed there doing
10  the books until 2018, until they retired.
11       Q   When you started in 2013, did your
12  father's medical practice operate under an LLC, a
13  sole proprietorship or something else, to your
14  knowledge?
15    A   When I started -- well, I was doing
16  the books in 1998.  I think he was a sole
17  proprietor.  In about the year 2000, my
18  brother-in-law and sister graduated from medical
19  school so they formed an LLC, the three of them.
20       Q   After that LLC was formed, did they
21  ever change into any other type of structure?
22    A   No.
23       Q   Now, did there come a time where you
24  became trustee of the Repicci Irrevocable Family
25  Trust?

Page 8

JULIE STONE

1
2    A   Yes.
3    Q   And when did that happen?
4    A   I believe it was at the inception of
5  this trust.
6       Q   And when was that trust incepted?
7    A   There are two trusts that we are
8  talking about.  One was incepted in maybe 2002 and
9  the other in 2006.  I am unclear as to which one,
10  you know, we are speaking about.
11       Q   Okay.  Let me -- I think this might
12  help is if you can look -- I sent to Richard -- we
13  have marked them I believe as -- I call them --
14  today I will make it a little easier.  Repicci/Stone
15  A and B.
16          MR. TRACY:  Ms. Allbee, have you
17       marked them yet?
18          THE REPORTER:  No.
19          MR. TRACY:  If you can.
20          And, Richard, just for your
21       benefit, what I want to mark and I will
22       mark it as Defendant's Repicci/Stone is a
23       correspondence.  It's a three-page letter
24       dated February 25, 2021, from Lincoln
25       Financial Group, and it's addressed to the



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
9–12

Page 9

1          JULIE STONE
2    John A. Repicci Irrevocable Insurance
3    Trust, Julie Stone, Trustee, 120 Deer Run,
4    Williamsville.
5          MR. GRIMM:  All right.  The
6    witness has two of them in front of her.
7          THE WITNESS:  Okay.
8          (Letter dated February 25, 2021
9    was marked as Defendant's Repicci/Stone
10   Exhibit A for identification, as of this
11   date.)
12         MR. TRACY:  Fantastic.  Even
13   better.  Even better.
14         Okay.  And then if you can also
15   put -- what I will mark as B the
16   correspondence of the same date,
17   February 25, 2021, Repicci Irrevocable
18   Family Trust.  Yes.  Julie Stone, Trustee,
19   and Hyman Polakoff, Trustee, 5818 Bradford
20   Court, East Amherst, New York.
21         (Letter dated February 25, 2021
22   was marked as Defendant's Repicci/Stone
23   Exhibit B for identification, as of this
24   date.)
25   Q    Ms. Stone, when you have both of them

Page 10

1          JULIE STONE
2    in front of you, just let me know.
3    A    Okay.  I have them.
4    Q    Okay.  Great.  I am going to look at
5    the first one which this one is addressed to
6    yourself at Deer Run.  And it seems to indicate that
7    the policy is the 7146026 which I would represent to
8    you is the older one, the 2002 policy.
9          Is it fair to state that the
10   Irrevocable -- the John A. Repicci Irrevocable
11   Insurance Trust was incepted for the purpose of
12   containing the policy which I will call the 26 policy?
13   A    Yes.
14   Q    Do you recall signing any trust
15   documents to incept this trust?
16   A    Yes.
17   Q    And when did you sign those documents?
18   A    Probably in 2002 when they were
19   presented to me.
20   Q    Who presented them to you?
21   A    It may have come in a FedEx from Celia
22   Clark.
23   Q    Would you still have a copy of that
24   FedEx?
25   A    I would have a copy of the documents.

Page 11

1    I don't think I have the FedEx envelope.
2    Q    Okay.  Let me ask you this:  Would you
3    have kept the file of insurance documents related to
4    these two policies?
5    A    I would have kept things that came to
6    me, yes.
7    Q    Okay.  And what things over the years
8    in general would have come to you?
9    A    Well, the original trust document and
10   any faxes from Chris Jarvis and Celia on telling me
11   what to do about this trust.
12   Q    Would you have been in receipt of any
13   annual statements from Lincoln with respect to these
14   two policies?
15   A    Well, not -- only -- first of all, the
16   address on this is 120 Deer Run.  That is not my
17   address.  So I would have not been directly mailed
18   anything unless my parents had given it to me.
19   Q    Fair enough.  Would your parents be --
20   strike that.
21         Would you recall your parents ever
22   bringing to you any documents related to either the
23   trusts or the insurance policies in the trusts?
24   A    No.  Only -- the documents that I had

