# EXHIBIT C

Page 1

```
 1             UNITED STATES DISTRICT COURT
                        for the
 2             Western District of New York
 3              Civil Action No. 17cv132
 4
    DR. JOHN A. REPICCI, et al.
 5
            Plaintiff,
 6
    v.
 7
    CHRISTOPHER JARVIS,
 8
            Defendant.
 9
    _____/
10
11  DEPOSITION OF:    HYMAN B. POLAKOFF
12  ON BEHALF OF:     Attorney for Defendant
13  DATE:             September 21, 2021
14  TIME:             1:02 p.m. to 2:30 p.m. ET
15  PLACE:            All Parties Remote Via Zoom
16  REPORTED BY:      Stephanie R. Zeitvogel, FPR-C
                      Stenographic Reporter
17                    Notary Public
                      State of Florida at large
18
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2  RICHARD A. MOORE, ESQ.
    Magavern, Magavern & Grimm
 3  1100 Rand Building
    14 Lafayette Square
 4  Buffalo, New York 14203
    rmoore6394@gmail.com
 5
            Attorney for Plaintiff
 6
 7
    MATTHEW TRACY, ESQ.
 8  Winget Spadafora Schwartzberg
    45 Broadway, 32nd Floor
 9  New York, New York 10006
    212-221-6900
10  tracy.m@wssllp.com
11          Attorney for Defendant
12
13  MORGAN BENTLEY, ESQ.
    Bentley Law
14  783 South Orange Avenue, Unit 300
    Sarasota, Florida 34236
15  mbentley@thebentleylawfirm.com
16          Attorney for Witness
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           INDEX TO PROCEEDINGS AND EXHIBITS
 2                                             PAGE   LINE
 3  Direct Examination by Mr. Tracy              4      8
 4  Exhibit A 10/9/2002 Letter from Jarvis      13     24
              to Polakoff
 5
    Exhibit B 2011 E-mails                      20     25
 6
    Exhibit C January 7, 2014 Letter from       33     18
 7            Repicci to Jarvis
 8  Exhibit D March 2014 E-mail from Jarvis     36      9
              to Polakoff
 9
    Exhibit E 58-page Enclosure, 2014           38      5
10            E-mails
11  Certificate of Oath                         55      1
12  Certificate of Reporter                     56      1
13  Errata sheet                                57      1
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      COURT REPORTER:  Do you swear or affirm that
 2  the testimony you are about to give will be the
 3  truth, the whole truth, and nothing but the truth?
 4      THE WITNESS:  Yes, I do.
 5      HYMAN B. POLAKOFF,
 6  the witness herein, being first duly sworn, was examined
 7  and testified as follows:
 8              DIRECT EXAMINATION
 9  BY MR. TRACY:
10   Q   Good afternoon, Mr. Polakoff.  My name is
11  Matthew Tracy.  I'm a lawyer with Winget, Spadafora &
12  Schwartzberg, and I represent Christopher Jarvis in a
13  lawsuit that was brought by Dr. John Repicci and the
14  various other parties against him.
15      My first question is, have you ever had your
16  deposition taken before?
17   A   I couldn't understand what you said.
18   Q   Have you ever had your deposition taken
19  before?
20   A   No.
21   Q   Okay.  Basically, well, it's as if we were in
22  a court of law.  I'm going to ask you a series of
23  questions.  I would ask that you respond verbally, and
24  that also if you can just let me finish my question
25  before you start speaking so the court reporter can get
```



Page 5
1 everything down.
2      Do you understand me so far?
3   A   Yes.
4   Q   Okay.  What, if anything, did you do to
5 prepare for today's deposition?
6   A   Not very much.
7   Q   When you say not very much, describe it as
8 generally as you can.
9   A   Well, I took some notes to myself just to
10 remind me of things, but I -- I didn't do that much.
11   Q   Did you review any documents in preparation
12 for today other than the ones you just told me?
13   A   No.
14   Q   And did I understand that you were one of the
15 founding partners of an accounting firm Brock, Schechter
16 & Polakoff?  Is that correct?
17   A   Yes.
18   Q   When was Brock, Schechter & Polakoff founded,
19 approximately?
20   A   I don't know.  30 years ago.
21   Q   And in the course of -- let me just back up.
22      Do you know who Dr. John Repicci is?
23   A   Yes.
24   Q   And how do you know him?
25   A   He was my client.

Page 6
1   Q   And when did he become your client, to the
2 best of your recollection?
3   A   About 20 years ago.
4   Q   Approximately 20 years ago.  And how did he
5 become your client, if you remember?
6   A   I don't remember.
7   Q   Okay.  What was -- when he came to you, was he
8 a referral or did you meet him socially or something
9 else, if you remember?
10   A   I don't remember.
11   Q   And what -- when you first started doing work
12 for Dr. Repicci, what services did he want you to
13 perform?
14   A   Well, I met with him to talk about taxes and
15 to -- we met usually around 10:00 to -- 10 o'clock or
16 2 o'clock.  We -- I picked up his tax preparation papers
17 and discussed various items.
18   Q   Other than tax preparation, did you provide
19 any other type of services to Dr. Repicci at any time?
20   A   Well, my firm, they -- he was the firm client.
21 So if there were things that were done sometimes, a
22 client would come and say I need this done or I need
23 this done.  So the major thing that I did for him is
24 associated with his taxes.
25      MR. BENTLEY:  Hey, Matt.  We just lost

Page 7
1 Richard, I think.
2      MR. TRACY:  Yeah, we did, so we have to wait a
3 second.
4      (Discussion off the record.)
5 BY MR. TRACY:
6   Q   Mr. Polakoff, when you founded Brock,
7 Schechter & Polakoff 30 years ago, how many accountants
8 were there?
9   A   At first there were about 30 accountants, 30
10 including the secretaries.  There were 30 people.
11   Q   Thirty people.  Okay.
12      And are you still working for Brock,
13 Schechter?
14   A   No, I haven't worked in about 20 years.
15   Q   In how long?
16   A   About 20 years.
17   Q   Okay.  And what happened 20 years ago?  Did
18 you retire or something else?
19   A   Well, they were phasing me out as a partner,
20 and I was working with the staff.  The staff had grown,
21 and I worked with the staff in the transition of my
22 clients.
23   Q   And in that transition, was there a particular
24 partner at your firm who started working with
25 Dr. Repicci?

Page 8
1   A   Well, I wouldn't know because I don't know
2 what's going on now and, like, I heard a couple partners
3 retired and I never knew that.  So I don't know anything
4 that's going on there.
5   Q   For now, but at the time when you were in your
6 transition period, was there a particular partner who
7 was assigned to take over Dr. Repicci's business from
8 you?
9   A   I don't know.
10   Q   Would you have any type of records that would
11 be able to tell you that or is that something I would
12 need to get from Brock, Schechter?
13   A   I would not have any records on that.
14   Q   And at Brock, Schechter, you indicated when --
15 at the time you were being phased out, what kind of
16 services did Brock, Schechter provide?
17   A   That included me or to my clients?
18   Q   Everybody, the whole firm.
19   A   What kind of services?
20   Q   Correct.
21   A   The firm did audits, tax services, various
22 consulting work.
23   Q   Did any of that -- in the consulting work, did
24 any of that include -- I'm sorry, my -- did any of that
25 include insurance?



