UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DR. JOHN A. REPICCI and LORRAINE REPICCI, Individually, and JULIE STONE as Trustee of the JOHN A. REPICCI IRREVOCABLE LIFE INSURANCE TRUST and THE REPICCI IRREVOCABLE FAMILY TRUST,

    Plaintiffs,

v.

CHRISTOPHER R. JARVIS and OJM Group LLC,

    Defendants.

**AFFIDAVIT OF DEFENDANT CHRISTOPHER R. JARVIS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Case No.: 1:17-cv-132

---

STATE OF TEXAS  )
         ) ss.:
COUNTY OF TARRANT )

Christopher R. Jarvis, being duly sworn, deposes and says:

1. I am a defendant in this action and I have personal knowledge of the facts set forth herein. I submit this affidavit in support of the motion for summary judgment dismissing the remaining claim against me. As is set forth below, the facts clearly show that I did not breach any fiduciary duty towards the Plaintiffs.

**A. Background**

2. I received by bachelor of science in Mathematics from the University of Rhode Island in 1992 and my Masters in Business Administration in 1998. In or about 1997, I started a consulting firm called Jarvis & Mandell. That firm provided consulting services primarily to physicians in a variety of areas, including wealth management and insurance.

1

3.     In or about 2000, I received a telephone call from Plaintiff, Dr. John Repicci. Dr. Repicci was a very successful orthopedic surgeon in Buffalo, New York. He informed me that he had millions of dollars in retirement assets. Because of his significant net worth, he no longer needed these assets, so he asked if we could assist him in transferring these assets to his heirs without incurring income taxes or estate taxes.

4.     In particular, Dr. Repicci had individual retirement plans (the "IRAs") worth $4 million. At the time, the exemption for estate and gift taxes was $600,000 so most of the IRA would be subject to estate taxation upon his death. At this time, the marginal estate tax rate was 60%. In addition, all of the withdrawals from these accounts would also be subject to income taxes. In New York, the combined federal and state income tax rates were close to 50%. The plan that was agreed to by the plaintiff, his lawyers, a pension consultant, and his accountants, was to have the plaintiff create a new Profit Sharing Plan ("PSP) that would allow for the purchase of life insurance (IRAs are not allowed to purchase life insurance). I believe that the plaintiff's lawyer created a new legal entity to be the sponsor of the new PSP. Then, the plaintiff would transfer the funds IRA assets into the PSP. The PSP would then invest most, if not all, of its assets on two separate life insurance policies. Though these policies were purchased with $3,000,000 of pretax dollars, Dr. Repicci would later sell these policies to a trust for his heirs (which was not part of his estate for estate tax purposes) for considerably less than $500,000. By doing so, Dr. Repicci would remove $2,500,000 of value from his taxable estate and would eliminate taxable retirement plan withdrawals by the same amount. Dr. Repicci's estimated savings from such a plan was approximately $1 million in income taxes and $1 million in estate taxes.

2

## B. The Policies

5. We submitted Dr. and Mrs. Repicci for medical and financial underwriting with various insurance carriers. One of the carriers, Massachusetts Mutual Life Insurance Company of New York ("Mass Mutual"), was able to issue Plaintiffs a policy with an initial death benefit of $17.5 million. The policy illustrations contemplated a future reduction in death benefit. The ultimate death benefit for this particular product was guaranteed. As I was a career agent at Mass Mutual, with subsidized office space and various employee benefits based on sales of Mass Mutual products, I had every incentive to purchase as much insurance from Mass Mutual as possible. However, the underwriters would only offer $17.5 million in death benefit because of the prior health conditions of Dr. Repicci and his wife, Lorraine Repicci. This necessitated us going to another insurance carrier.

6. We ultimately went to Lincoln Life & Annuity Company of New York ("Lincoln") which offered a policy with $25 million in death benefit – in addition to the $17.5 million Mass Mutual was offering. However, the difference in this policy was that the death benefit was not guaranteed for more than 13 years. While the current assumptions used in the compliance approved illustrations in 2002 projected that the policy would last until the plaintiff turned 100 years of age, Lincoln would not guarantee it. This was made clear to Dr. Repicci and his accountant, Hy Polakoff at the time.

