UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

DR. JOHN A. REPICCI and LORRAINE
REPICCI, Individually, and JULIE STONE
as Trustee of the JOHN A. REPICCI
IRREVOCABLE LIFE INSURANCE
TRUST and THE IRREVOCABLE
FAMILY TRUST,

        Plaintiffs,

vs.

CHRISTOPHER R. JARVIS, et al.,

   <u>      </u>Defendants.

**PLAINTIFFS' LOCAL RULE 56(A)(1)
STATEMENT IN OPPOSITION TO
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Case No.: 1:17-cv-00132-WMS-MJR

  Plaintiffs, through their counsel, MMG , as and for their Opposing Statement pursuant to Local Rule 56(a)(2) of the United States District Court for the Western District of New York alleges as follows (**Note**: Relevant citations to the Record regarding Plaintiffs' Responses are contained in The Statement of Facts, Section B, in Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment):

  1. Dr. John Repicci is a very successful orthopedic surgeon and the inventor of a non-invasive knee procedure. (Deposition of John Repicci dated July 26, 2021 at p. 6). The deposition transcript of Dr. John Repicci is annexed as Exhibit "A" to the Declaration of Matthew Tracy dated February 11, 2022 (the "Tracy Declaration").

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

  2. In 2002, Dr. Repicci was 66 years old and had a net worth of $20 million.  (Repicci Tr. p. 22 lines 5-16 ). He was interested in saving on taxes and leaving as much money to his heirs as

possible. (Repicci Tr. p. 19). Lorraine Repicci is his wife and handled the books for Dr. Repicci's medical practice. (Repicci Tr. p. 16). Julie Stone is his daughter and acted as office manager. (Deposition of Julie Stone, dated July 27, 2021 at p. 7, lines 1-10). The deposition transcript of Julie Stone is annexed as Exhibit "B" to the Tracy Declaration").

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

3. Dr. Repicci testified that he made all of the financial decisions for the practice. (Repicci Dep. p. 16, line 25- p. 17 line 1.).

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

4. Mr. Jarvis received his Bachelor of Science in Mathematics from the University of Rhode Island in 1992 and his Masters in Business Administration in 1998. In or about 1997, he started a consulting firm called Jarvis & Mandell. That firm provided consulting services primarily to physicians in a variety of areas, including wealth management and insurance. Affidavit of Christopher R. Jarvis, sworn to on February 9, 2022 (the "Jarvis Aff.") at ¶2.

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

**ADDITIONAL MATERIAL FACTS:  In furtherance of the business of Jarvis & Mandell, Mr. Jarvis authored a number of books and made appearances at physician or medical conferences.  Dr. Repicci heard Mr. Jarvis at one such conference and was impressed with him.**

5. In or about 2000, Mr. Jarvis received a telephone call from Plaintiff, Dr. John Repicci. Dr. Repicci was a very successful orthopedic surgeon in Buffalo, New York. He informed Mr. Jarvis that he had millions of dollars in retirement assets. Because of his significant net worth, he no

longer needed these assets, so he asked if Mr. Jarvis could assist him in transferring these assets to his heirs without incurring income taxes or estate taxes. Jarvis Aff. ¶3.

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

6. In particular, Dr. Repicci had individual retirement plans (the "IRAs") worth $4 million. At the time, the exemption for estate and gift taxes was $600,000 so most of the IRA would be subject to estate taxation upon his death. At this time, the marginal estate tax rate was 60%. In addition, all of the withdrawals from these accounts would also be subject to income taxes. In New York, the combined federal and state income tax rates were close to 50%. The plan that was agreed to by the plaintiff, his lawyers, a pension consultant, and his accountants, was to have the plaintiff create a new Profit Sharing Plan ("PSP) that would allow for the purchase of life insurance (IRAs are not allowed to purchase life insurance). Jarvis Aff. ¶4.