Page 12

1          JULIE STONE
2    were in the beginning of setting up the trust, not
3    as an ongoing basis.
4    Q    And Exhibit B has an address in East
5    Amherst, New York.  Would that be your address?
6    A    That is my address, yes.
7    Q    And let me make sure I am doing
8    this -- just bear with me.
9          Okay.  And with respect to the family
10   trust, it indicates that Hy Polakoff is your
11   co-trustee.  Did you have any discussions with
12   Mr. Polakoff about the family trust or the insurance
13   within the family trust?
14   A    Back when this was being set up, I am
15   sure I had spoken with him about documents or
16   payments.  But he has since retired and moved to
17   Florida, so I really hadn't had any interaction with
18   him personally for ten years.
19   Q    Okay.  So is it fair to state that you
20   have not had any interaction with Hy Polakoff since
21   about 2011, it sounds like or --
22   A    Yes.  Except yesterday when I did talk
23   to him because I needed to get his address.
24   Q    And when you were in the process of
25   getting his address, did you have any discussions

JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
13—16

Page 13

1              JULIE STONE
2  regarding the policies or the trusts?
3        A    No.
4        Q    And prior to 2011, did you speak with
5  Mr. Polakoff on any type of regular basis about the
6  trust or the policy within the trust?
7        A    No.
8        Q    Prior to 2011, did you talk to
9  Mr. Polakoff on an irregular basis or at any time
10 did you discuss the trust or the policy within the
11 trust?
12       A    No.
13       Q    In looking at the older policy which I
14 believe is -- again, I am going to get these wrong,
15 but I just want to make sure I get this -- it's the
16 Irrevocable Insurance Trust.
17            Actually, quick question before that.
18 Why were there two trusts, if you know?
19       A    I don't know for sure.
20       Q    Were you ever told why there were two
21 trusts or have a general idea of why?
22       A    No, I was never told why there were
23 two.
24       Q    Are you familiar with an entity called
25 Ebi-Repicci, LLC?

Page 14

1              JULIE STONE
2        A    Yes.
3        Q    And what is your understanding of that
4  entity?
5        A    So when these trusts or one of them
6  was set up, the trust -- the insurance was in that
7  entity.  That entity was set up as an offshore
8  account, as some kind of tax haven or whatnot.
9            What happened after it was set up, years
10 later, that triggered an IRS audit for my father.  Hy
11 Polakoff was involved in straightening that out or
12 responding to the audit because he was my father's
13 accountant at the time.  And I was told that the trust
14 is screwed up.  And, you know, there was an audit.
15 And this probably is not the way that this needs to be
16 set up.  And so sometime later, this insurance policy
17 was taken out of Ebi-Repicci and that was abandoned,
18 that Ebi-Repicci.
19       Q    And where was the insurance policy
20 placed at that point?
21       A    Into -- I forget which policy it was,
22 but it was placed directly in the trust.  I believe
23 Ebi-Repicci owned the trust or the trust owned
24 Ebi-Repicci and the insurance was in it.  But then
25 Ebi-Repicci could not be an entity, and so that was

Page 15

1              JULIE STONE
2  essentially erased.
3        Q    Okay.  Let me show -- I believe I sent
4  it to your attorney this morning.  And this was
5  if -- you know what we will do, I had this premarked
6  as Exhibit D which is the copy of the insurance
7  policy, the 144 insurance policy.  This is the one
8  in 2006.  And --
9            MR. GRIMM:  Matthew, when did you
10           send that?  Because I didn't see it.  Did
11           you send it after you sent the other --
12           MR. TRACY:  I thought I -- I sent
13           it -- I apologize.  I sent it to you about
14           20 minutes ago.
15           MR. GRIMM:  Okay.  I didn't check.
16           That's okay.
17           MR. TRACY:  Yes.  I knew it was
18           right around that point, as I am showing
19           at 10:04, when we just started.  I guess
20           it took a little longer.
21           Just so we're not wasting the
22           witness's time, Ms. Allbee, you have that
23           exhibit marked?
24           THE REPORTER:  Can I go off the
25           record?