Page 9

1  MR. BENTLEY: Did any of it include insurance?
2  THE WITNESS: No. We went through -- we
3  did -- a few of us got our insurance licenses, but
4  like in my own case, I -- I didn't want to do it
5  and I reversed it. I didn't do it.
6  BY MR. TRACY:
7  Q  When you say reversed it, what type of
8  insurance license were --
9  A  A general insurance license, but I never used
10  it.
11  Q  When did you have your general insurance
12  license?
13  A  What was it in?
14  Q  When did you have it, approximately? And a
15  general insurance license, would that apply to life
16  insurance?
17  A  I don't remember because I went in and out and
18  I never did anything. I just signed up and then
19  withdrew from it. But I never did anything with life
20  insurance.
21  Q  Let me ask you this. I'm going to have to
22  just back up a little bit.
23  When -- you were a CPA, correct?
24  A  Yes.
25  Q  And when did you obtain your CPA license?

Page 10

1  A  Around 1975.
2  Q  And when you obtained -- I think you indicated
3  that you worked with Brock, Schechter for about 30
4  years. From, say, 1975 through 1990, did you work at
5  any place -- strike that.
6  After -- when you obtained your CPA in 1975,
7  where were you working?
8  A  It was a firm called Reefer, Brock and Bolenka
9  [phonetic].
10  Q  And how long were you there?
11  A  I was there, I don't know, five, six, seven
12  years.
13  Q  Okay. And then after that, where did you go
14  to?
15  A  Joe Brock and myself split off with somebody,
16  Norbert Schechter, to set up the firm Brock, Schechter &
17  Polakoff, and Dave Reefer merged with a national
18  accounting firm, which I forget what the name was.
19  Q  Okay. And so you basically since that time
20  until retirement were with Brock, Schechter & Polakoff,
21  correct?
22  A  Correct.
23  Q  And with respect to Dr. Repicci, did there
24  ever come a time when you stopped providing tax services
25  to him personally?

Page 11

1  A  No.
2  Q  So you're still providing tax services to him?
3  A  No. I haven't worked, done anything for the
4  past almost 20 years. I don't do anything -- for him.
5  MR. BENTLEY: You do a lot, just not taxes for
6  the doctor.
7  THE WITNESS: Oh, yeah.
8  BY MR. TRACY:
9  Q  That's what I'm asking. I mean, what kind of
10  services if any are you providing for the doctor now?
11  A  Now? Nothing.
12  Q  How about ten years ago, 2011?
13  A  Right. Well, I was doing some special tax
14  work and -- with another attorney, and which enveloped
15  special -- special type of tax, like trusts -- not
16  trusts. Let's see. I wrote down trust. There's a
17  whole list of things. I used to go to the Heckerling
18  Institute at the University of Miami, and it's a high
19  level estate planning for clients.
20  Q  And as part of that, would you provide estate
21  planning services at any time for Dr. Repicci?
22  A  Yes.
23  Q  And when did you start doing that?
24  A  Well, it didn't start or end. It comes up if
25  something is -- would help him, I would tell him -- I

Page 12

1  would talk to him about it.
2  Q  When was the last time you spoke to him about
3  estate planning services?
4  A  Ten or 20 years ago.
5  Q  And what -- to the best of your recollection,
6  what was that conversation about?
7  A  I don't remember.
8  Q  Now, did there come a time -- well, strike
9  that.
10  Do you know who Chris Jarvis is?
11  A  I know who he is.
12  Q  How do you know him?
13  A  Well, I know him through Dr. Repicci there
14  with the insurance.
15  Q  And did you ever meet with Chris Jarvis in
16  person at any time?
17  A  No.
18  Q  Have you ever had a telephone conversation
19  with Chris Jarvis?
20  A  Not a lot, you know. I --
21  Q  When you say not a lot, how -- what would be
22  the frequency?
23  A  It may be, like, twice a year.
24  Q  And what would be the purpose of those calls
25  twice a year?



Page 13

1  A   Well, mostly it was Dr. Repicci asking me to
2  talk to him.
3  Q   And why would Dr. Repicci ask you to talk to
4  him?
5  A   Well, Chris would tell him certain things, and
6  then he just wanted me to be aware of it.  He wasn't
7  asking me to perform a service, but he just wanted me to
8  be aware of things.
9  Q   Did he ever ask your opinion about what Chris
10 Jarvis was telling you?
11 A   No.  He knew -- he knew -- very, very, very
12 smart.  He's probably smarter than the five of us all
13 put together.
14 Q   I will stipulate to that.
15     Now, why don't we take a look, if you can --
16 I'm going to mark as Exhibit A what I put in the chat
17 which is October 9, 2002, letter.  And if you could show
18 the witness that -- I guess -- Stephanie, do you mark it
19 electronically?
20     COURT REPORTER:  Yes, I usually mark it after
21  the deposition.
22     MR. TRACY:  That's fine.  Okay.  This is what
23  that is.
24     (Exhibit A marked for identification.)
25     MR. BENTLEY:  This is the Jarvis letter,

Page 14

1  October 9th?
2     MR. TRACY:  Correct, yes.
3     MR. BENTLEY:  Yeah, I have it up on our screen
4   here.
5     MR. TRACY:  Can you read it?
6     MR. BENTLEY:  Yes, it's gigantic.
7     MR. TRACY:  Fantastic.
8  BY MR. TRACY:
9  Q   Mr. Polakoff, when you get a chance, have you
10 read this letter or do you recognize it?
11 A   I read it.
12 Q   I'm sorry?
13 A   I read it.
14 Q   Okay.  And it's addressed from Chris Jarvis to
15 you.  Now, as of October 9th, 2002, were you still
16 active at Brock, Schechter?
17 A   Not a lot.
18 Q   Not a lot, but it looks -- indicates that you
19 were still working there.
20 A   It indicates that my name is on the letter.
21 That's all that indicates.
22 Q   Well, let me ask you this.  Does it refresh
23 your recollection timing wise as to when you started to
24 do less work at Brock, Schechter?
25 A   It was over the period that I told you about,

Page 15

1  most of the period that I told you about.
2  Q   And in the case here:  Hy, thanks for all your
3  help so far.  We are still awaiting the financial
4  information, including profit and loss statements for
5  the businesses and verified values of some of his
6  assets.
7     Was that information that you were going to be
8  able to send to Chris Jarvis?
9  A   I -- I don't remember ever getting this
10 letter.
11 Q   Have you seen it before today?
12 A   I got this -- I got this letter when I was
13 supposed to do a deposition in June, and I don't know if
14 it was -- I don't know who sent it to me but it came in
15 the mail.
16 Q   And let me ask you this.  Were you still
17 affiliated with Brock, Schechter & Polakoff on
18 October 9, 2002?
19     MR. BENTLEY:  Objection, asked and answered.
20   But you can answer if you can.
21     THE WITNESS:  Very little.
22 BY MR. TRACY:
23 Q   Okay.  Was Brock, Schechter & Polakoff's
24 address on October 9th, 2002, 135 Delaware Avenue,
25 Buffalo, New York 14202?