7. In an October 2002 letter to Hy Polakoff, Plaintiff's accountant (Exhibit "A"), I went through the fact that the Lincoln Policy was not guaranteed. I raised three future options in the event of future economic changes that would cause the policy to perform below the current assumptions, including: (a) reduce the death benefit; (b) do nothing if the changes only minimally

3

reduced the projected coverage period; (c) add more premium to the policy. Thus, adding more premium was always a possibility and the Plaintiffs knew this in 2002.

8. For the Lincoln policy, the Plaintiffs paid $600,000 in premium in both 2002 and 2003, but did not pay another $600,000 in 2004. This is significant as the plan was based on Plaintiffs paying $1.8 million in premium and not $1.2 million. The $600,000 shortfall, together with much lower interest rates changed the projections of the Lincoln Policy.

9. In 2003, the expectation was that in 2005 we could exchange the Lincoln Policy for a guaranteed product. However, in or about 2005, Lincoln changed its policy and that was no longer possible. Dr. Repicci was well aware of this and the annual statements that he received would show when the guaranteed provision in the Lincoln Policy was set to expire well before his 100th birthday. Upon information and belief (as I am no longer the broker of record) it is set to expire in or about November 2022 unless additional funds are put in.

10. In or about 2006, I had discussions with Dr. Repicci about the purchase of a second policy from Lincoln (referenced in the Complaint as the "144 Policy"). However, I did not sell that policy to Plaintiffs and from 2007 to 2011 the broker of record was David Mandell.

11. From 2007 to 2011 I had no contact with Dr. Repicci. For two of those years I was in a business dispute with my former partners and was prohibited from communicating with Dr. Repicci.

12. However, in August 2011, I was contacted by Plaintiffs' accountant, Hy Polakoff, and his attorney, Celia Clark. They asked me if I could assist with issues that arose with the 144 Policy. Initially I could not help because I was not the agent of record. However, in order to allow me to service this policy, the Plaintiffs appointed me agent of record in late 2011.

4

13. I was asked to see what would it take for the policy to last until Dr. Repicci was 100. I had projections run in October 2011 that showed a number of scenarios of adding premium to have the second policy last longer. I had numerous conversations with Mr. Polakoff and Ms. Clark about this. Notably, at no time was I asked to conduct a similar analysis of the first Lincoln Policy.

14. In January 2014, Dr. Repicci asked me about the status of the policies. In March 2014, I wrote Dr. Repicci and informed him that while the Mass Mutual policy was guaranteed, the Lincoln policies were not. I recommended that he put $50,000 in each policy for 5-6 years and we would then review. Dr. Repicci rejected this recommendation and I believe no premium was paid into these policies until 2020.

_____
Christopher R. Jarvis

Sworn to before me this 09TH
day of February 2022

_____
Notary Public

KAYLA ANN RODRIGUEZ
Notary Public, State of Texas
Comm. Expires 11-30-2025
Notary ID 133467103

5

# EXHIBIT A



**JARVIS & MANDELL LLC**
INTEGRATED PLANNING SOLUTIONS

1875 CENTURY PARK EAST, SUITE 1550
LOS ANGELES, CA 90067
TEL: (310) 407-2850
FAX: (310) 407-2801
WWW.JARVISANDMANDELL.COM

October 9, 2002

Hy Polakoff
Brock, Schechter & Polakoff, LLP
135 Delaware Avenue
Buffalo, NY 14202

Dear Hy:

Thanks for all of your help so far. We are still awaiting the financial information, including profit and loss statements for the businesses and verified values of some of his assets. If you can fax that information to us today at (310) 203-9240, that would be a big help.

I am also writing you to give an explanation of the different numbers in the illustrations that John is getting ready to sign. I spoke with John today and, even though I think he understands what we told him, I want to make sure that I get you copies of some of the supporting information. This way, you can review the situation and we can go over all of the possible outcomes.

First, each company uses three elements to the design its insurance illustrations:

- **Mortality Charges** (in layman terms, the term cost of the insurance)
- **Administrative Expenses** (they are allowed a reasonable profit margin)
- **Interest Credited** (the growth in the cash account value)

The combination of premiums paid, plus interest credited minus the mortality and administrative charges over the years impact the policy's cash. As long as there is $1 of cash in the account at the time of the second death, the policy is paid in full. If the client lives to be 100, then no further mortality charges are withdrawn, yet interest is still credited.