**PLAINTIFFS' RESPONSE:  Plaintiffs agree that the net worth of the IRAs was approximately $4 million.  Plaintiffs agree that there were significant tax rates in effect at the time but are not certain as to the specific rates.  This paragraph is misleading to the extent it implies that the wealth transfer plan was collaborative or jointly conceived and agreed upon.  The proposal was put forth by Mr. Jarvis, solely.   Once agreed to by Dr. Repicci, other parties assisted in implementing the plan as orchestrated by Mr. Jarvis.  The only insurance expert involved in the plan was Mr. Jarvis and his expertise was relied upon entirely.  Dr. Repicci had never purchased life insurance previously and neither Dr. Repicci nor Julie Stone have any insurance expertise.**

7. The IRA assets constituted approximately 20% of Dr. Repicci's overall net worth. (Repicci Tr. p. 22).

**PLAINTIFFS' RESPONSE: The factual statements of this paragraph are not disputed.**

8. The remaining 80% (i.e. $16 million) was controlled by Dr. Repicci and his advisers, accountant Hy Polakoff, attorney Celia Clark, as well as financial advisors at Merrill Lynch and Marine Midland Bank. Id.

**PLAINTIFFS' RESPONSE: The remaining approximate $16 million was comprised of approximately $3 million in real estate and $13 million in two accounts at Merrill Lynch and Marine Midland Bank. Dr. Repicci's advisors Hy Polakoff and Celia Clark did not have any control over these assets.**

9. Dr. Repicci's lawyer created a new legal entity to be the sponsor of the new PSP. Then, Dr. Repicci transferred the IRA assets into the PSP. The PSP would then invest most, if not all, of its assets on two separate life insurance policies. Though these policies were purchased with $3,000,000 of pretax dollars, Dr. Repicci would later sell these policies to a trust for his heirs (which was not part of his estate for estate tax purposes) for considerably less than $500,000. By doing so, Dr. Repicci would remove $2,500,000 of value from his taxable estate and would eliminate taxable retirement plan withdrawals by the same amount. Dr. Repicci's estimated savings from such a plan was approximately $1 million in income taxes and $1 million in estate taxes. Jarvis Aff. ¶¶4-5.

**PLAINTIFFS' RESPONSE: The factual statements of this paragraph are generally not disputed although Plaintiffs are uncertain of the exact estimated savings.**

10. Mr. Jarvis submitted Dr. and Mrs. Repicci for medical and financial underwriting with various insurance carriers. One of the carriers, Massachusetts Mutual Life Insurance Company of New York ("Mass Mutual"), was able to issue Plaintiffs a policy with an initial death benefit of $17.5 million. The policy illustrations contemplated a future reduction in death benefit.  The ultimate death benefit for this particular product was guaranteed. Jarvis Aff. ¶6.

**PLAINTIFFS' RESPONSE:  The factual statements of this paragraph are not disputed.**

11. As Mr. Jarvis was a career agent at Mass Mutual, with subsidized office space and various employee benefits based on sales of Mass Mutual products, he had every incentive to purchase as much insurance from Mass Mutual as possible. However, the underwriters would only offer $17.5 million in death benefit because of the prior health conditions of Dr. Repicci and his wife, Lorraine Repicci. This necessitated them going to another insurance carrier. Jarvis Aff. ¶7.

**PLAINTIFFS' RESPONSE:  There is no documentary evidence that this was the case.**

12. They ultimately went to Lincoln Life & Annuity Company of New York ("Lincoln") which offered a policy with $25 million in death benefit – in addition to the $17.5 million Mass Mutual was offering. However, the difference in this policy was that the death benefit was not guaranteed for more than 13 years. While the current assumptions used in the compliance approved illustrations in 2002 projected that the policy would last until the plaintiff turned 100 years of age, Lincoln would not guarantee it. This was made clear to Dr. Repicci and his accountant, Hy Polakoff at the time. Jarvis Aff. ¶6.