Page 16

1         JULIE STONE
2         MR. TRACY:  I am sorry?
3         THE REPORTER:  Can I go off the
4  record?
5         MR. TRACY:  Sure.  Of course.
6         (Discussion off the record.)
7         MR. TRACY:  C will be what is
8  called the 44 policy.  It ends in 44,
9  dated in 2006.
10        Exhibit D, the 26 policy dated in
11 2002.
12        Exhibit E letter dated May 6,
13 2015.
14        (Policy Number 7317144, dated
15 December 21, 2006, was marked as Exhibit C
16 for identification, as of this date.)
17        (Policy Number 7146026, dated
18 December 10, 2002, was marked as Exhibit D
19 for identification, as of this date.)
20        (Letter dated May 6, 2015, was
21 marked as Exhibit E for identification, as
22 of this date.)
23        MR. TRACY:  What I want the
24 witness to look at is the 144 policy.
25        MR. GRIMM:  We are still off the



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
17—20

| Page 17 | Page 19 |
|---|---|
| 1                JULIE STONE | 1                JULIE STONE |
| 2    record. | 2    A    If you mean strategy, no. |
| 3          THE REPORTER:  I just went back | 3    Q    Just so we are clear -- yes.  Did you |
| 4    on. | 4    discuss with him the strategy of the policy or the |
| 5          MR. TRACY:  Let's go off again. | 5    purpose of the policy with Chris Jarvis? |
| 6          (Discussion off the record.) | 6    A    No.  Not beyond my parents wanted to |
| 7    BY MR. TRACY: | 7    do this.  This was life insurance after they died |
| 8    Q    Back on. | 8    that would pay to the family in some purpose.  That |
| 9          If you could look, Ms. Stone, at Exhibit | 9    was my understanding. |
| 10    C which is the 2006 policy.  If you go to -- it's page | 10    Q    Did you discuss the purpose of the |
| 11    41 of 50.  They should have little -- they do, yes. | 11    policy or the trust with your parents? |
| 12    They are numbered on the top.  Page 41 of 50. | 12    A    Not beyond that I needed to sign |
| 13    A    Okay. | 13    papers and I was the trustee. |
| 14    Q    And it indicates -- and this is for | 14    Q    Did anybody in 2002 explain to you |
| 15    the 144 policy in 2006.  If you go down towards the | 15    what your duties and responsibilities as trustee |
| 16    top of the page -- actually in the bottom as well -- | 16    were going to be? |
| 17    it indicates owner Ebi-Repicci, LLC.  Does that | 17    A    No. |
| 18    refresh your recollection that Ebi-Repicci owned the | 18    Q    Did you discuss the policy or the |
| 19    2006 policy? | 19    insurance trust in 2002 with your mother? |
| 20    A    Yes. | 20    A    Not beyond signing papers and moving |
| 21    Q    And do you know who the members of the | 21    money around to pay the premium initially. |
| 22    Ebi-Repicci, LLC were? | 22    Q    If you know, who would have been more |
| 23    A    No. | 23    in charge of the strategy behind the policy: your |
| 24    Q    Were you a member at any time? | 24    father or your mother? |
| 25    A    I don't know. | 25    A    My father would have been behind the |

| Page 18 | Page 20 |
|---|---|
| 1                JULIE STONE | 1                JULIE STONE |
| 2    Q    Did you keep the operating agreement | 2    strategy of it. |
| 3    of Ebi-Repicci in your records? | 3    Q    And what would your mother's role be, |
| 4          MR. GRIMM:  Object to the form. | 4    if any? |
| 5          You can answer. | 5    A    Moving money around, signing papers, |
| 6    A    I don't know. | 6    that kind of thing. |
| 7    Q    When the -- let's make sure -- when | 7    Q    In 2002, did there ever come a time |
| 8    the John A. Repicci Irrevocable Insurance Trust -- | 8    when you personally met with Christopher Jarvis? |
| 9    and that's the first trust -- was formed, what was | 9    A    No. |
| 10    your understanding of what it was for? | 10    Q    A more general question:  Did there |
| 11    A    That it was life insurance when my | 11    ever come a time when you personally met with |
| 12    parents died. | 12    Christopher Jarvis? |
| 13    Q    Okay.  And at that time, in or about | 13    A    No. |
| 14    2002 -- strike that. | 14    Q    And you were talking about the |
| 15          At that time in about 2002, did you have | 15    Ebi-Repicci, LLC triggered an audit.  How were you |
| 16    any discussions with Chris Jarvis about the insurance | 16    made aware of that? |
| 17    policy or the trust? | 17    A    My father had discussed that he was |
| 18    A    Yes. | 18    being audited.  Right? |
| 19    Q    What conversations did you have? | 19    Q    Fair enough.  That sounds fun.  Okay. |
| 20    A    It was mostly about setting up bank | 20          Other than Mr. Polakoff, did anyone else |
| 21    accounts, transferring -- wire transferring money, | 21    assist him with the audit, if you know? |
| 22    getting a tax ID number, signing papers. | 22    A    Not to my knowledge. |
| 23    Q    Did you have any what I will call | 23    Q    What involvement, if any, did you have |
| 24    substantive conversation with him about the purpose | 24    with respect to the audit? |
| 25    of the policy or the purpose of the trust? | 25    A    None. |