Page 16

1  A   I don't know because we moved and -- to
2  Exchange Street, and I don't know what the date was of
3  that move.
4  Q   Were -- in October of 2002, were you having
5  any issues getting your mail?
6  A   If I didn't get it, I wouldn't have known.
7  Q   Well, did you have any -- to the best of your
8  recollection, did you have any other instances that you
9  recall where someone said they mailed something to you
10 and you never got it?
11     MR. BENTLEY:  Object to form.  I don't think
12   he -- I don't know.  Slightly mischaracterizes the
13   testimony.
14     But you can answer if you can.
15     MR. TRACY:  I'm just asking if he was having
16   any trouble, to his knowledge --
17 BY MR. TRACY:
18 Q   To your knowledge, were you having any trouble
19 receiving mail in October of 2002?
20     MR. BENTLEY:  And that's fine.  Your other
21   question though was any other problems, so that's
22   why I objected.
23     THE WITNESS:  I don't remember.  I can't -- I
24   don't remember that.
25

Page 17

1  BY MR. TRACY:
2  Q   Okay.  Do you recall -- do you recall ever
3  having a conversation with Chris Jarvis in 2002 or any
4  time regarding the fact that illustrations for the
5  Lincoln life insurance policy showed that it could run
6  out -- it could basically run out of money in about 12
7  to 15 years.  Do you recall having a conversation like
8  that?
9  A   I did not have a conversation about that.
10  Q   With anybody?
11  A   Dr. Repicci told me some things and it may
12  have been in the conversation, but I didn't do anything
13  about it.
14  Q   Well, what did he say to you in those
15  conversations?
16  A   I mean, he all the time said that this is this
17  and this is that and he's telling me things, and I'm
18  really not an expert on insurance.  I couldn't give him
19  advice.  And I wouldn't give him advice, so -- but he
20  just wanted me to know what he was thinking and what was
21  being done.
22  Q   Okay.  What was he thinking?  I mean, when you
23  say he told you things, like, what would -- for example,
24  what was he telling you?
25  A   I don't remember.  It was a long time ago, and

Page 18

1  I don't remember.
2  Q   Now, what was Dr. Repicci's background in
3  terms of insurance?  Was he familiar with it?
4  A   Dr. Repicci?
5  Q   Yeah.
6  A   Well, again, I have to tell you that he's
7  smarter than the five of us, and if he reads something
8  or looks into it, I would put my money on him.
9  Q   That's fine.
10     Did he have any, to your knowledge, any prior
11  experience with insurance?
12  A   I don't know.
13  Q   Well, when he came to you in -- well, let me
14  ask you this.  In 2002, approximately how long had
15  Dr. Repicci been a client of yours?
16  A   I don't know.  10, 15 years.
17  Q   Okay.  And so at that point, so somewhere in
18  the late '80s, early '90s, you started doing work for
19  him.  And did -- in the late '80s and early '90s, was
20  there any discussion with you and him about estate
21  planning?
22  A   I don't remember.  Probably, but I don't
23  remember.
24  Q   Well, did you have any discussions with him
25  regarding Chris Jarvis and the purchase of this

Page 19

1  insurance policy in or about 2002?
2  A   I don't remember, and I -- I just don't
3  remember that.
4  Q   Let me ask you this.  How frequently in 2002
5  would you meet with Dr. Repicci?
6  A   Probably once a year to do his taxes, and
7  spend two or three or four hours with him talking about
8  the economy or something.
9  Q   Did you at any time ever communicate with him
10  via e-mail?
11  A   Did I communicate via e-mail?
12  Q   With him, with Dr. Repicci.
13  A   With him?  I don't think he used e-mail.
14  Q   Would you e-mail anyone who acted on his
15  behalf?
16  A   I don't know.
17  Q   Okay.
18  A   Probably not.  He communicated via fax
19  machines.
20  Q   Now, if you look at the fourth page of this or
21  third page of this document, I should say, it indicates,
22  Conclusion, and it states:  I understand why you and
23  John were concerned with an illustration that showed the
24  policies running out in 12 to 15 years.
25     Do you recall expressing to either Dr. Repicci

Page 20

1  or Chris Jarvis concerns about an illustration that
2  shows that the policy is running out in 12 to 15 years?
3  A   Dr. Repicci had expressed it to me verbally.
4  Q   When did he express that to you?
5  A   I don't know.  I -- I'm 81 years old, and I
6  don't remember what I did yesterday, and I'm going to
7  remember 20 years ago what somebody said or did?
8  Q   Do the best you can.  It's not a memory
9  contest.  That's why I ask.
10     Okay.  Now, I think you indicated that you
11  spoke to Chris Jarvis approximately twice a year, if I
12  have it.  When was the last time you spoke to Chris
13  Jarvis, if you recall?
14  A   I don't remember.
15  Q   Do you recall what the sum and substance of
16  such conversation would have been?
17  A   I don't remember.
18  Q   What I'm going to next are a set of e-mails
19  from 2011.  Just bear with me one second.
20     Okay.  You can show the witness when you get a
21  moment.  I'm going to have to ask the reporter to
22  mark -- it's a 64-page document, which would be Polakoff
23  Exhibit B, and I would describe it as e-mails from --
24  2011 e-mails.
25     (Exhibit B marked for identification.)



Page 21

1   MR. MOORE:  Can I interrupt for just a second
2   here?
3   MR. TRACY:  Sure.
4   MR. MOORE:  Just want to let know.  I'm on the
5   same screen with the document and it's not going
6   too well.  I'm going to try and set up another
7   screen that I can put the document up on
8   separately, but go ahead and continue.
9   MR. TRACY:  That's fine.  And when --
10  BY MR. TRACY:
11  Q   Mr. Polakoff, can you put the --
12  MR. BENTLEY:  We have it on the screen.
13  MR. TRACY:  Okay, great.
14  MR. BENTLEY:  Do you want me to start at the
15  beginning of the e-mail chain or do you just --
16  MR. TRACY:  Why don't we start at the
17  beginning just on Page 1 of 64.  And it
18  indicates -- it's Chris Jarvis, sent Wednesday,
19  August 24th, 2011, to Celia Clark and Hyman
20  Polakoff, Subject:  Repicci.  And --
21  MR. BENTLEY:  The first one I have is
22  November 1st, 2011, on Page 64 from Chris Jarvis to
23  I and Celia.
24  MR. TRACY:  Hang on one second.  Go all the
25  way to Page 1.  I think that's the back of the

Page 22

1   document.
2   MR. BENTLEY:  Oh, okay.  That's August 24th,
3   yeah.  Got you.
4   MR. TRACY:  Yeah, that's it.
5   BY MR. TRACY:
6   Q   And, Mr. Polakoff, who is Celia Clark?
7   A   Celia Clark was a tax attorney, and I worked
8   with her on what I talked about, the various items of
9   estate planning.
10  Q   And where is she located?
11  A   She's in New York City.
12  Q   And this indicates, I guess, earlier is
13  on 8/24/11, Celia Clark wrote -- and she was writing to
14  Chris:  Were you going to confirm the amount of paid-up
15  death benefit in the EBI-Repicci LLC policy?  Dr. R
16  seems to be confused about this.  Hy just called.
17      And that -- well, let me ask you a couple
18  questions.  What to your recollection is EBI-Repicci
19  LLC?
20  A   You know, I don't remember.  I can guess
21  but --
22  MR. BENTLEY:  I don't think he wants you to
23  guess, but --
24  BY MR. TRACY:
25  Q   Do you recall working with Dr. Repicci on a