**Mortality Charges**
Companies have filed their mortality charges with the insurance department. If they change the mortality table, they need to document that and submit that with the insurance department. The insurance department will need to see a significant change in life expectancies to warrant such a change. Incidentally, Mass Mutual has NEVER increased its mortality charges in its 150 year history. In fact, they have actually reduced their mortality charges twice. The attached article confirms this. This should give John additional comfort.

Registered Representative of, and securities and services offered through MML Investors Services, Inc. 1875 Century Park East Suite 1550 Los Angeles, CA 90067 (310) 407-2850. Jarvis & Mandell, LLC has no affiliation with MML Investors Services, Inc. Christopher Jarvis' California Insurance License is License #0C24226

Repicci 000013

**Administrative Expenses**
As a former actuary who dealt with insurance departments, I can tell you that the insurance industry generally allows for a reasonable return and the insurance department monitors this number for every company every year. I know that companies can NOT arbitrarily decide to make a 20% rate of return. The insurance department would not allow it. For what it is worth, New York is the most protective (California is probably second most protective) insurance regulatory body when it comes to the customers.

**Interest Credited**
The third component of insurance policy calculation is the interest crediting rate. Mass Mutual guarantees its policyholders no less than 3% in any one year. At present, despite the stagnant economy and very low interest rates, they are crediting 6.70% per year on the policy that John and Lorraine are buying. Lincoln guarantees its policyholders no less than 4% in any one year and is currently crediting 5.85% in today's low interest rate environment.

I have also attached some documentation of what Mass Mutual and Lincoln have credited over the past 10-20 years on their products. Mass Mutual has never credited less than 5.50% and Lincoln has never credited less than 5.2%. This should give you and John a great deal of confidence that 3% and 4% returns for one year, let alone the entire life of the policy, are highly unlikely.

**Legal Disclosure**
In the *Guaranteed* portions of the illustrations, the insurance companies have to, by law, show what the highest possible mortality expenses and administrative expenses could be (under the law) AND they have to show the lowest interest crediting rate – even if the company has never credited that low. It is a "Worst-Case Scenario" illustration that shows the client what could happen if every element of the policy resulted in the worst possible results for the insured in EVERY year of the policy.

Practically, I believe that interest rates can't drop much further, so I would expect interest crediting rates to go up, not down, in the future. Further, if an insurance company gave its lowest guaranteed interest rate to its policyholders (this information is disclosed every year), they would have a very difficult time selling any product the following year because the competition would say "They gave 3% last year and we credited 6%. Which company do you think is stronger?" If Mass Mutual, for example, has never given less than 5.5% for any one year, how realistic is it that they will credit only 3% for 15 straight years?

Lastly, it would be impossible for 15 years of minimum crediting and maximum mortality charges to sneak up on us. We see what happens every year. John, Lorraine and I will know each and every year what their policy is being credited. If we see two or three bad years in a row, then we will address the problem immediately so no major problem arises for them or their children.

**Options**
If we noticed bad returns for a few years, we would look at a number of options:
 1.) Change insurance companies
 2.) Reduce the face amount of insurance to reduce mortality expenses. (However unlikely, even if the policy had to be reduced significantly to, for example, $7 million, the strategy would still be a windfall for John's family because the proceeds would pay out through the insurance trust income and estate tax-free, rather than be hit with BOTH sets of onerous taxes).
 3.) Calculate how much additional premium would have to be paid to continue with the $10+ million of death benefit to offset the bad years we had.
 4.) See how many years we are losing from 2 or 3 bad years. It is possible that 2 or 3 bad years only reduce the coverage to end at age 95. We can recalculate how we are doing every year. In fact, every annual policy statement shows you where you are relative to your initial purchase and projects what you might expect -- given the conditions at that time.

**Conclusion**
I understand why you and John were concerned with an illustration that shows the policies running out in 12-15 years. I am comfortable that the illustrations based on current assumptions that show John and Lorraine's policies lasting beyond Age 100, are a very accurate depiction of what is likely to happen to this policy. Further, in the unlikely event of minimum returns and maximum mortality and administrative expenses, there are options that can protect John and Lorraine's cash flow and their children's estate.

Please call me with any questions that you might have at (310) 407-2850. I am hoping to complete and pay for this policy by some time next week.

I appreciate all of your assistance.

Sincerely,

Christopher R. Jarvis, MBA

Repicci 000015