**PLAINTIFFS' RESPONSE:  This paragraph is misleading to the extent it suggests the risks of the non-guaranteed policy were made clear to Dr. Repicci and Hy Polakoff.  In**

**numerous conversations and in correspondence in the Fall of 2002 Mr. Jarvis repeatedly assured Dr. Repicci that the policies (both the Mass Mutual and the Lincoln) were "GUARANTEED".  Mr. Jarvis has admitted that he understood it was critical to Dr. Repicci that any insurance be guaranteed to age 100.  After reviewing the policies, Dr. Repicci and Mr. Polakoff noted the illustration which showed a possible lapse of coverage after a period of years and they questioned Mr. Jarvis about this.  In response, by letter dated October 9, 2002, Mr. Jarvis acknowledged that the Lincoln policy was not "legally" guaranteed but he continued to assure Dr. Repicci that there was effectively no risk with the policy.  In that letter he also made the affirmative representation that he would review the annual statements each year and that if any issues arose, they would be taken care of.  Mr. Jarvis has admitted that he did not do a formal annual review of status of the policy.  In fact, there is no documentation that he ever informed Plaintiffs of any issues with the Lincoln policy even though he continued to make additional wealth or estate planning proposals to Dr. Repicci.  It wasn't until 2014 and later, after inquiry by Dr. Repicci, that Mr. Jarvis acknowledged there was a problem with the Lincoln policy and that he was trying to "fix" the problem.  Mr. Jarvis has acknowledged that his commission on the Lincoln policy might have been more than $300,000.  It may have been more than $400,000.**

13. In an October 9, 2002 letter to Hy Polakoff, Plaintiff's accountant (annexed as Exhibit "A" to the Jarvis Aff.), Mr. Jarvis went through the fact that the Lincoln Policy was not guaranteed. He raised three future options in the event of future economic changes that would cause the policy to perform below the current assumptions, including: (a) reduce the death benefit; (b) do nothing if the changes only minimally reduced the projected coverage period; (c)

add more premium to the policy. Thus, adding more premium was always a possibility and the Plaintiffs knew this in 2002. Jarvis Aff. ¶7.

**PLAINTIFFS' RESPONSE:  See Response to Paragraph 12, above.**

14. For the Lincoln policy, the Plaintiffs paid $600,000 in premium in both 2002 and 2003, but did not pay another $600,000 in 2004. This is significant as the plan was based on Plaintiffs paying $1.8 million in premium and not $1.2 million. The $600,000 shortfall, together with much lower interest rates changed the projections of the Lincoln Policy. Jarvis Aff. ¶8.

**PLAINTIFFS' RESPONSE:  Mr. Jarvis never advised that the lesser payment was a problem or would ever become a problem.**

**The Defendant's statement is also misleading.  The original projections were mased on paying three $600,000 premiums.  Two payments were made; however, the three premiums were supposed to carry a policy of $10 million.  Thus, two premiums were supposed to carry $6,666,667 in death benefit.  The policy was reduced to $4,595,908, considerably less than the $6.67 million intended.  Thus, it is incorrect to conclude that the policy performed worse than projected because only two premiums totaling $1.2 million were paid. (see Exhibit "P", Section 6.2 appended to the Affirmation of Ricard A. Moore, sworn to April 18, 2022)**

15. In 2003, the expectation was that in 2005 they could exchange the Lincoln Policy for a guaranteed product. However, in or about 2005, Lincoln changed its policy and that was no longer possible. Dr. Repicci was well aware of this and the annual statements that he received (Annexed as Exhibit "D" to the Tracy Declaration) would show when the guaranteed provision in the Lincoln Policy was set to expire well before his 100th birthday. Upon information and

belief, it is set to expire in or about November 2022 unless additional funds are put in. Jarvis Aff. ¶9.

**PLAINTIFFS' RESPONSE: In both 2002 and 2003 Mr. Jarvis identified guaranteed Lincoln policies that he assured Dr. Repicci could be internally exchanged for the non-guaranteed policy he sold Dr. Repicci. The internal exchange never took place. Mr. Jarvis now asserts that the exchange did not take place because Lincoln changed its policy but there is no documentation to support this assertion. Moreover, even if Mr. Jarvis is correct and Lincoln no longer offered such policies in 2005, there is no explanation of why the exchange did not occur at an earlier date. The policies were transferred or "sold" into the trust well before 2005. An exchange could have been done then.**