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
21–24

Page 21

1                JULIE STONE
2     Q    Now, you have a degree in engineering;
3 correct?
4     A    Yes.
5     Q    Do you have any -- subsequent to that,
6 have you taken any financial courses or the like?
7     A    No.
8     Q    And with respect to the family hotel
9 business, do you handle the books and records of
10 that hotel business?
11    A    Yes, I do.
12    Q    And with respect to the hotel
13 business, are there any life insurance policies or
14 life insurance trusts involved with that business?
15    A    No.
16    Q    Other than these two insurance trusts,
17 have you ever been the trustee of any other trust?
18    A    No.
19    Q    In 2002, did you have any discussions
20 with Hy Polakoff regarding the insurance policy or
21 the insurance trust?
22    A    No.
23    Q    This is with respect to the first
24 insurance trustee, John A. Repicci Irrevocable Life
25 Insurance trustee.  Did there ever come a time at

Page 22

1                JULIE STONE
2 any point that you had discussions with Hy Polakoff
3 regarding the trust or the insurance policy within
4 the trust?
5     A    No.
6     Q    With respect to the John A. Repicci
7 Irrevocable Insurance Trust, other than the Lincoln
8 policy, are there any other assets or insurance
9 policies within that trust?
10    A    I believe that one also contains the
11 MassMutual policy, but I am unsure.
12    Q    Same question with respect to the
13 Repicci Irrevocable Family Trust.  Other than the
14 Lincoln policy, are there any other assets or
15 insurance policies within that policy -- within that
16 trust?
17    A    Okay.  I am unsure.  I know that there
18 is a MassMutual policy that is contained in one of
19 these trusts.  There is also a bank account that is
20 contained in one of these trusts, but I am not sure
21 which one contains them.
22    Q    Fair enough.  What bank account is it
23 contained in one of them?
24    A    There is a Bank of America account
25 that has some money in it that's in one of these

Page 23

1                JULIE STONE
2 trusts.
3     Q    Do you know the approximate amount of
4 that bank account?
5     A    $500,000.
6     Q    Did there come a time in or about 2014
7 when you were made aware that there were issues with
8 the policies within these trusts?
9     A    I can't recall what year it was, but,
10 yes, I was made aware that there were problems.
11    Q    How were you made aware?
12    A    My father had told me about this
13 Eib-Repicci [sic] thing -- I don't know what year it
14 was -- but the whole audit issue.
15    Q    After that, other than the Eib-Repicci
16 [sic] issue, were you made aware of any other issue
17 with respect to the policy or the trusts?
18    A    I was made aware maybe over the last
19 year and a half, two years, that they thought
20 they -- their life insurance policies were expiring
21 and it became an emergency to figure out how to get
22 life insurance.  I don't think it was back in 2014,
23 though.
24    Q    How were you made aware of that?
25    A    My father said to me, "You need to

Page 24

1                JULIE STONE
2 find out about these insurance policies because
3 nobody will talk to me.  You are the trustee, and
4 you are the person that can actually make these
5 phone calls."
6     Q    Did there ever come a time -- strike
7 that.
8         Were you ever made aware that insurance
9 consultants were hired to review these policies?
10    A    I paid a bill from the medical
11 practice -- it must have been prior to 2018 -- to
12 Policy Guard, and I was told that this person was
13 going to help with insurance policies.
14    Q    And did you ever have any
15 conversations with anyone at Policy Guard regarding
16 these policies?
17    A    No.
18    Q    Were you ever -- strike that.
19         Are you aware if Policy Guard ever
20 produced a report regarding these policies?
21    A    No, I am not aware.
22    Q    Would you have ever been in the
23 practice of emailing Chris Jarvis regarding these
24 policies or the trusts?
25    A    I may have, but communication was a