Page 23

1   limited liability claim?
2   A   I wouldn't work with him, I would work with
3   Celia.
4   Q   Do you recall doing work with her with the two
5   of you in conjunction working on that for Dr. Repicci?
6   A   I don't remember, but it could have been.  I
7   don't remember.
8   Q   Well, let me ask you this --
9   A   She may have done this on her own without me.
10  I don't know if I would add any benefits to what she's
11  doing.  She did do a lot of independent tax work for
12  him.
13  Q   Well, it seems to be they are copying you and
14  you apparently were making at least one phone call to
15  Celia about it.  Does that refresh your recollection?
16  A   Where do you see that?
17  Q   It says, Hy just called.  Dr. R seems to be
18  confused about this.  Hy just called.
19      And it would indicate --
20  A   Well, probably John said something to me and I
21  probably -- calls in between myself and his attorney and
22  Chris or anybody else don't mean that I'm doing work.
23  It means that he told me something and that's what
24  probably happened.
25  Q   Well, and then that would be -- well, I mean,

Page 24

1   let me ask you.  If Dr. Repicci asked you or raised a
2   concern --
3   A   He didn't ask me, he told me.
4   Q   He told if --
5   A   He told me if he would do something or if he
6   had a problem or if he felt something was wrong, he
7   would tell me.  He usually didn't ask me, especially on
8   insurance.
9       Now, if he did it on estate taxes, I used to
10  teach through the AICPA and the New York State Society
11  of CPAs various estate planning items.  So if he did ask
12  me on something, I probably could have answered.
13  Q   Well, let me ask you this.  In 2002, when
14  Chris Jarvis presented -- or strike that.
15      When Chris Jarvis -- let me ask you this.
16  Strike both those questions.
17      What was your understanding of the purpose of
18  the insurance policies that Dr. Repicci purchased in
19  2002?
20  A   Well, as explained to me, he wanted to provide
21  for his family if he should die.
22  Q   Was there an estate planning/tax savings
23  component to that, to the best of your recollection?
24  A   I don't know.
25  Q   You don't recall or you don't know?



Page 25

1  A  I don't recall.
2  Q  Would you have taken any notes from 2002 -- I
3  know it's a long time ago but I have to ask -- regarding
4  any meetings you might have had or phone conversations
5  you would have had with either Dr. Repicci or Chris
6  Jarvis?
7      MR. BENTLEY:  I'm sorry.  Are you asking
8   whether he took them or whether he has the notes?
9  BY MR. TRACY:
10  Q  Well, let's start with took.
11  A  Usually if Dr. Repicci told me something, back
12  then my memory was pretty good.  And if he told me
13  there's a problem with a life insurance policy, I
14  probably would remember it.
15  Q  But were you in the habit or was that your
16  custom and practice to take notes of client meetings in
17  2002?
18  A  No, never.
19  Q  If Chris Jarvis had called you in 2002 and you
20  had any kind of conversation, was it your custom and
21  practice in 2002 to take notes of such conversation?
22  A  No.
23  Q  Now, you indicated that you spoke to Chris
24  Jarvis either annually or semiannually.  Did there come
25  a time when that stopped?

Page 26

1  A  Well, I wouldn't say that it was annually or
2  anything else.  It was, like, just out of the blue.
3  It's, like, he may call me one year and say this is this
4  way, this is -- I'm just filling you in, or if he asked
5  me a question, I would say you're going to have to call
6  Dr. Repicci about that.
7  Q  Okay.  So is it fair to say that -- like I
8  said, I just want to make sure I'm getting this right --
9  is that over the years you did not have regular contact
10  with Chris Jarvis?
11  A  Correct.
12  Q  That's correct?
13  A  Yeah.  Some years I think would be more than
14  other years.  Generally it wasn't a lot of contact with
15  them because the contact that I would be interested in
16  was from John Repicci to Chris Jarvis.
17  Q  And to your knowledge, how often were they in
18  contact, if you know?
19  A  I don't know.
20  Q  Now, if we scroll down to -- there's a bunch
21  of stuff about hurricanes -- we go to Page 12, it's an
22  August 31st, 2011 e-mail from Celia Clark.  You're not
23  copied on this so you may not recall, but I just want to
24  check.
25      It says, Chris, I just spoke to Hy again.

Page 27

1  Dr. Repicci wants to know what he has to do and what it
2  will cost him to unwind the EBI-Repicci LLC and take the
3  insurance policy as a distribution to him and his trust
4  (EBG can have the bonds).
5      Do you know what Celia Clark is referring to
6  there?
7  A  No.  I mean, I could guess what it is.
8  She's -- they are probably talking about doing something
9  and she --
10  Q  Okay.  If you go down to Page 14, it's an
11  e-mail addressed hp@bspcpa.com.  Was that your e-mail
12  address in October 2011?
13  A  Yes.
14  Q  Okay.  From Hyman B. Polakoff, dated
15  October 10th, 2011, to Christopher Jarvis:  Chris,
16  Dr. Repicci just called.  He's getting very anxious.
17  Can you accelerate getting me the numbers on the
18  insurance policy?  Hy.
19      To the best of your recollection, what was
20  Dr. Repicci getting anxious about?
21  A  I don't know.
22  Q  And what do you recall about getting numbers
23  on the insurance policy, if you know what that's
24  referring to?
25  A  I'm sorry.  What?

Page 28

1  Q  You state in your e-mail to Chris:  Can you
2  accelerate getting me the numbers on the insurance
3  policy?
4      Do you remember what you were referring to
5  there?
6  A  I don't remember.
7  Q  Do you recall there being any -- do you recall
8  in 2011 Dr. Repicci wanted to unwind a limited liability
9  company?
10  A  I don't remember.
11  Q  Did you have a lot of experience at any time
12  in unwinding limited liability companies?
13  A  Unwinding what?
14  Q  Unlimited liability company.
15  A  It depends on the meaning of unwinding.  Are
16  you going to close it up and make a distribution or are
17  you going to put it someplace else?  I don't know.
18  Q  Well, how frequently would that come up in
19  your work?
20  A  Not too much.
21  Q  So if it's not too much, I'm just asking, is
22  this something that would stand out?
23  A  What you do with taxes, the laws change all
24  the time.  So you have to be aware of the tax
25  implications, and if you could do one thing like a



Page 29

1 tax-free merger or something else, those are things that
2 you look into to see what the best way of unwinding
3 something.
4   Q   Go to Page 17 of 64.  It's from Chris Jarvis
5 to Hyman Polakoff.  It's Thursday, October 27, 2011, at
6 12:25, Subject: Forward:  Repicci - Inforce
7 Illustrations, and then it has various attachments.
8       Do you recall getting Inforce illustrations
9 for policy 144 on October 27, 2011?
10   A   I don't remember.
11   Q   If you had gotten Inforce illustrations, would
12 you have shared those with Dr. Repicci?
13   A   The Subject: FW: Repicci Inforce -- Inforce
14 Illustrations mean that he got that?
15   Q   No, I'm asking you.  You got it, it appears,
16 and if you had gotten it, would you have then shared
17 this information with Dr. Repicci?
18   A   Well, I would have assumed that Chris would
19 have sent that directly to Dr. Repicci.
20   Q   Why would you assume that?
21   A   Or that he was aware of it.  I don't know.
22 You're asking me about a --
23       MR. BENTLEY:  It's okay.
24       THE WITNESS:  -- a situation that I don't know
25    the complete package.  So you want me to give an