**Mr. Jarvis' assertion that Dr. Repicci was "well aware" of the status of the policies is false.**

**There is a possibility that the exchange did not occur at an earlier date because Mr. Jarvis' commission may have been subject to a chargeback (paid back to the insurance company) if the exchange took place before the end of a two-year period. This was Lincoln's chargeback policy in 2014 and Mr. Jarvis has acknowledged that it may have been the policy at the time of the anticipated internal exchange. While Mr. Jarvis would still have earned a commission on the new policy exchanged for, the commission would likely have been significantly less due to greatly diminished face value of the new policy.**

**Plaintiffs agree that the policy is scheduled to lapse in November 2022 unless additional premiums are paid.**

16. In or about 2006, Mr. Jarvis had discussions with Dr. Repicci about the purchase of a second policy from Lincoln (referenced in the Complaint as the "144 Policy"). However, Mr. Jarvis did not sell that policy to Plaintiffs and from 2007 to 2011 the broker of record was David Mandell. Jarvis Aff. ¶10. Furthermore, Mr. Jarvis received no compensation in connection with the Plaintiffs other than commissions.

**PLAINTIFFS' RESPONSE: The factual statements of this paragraph are not disputed for the purposes of the current motion.**

17. From 2007 to 2011, Mr. Jarvis had no contact with Dr. Repicci. For two of those years, Mr. Jarvis was in a business dispute with my former partners and was prohibited from communicating with Dr. Repicci. Jarvis Aff. ¶11.

**PLAINTIFFS' RESPONSE: Plaintiffs have no knowledge with regard to the alleged business dispute. Plaintiffs are uncertain as to the amount of any contact with Mr. Jarvis during this period.**

18. However, in August 2011, Mr. Jarvis was contacted by Plaintiffs' accountant, Hy Polakoff, and his attorney, Celia Clark. They asked Mr. Jarvis for assistance with issues that arose with the 144 Policy. Initially Mr. Jarvis could not help because he was not the agent of record. However, in order to allow him to service this policy, the Plaintiffs appointed him agent of record in late 2011. Jarvis ¶11.

**PLAINTIFFS' RESPONSE: The factual statements of this paragraph are not disputed for the purposes of the current motion.**

19. Mr. Jarvis was asked to see what would it take for the 144 Policy to last until Dr. Repicci was 100. Mr. Jarvis had projections run in October 2011 that showed a number of

scenarios of adding premium to have the second policy last longer. (A copy of such communications are annexed to the Tracy Declaration as Exhibit "E"). Mr. Jarvis had numerous conversations with Mr. Polakoff and Ms. Clark about this. Notably, at no time was Mr. Jarvis asked to conduct a similar analysis of the first Lincoln Policy. Jarvis ¶12.

**PLAINTIFFS' RESPONSE: The factual statements regarding the 144 Policy are not disputed for the purposes of the current motion. Plaintiffs dispute any inference suggested with regard to the first Lincoln Policy.**

20. In January 2014, Dr. Repicci asked Mr. Jarvis about the status of the policies. A copy of the letter is attached to the Tracy Declaration as Exhibit "F". In March 2014, Mr. Jarvis wrote Dr. Repicci and informed him that while the Mass Mutual policy was guaranteed, the Lincoln policies were not. Mr. Jarvis recommended that Dr. Repicci put $50,000 in each policy for 5-6 years and they would then review. A copy of the March 2014 communication is attached to the Tracy Declaration as Exhibit "G". Dr. Repicci rejected this recommendation, and no premium was paid into these policies until 2020.

**PLAINTIFFS' RESPONSE: The correspondence referenced in this paragraph is not disputed. The correspondence of March 2014 was the first time Plaintiffs were advised that the Policy was at risk. Plaintiffs note that the recommendation proposed did not provide for coverage to age 95 or above. There was no certainty provided or true explanation of the problem.**

Dated: Buffalo, New York
April 18, 2022

        MAGAVERN MAGAVERN GRIMM LLP

        By: s/ Richard A. Moore
            Richard A. Moore, Esq.
            1100 Rand Building, 14 Lafayette Square
            Buffalo, New York  14203
            Phone: 716-856-3500
            Fax:    716-856-3390
            Email: rmoore@magavern.com
            Counsel for Plaintiffs

\\18162.0001\1028277