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
25–28

Page 25
1              JULIE STONE
2 lot of faxing, I recall.
3      Q     And if you were to email -- well,
4 strike that.
5            If you were to fax, would that be from
6 the office fax, your parents' personal fax or
7 something else?
8      A     My personal fax number at my home
9 office.
10     Q     Would you have kept a record of all of
11 those faxes?
12     A     Yes.
13           MR. TRACY:  If you could show the
14     witness Exhibit E, her Exhibit E, which is
15     the May 6, 2015 letter.
16           MR. GRIMM:  That's Exhibit F from
17     yesterday and Exhibit E from today?
18           MR. TRACY:  Yes.
19           MR. GRIMM:  I am sorry.  How do we
20     have that, Repicci-Stone what for today?
21           MR. TRACY:  I am sorry?
22           MR. GRIMM:  What is it marked for
23     today?
24           MR. TRACY:  E.
25           MR. GRIMM:  E, as in Edward?

Page 26
1              JULIE STONE
2            MR. TRACY:  E, Edward, yes.
3      Q     Have you ever seen this letter before?
4      A     No.
5      Q     And so I will just paraphrase, real
6 quick, for the sake of time.  It indicates that your
7 father had received information from the insurance
8 consultant.  Were you ever provided information from
9 the insurance consultant regarding the policies?
10     A     No.
11     Q     Were you ever made aware of who hired
12 the insurance people?
13     A     I had paid the bill.  I had created a
14 check to pay the person that -- Policy Guard -- and
15 assuming that my father retained him because that
16 bill was in my inbox.
17     Q     Okay.  To your knowledge, did your
18 father have any -- and this is back in 2015 -- would
19 your father have had any financial advisors?
20     A     No.  I know that he interacts with
21 Bank of America and that he interacts with Fisher
22 Investments.  That's it.
23     Q     With respect to the medical practice,
24 did you have an insurance broker?
25     A     Yes.

Page 27
1              JULIE STONE
2      Q     And who was your insurance broker?
3      A     It was Dave Noto who had his own
4 practice and he subsequently went to M&T Bank
5 Insurance.
6      Q     To your knowledge, did you ever have a
7 discussion with David Noto about the insurance
8 policy or the trust?
9      A     No.  I solely interacted with him
10 about like commercial liability, that kind of thing,
11 for the business.
12     Q     To your knowledge, did your father
13 ever try to obtain insurance, life insurance, from
14 anyone other than Lincoln or MassMutual --
15     A     No.
16     Q     -- for the period -- for the last 15
17 years?
18           Yes, I know you are -- okay.
19           So your father asked you to reach out to
20 Lincoln Financial as trustee to make phone calls and
21 communications and the like.  Have you had any
22 discussions with Lincoln Financial about these
23 policies?
24     A     Yes.
25     Q     When did those discussions take place?

Page 28
1              JULIE STONE
2      A     I would say in the last year I had
3 called periodically on several issues.
4      Q     What would those issues be, to the
5 best of your recollection?
6      A     Well, I believe these two reports,
7 Exhibit A and B, I must have called to get how much
8 money did we pay into each policy.  I called because
9 I wanted to understand who actually owned the
10 policies and is Eib-Repicci [sic] off of them which
11 it is.  And I called to get several illustrations
12 regarding a bunch of different scenarios.
13     Q     And with respect to the illustration,
14 what is your understanding of the amount of money
15 needed to keep these policies in place until your
16 parents are 95?
17     A     Well, there are two separate
18 illustrations.  I mean, I can't recall off the top
19 of my head.  But I believe each one, if we were to
20 make a lump-sum payment in -- like in a year or this
21 year, each one I believe was to the tune of like
22 $1.2 million.
23     Q     Was there any discussion on making
24 those payments over a period of time?
25     A     Yes.  So then we got illustrations