Page 30

1    opinion on nothing I know about.
2 BY MR. TRACY:
3   Q   No, I'm just -- I'm asking you is --
4   A   I don't know.  I don't remember this.  I don't
5 know what the background is.  I don't know who talked to
6 who.  There's a lot that goes with this.  I just don't
7 know.
8   Q   Would you in 2011 -- well, in 2011, were you
9 still working -- were you working in Buffalo or were you
10 working in Florida at that point or both?
11   A   I moved almost 14 years ago.
12   Q   So that's 2007.  So would you -- have you used
13 any other e-mail address but the -- your Brock,
14 Schechter e-mail address for this?
15   A   I did change my e-mail from hp@bspcpa.com to
16 hbpcpa12@gmail.com.
17   Q   Now, in 2011, if you recall, do you recall
18 having any conversation with Dr. Repicci about his
19 insurance policies with Lincoln?
20   A   His policies what?
21   Q   With his life insurance policy with Lincoln.
22   A   With blanket?
23   Q   With Lincoln, Lincoln Insurance.
24   A   Oh, with Lincoln.
25   Q   Yeah.

Page 31

1   A   No.  I mean, he periodically told me examples
2 of what the numbers were, but I didn't do anything with
3 that kind of information.  I'm just -- because he --
4 again, he's very, very smart and he -- he knew what he
5 was doing.  And for the most part, if he didn't know, he
6 should call Chris Jarvis.
7   Q   Let me ask you this.  Hang on one second.  Let
8 me just kind of get another exhibit up there.  Bear with
9 me one moment.
10   A   Is there more on that page?  Is there more
11 down below?
12   Q   Not that I'm aware of.  I have what I provided
13 to everybody.  Just the whole -- what we have.  If
14 anything else, I'm unaware.
15   A   Let me see what's below.
16   Q   Keep going.  Feel free.
17   A   Who is Alex Johnson?
18   Q   That, I'm not sure.
19       Well, let me ask you this.  Do you know who
20 Alex Johnson is?
21   A   So you only showed me part of this letter.
22   Q   I'm asking you.  Like I said, no one here --
23 I'm serious, no one here is trying to trick anybody or
24 do anything.  I just want to know what you know.
25   A   Well, my partner Norbert Schechter once came

Page 32

1 in my office and said, I just found a tax code that we
2 don't have to pay any taxes on our income.
3       And I said, Norbert, what are you talking
4 about?
5       He said, Here, it's in writing.
6       I said, Well, how about the page before it and
7 the page after it?
8       MR. BENTLEY:  Details.  We have the FedEx
9    package now that just came.  So if you want to
10    refer to that --
11       MR. TRACY:  Fantastic.  If you open up -- hang
12    on.  For some reason I'm having trouble opening
13    something myself.  Bear with me.  It's a
14    January 7th, 2014, letter.
15       MR. BENTLEY:  January 7th, 2014?
16       MR. TRACY:  Yeah.
17       MR. MOORE:  Is that in that second grouping of
18    documents?
19       MR. TRACY:  I thought it was.  Now also I'm
20    having a little trouble.  Just bear with me a
21    second.
22       MR. BENTLEY:  I have it.  Is this a letter
23    from Dr. Repicci?
24       MR. TRACY:  Yes, if you could show the witness
25    that.



Page 33

1  MR. MOORE: Can I ask what page that's on of
2  the group of 64?
3  MR. TRACY: It's not in the 64. It's a
4  separate document.
5  MR. MOORE: All right. Wait a second here.
6  MR. TRACY: It was listed as January 7, 2014
7  letter electronically, but for some reason --
8  MR. MOORE: Which grouping is it in?
9  MR. TRACY: It should have been in an e-mail I
10  sent to you.
11  MR. MOORE: Right. But there's six groupings
12  of documents in there.
13  MR. TRACY: Yeah, there's the three sets of
14  e-mails --
15  MR. BENTLEY: It says Exhibit H, as in Harry,
16  on the outside of it.
17  MR. TRACY: Right. Correct.
18  (Exhibit C marked for identification.)
19  BY MR. TRACY:
20  Q   And this is a January 7th, 2014, letter from
21  Dr. Repicci to Chris Jarvis in which he's raising
22  various complaints about the policies. And my question
23  for you is: Prior to today, have you ever seen this
24  letter before?
25  A   Me?

Page 34

1  Q   Yes.
2  A   I don't know.
3  Q   Were you asked to look at any such letter by
4  Dr. Repicci before he sent it out?
5  A   I don't know.
6  Q   That's a yes or a no. I mean, is -- did
7  you -- you would have any recollection of Dr. Repicci --
8  well, let me ask you it this way. Strike everything.
9     Do you have a recollection of Dr. Repicci
10  complaining about Chris Jarvis and these policies at any
11  time?
12  A   I don't remember.
13  Q   So -- well, let me ask you this: When was the
14  last time you had a discussion with Dr. Repicci about
15  these policies?
16  A   A long time ago.
17  Q   When you say a long time ago, do the best that
18  you can in terms of an approximation.
19  A   I have no idea. I just don't have any idea.
20  Q   More than five years ago?
21  A   When you're talking -- are you talking about
22  this is situation --
23  Q   Yes.
24  A   -- or other situations?
25  Q   This situation.

Page 35

1     When was the last time you had --
2  A   I wouldn't -- I wouldn't have been involved in
3  this. Celia Clark was a topnotch tax attorney, and
4  there may be somebody from my firm who we have some very
5  good people that -- that know taxes and -- but I -- I
6  would guess that Celia Clark would be the -- technically
7  the lead person on any problems like this.
8  Q   Well, let me ask you this: Would you know
9  somebody by the name of Neil Finestone?
10  A   I know the name -- I know Dr. Repicci hired
11  him. He's a -- he wasn't -- he's dead, but he was an
12  expert in insurance.
13  Q   And when did Dr. Repicci hire him, to the best
14  of your recollection?
15  A   I don't know.
16  Q   How were you made aware that Dr. Repicci had
17  hired him?
18  A   Celia Clark referred him.
19  Q   Okay. Taking a look -- and I'm going to --
20  A   I didn't have any involvement in this.
21  Q   Bear with me one second. The next exhibit.
22  MR. BENTLEY: Do you need a break?
23  THE WITNESS: No.
24  MR. TRACY: Do you need a break? I forgot to
25  mention that part. I apologize. If you need a