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
29–32

Page 29

        JULIE STONE
1
2   over five years and ten years.
3       Q    And those five-year and ten-year
4   illustrations would allow you to pay that out over
5   time rather than a lump sum?
6       A    Yes.  Yes.
7       Q    And with respect to -- if you go to, I
8   believe -- bear with me -- your Exhibit B which is
9   for the family trust.
10          MR. GRIMM:  I am sorry.  Which
11      exhibit?
12          MR. TRACY:  Exhibit B.
13          MR. GRIMM:  From today?
14          MR. TRACY:  From today.
15          MR. GRIMM:  Okay.
16      Q    If you go to page 3 and it seems to
17  indicate for the 144 policy that payments were made
18  in 2017 and 2018.  Do you see that?
19      A    Yes.
20      Q    And this letter is dated February of
21  2021.  What prompted the payments in 2017 and 2018,
22  if you know?
23      A    I don't know.
24      Q    Do you know why payments were not made
25  for 2019 and 2020?

Page 30

        JULIE STONE
1
2       A    No.
3       Q    And looking at the first page, again
4   this indicates that Hyman Polakoff is trustee of the
5   family trust as well.  Had you had any discussions
6   with him regarding making additional payments?
7       A    No.
8       Q    To your knowledge, has your father had
9   any discussions with Hy Polakoff regarding the
10  family trust?
11      A    No.
12      Q    To your knowledge, did you have any
13  discussions with Mr. Polakoff about him resigning as
14  trustee of this trust?
15      A    No.  I personally have not.
16      Q    To your knowledge, other than your
17  father's testimony yesterday, were you aware of any
18  conversations between your father and Mr. Polakoff
19  that he wanted to resign as trustee?
20      A    No.
21      Q    Going back to -- I know this is a
22  while back -- 2002.  Did you review any of the
23  policy illustrations in 2002?
24      A    No.
25      Q    At that time?

Page 31

        JULIE STONE
1
2       A    No.
3       Q    When was the first time for either
4   policy that you reviewed a policy illustration?
5       A    Within the last two years, when my
6   father told me that he thought he had no insurance
7   and that I had to start making phone calls.
8       Q    Prior to two years ago, did you have
9   any -- strike that.
10          Between 2006 and approximately two years
11  ago, how many discussions would you have had with your
12  father about these insurance policies or the trusts?
13      A    I had a discussion with the IRS thing
14  and the Eib-Repicci [sic], whenever that occurred.
15  And then within the last two years with this all
16  coming up.
17      Q    Other than those two issues, did you
18  ever have any discussion with your father or your
19  mother about their expectations for the policy, how
20  the policies were doing, that sort of thing?
21      A    No.  No.  And I did have a discussion
22  when he hired that Neil Finestone firm because it
23  was an unfamiliar bill and I didn't know what it was
24  for, and so I asked.  And he told me there was a
25  problem with the policies and he was asking this

Page 32

        JULIE STONE
1
2   person to review them.
3       Q    After -- other than with respect to
4   that conversation regarding the payment to Policy
5   Guard, did you have any discussions with your father
6   about the conclusions that Policy Guard may have
7   reached?
8       A    No.
9       Q    And between -- during the Repicci
10  issue, did you have any conversations with Chris
11  Jarvis?
12      A    I don't understand.  What do you mean
13  by the Repicci issue?
14      Q    I am sorry.  The Ebi-Repicci, LLC --
15  the tax audit issue.
16      A    I don't recall.  No.
17      Q    You had no discussion with him.
18          Did you have discussions with Celia
19  Clark at that time?
20      A    Yes.
21      Q    Yes.  I don't want you -- because she
22  is an attorney, I don't want you to get into
23  privileged communications.
24          And then would you have had any
25  discussion with Hy Polakoff at that time?



Page 33

JULIE STONE

2    A    No.

3    Q    Now, just so I am clear, the family
4  trust was formed after the IRS audit; is that
5  correct?

6    A    I don't know.  What I think is that
7  both of these trusts were set up and one of them,
8  because Eib-Repicci [sic] was involved or an
9  ownership of one of these policies, that was the
10 trigger for the IRS audit.  That's what I believe.

11    Q    Okay.  Just so I am clear, do you know
12 approximately when the Repicci Family Trust was set
13 up?

14    A    In about 2006, directly preceding
15 buying these policies.

16    Q    And from 2006 through 2011, did it
17 have any policies or other assets in it?

18    A    In 2006, it would have had this
19 Lincoln policy, 7144.  This may also be the trust
20 that has the $500,000 in it, but I am not sure.