Page 36

1  break, take a break for any reason.
2     The next one is an e-mail from March of 2014.
3  MR. BENTLEY: March 5th?
4  MR. TRACY: Yep.
5  MR. BENTLEY: Does it say Jade Risk at the
6  bottom?
7  MR. TRACY: Correct, yes. Exactly.
8  MR. MOORE: I've got it too.
9  (Exhibit D marked for identification.)
10  BY MR. TRACY:
11  Q   Okay. This is dated March 5th, 2014, to Hyman
12  B. Polakoff, David R. Di Matteo, Jennifer N. Insalaco,
13  Celia Clark, and Christine Edwards. And it says, Team,
14  I had a nice call with John today and spoke with Hy
15  Polakoff twice.
16     And this is dated March 5th, 2014.
17     Mr. Polakoff, did this refresh your
18  recollection of having any discussions with Chris Jarvis
19  regarding the Lincoln policies?
20  MR. BENTLEY: His question was only does it
21  refresh your recollection as to whether you spoke
22  to Chris Jarvis in 2014. That's all he's asking.
23  THE WITNESS: I don't remember. Who is
24  Christine Edwards?
25



Page 37

1  BY MR. TRACY:
2     Q   Going to be my question.  Appears she works
3  with Celia Clark.
4         How about David R. Di Matteo, who is that?
5     A   David was my partner.
6     Q   Is he still with Brock, Schechter?
7     A   Yes.
8     Q   How about Jennifer Insalaco?
9     A   She's still there.
10    Q   Oh, is she a partner there?  I just want to
11 confirm that.
12    A   Yeah.
13    Q   I'm not sure -- do you recall this letter or
14 having conversation with Chris Jarvis about this?
15    A   I don't recall the letter, no.
16    Q   Do you recall having any conversations with
17 Dr. Repicci that he would have to put more money into
18 the Lincoln policies?  And this would be around 2014.
19    A   2014?
20    Q   Yes.
21    A   I don't think I talked with John Repicci in
22 2014.  I haven't talked to him in a long time.
23    Q   We'll look at the next exhibit.  2014 e-mail,
24 not as lengthy as the 2011 one.
25        MR. BENTLEY:  What date are we looking for?

Page 38

1         MR. TRACY:  Let's just start with the first
2      one.  Just for the record, this is a 58-page
3      enclosure starting on Page 1.
4         MR. BENTLEY:  February 21st, 2014?
5         (Exhibit E marked for identification.)
6  BY MR. TRACY:
7     Q   February 21st.  We'll scroll down a little.
8  And if you go to Page 2, Stephanie Matlock,
9  February 21st, 2014, to yourself and Chris Jarvis, and
10 copying C. Edward, C. Clark, and Jennifer Insalaco.  Do
11 you recall having any kind of conference call with this
12 group regarding Dr. Repicci?
13    A   Me?
14    Q   Yes.
15    A   This was 2014?
16    Q   Correct.
17    A   Or two-thousand --
18    Q   2014.  This is '14.
19    A   I doubt it.  I -- I don't remember, but I
20 doubt it.  Those people in my firm are very high levels,
21 and it's quite possible that they did this themself.
22    Q   And if you go to Page 3, it's from Chris
23 Jarvis, it's Thursday, February 27, 2014, to Celia
24 Clark, Hyman Polakoff, Jennifer Insalaco, and David R.
25 Di Matteo.  And it says, Attached are the other Lincoln

Page 39

1  policy that the Repiccis have outside their estate.  I
2  have requested in force ledgers.  Turnaround time period
3  is usually four to five days, so we should have
4  something by next week.
5         Do you recall getting this from Chris Jarvis
6  at that time?
7     A   No.  But it's very common that if I got
8  something from Chris and there were other people
9  involved, I would scan it and then put it in the file.
10    Q   Now --
11    A   I don't remember this, so I would guess that I
12 wasn't involved.
13    Q   Well, let me ask you this.  If you go to
14 Page 5, hbpcpa12@gmail.com, is that an e-mail address of
15 yours?
16    A   Yeah, it's the new one I'm using now.
17    Q   Yeah.  And it's March 11, 2014 to Chris, and
18 you're saying, Chris, please let me know when you are
19 back to work.  Thanks, Hy.
20        Now this was sent on a BlackBerry.
21        Now, do you recall sending this message to
22 Chris Jarvis on March 11, 2014?
23    A   Was this in connection with what we just went
24 through?
25    Q   It says Dr. Repicci.  I'm just asking you if

Page 40

1  you know what this is about.
2     A   No, but I'm talking about the content.
3  What --
4     Q   I'm just asking you --
5         MR. BENTLEY:  His question is do you remember
6      this e-mail.
7  BY MR. TRACY:
8     Q   Yeah.
9     A   I don't remember that e-mail, but it's quite
10 possible -- Chris Jarvis subject.  Chris, Please let me
11 know --
12        I don't know why I sent that.  I don't
13 remember it.  And there could have been a reason.
14 BY MR. TRACY:
15    Q   Going to Page 6, this is going to be a
16 slightly different issue, and it's more of an accounting
17 issue.  6 of 58.  It's from David Di Matteo.  It's
18 Tuesday, March 25th, 2014.  It's to Anjali Bhat, Hyman
19 B. Polakoff, Jennifer Insalaco, Celia Clark, and
20 David Di Matteo.  It's about Gifts of Preferred and
21 Common Interests in EBI-Repicci, LLC.
22        Is -- do you recall being informed that they
23 were going to -- there was some kind of gift tax
24 calculation they were performing in or about March of
25 2014?



Page 41
1   A   Well, I was copied on this and I probably got
2  it. I don't remember it. But the people -- it's from
3  David Di Matteo so I don't know who he was working with
4  or if Celia was involved or what, but I just don't know
5  anything about this.
6   Q   Other than you were copied. But you did not
7  have any substantive conversations with anybody about
8  it?
9   A   As far as I know. You know, it's 2014. We
10  are in 2021. So that's seven years ago.
11   Q   If you scroll down to Page 11 of 58, it's
12  March 25th. It's Anjali Bhat to yourself, Jennifer and
13  David: Mr. Polakoff, I'm an associate at Clark &
14  Gentry, working on the gifts of interests in
15  EBI-Repicci, LLC that will be made by John and Lorraine
16  Repicci to the Repicci Irrevocable Family Trust by the
17  end of this month. Please see attached a memorandum
18  explaining these gifts.
19      Do you recall getting this memorandum or
20  having any conversation with Anjali Bhat, who was an
21  associate at Clark & Gentry?
22   A   I don't remember, no.
23   Q   Do you recall that in or about -- strike that.
24      Do you recall that at some point in time you
25  were made a trustee of the Repicci family life insurance

Page 42
1  trust?
2   A   I remember having it done, and it was a long
3  time ago, and it was a nominal function.
4   Q   When you say a nominal function, what was your
5  understanding of the function?
6   A   Well, it -- that whatever I did didn't involve
7  insurance and it didn't involve -- probably doesn't
8  involve taxes. It was a mechanical situation, and I
9  resigned as trustee some time ago.
10   Q   When did you resign?
11   A   Oh, I don't know. 10, 15 years ago.
12   Q   I'm just going to represent to you that
13  it's -- as far as I'm aware, that has not gone through.
14  Are you aware of that?
15   A   Well, there was four trusts, and John
16  Repicci's daughter called me to -- a couple weeks ago to
17  tell me that the fourth trust apparently never went
18  through, and I didn't know that. So she sent -- had
19  somebody send me papers to sign to take me off as
20  trustee, but it should have been done at the time that
21  the other three trusts were done.
22   Q   If you look about Page 12, it's yourself to
23  Chris on March 26th, 2014: Chris, I just talked with
24  John. He said he spoke with you. I asked him to call
25  you again and discuss which policies he would keep. He