21    Q    But you are not sure, okay.

22         MR. TRACY:  Subject to what I
23         review in my -- the document production
24         from Friday, and I will reserve my right
25         to call you back, but I have no further

Page 34

1         JULIE STONE
2  questions for you.  We are done for today.

3         MR. GRIMM:  Thank you.

4         THE WITNESS:  Thank you.

5         MR. TRACY:  Let's go off the
6  record.

7         THE REPORTER:  Are you ordering
8  the final transcript of this?

9         MR. TRACY:  Me, yes.  PDF.  I
10 don't need a hard copy.

11         THE REPORTER:  Mr. Grimm, are you
12 ordering a copy?

13         MR. GRIMM:  Matt, do you supply or
14 no?

15         MR. TRACY:  Yes, I am supplying
16 that.  Yes.

17         MR. GRIMM:  I will take a PDF as
18 well.

19         (Time noted: 10:59 a.m.)

20

21

22

23

24

25

Page 35

1

2                C A P T I O N

3

4  The Deposition of Julie Stone, taken in the
5  matter, on the date, and at the time and place set
6  out on the title page hereof.

7

8

9  It was requested that the deposition be taken by
10 the reporter and that same be reduced to
11 typewritten form.

12

13

14 The Deponent will read and sign the transcript
15 of said deposition.

16

17

18

19

20

21

22

23

24

25

Page 36

1

2                C E R T I F I C A T E

3

4  STATE OF_____:

5  COUNTY/CITY OF_____:

6

7  Before me, this day, personally appeared
8  Julie Stone, who, being duly sworn, states
9  that the foregoing transcript of his/her
10 Deposition, taken in the matter, on the date, and
11 at the time and place set out on the title page
12 hereof, constitutes a true and accurate transcript
13 of said deposition.

14

15                  _____

16                       Julie Stone

17

18

   SUBSCRIBED and SWORN to before me this_____

19

20 day of _____, 2021, in the

21 jurisdiction aforesaid.

22

23 _____    _____

24 My Commission Expires         Notary Public

25



JULIE STONE
REPICCI V. CHRISTOPHER JARVIS

July 27, 2021
37–39

Page 37

```
 1
 2              DEPOSITION ERRATA SHEET
        RE:
 3      FILE NO.
 4      CASE CAPTION:   Repicci  vs.   Jarvis
 5      DEPONENT:  Julie Stone
        DEPOSITION DATE:  July 27, 2021
 6
        To the Reporter:
 7      I have read the entire transcript of my Deposition
        taken in the captioned matter or the same has been
 8      read to me.  I request for the following changes
        be entered upon the record for the reasons
 9      indicated.
        I have signed my name to the Errata Sheet and the
10      appropriate Certificate and authorize you to
        attach both to the original transcript.
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19      _____
20      _____
21      _____
22      _____
23      _____
24      SIGNATURE:_____  DATE:_____
25          Julie Stone
```

Page 38

```
 1
 2                   I N D E X
 3      Witness:  Julie Stone                    Page
 4      Examination by Mr. Tracy                    3
 5
 6
 7
                     E X H I B I T S
 8
 9      Defendant's       Description           Page
        Repicci/Stone
10      For Ident.
11      A     Letter dated February 25, 2021       9
12      B     Letter dated February 25, 2021       9
13      C     Policy Number 7317144, dated        16
              December 21, 2006
14
        D     Policy Number 7146026, dated        16
15            December 10, 2002
16      E     Letter dated May 6, 2015            16
17
18
19
20
21
22
23
24
25
```

Page 39

```
 1
 2              C E R T I F I C A T E
 3
 4          I, Leah Allbee, a Registered Professional
 5      Reporter, Certified Court Reporter and Notary Public
 6      of the State of New Jersey, do hereby certify that the
 7      foregoing Deposition of the witness Julie Stone, taken
 8      at the time and place aforesaid, is a true and correct
 9      transcription of my shorthand notes.
10          I further certify that I am neither counsel
11      for nor related to any party to said action, nor in
12      any way interested in the result or outcome thereof.
13          IN WITNESS WHEREOF, I have hereunto set my
14      hand this 12th day of August, 2021.
15
16          _____
17              Leah Allbee, RPR, CCR
                CCR# 30X100234500
18              Expires 6/30/2022
19
20
21
22
23
24
25
```