Page 43
1  has to make the decision. If you let me know when you
2  are done, I can talk with him one more time about this.
3  Thanks. Hy.
4      Do you recall in or about March 2014 talking
5  to Dr. Repicci about which policies he would keep?
6   A   I don't remember it, but I would guess that it
7  probably happened, and it was very common for me to talk
8  to Chris and suggest that he talk to John, and sometimes
9  I talked to John and suggested John talk to Chris. So
10  it means that I really didn't do anything, I'm just
11  leading them as a way to resolve the situation.
12   Q   Okay. If we go now to Page 13 of 58 from
13  yourself to Chris and Celia, this is Friday, April 4th,
14  2015: Chris, I emailed Celia yesterday and she said she
15  had not heard from you about the insurance policies. If
16  you have not spoken to John, today may be a good day to
17  do it.
18      Do you recall why April 4th, 2014, was a good
19  day to talk to John about the insurance policies?
20   A   I don't know what that's about, but if it's
21  there I probably did it.
22   Q   And if we look at Page 16 of 58, it's a little
23  bit of a chain. So it starts with Chris to yourself on
24  Friday, April 4th, 2014, copy to Celia. And he says to
25  you: A couple things: I have spoken to John again and

Page 44
1  I am working on his next round of suggestions; I just
2  received the fourth round of options from Lincoln and
3  will review today; and I have tried to get a call on the
4  calendar with Celia for a couple of weeks now. I should
5  have a set of recommendations to discuss later today.
6  Does that work?
7      And you respond: That's okay with me. At
8  9:36.
9      Do you recall --
10   A   Where does it say that?
11   Q   At the top. Top of the page.
12   A   It's okay with me?
13   Q   Do you recall having this dialogue with Chris
14  Jarvis?
15      MR. BENTLEY: It's the same e-mail chain, it
16    just has one more entry in it, see? This is all
17    the same, and then it adds that.
18  BY MR. TRACY:
19   Q   Take your time. I get that. It's better than
20  most.
21   A   Okay. Whatever.
22   Q   Let me ask you this. If you go to 18 of 58,
23  it's -- it's to Chris, on May 30, 2014: Chris, anything
24  new on the insurance?
25      Do you recall what would have prompted you to



Page 45
1  send that e-mail?
2     A   Chris, anything new on the insurance?
3         I must have talked to John.  I don't know if
4  he was waiting for something, but again, I don't
5  remember this.
6     Q   Also, if you look at Page 19 --
7     A   It's 17 years ago.
8     Q   Just for the record, it's seven, but -- which
9  is not an unsubstantial time, I understand.
10        At 19 of 58 --
11    A   Is this the same as the other one?
12    Q   It's a different date.  It's about a couple
13 weeks later.  Any news on Dr. Repicci?
14        And do you recall --
15    A   I don't remember then.  Well, I'm not named on
16 here on anything, am I?
17        MR. BENTLEY:  These are different e-mails.
18        MR. TRACY:  Yeah, these are different.
19        MR. BENTLEY:  This is the last --
20 BY MR. TRACY:
21    Q   Yeah, I just want to double check one thing.
22 I don't think --
23    A   Oh, any news on Dr. Repicci?
24    Q   Yeah.
25    A   Okay.

Page 46
1     Q   I'll direct you to -- I thought there was one
2  more, but I don't want you to have to -- yeah, you don't
3  have to worry about this.
4     A   I never heard of the name Diana Chen.
5     Q   Don't worry about it.
6         Okay.  If you look at Page 40 of 58, it's
7  Chris Jarvis to Celia Clark copied to you, Repicci
8  Estate Planning.  Celia --
9         MR. BENTLEY:  What is the date?
10 BY MR. TRACY:
11    Q   July 11, 2014.  It's on Page 40 of 58.
12    A   Okay.
13    Q   And it's:  Celia, I just spoke with Hy.  I
14 believe we have the statements on all the insurance
15 policies (1-mass mutual and 2 lincoln).  I'm working
16 most of the day tomorrow if you want to catch up.
17        Do you recall speaking with Chris Jarvis in or
18 about July of 2014 about the insurance policies?
19    A   No.  But this is -- this shows me as having a
20 copy, so this came from Chris Jarvis to Celia Clark.
21    Q   And you're copied, yes.
22    A   How can it be from Chris Jarvis to Celia Clark
23 and Chris Jarvis?
24    Q   I think he's just sending it to himself for
25 whatever reason.  I know that's confusing.

Page 47
1     A   Spoke to Celia -- I just -- I believe we
2  have -- [Reading document.]
3     Q   It helps if you go down to the next one.  It's
4  from Celia to Chris and you're copied on it as well.  It
5  says, Chris:  Hy and I are stuck because we don't know
6  which trusts own which policies currently.  I don't know
7  what the problem is here.  If we could get account
8  statements showing owner and beneficiary we would at
9  least know where we are starting from.  We agree Dr. R
10 needs more insurance.
11        Do you recall having any conversations with
12 either Chris or Celia on that topic?
13    A   I don't remember, but it's possible.
14    Q   When you say it's possible, why do you say
15 that?
16    A   Well, because it's in writing here, but it was
17 2014.  I'm surprised -- I just don't remember.
18    Q   And on Page 41, this is Chris writing --
19 although I don't see -- let me see this.  I don't see
20 like an address thing.  This seems to be part of a
21 chain:  Hy and Celia, I hope you are doing well and
22 finding some time to enjoy your summer.  I spoke to John
23 Repicci.  He would like us to come up with a plan for
24 his $40 million -- $40 million of investment dollars
25 that are currently in his and Lori's estate.  I am going

Page 48
1  to present a couple scenarios to him in the near future
2  and I wanted to give you both a heads up what I have
3  created for him so far so we can discuss and come up
4  with a unified front to help him move forward.  I have
5  run a number of projections for them with four
6  strategies.  One, do nothing.  Two, LLC ownership with
7  discounting.  Three, Estate Freeze.  Four, Our Wealth
8  Transfer.
9         And then it goes on.
10        Do you recall having any such discussions with
11 Dr. Repicci about this?
12    A   No.
13    Q   Do you recall having any conversation with
14 Celia Clark about this?
15    A   No.
16    Q   Do you recall having any conversations with
17 Chris Jarvis about this?
18    A   No.  This is pretty straightforward, though,
19 right?
20    Q   Now, did you ever have any conversation with
21 Lori Repicci about the insurance policies?
22    A   No.
23    Q   Did you have any conversation -- well, let me
24 ask this this way.  Have you ever had a conversation
25 with Lori Repicci?



Page 49

1  A   About the weather.
2  Q   When was the last time you spoke to her?
3  A   A long time ago.
4  Q   More than ten years?
5  A   I -- you know, I don't remember.  They had
6  some family problems and I talked to her.  I don't know
7  if it was their mother or her brother or something, but
8  I did talk to her about that.  But it was not -- it's
9  nothing to do with this.  It was a personal situation.
10 Q   Okay.  Without delving into that, I don't
11 need -- obviously don't need to delve into that.
12     Was it a relatively recent conversation?
13 A   With Lori Repicci?
14 Q   Yes.
15 A   No.  She sends me a Christmas card each year.
16 Q   Do you recall having any communications with
17 Chris Jarvis that he was concerned that Dr. Repicci was
18 going to sue him?
19 A   No.  I mean, when I found out that he was
20 suing him, but I -- I don't know when that was.
21 Q   Let me ask you this.  How did you find out
22 that Dr. Repicci had filed suit?
23 A   I don't know, but it was recently.  When did
24 he start the suit?
25 Q   2017.

Page 50

1  A   So that was four years ago.  So I -- when I
2  found out was, I would guess, in the last year.
3  Q   How did you find out?
4  A   No, I take that back.
5  Q   Okay.
6  A   It may have been a year and a half ago.
7  Q   How did you find out a year and a half ago?
8  A   I don't remember.
9  Q   Did Dr. Repicci tell you or did you talk to
10 somebody else or --
11 A   There may have been somebody in my office.
12 Q   Now, when did you start doing estate planning
13 work with Celia Clark?
14 A   What kind of work?
15 Q   Estate planning.
16 A   Estate planning?
17 Q   Yes.
18 A   I did a lot of estate planning with other
19 attorneys.  With Celia it probably was around -- I
20 didn't think -- I didn't think it would have been, like,
21 around 2015 or 2014, but it may have been around that
22 time.
23 Q   Now, you had indicated you have done a lot of
24 estate planning work with other attorneys.  When did you
25 start doing that?

Page 51

1  A   I would say around 1980.
2  Q   Okay.  So a while.  Now --
3  A   I was on estate planning committees of both
4  the American Institute of CPAs and the New York State's
5  Society of CPAs.
6  Q   Now, other than Dr. Repicci, have you ever
7  worked -- well, strike that.
8      Other than with Dr. Repicci, have you ever
9  worked with Chris Jarvis in any capacity?
10 A   No.
11 Q   Did Chris Jarvis ever ask you for any
12 referrals or try to work with you on other clients or
13 prospective clients?
14 A   Not that I remember.
15 Q   And in working with estate planning, are life
16 insurance policies utilized in estate planning?
17 A   Sometimes.
18 Q   And are -- and when you say sometimes, like,
19 what would they be used for?
20 A   You know what, I can't -- I haven't done it in
21 so long.  My mind is a blank.
22 Q   Now, do you know the difference between a
23 whole life insurance policy and a term life insurance
24 policy?
25 A   Yes.

Page 52

1  Q   And what's the difference?
2  A   A term is -- it generally doesn't have cash
3  build up and the other one usually does.  I would say
4  maybe not -- don't all the time.
5  Q   And are you familiar with the concepts of
6  guaranteed value versus based on current assumptions?
7  A   No.
8  Q   Are you -- let me break that down for you.
9  Would you be familiar with the concept of guaranteed
10 insurance value?
11 A   I can't say that I'm familiar with it or
12 understand it, and my mind is -- I'm going to a doctor
13 for some mind work and I don't remember a lot.  If you
14 want, I'll have my wife send you a letter.
15 Q   I hear that, and understood.
16     I may have asked you this before, but just
17 bear with me for a second.  How did you meet
18 Dr. Repicci, do you remember?
19 A   Believe it or not, I was referred by another
20 attorney.
21 Q   Totally believe it.
22     And what was Dr. Repicci's practice like at
23 that time?
24 A   It was very good.
25 Q   And were you asked to handle his personal

Page 53

1  accounting or his practice's accounting or both?
2    A   I did both, or my firm did both.
3    Q   With respect to your firm, would Dr. Repicci
4  be considered a big client, a medium client, a small
5  client, or something in between?
6    A   He's a very good client.
7        MR. TRACY:  Subject to if Mr. Moore has any
8  questions, I have no further questions for the
9  witness.
10       MR. MOORE:  I have no questions.
11       MR. TRACY:  Thank you for your time,
12 Mr. Polakoff.
13       MR. BENTLEY:  Thanks.  We'll read, Stephanie.
14 And you can just coordinate it through my office,
15 and the e-mail is mbentley@thebentleylawfirm.com.
16       COURT REPORTER:  Okay.  And Mr. Tracy, did you
17 want to order the transcript today?
18       MR. TRACY:  Yeah, I'll order.  Yeah.
19       COURT REPORTER:  And would anyone else like to
20 order a copy?
21       MR. MOORE:  I would too.  Thank you.
22       COURT REPORTER:  Mr. Bentley, did you want to
23 order a copy?
24       MR. BENTLEY:  I don't, but I do want to look
25 at it.

Page 54

1        COURT REPORTER:  Okay.  I'll let Esquire get
2  with you on the arrangements for that.
3        MR. TRACY:  Yeah, I'll take care of that.
4           (Deposition concluded.)

Page 55

CERTIFICATE OF OATH

STATE OF FLORIDA      )
COUNTY OF BAY         )

In my capacity as a Notary Public of the State of
Florida, I certify that on the 21st day of
September, 2021, at 1:02 p.m., HYMAN B. POLAKOFF
personally appeared before me and took an oath or
affirmation for the purpose of giving testimony in
the matter of Dr. John A. Repicci, et al. v.
Christopher Jarvis.
Produced Identification.  Type of Identification
Produced: Driver's license.
DATED this 1st day of October, 2021.

_____
STEPHANIE R. ZEITVOGEL, FPR-C
Notary Public - State of Florida
My Commission No.  GG145742
Expires:  October 27, 2021

Page 56

CERTIFICATE OF REPORTER

STATE OF FLORIDA      )
COUNTY OF BAY         )

I, Stephanie R. Zeitvogel, Stenographic Reporter, do
hereby certify that I was authorized to and did
stenographically report the deposition of HYMAN B.
POLAKOFF; that a review of the transcript was
requested; and that the foregoing transcript, pages
1 through 57, is a true and complete record of my
stenographic notes.
I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel of any of the
parties, nor am I a relative or employee of any of
the parties' attorney or counsel connected with the
action, nor am I financially interested in the
action.
DATED this 1st day of October 2021, at Panama City,
Bay County, Florida.

_____
Stephanie R. Zeitvogel, FPR-C

```
                                               Page 57
 1   Please attach to the September 21, 2021 deposition of
     HYMAN B. POLAKOFF in the case of Dr. John A. Repicci, et
 2   al. v. Christopher Jarvis.
 3   INSTRUCTIONS:  Please read the transcript of your
     deposition and make note on this page of any changes.
 4   Do not mark on the transcript itself.  Please sign and
     date this sheet.
 5                     ERRATA SHEET
 6   PAGE  LINE  ERROR OR AMENDMENT              REASON
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20
     Under penalties of perjury, I declare that I have read
21   my deposition and that it is true and correct subject to
     any changes in form or substance entered here.
22
23   _____      _____
     DATE                  HYMAN B. POLAKOFF
24
25   REPORTER:  SRZ
```



800.211.DEPO (3376)
*EsquireSolutions.com*