# EXHIBIT M

**Page 1**

```
                VIDEO TELECONFERENCE DEPOSITION
                    CHRISTOPHER RAYMOND JARVIS


           UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NEW YORK

           ----------------------------------------
           DR. JOHN A. REPICCI, LORRAINE REPICCI,
           Individually and JULIE STONE as Trustee
           of THE JOHN A. REPICCI IRREVOCABLE LIFE
           INSURANCE TRUST AND THE REPICCI IRREVOCABLE
           FAMILY TRUST,

                            Plaintiffs,

                    - vs -     Index Number
                               17-CV-132-WMS-MJR

           CHRISTOPHER R. JARVIS and
           OJM GROUP, LLC,

                            Defendants.
           ----------------------------------------


              Video teleconference deposition of
           CHRISTOPHER RAYMOND JARVIS, Defendant, present at
           2350 Global Drive, DFW Airport, Texas, taken
           pursuant to the Federal Rules of Civil Procedure,
           connecting to various locations on October 7, 2021,
           commencing at 10:20 a.m., before DANIELLE M.
           FETZER, Notary Public.



                    JACK W. HUNT & ASSOCIATES, INC.
```

**Page 2**

```
 1   APPEARANCES:   MAGAVERN MAGAVERN GRIMM LLP,
                     By RICHARD A. MOORE, ESQ.,
 2                   1100 Rand Building,
                     14 Lafayette Square,
 3                   Buffalo, New York  14203,
                     (716) 856-3500,
 4                   rmoore@magavern.com,
                     Appearing for the Plaintiffs,
 5                   via Zoom.

 6                   WINGET SPADAFORA SCHWARTZBERG,
                     By MATTHEW TRACY, ESQ.,
 7                   45 Broadway, 32nd Floor,
                     New York, New York  10006,
 8                   (212) 221-6900,
                     tracy.m@wssllp.com,
 9                   Appearing for the Defendant,
                     Christopher R. Jarvis,
10                   via Zoom.

11   PRESENT
     VIA ZOOM:       CASEY REVKIN,
12                   Principal of Policy Guard, LLC

13
14
15
16
17
18
19
20
21
22
23
```

**Page 3**

10:19:49  1    THE REPORTER:  Counsel, because the witness
2    is not physically in my presence, pursuant to NY
3    CPLR 3113(d), do you stipulate that I can swear in
4    the witness remotely?
5        In addition, can counsel representing the
10:20:20  6    witness confirm the identity of the witness?
10:20:20  7    MR. TRACY:  Yes, and I want to identify the
10:20:25  8    identity of the witness here as Christopher Jarvis.
10:20:29  9    THE REPORTER:  Thank you.  And are there any
10:20:33 10    stipulations?
10:20:35 11    MR. TRACY:  Just usual.
10:20:35 12    MR. MOORE:  Usual.
13
14    CHRISTOPHER RAYMOND JARVIS, 289 Pine Drive,
15    Southlake, Texas  76092, pursuant to NY CPLR
16    3113(d), was duly called and sworn after
17    stipulation by counsel, testified via video
10:21:57 18    conference as follows:
19              EXAMINATION
20    BY MR. MOORE:
10:22:02 21    Q.  Mr. Jarvis, my name is Richard Moore;
10:22:05 22    I'm counsel for the plaintiffs in this matter.  I'm
10:22:09 23    counsel for Magavern, Magavern & Grimm in Buffalo.

**Page 4**

10:22:12  1        Let me ask you this:  Have you ever been
10:22:14  2    deposed before?
10:22:14  3    A.  I have.
10:22:14  4    Q.  Okay.  And how many times would you
10:22:17  5    say, approximately?
10:22:17  6    A.  Two or three.
10:22:19  7    Q.  Okay.  So I'm not going to go into
10:22:24  8    detail, but I would just ask that if you don't
10:22:26  9    understand any of my questions, please stop me and
10:22:29 10    make sure you do understand what I'm asking.
10:22:33 11        If -- I would appreciate if you could speak
10:22:38 12    clearly in terms of yeses or nos instead of nods or
10:22:42 13    other manners.  And, again, the important thing is
10:22:46 14    if you don't understand a question, let me know.
10:22:48 15        If you need to take a break for any reason
10:22:52 16    whatsoever, please let me know and we'll take a
17    break.
10:22:52 18        Do you have any questions at all for me?
10:22:53 19    A.  I do not.
10:22:54 20    Q.  Okay.  Very good.  Can you just give us
10:23:00 21    briefly your educational background?
10:23:01 22    A.  Educational background, I have a
10:23:04 23    bachelor's of science in applied mathematics from

5

| | |
|---|---|
| 10:23:08 | 1   the University of Rhode Island and I have a |
| 10:23:11 | 2   master's in business administration from UCLA. |
| 10:23:15 | 3   That's my educational ... |
| 10:23:17 | 4       Q.   Okay.  And can you give me your work |
| 10:23:21 | 5   experience subsequent to college? |
| 10:23:23 | 6       A.   After college? |
| 10:23:24 | 7       Q.   Since your master's. |
| 10:23:26 | 8       A.   Since the master's, started a company, |
| 10:23:29 | 9   Guardian Publishing.  While I was in business |
| 10:23:33 | 10  school, started a firm called Jarvis & Mandell, |
| 10:23:39 | 11  M-A-N-D-E-L-L, which was a consulting firm. |
| 10:23:43 | 12      Q.   Can you tell us what type of consulting |
| 10:23:46 | 13  firm? |
| 10:23:46 | 14      A.   Sure.  Consulting, we did financial |
| 10:23:48 | 15  consulting, business consulting for a variety of |
| 10:23:52 | 16  clients, predominantly physicians.  We subsequently |
| 10:23:59 | 17  merged with another gentleman who started a firm, |
| 10:24:05 | 18  OJM, OJM Group, in 2007. |
| 10:24:11 | 19      I left there 2010, early -- end of 2009, |
| 10:24:17 | 20  maybe, started -- two years off, started a new firm |
| 10:24:22 | 21  in 2011, which was Jade, J-A-D-E, Risk, sold that |
| 10:24:30 | 22  firm in 2016, and I've been working independently |
| 10:24:38 | 23  since 2017. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

6

| | |
|---|---|
| 10:24:39 | 1       Q.   Could you tell me what time you started |
| 10:24:44 | 2   Jarvis & Mandell? |
| 10:24:45 | 3       A.   Jarvis & Mandell started somewhere in |
| 10:24:49 | 4   1997. |
| 10:24:53 | 5       Q.   And OJM Group, can you tell me what |
| 10:24:56 | 6   type of business that was? |
| 10:24:59 | 7       A.   OJM Group was -- they're still |
| 10:25:03 | 8   operating -- a registered investment advisory firm |
| 10:25:06 | 9   specializing in financial solutions for physicians, |
| 10:25:16 | 10  not exclusively, but specializing in, headquartered |
| 10:25:22 | 11  in Cincinnati. |
| 10:25:25 | 12      Q.   And can you tell me what the -- what |
| 10:25:31 | 13  was Jade Risk's involvement? |
| 10:25:32 | 14      A.   Jade Risk was a licensed insurance |
| 10:25:35 | 15  agency and it also did Captive Management, so it |
| 10:25:39 | 16  provided Captive, C-A-P-T-I-V-E, Management |
| 10:25:43 | 17  solutions for small insurance companies. |
| 10:25:48 | 18      Q.   Do you have any certifications beyond |
| 10:25:53 | 19  your MBA? |
| 10:25:56 | 20      A.   Yes, I have active insurance licenses |
| 10:26:01 | 21  in multiple states and I'm a certified financial |
| 10:26:09 | 22  planner, certificant, which is the proper language, |
| 10:26:11 | 23  and I received that in 2011. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

7

| | |
|---|---|
| 10:26:15 | 1       Q.   The -- did you -- my understanding is |
| 10:26:22 | 2   you had published quite a few publications.  Can |
| 10:26:29 | 3   you -- let me show you what's been marked as |
| 10:26:32 | 4   Exhibit 1, and if you can identify on Exhibit 1 any |
| 10:26:42 | 5   of the publications in which you are the author or |
| 10:26:46 | 6   co-author of? |
| 10:26:46 | 7       A.   Sure.  Wealth Secrets of the Affluent; |
| 10:26:51 | 8   Doctor's Wealth Protection Guide; For California |
| 10:26:57 | 9   Doctors; For New York Doctors; For Ohio Doctors; |
| 10:27:03 | 10  The Physician's Money Manual; Wealth Protection; |
| 10:27:13 | 11  Wealth Protection MD; For Doctors Only; Managing |
| 10:27:20 | 12  Risk, and there's a handful of others, too. |
| 10:27:24 | 13      Q.   Okay.  Would you be able to provide us |
| 10:27:27 | 14  with a list of all your publications at some point? |
| 10:27:31 | 15      A.   I can now if you'd like. |
| 10:27:32 | 16      Q.   Sure. |
| 10:27:33 | 17      A.   So the ones that are missing are For |
| 10:27:35 | 18  Georgia Doctors, there's Giraffe Money, 6 Secrets |
| 10:27:48 | 19  to Leveraging Success. |
| 10:27:50 | 20      Q.   Okay. |
| 10:27:50 | 21      A.   Risk Management For the Practicing |
| 10:27:52 | 22  Physician.  How many do you have now?  Oh, and |
| 10:27:59 | 23  Mastering the Art of Success. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

8

| | |
|---|---|
| 10:28:02 | 1       Q.   And can you tell which of these books |
| 10:28:05 | 2   were published prior to 2006? |
| 10:28:08 | 3       A.   Prior to 2006, The Doctor's Wealth |
| 10:28:14 | 4   Protection Guide; the four state books, California |
| 10:28:19 | 5   Doctors; For Ohio; For New York, and for Georgia |
| 10:28:23 | 6   Doctors were all before 2006. |
| 10:28:25 | 7       Wealth Protection and Wealth -- Wealth |
| 10:28:33 | 8   Protection definitely was -- let's see -- that was |
| 10:28:36 | 9   2002, Wealth Protection MD.  I think that's it. |
| 10:28:47 | 10      Q.   And of all these books published prior |
| 10:28:52 | 11  to 2006, the ones you've listed, were you involved |
| 10:28:58 | 12  in Jarvis & Mandell during the time in which you |
| 10:29:01 | 13  published each of these? |
| 10:29:03 | 14      A.   Yes. |
| 10:29:03 | 15      Q.   Okay.  And were those -- were those |
| 10:29:05 | 16  publications used directly for the purposes of the |
| 10:29:09 | 17  business Jarvis & Mandell? |
| 10:29:12 | 18      A.   Can you be more specific? |
| 10:29:14 | 19      Q.   Yes.  Let's -- were those -- did you |
| 10:29:16 | 20  have any business activities independent of |
| 10:29:20 | 21  Jarvis & Mandell once you formed that entity? |
| 10:29:37 | 22      A.   Yes.  So Guardian Publishing, so we |
| 10:29:43 | 23  wrote public books and Guardian would also promote |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

9

10:29:49 1 us as speakers to conferences and we wouldn't seek
10:29:52 2 speaking fees or other ...
10:29:53 3 Q. When you -- can you tell me a little
10:29:55 4 bit more about Guardian Publishing?  Were you an
10:29:58 5 owner?
10:29:59 6 A. I was.
10:29:59 7 Q. Okay.  And were there any other owners?
10:30:02 8 A. David Mandell.
10:30:03 9 Q. Okay.  And so can you explain to me in
10:30:06 10 more detail what Guardian Publishing did as opposed
10:30:11 11 to what Jarvis & Mandell did?
10:30:11 12 A. So Guardian Publishing would publish
10:30:14 13 books, promote outside speakers, the two authors
10:30:19 14 and partners as speakers, so we'd receive royalties
10:30:24 15 on books, we would receive speaking fees on
10:30:28 16 variance.
10:30:28 17 So separation between the two entities was
10:30:31 18 Guardian did writing, speaking, and handle
10:30:38 19 educational-type services, and Jarvis & Mandell
10:30:41 20 provided consulting.
10:30:42 21 Q. And that would be financial consulting
10:30:45 22 services, correct?
10:30:46 23 A. Yes.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

10

10:30:46 1 Q. Okay.  Now, do I understand that during
10:30:52 2 the period that you were working with Jarvis &
10:30:56 3 Mandell that you were involved in speaking --
10:31:02 4 speaking tours with Jarvis & Mandell, with those
10:31:08 5 tours or those engagements, was that primarily
10:31:09 6 focused on physicians?
10:31:10 7 A. Primarily, yes.
10:31:11 8 Q. Okay.  And can you tell me what the
10:31:13 9 nature of those -- what those events were?
10:31:19 10 A. So probably spoke at 100 medical
10:31:24 11 societies and hospitals over a 10 to 15-year
10:31:27 12 period -- 10 to 12-year period.  Topics would vary
10:31:35 13 based on what the medical societies and their
10:31:37 14 members were interested in.  So it could be asset
10:31:40 15 protection, it could be the physician as a business
10:31:42 16 owner, it could be anything financial or legal
10:31:47 17 related that they thought was interesting.
10:31:50 18 Q. And if I understand you, the point of
10:31:53 19 that was to incur business with Jarvis & Mandell in
10:31:56 20 providing financial consulting services?
10:31:58 21 A. When you're working with medical
10:32:04 22 societies, you have pharmaceutical companies
10:32:08 23 sponsoring you to teach.  There's a great deal of

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

11

10:32:09 1 conflicts that you have to manage and they were
10:32:11 2 very much not about promoting what we did.
10:32:12 3 So we did it as an educational thing, which
10:32:16 4 built credibility.  People in the audience would
10:32:18 5 often call us.
10:32:19 6 So we did get clients out of it for sure,
10:32:21 7 but the goal -- Guardian wanted to get paid for us
10:32:25 8 to speak as an educational thing, but clients
10:32:27 9 certainly came out of it.  So ...
10:32:28 10 BY MR. MOORE:
10:32:28 11 Q. Did you ever encourage clients to
10:32:31 12 contact you -- potential clients to contact you?
10:32:33 13 A. We would invite people to.  So ...
10:32:36 14 Q. Can you tell us how you first came in
10:32:42 15 contact with Dr. Repicci, the plaintiff?
10:32:44 16 A. I was in our offices in Westwood, which
10:32:48 17 was my apartment at the time, the phone rang, and I
10:32:51 18 remember the conversation pretty well.
10:32:54 19 I picked up the phone, gentleman asked to
10:33:00 20 speak to David Mandell or Chris Jarvis.  I said
10:33:03 21 speaking.
10:33:04 22 He said, I'm John Repicci, I'm an orthopedic
10:33:07 23 surgeon in Buffalo, New York, and he said something

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

12

10:33:10 1 very funny, like I'm a fool, or I'm an idiot, or
10:33:13 2 something very playful and silly, but negative.
10:33:16 3 And I said, John, nice to meet you, I'm sure
10:33:21 4 you're neither of those things, but why do you
10:33:21 5 think that?
10:33:23 6 And John's response was:  I read an article
10:33:27 7 about you three or four years ago in a medical
10:33:30 8 journal, and then I went around for three years
10:33:33 9 trying to find people to help me solve the problem
10:33:35 10 that you presented in the article, and then I just
10:33:37 11 recently saw your name again and thought, good God,
10:33:40 12 why don't I just call the guy who wrote the article
10:33:43 13 instead of wasting years trying to do the things
10:33:43 14 that you told me to -- that I read and thought was
10:33:43 15 a good solution.
10:33:49 16 So that was the first of well over 100 phone
10:33:53 17 calls that I've had with John over the years, and
10:33:56 18 it started rather playfully and fun until very
10:34:00 19 recently all the conversations weren't.
10:34:01 20 Q. All right.  Do you recall him attending
10:34:02 21 any of your events or conferences?
10:34:05 22 A. No, John and I -- John -- as far as I
10:34:09 23 know, John has never seen me speak or attended a

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

13

10:34:15  1  conference that I spoke.
10:34:17  2      I didn't meet John until, gosh, five,
10:34:20  3  seven years after we started working together.  He
10:34:22  4  was out in California for a conference, and he was
10:34:23  5  also seeing his son Tom at the time, I think, who
10:34:26  6  lived there, and we met for lunch, but we hadn't --
10:34:32  7  he may have met Dave Mandell, my partner, at some
10:34:32  8  point, but we worked together without having met in
10:34:37  9  person.
10:34:37  10     Q.    At any point do you recall sending him
10:34:40  11 one of your publications or handing him one of your
10:34:43  12 publications?
10:34:44  13     A.    I don't remember handing him one, but
10:34:47  14 would I have sent him a copy?  Very possibly.  He
10:34:51  15 may have bought one.  I don't remember.
10:34:52  16     Q.    Do you have any more specific
10:34:54  17 recollection of that?  Do you recall if you did
10:34:58  18 present him in any way with it?
10:35:00  19     A.    I do not recall.
10:35:00  20     Q.    Okay.  And what -- and the conversation
10:35:09  21 you had with Dr. Repicci, did that lead to any kind
10:35:18  22 of business engagement?
10:35:19  23     A.    We definitely worked together on a

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

14

10:35:22  1  number of things, whether we had an engagement --
10:35:27  2  stated engagement, we may have had one, I honestly
10:35:31  3  don't remember if it was something.
10:35:32  4      Q.    Do you recall if you did any financial
10:35:35  5  consulting or planning with Dr. Repicci?
10:35:37  6      A.    I definitely -- definitely did.
10:35:38  7      MR. TRACY:  Object to the form.
10:35:39  8      THE WITNESS:  I do remember talking to John
10:35:41  9  about financial insurance, tax matters.  I do
10:35:44  10 remember working with Nick, Hy Polakoff, Celia
10:35:48  11 Clark, Dave Mandell, DeMatteo, and I do -- I did
10:35:51  12 get involved in selling insurance to John and Lori
10:35:54  13 and working with Julie.
10:35:55  14     So we absolutely had a relationship that
10:35:58  15 involved financial products, and that was working
10:36:00  16 together over the years.
10:36:01  17     BY MR. MOORE:
10:36:03  18     Q.    Okay.  Let me show you what's been
10:36:05  19 marked as Plaintiff's Exhibit Number 2.  Please
10:36:19  20 review the document, if you could.
10:36:53  21     A.    I read the letter.
10:36:55  22     Q.    Okay.  And you're familiar with that?
10:36:56  23     A.    Yes.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

15

10:36:56  1      Q.    Okay.  And can you tell -- briefly
10:37:00  2  describe what this letter is about.
10:37:03  3      A.    We had been working together for a
10:37:05  4  while, a great deal of phone calls with him, with
10:37:22  5  Hy Polakoff, his accountant at the time, and may
10:37:26  6  have involved an attorney in New York, Celia,
10:37:29  7  C-E-L-I-A, Clark, C-L-A-R-K, and David Mandell, and
10:37:33  8  we had been talking about ways to -- alternative
10:37:41  9  ways to invest his retirement funds that would
10:37:43  10 reduce taxes on his death.
10:37:46  11     John had hired us, asked us to help him with
10:37:50  12 money in his retirement plan.  As he put it, he was
10:37:54  13 an orthopedic surgeon making seven figures, doing
10:37:57  14 very well, plus he had invented the Repicci knee,
10:38:04  15 had made millions of dollars in patent income.
10:38:07  16     He lived in Buffalo, which was a very
10:38:09  17 inexpensive place to live, and as a result, he had
10:38:11  18 plenty of money.  He wasn't going to need this
10:38:12  19 money to live, he wanted to leave it to kids and
10:38:15  20 future grandkids, and if there was a way to reduce
10:38:21  21 the taxes on that money, he was interested.
10:38:22  22     So he asked us to look into ways to reduce
10:38:24  23 the tax on his retirement plan, and we talked about

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

16

10:38:27  1  that dozens of times.
10:38:29  2      And so this is the letter talking about what
10:38:33  3  we're trying to accomplish and giving him an update
10:38:37  4  as to how far the underwriting -- the solution that
10:38:40  5  we presented involved insurance and we were giving
10:38:45  6  him an update as to the underwriting, which had
10:38:50  7  taken a while and was a little bit difficult.
10:38:51  8      Q.    Okay.  Let me show you what's been
10:38:56  9  marked as Plaintiff's Exhibit Number 3.  Are you
10:39:04  10 familiar with this?
10:39:06  11     A.    I am.
10:39:07  12     Q.    Do these documents provide further
10:39:12  13 explanation of the plan that you just discussed?
10:39:14  14     A.    Yes.
10:39:14  15     Q.    And very -- in as simplistic of terms
10:39:21  16 as possible, can you explain how -- what the plan
10:39:24  17 was and how it worked?
10:39:25  18     A.    Sure.  John had $4 million in his
10:39:28  19 retirement plan -- in his retirement accounts, and
10:39:34  20 that money was going to be taxed.  It was going to
10:39:38  21 be taxed for state taxes and for income taxes when
10:39:42  22 he left it to his kids.
10:39:44  23     So at the time, the exemption amount for a

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

**17**

10:39:46  1    family was only $600,000, I think.  Today, it's
10:39:49  2    11 million per person.
10:39:50  3          So John didn't need the money, he wanted to
10:39:53  4    give it to his kids.  He didn't like the idea of
10:39:57  5    losing 80 percent of it to tax.
10:39:59  6          So at the time, life insurance policies
10:40:01  7    purchased in a retirement plan could be purchased
10:40:05  8    with pre-tax dollars.  They could subsequently be
10:40:08  9    distributed or purchased.
10:40:09  10         And what John was excited about was the fact
10:40:13  11   that when cash leaves a retirement plan, it's taxed
10:40:16  12   for what it is.  If you take $1 million out, it
10:40:18  13   taxes $1 million, but if you were to distribute a
10:40:22  14   life insurance policy out of the retirement plan,
10:40:22  15   the valuation for tax purposes is significantly
10:40:25  16   less.
10:40:26  17         At the time, it was -- we were drifting
10:40:28  18   around 40 percent.  So this idea was let's
10:40:34  19   recharacterize the assets inside your retirement
10:40:37  20   accounts to give or remove them, and save taxes on
10:40:41  21   60 percent of your $4 million.
10:40:43  22         So this plan was how do we take money you
10:40:46  23   don't need, eliminate tax, unnecessary tax, and

**18**

10:40:50  1    leave a substantial amount more to your kids than
10:40:53  2    if you just let it grow in your IRA.
10:40:56  3          Q.   Would you describe this as a reasonably
10:41:14  4    sophisticated plan?
10:41:15  5          A.   Relative to what, I guess?  That's
10:41:19  6    the --
10:41:19  7          Q.   Well, let me put it this way:  Is this
10:41:24  8    the sort of thing that you could walk into an
10:41:27  9    insurance brokerage anywhere in the country and
10:41:30  10   expect the same type of plan?
10:41:31  11         A.   Could I expect any insurance agent to
10:41:36  12   know how to do this well?  No, because we're
10:41:41  13   talking about people with substantial amounts of
10:41:45  14   money in their retirement plans and it's money they
10:41:49  15   don't need, and certainly the majority of people in
10:41:52  16   America don't have money far beyond what they need
10:41:53  17   to live on.
10:41:54  18         So I don't know, 1 percent, one-tenth of
10:41:58  19   1 percent of people actually need to do this.  So I
10:42:01  20   would not expect the average insurance agent to
10:42:05  21   know how to do this.
10:42:05  22         Q.   As I understand, at one point in the
10:42:09  23   plan -- strike that.

**19**

10:42:13  1          Looking at this exhibit, the first page of
10:42:16  2    it, Bates number 21, it mentions the IRA at the top
10:42:24  3    and then it mentions two life insurance policies,
10:42:27  4    one being MassMutual, 17,500,000 or I believe --
10:42:33  5          A.   The second one is --
10:42:34  6          Q.   17,500,000?
10:42:37  7          A.   Yes.
10:42:37  8          Q.   And then a Lincoln Life policy of
10:42:40  9    25 million?
10:42:40  10         A.   Correct.
10:42:41  11         Q.   Were those the face values originally
10:42:44  12   purchased for each of those insurances?
10:42:44  13         A.   Those were the original death benefit
10:42:47  14   amounts of those two policies, correct.
10:42:49  15         Q.   Okay.  And at some point did the death
10:42:50  16   benefit get reduced on those policies?
10:42:52  17         A.   It did.
10:42:53  18         Q.   And why was that done?
10:42:55  19         A.   So a couple of things, the original
10:42:57  20   purchase, the original -- the original purchase
10:43:02  21   anticipated the premiums that are on the fourth
10:43:06  22   column here, $400,000 per year for three years into
10:43:10  23   the MassMutual policy, $600,000 a year for three

**20**

10:43:15  1    years into the Lincoln policy.  These premiums
10:43:17  2    weren't made, so they didn't make as much of a
10:43:21  3    premium as they originally had intended, so that
10:43:22  4    was -- that was part of this.
10:43:23  5          So the policies were -- we would not have
10:43:30  6    been able to keep the policy death benefit amounts
10:43:32  7    at that level for their lifetimes if we kept them
10:43:34  8    there.
10:43:34  9          So we started at a high number, a higher
10:43:38  10   number we had -- a higher the death benefit number,
10:43:42  11   the lower the value for distribution, which might
10:43:46  12   seem counterintuitive, but if we had bought less
10:43:52  13   death benefit, the value in distribution would have
10:43:54  14   been considerably higher and it would have meant
10:43:56  15   more tax.
10:43:56  16         So this was a balancing act of how do we
10:43:58  17   eliminate tax, as much tax as possible, with
10:44:06  18   preserving as much cash value as possible.
10:44:09  19         Q.   Let me talk specifically with regard to
10:44:14  20   the MassMutual policy.  It was -- the original face
10:44:20  21   value was 17,500,000.  Did I understand you to say
10:44:24  22   it had originally intended distributions of
10:44:27  23   $400,000 for each of the first three years, and

21

10:44:30 1 that had led to continued value of the policy at

10:44:36 2 17,500,000?

10:44:37 3 A. No, they -- it was premium, not

10:44:41 4 distributions. So the original illustration was

10:44:43 5 premiums of 400,000 for year.

10:44:46 6 So you buy a larger death benefit early,

10:44:51 7 create significant surrender charges in the policy,

10:44:51 8 which would decrease the value upon distribution,

10:44:54 9 pay lower tax, reduce the death benefit, and

10:44:59 10 preserve the reigning death benefit for as long as

10:45:01 11 possible.

10:45:01 12 Q. Okay. So the intention is at some

10:45:04 13 point down the line, my understanding is that in

10:45:05 14 two to three years down the line to significantly

10:45:09 15 reduce the coverage of the policy amount, but at

10:45:15 16 that point, it's preserved; is that a fair

10:45:18 17 statement?

10:45:18 18 MR. TRACY: Object to the form.

10:45:19 19 THE WITNESS: What's -- the higher the cash

10:45:25 20 value, the larger the -- I'm sorry. The higher the

10:45:28 21 death benefit amount, the larger the cost of the

10:45:30 22 policy we administer.

10:45:31 23 So if we kept the policy, it should --

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

22

10:45:34 1 unsurprisingly, $17 million of insurance costs a

10:45:39 2 lot more than 4 million.

10:45:41 3 So by reducing the death benefit -- if you

10:45:45 4 bought 4 million, for example, which would target

10:45:47 5 the end -- if we had bought this policy at

10:45:51 6 4 million and kept it at 4 million, it would have

10:45:53 7 had a much higher value at distribution purposes,

10:45:57 8 which would cost John more tax.

10:45:59 9 So the design of the policy was around

10:46:02 10 meeting John's desire to reduce tax as much as

10:46:07 11 possible.

10:46:07 12 BY MR. MOORE:

10:46:07 13 Q. But my understanding is that the -- so

10:46:09 14 there was an intention to reduce the --

10:46:12 15 ultimately reduce what the value of the policy was?

10:46:15 16 A. Correct.

10:46:16 17 Q. There were very high face values

10:46:19 18 initially, but the intention to lower that at a

10:46:22 19 certain point?

10:46:22 20 A. Correct.

10:46:22 21 Q. Okay. And did, in fact -- at some

10:46:28 22 point, were these policies purchased?

10:46:30 23 A. Yes.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

23

10:46:30 1 Q. And were you the -- the purchasing or

10:46:33 2 selling agent for those policies?

10:46:35 3 A. I was.

10:46:35 4 Q. Okay. I'm showing you what's been

10:46:54 5 marked as Exhibit 4.

10:47:30 6 A. Okay. I've reviewed it.

10:47:31 7 Q. And do you recall this letter?

10:47:33 8 A. Yes, I do.

10:47:33 9 Q. Okay. And is that letter sent from you

10:47:38 10 to Dr. and Mrs. Repicci?

10:47:38 11 A. Yes.

10:47:38 12 Q. Okay. It says: Number one, how long

10:47:44 13 do these policies last? The policies are designed

10:47:47 14 to last to age 100.

10:47:57 15 So in each case, the policies were designed

10:47:59 16 to last to age 100; is that correct?

10:48:01 17 A. Yes, they were both created under

10:48:06 18 current assumptions. They were projected to last

10:48:06 19 to age 100, yes.

10:48:07 20 Q. And was that the intent of the

10:48:10 21 policies?

10:48:10 22 A. The intent was to provide death benefit

10:48:13 23 as long as possible, yes.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

24

10:48:14 1 Q. But was it Dr. Repicci's expressed

10:48:17 2 desire to maintain coverage to at least age 100?

10:48:20 3 A. Yes.

10:48:21 4 Q. Okay. I'm going to give you exhibits

10:48:44 5 marked 5, 6, and 7. See if you could please review

10:48:52 6 those.

10:49:04 7 A. Okay.

10:49:44 8 Q. Okay. And referring really just to

10:49:48 9 Exhibits 5 and 6, are you familiar with these

10:49:50 10 exhibits?

10:49:51 11 A. 5 looks to be the existing policy, the

10:49:53 12 MassMutual policy itself that John purchased; 6

10:49:57 13 looks to be an in-force ledger that was run last

10:50:02 14 year.

10:50:02 15 Q. Okay. Now, can you tell me, the

10:50:09 16 MassMutual policy, as I understand, it's called a

10:50:14 17 guaranteed policy; is that correct?

10:50:14 18 A. The policy is called -- let's see what

10:50:19 19 it's actually called. I'm not sure what it's

10:50:20 20 called.

10:50:35 21 I'm not sure what it's called, but the

10:50:37 22 policy is -- this particular product is a

10:50:40 23 guaranteed death benefit product, that part's --

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

25

10:50:43 1   that's correct.

10:50:43 2       Q.   Okay.  And what does that mean, it's a

10:50:48 3   guaranteed death benefit?

10:50:49 4       A.   What this means is that the insurance

10:50:53 5   company has given a secondary guarantee, meaning

10:50:56 6   they don't guarantee the cash, but they guarantee

10:50:58 7   that the policy, provided no premiums were taken

10:51:00 8   out of it, no withdrawals are made, the death

10:51:03 9   benefit will be there as long as the insurance

10:51:05 10  company is still in business.

10:51:06 11      Q.   Okay.  Now, are there -- are there

10:51:13 12  policies that are not guaranteed available?

10:51:13 13      A.   Yes.

10:51:15 14      Q.   Okay.  Why -- why would you want a

10:51:21 15  guaranteed policy versus a non-guaranteed policy?

10:51:23 16      A.   There are a variety of reasons why

10:51:27 17  somebody might want a guaranteed versus a

10:51:31 18  non-guaranteed.

10:51:32 19      Policies have current assumption, which are

10:51:35 20  based on today's crediting rates and today's

10:51:38 21  expenses, and then you have policies that are based

10:51:40 22  on a guaranteed assumption, which is the minimum --

10:51:43 23  minimum crediting rate they can allow under the

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

26

10:51:46 1   law, the law that -- how the policy has been

10:51:51 2   approved by the insurance department with the

10:51:54 3   maximum charges they can -- they can levy.

10:51:55 4       So insurance policies have a range of

10:51:58 5   crediting, there's usually not a cap but there's a

10:52:00 6   floor, and expenses, there's a range of what they

10:52:04 7   can -- the insurance department has allowed them to

10:52:05 8   charge.

10:52:06 9       So if you buy the guaranteed product, it's

10:52:09 10  usually more expensive, buying a guaranteed product

10:52:13 11  than it is non-guaranteed product, because the

10:52:15 12  insurance company is giving you a secondary

10:52:21 13  guarantee, they make a promise to guarantee that

10:52:24 14  regardless of the investment, regardless of the

10:52:27 15  change in expenses or the change in interest rates,

10:52:31 16  they will still pay you the death benefit.  It's a

10:52:34 17  more expensive product so it's not commonly

10:52:39 18  purchased.

10:52:40 19      Q.   Roughly how much more expensive, if you

10:52:43 20  can estimate, is a guaranteed product compared to a

10:52:47 21  non-guaranteed product?

10:52:48 22      A.   Hard to say.  It depends on the

10:52:51 23  interest rate and it depends on how much the

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

27

10:52:54 1   company is crediting relative to its -- how much

10:52:57 2   more above its minimum.

10:52:59 3       So a company's crediting 6 percent interest

10:53:02 4   and the minimum guarantee on the production is 3,

10:53:06 5   that's going to be a heck of a lot more expensive.

10:53:11 6   If it's 4 versus 3, it won't be quite as much.

10:53:14 7       Today, guaranteed products are super

10:53:16 8   expensive because interest rates are super low, so

10:53:20 9   almost nobody is buying guaranteed products today.

10:53:22 10      Q.   In 2002, do you have any recollection

10:53:26 11  of the approximate increased cost of a guaranteed

10:53:31 12  policy?

10:53:31 13      A.   I don't know what the increased cost

10:53:34 14  was.  I know that when we ran that number for John

10:53:38 15  at Lincoln, because we did, the problem was

10:53:39 16  the guaranteed product would have so much less

10:53:43 17  death benefit that there wouldn't be a compression

10:53:47 18  for tax purposes.

10:53:48 19      So we showed him a guaranteed product, but

10:53:51 20  the problem was we couldn't get 60 percent

10:53:54 21  compression for tax purposes.

10:53:54 22      We could have sold that product, but he

10:53:58 23  opted for the product that had more tax

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

28

10:54:00 1   compression, not the product that had the

10:54:02 2   guarantees.

10:54:02 3       Q.   The -- wouldn't you have had the same

10:54:10 4   issue on the MassMutual policy in terms of

10:54:14 5   compression?

10:54:14 6       A.   In Mass, we had -- we had different

10:54:17 7   underwriting and the products were designed

10:54:20 8   differently.

10:54:21 9       So Mass was an unusual situation where their

10:54:25 10  guaranteed product had enormous compression for tax

10:54:29 11  purposes, which was a surprise.

10:54:31 12      Q.   From a risk standpoint for a client, is

10:54:35 13  a guaranteed product less risky or more risky than

10:54:39 14  a non-guaranteed product?

10:54:41 15      A.   Depends on the circumstances.

10:54:44 16      Q.   Could you elaborate?

10:54:46 17      A.   Sure.  Guaranteed products often have

10:54:50 18  much less cash or accumulation in them.  So in a

10:54:54 19  return for the secondary guarantee that the

10:54:55 20  insurance company gives you, you -- there are

10:54:57 21  usually higher costs inside the product.

10:54:59 22      So if you spend $1 million in premium, you

10:55:04 23  might find that the overhead expense wipes out

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

29

10:55:07 1 significantly more of that cash in a guaranteed
10:55:10 2 product than in a non-guaranteed product.
10:55:12 3       So what that means for a client is you get
10:55:15 4 the guaranteed death benefit, but if you change
10:55:17 5 your mind and you want to go to another company, if
10:55:21 6 you wanted to take the cash out, there will be a
10:55:23 7 significant penalty applied.
10:55:24 8       So the tradeoff is, yes, you can get the
10:55:26 9 death benefit, but you will not have the long-term
10:55:30 10 cash accumulation because the expenses are higher.
10:55:35 11       Q.   If your long-term intent is to have
10:55:38 12 insurance coverage in place to asset you.  Is there
10:55:44 13 less risk in a guaranteed policy than a
10:55:47 14 non-guaranteed policy?
10:55:48 15       A.   Can you rephrase that?
10:55:49 16       Q.   If the -- if the ultimate goal of the
10:55:52 17 insurance policy is to provide for the existence of
10:55:58 18 insurance at the age of death to a certain point, a
10:56:01 19 certain year, is the guaranteed product less risky
10:56:05 20 than a non-guaranteed product?
10:56:07 21       A.   All things being equal and not trying
10:56:15 22 to buy the policy inside a retirement plan, I would
10:56:19 23 say yes.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

30

10:56:19 1       Q.   Okay.  And is that the reason you
10:56:23 2 purchased the MassMutual policy as a guaranteed
10:56:26 3 policy?
10:56:26 4       A.   Was what the reason?
10:56:30 5       Q.   Less risk for the client.
10:56:32 6       A.   We purchased the Mass policy because
10:56:35 7 the compression was great, so we had great
10:56:38 8 compression and we had underwriting, which was a
10:56:40 9 real big struggle.
10:56:41 10       John and Lori had both had cancer, so we got
10:56:46 11 them approved, we found a policy that had great
10:56:49 12 compression and it had the guarantee, which was
10:56:51 13 obviously great.
10:56:51 14       Q.   So the guarantee was, in fact, an
10:56:54 15 enhancement for the client?
10:56:56 16       A.   Yes.
10:56:56 17       Q.   So all things being equal, that's a
10:57:00 18 benefit to the client?
10:57:02 19       A.   All things being equal, having a
10:57:05 20 guaranteed versus non-guaranteed would be -- would
10:57:07 21 make it better, sure.
10:57:08 22       Q.   Do you recall what your commission was
10:57:21 23 for the MassMutual policy?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

31

10:57:24 1       A.   I do not.
10:57:24 2       Q.   Do you recall whether it was more than
10:57:39 3 $400,000?
10:57:41 4       A.   I don't believe that to be the case.
10:57:43 5       Q.   Do you recollect it might be more than
10:57:48 6 $300,000?
10:57:49 7       A.   For the Mass policy?
10:57:50 8       Q.   Yes, for the MassMutual policy.
10:57:52 9       A.   I don't think so.
10:57:52 10       Q.   What about over 200,000?
10:57:55 11       A.   I couldn't be sure, but it's possibly
10:57:57 12 in that range.
10:58:23 13       Q.   Let me show you what's been marked as
10:58:27 14 Exhibit 8.  If you could review that, please.
10:58:46 15       A.   Sure.  Sorry.  Okay.
10:59:17 16       Q.   My question is, is this the policy that
10:59:19 17 was put in place under the conjunction of the
10:59:23 18 MassMutual policy?
10:59:23 19       A.   This was the Lincoln policy that was
10:59:25 20 purchased at the same time, yes.
10:59:26 21       Q.   Okay.  And --
10:59:30 22       A.   I'm sorry.  There's something -- yes,
10:59:50 23 this is the Lincoln policy.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

32

10:59:51 1       Q.   And was that policy a guaranteed
11:00:04 2 policy?
11:00:05 3       A.   This policy had been guaranteed for a
11:00:08 4 certain number of years, and this isn't the -- I
11:00:15 5 don't have the illustration with this so it's hard
11:00:18 6 to say.  There is a guaranteed period, and I don't
11:00:23 7 remember where the guaranteed period ran out.
11:00:23 8       Q.   Is it possible that that guaranteed
11:00:30 9 period would have been for the first three years of
11:00:30 10 the policy?
11:00:30 11       A.   Only three years, no.
11:00:32 12       Q.   Why --
11:00:35 13       A.   But I think I -- go ahead.
11:00:42 14       Q.   Why do you say it would not have been
11:01:03 15 more than three years?
11:01:04 16       A.   Why the policy would be guaranteed for
11:01:07 17 more than three years?
11:01:08 18       Q.   Yes.
11:01:09 19       A.   I recall one of the letters that we
11:01:18 20 went over with John and Hy talking about 15 or
11:01:23 21 16 years of guarantees, not three.  So I cannot
11:01:26 22 imagine a policy with three years.  I've never seen
11:01:29 23 a policy with three-year guarantees.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

33

| | |
|---|---|
| 11:01:31 | 1 |
| 11:01:34 | 2 |
| 11:01:37 | 3 |
| 11:01:37 | 4 |
| 11:01:37 | 5 |
| 11:01:42 | 6 |
| 11:01:44 | 7 |
| 11:01:48 | 8 |
| 11:01:49 | 9 |
| 11:01:52 | 10 |
| 11:01:53 | 11 |
| 11:01:57 | 12 |
| 11:01:59 | 13 |
| 11:01:59 | 14 |
| 11:02:13 | 15 |
| 11:02:22 | 16 |
| 11:02:26 | 17 |
| 11:02:32 | 18 |
| 11:02:35 | 19 |
| 11:02:35 | 20 |
| 11:02:39 | 21 |
| 11:02:41 | 22 |
| 11:02:49 | 23 |

1    Q.    Okay.  Do you have any recollection of
2  what your commission was with regard to this
3  policy?
4    A.    I do not.
5    Q.    Could it have been more than $500,000?
6    A.    Highly doubt that.
7    Q.    Could it have been more than $400,000?
8    A.    I don't think that's the case, either.
9    Q.    Could it have been more than $300,000?
10    A.    Maybe.
11    Q.    Is it fair to say that the commissions
12  on these policies were fairly high?
13    A.    Yes.
14    Q.    Okay.  Showing you what's been marked
15  as Exhibit 9, and if you could review that and tell
16  me if you recognize the document.
17    A.    Yes.
18    Q.    And could you briefly describe what it
19  is?
20    A.    This is a letter to John and Lori,
21  their policies have been approved, and this looks
22  to be a letter that suggests that they pay half the
23  premium -- half the annual premium now to get these

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

35

1  insurance that way.
2    So there were tax and legal advisors
3  involved putting the piece together, which they
4  handled.  I handled the placing of the insurance.
5    So I handled the application, the
6  signatures, managed the underwriting process, and
7  it was -- they were going to pay the premium and
8  then the insurance would be enforced.
9    So I'm not sure if that answers your
10  question, but I was definitely responsible for
11  placing the insurance.
12    Q.    And is it fair to say that you -- the
13  clients need a lot of direction in this sort of
14  situation, in implementing this type of a plan?
15    MR. TRACY:  Object to the form.
16    THE WITNESS:  When there's a lot of pieces,
17  sure.  John's a really smart guy, he seems to
18  follow things very well, one of the smartest
19  clients I can recall having.  He also had a team of
20  people.
21    So we spent time with Hy, we spent time
22  with -- there were a lot of people making
23  decisions.  So did I ever make decisions for John?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

34

1  policies enforced, and it's wiring instructions to
2  MassMutual.
3    Q.    Okay.  So were you basically -- strike
4  that.
5    Did you expect the clients to be able to get
6  these policies enforced themselves, or did you
7  expect your company to help them do that?
8    MR. TRACY:  Object to the form.
9    THE WITNESS:  I'm not sure what you mean by
10  the questions.
11    BY MR. MOORE:
12    Q.    Describe your role in implementing the
13  policies.
14    A.    So I sold them the policies.  From the
15  previous chart on one of the exhibits, they had
16  money in IRAs, IRAs are not allowed to buy life
17  insurance, we had explained to John that he
18  couldn't buy the insurance in an IRA, you have to
19  buy from a profit sharing plan.
20    So we had to talk to Hy Polakoff, tax
21  attorney, another two attorneys, to figure out --
22  to move money from his IRA to a profit sharing plan
23  under his practice and facilitate the purchase of

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

36

1  No, that never happened.  Did it require a lot of
2  people to look at this?  John was smart enough to
3  know he wanted to save taxes and he had a great
4  accountant in Hy Polakoff.  We went spent a lot of
5  time talking through the pieces.
6    So we were saving John a couple million
7  bucks in taxes and it's definitely not easy and it
8  did involve a lot of people.
9    BY MR. MOORE:
10    Q.    So it's fair to say then that the
11  client would -- needed direction to implement this
12  plan?
13    MR. TRACY:  Object to the form.
14    THE WITNESS:  I'd say the client needed
15  information.  The client needed information.  This
16  was the -- this letter, as well as all the other
17  ones, were things that came on the heels of
18  multiple conversations that we had.
19    So pre the letter, there's probably five or
20  ten phone calls -- well, a few phone calls, and
21  this was the, hey, send me information so I can
22  give it to somebody.
23    So I'm sure John's not directing the wire.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

37

11:06:10 1 That might have been Lori, that might have been Hy,
2 that might have been Julie.
11:06:10 3 I'm sure John is not going to the bank and
11:06:12 4 getting in line to send a wire.  So he would ask
11:06:15 5 me, send me the information on what to do so I can
11:06:20 6 have somebody do it.
11:06:23 7 **BY MR. MOORE:**
11:06:27 8 **Q.  So the client is expecting some**
11:06:29 9 **direction from someone in order to get this plan**
11:06:34 10 **implemented?**
11:06:35 11 **A.  He's definitely looking for help on the**
11:06:38 12 **logistics, where to send the money, where to wire**
11:06:42 13 **the money, what to do, yes.**
11:06:43 14 Q.  Let me show you what's been marked as
11:06:49 15 Exhibit 10.
11:07:00 16 **A.  Okay.**
11:07:00 17 Q.  And could you just briefly describe
11:07:03 18 what this document is?
11:07:04 19 **A.  Similar to the previous one except this**
11:07:07 20 **is the wiring instructions for the Lincoln policy.**
11:07:09 21 Q.  And did those instructions come from
11:07:12 22 you?
11:07:12 23 **A.  Yes.**

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

38

11:07:12 1 Q.  Okay.  And let me show you what's been
11:07:16 2 marked as Number 11.  Have you reviewed this
11:08:12 3 document?
11:08:12 4 **A.  Yes.**
11:08:13 5 Q.  Can you just briefly describe what it
11:08:15 6 is?
11:08:15 7 **A.  Yes, so this is telling the plan for**
11:08:19 8 **the premiums and how we plan to finalize the**
11:08:22 9 **policy.**
11:08:24 10 **Number three is a letter from Lincoln.  John**
11:08:29 11 **has asked -- John has expressed interest in a**
11:08:34 12 **guaranteed product.  We've talked to John about the**
11:08:37 13 **fact that the guaranteed product will not give him**
11:08:40 14 **the tax savings he wants upon a withdrawal or**
11:08:43 15 **purchase of the policy from a retirement fund.**
11:08:46 16 **Lincoln -- he has asked for a letter from**
11:08:49 17 **Lincoln stating that he will be able to make the**
11:08:54 18 **exchange without -- without any surrender charges**
11:08:59 19 **in the future, so we've shown John a guaranteed --**
11:09:04 20 **we've shown John buying the policy that's not**
11:09:07 21 **guaranteed to get the compression and then using**
11:09:08 22 **that policy's cash to transfer the value through an**
11:09:14 23 **internal exchange at Lincoln through a policy that**

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

39

11:09:18 1 **is guaranteed, and he wants that in writing from**
11:09:21 2 **Lincoln.**
11:09:22 3 **And it looks like he's already received the**
11:09:27 4 **conversation from them, but he wants it in writing**
11:09:31 5 **and the plan is for them to give him the letter**
11:09:35 6 **that I think was subsequently sent on the 23rd.**
11:09:37 7 Q.  Okay.  And this letter was from you --
11:09:38 8 **A.  It is.**
11:09:39 9 Q.  -- to Dr. Repicci?
11:09:40 10 **A.  Correct.**
11:09:40 11 Q.  And looking at number seven of that
11:09:43 12 letter, second sentence, it says:  Face values are
11:09:47 13 converted in month 25 or later.
11:09:49 14 Does that refer to what I was generally
11:09:52 15 describing earlier as the intent of the plan to
11:09:55 16 reduce at some point the large face values --
11:09:57 17 **A.  Yes.**
11:09:59 18 Q.  -- of the policies?
11:10:00 19 **A.  Yes, it is.**
11:10:01 20 Q.  All right.  Let me show you what's been
11:10:11 21 marked as Exhibit 12, and if you could just tell me
11:10:43 22 if you're familiar with this document.
11:10:44 23 **A.  Yes.**

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

40

11:10:45 1 Q.  And can you describe this document for
11:10:47 2 me, please?
11:10:47 3 **A.  This looks to be a flow chart of John's**
11:10:51 4 **plan dated October 24th, 2003, that gives him a**
11:10:58 5 **visual of what we plan to do to help facilitate**
11:11:04 6 **moving these insurance policies out of his**
11:11:07 7 **retirement plan into an irrevocable trust for the**
11:11:13 8 **benefit of his kids.**
11:11:14 9 Q.  And do you know who prepared this
11:11:17 10 document?
11:11:17 11 **A.  I believe I did this.**
11:11:21 12 Q.  And, again, let me just show you
11:11:34 13 Exhibit 13.  Are you familiar with this document?
11:11:46 14 **A.  Give me one second to read it.**
11:11:49 15 Q.  Sure.  Sorry.
11:11:50 16 **A.  That's okay.**
11:11:55 17 **Okay.  Yes.**
11:11:56 18 Q.  And are you able to tell me what this
11:11:59 19 document regards?
11:12:01 20 **A.  It looks to be more -- more**
11:12:10 21 **step-by-step instructions on what we wanted to --**
11:12:14 22 **what we had just talked about on a call, and this**
11:12:19 23 **facilitates the steps of the previous chart.**

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

41

11:12:22 1     Q.   Okay.  And is this correspondence from
11:12:25 2 you?
11:12:25 3     A.   Yes.
11:12:25 4     Q.   Showing you what's been marked as
11:12:40 5 Exhibit 14, if you could review that, please, and
11:12:42 6 tell me if you're familiar with it.
11:12:52 7     A.   Yes.
11:13:10 8     Q.   Can you briefly describe this document
11:13:14 9 for me, please?
11:13:15 10     A.   In 2006, John and I had a conversation
11:13:19 11 about estate planning, and John wanted to give some
11:13:28 12 money to the kids.
11:13:32 13         At the time, their estate was -- was a
11:13:35 14 taxable estate of 24 million, or some significant
11:13:40 15 number, and he wanted to facilitate giving -- he
11:13:45 16 asked us about ways to -- I believe the
11:13:48 17 conversation went along the lines of what we did in
11:13:52 18 the pension was great, that worked out really well,
11:13:55 19 what can we do now?  What else can we do for estate
11:13:59 20 planning?
11:13:59 21         So these are some -- this is an introduction
11:14:02 22 to an idea that -- for estate planning to help him
11:14:05 23 facilitate his other goals of removing money from

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

42

11:14:09 1 his estate tax efficiently.
11:14:12 2     Q.   Did you have periodic discussions with
11:14:14 3 Dr. Repicci regarding potential plans of -- let's
11:14:21 4 say potential plans for wealth management?
11:14:24 5     A.   John would call from time to time and
11:14:26 6 we'd have conversations.
11:14:26 7     Q.   Okay.  And do you know if this was ever
11:14:28 8 implemented in any way?
11:14:29 9     A.   No, I don't believe it was.
11:14:30 10     Q.   Okay.  Showing you Number 15, and I'm
11:14:42 11 basically going to have the same questions for you
11:14:44 12 with regard to Number 15.
11:14:52 13     A.   Yes.
11:14:52 14     Q.   Are you familiar with the document?
11:14:56 15     A.   I am.
11:14:57 16     Q.   Okay.  And is this a letter from you to
11:15:01 17 Dr. Repicci?
11:15:01 18     A.   It is.
11:15:02 19     Q.   Is it fair to say it's discussing
11:15:08 20 wealth protection plans?
11:15:11 21     A.   This is introducing him to another
11:15:14 22 concept, relatively complicated plan, yes.
11:15:19 23     Q.   Okay.  Is this a plan that you

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

43

11:15:26 1 presented Dr. Repicci with?
11:15:26 2     A.   Yes, this is something we talked
11:15:29 3 about -- this is something we talked about on the
11:15:31 4 phone and then I sent him some other information,
11:15:33 5 yes.
11:15:33 6     Q.   Do you know if this plan was ever
11:15:37 7 implemented at all?
11:15:38 8     A.   It was.
11:15:38 9     Q.   Okay.  And can you tell me how that was
11:15:41 10 implemented?
11:15:41 11     A.   So we had this conversation, John
11:15:44 12 expressed some concern or some interest in this
11:15:47 13 plan, and then the next step of this plan was for
11:15:52 14 John to speak to David Mandell, Celia Clark, and Hy
11:16:00 15 Polakoff, because it was relatively complicated,
11:16:03 16 and so I gave John off to David and Celia to talk
11:16:09 17 about this plan.
11:16:10 18     Q.   I don't mean to jump ahead too far, but
11:16:16 19 is this plan related in any way to the second
11:16:24 20 Lincoln Life policy that was purchased?
11:16:25 21     A.   It is.
11:16:25 22     Q.   Okay.  All right.  Then let's go right
11:16:28 23 to showing you 16, and I'd just like to see if you

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

44

11:16:40 1 were familiar with this document, and my question
11:16:42 2 is whether this is relative to the second Lincoln
11:16:46 3 Life policy that was purchased.
11:16:47 4     A.   Marcus did something different.  So
11:16:53 5 Marcus is his son-in-law, so this doesn't have to
11:17:02 6 do with the policy, this has to do with the medical
11:17:05 7 practices engaging of CBIZ, C-B-I-Z, for a program
11:17:15 8 with their practice, but it's not directly related
11:17:19 9 to the policy.
11:17:19 10     Q.   Okay.  Let me show you what's been
11:17:35 11 marked as Exhibit 17.
11:18:04 12     A.   Okay.
11:18:04 13     Q.   Okay.  This is a Lincoln Life Annuity
11:18:11 14 Company of New York Policy, Policy No. 7317144.
11:18:15 15 For purposes of this deposition, I'll refer to this
11:18:17 16 as the 144 Lincoln policy.
11:18:19 17     A.   Sure.
11:18:20 18     Q.   Are you familiar with this policy?
11:18:24 19     A.   I'm aware of this, yes.
11:18:27 20     Q.   Okay.  And is this -- when I -- in my
11:18:30 21 previous questions, I had asked about a second
11:18:33 22 Lincoln Life policy; is this the second Lincoln
11:18:35 23 Life policy?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

45

| | |
|---|---|
| 11:18:36 | 1    A.   It is. |
| 11:18:36 | 2    Q.   And for the record, the initial Lincoln |
| 11:18:40 | 3  Life policy, which I believe was Exhibit 8 -- |
| 11:18:49 | 4    A.   I'm sorry. |
| 11:18:49 | 5    Q.   Exhibit 8, I'll refer to that as the |
| 11:18:56 | 6  026 policy just for clarification purposes, but |
| 11:19:00 | 7  with regard to this 144 policy, were you the |
| 11:19:03 | 8  writing agent for this policy? |
| 11:19:04 | 9    A.   I was not. |
| 11:19:05 | 10   Q.   And can you tell me who the writing |
| 11:19:07 | 11 agent was? |
| 11:19:07 | 12   A.   David Mandell. |
| 11:19:09 | 13   Q.   Okay.  Very briefly, I'll give you, |
| 11:19:27 | 14 actually -- later in the deposition, I will give |
| 11:19:29 | 15 you the full opportunity to give more detail on |
| 11:19:33 | 16 this policy.  For the moment, I'm just interested |
| 11:19:37 | 17 in basic information on the policy. |
| 11:19:41 | 18      You had said David Mandell is the writing |
| 11:19:43 | 19 agent.  What was your role with regard to this |
| 11:19:47 | 20 insurance in brief form? |
| 11:19:49 | 21   A.   I don't know that I had a role at this |
| 11:19:56 | 22 time. |
| 11:19:56 | 23   Q.   Did you receive any kind of commission |

JACK W. HUNT & ASSOCIATES, INC.
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

46

| | |
|---|---|
| 11:19:59 | 1  with regard to this policy? |
| 11:20:00 | 2    A.   I did not. |
| 11:20:00 | 3    Q.   Nothing of any kind? |
| 11:20:02 | 4    A.   Nothing. |
| 11:20:02 | 5    Q.   Okay.  And Exhibit 15 relates to this |
| 11:20:21 | 6  144 Lincoln policy, correct? |
| 11:20:23 | 7    A.   15 was the e-mail where I introduced |
| 11:20:27 | 8  the idea to John? |
| 11:20:29 | 9    Q.   Yes. |
| 11:20:29 | 10   A.   Yes. |
| 11:20:29 | 11   Q.   So that came from you, and yet you had |
| 11:20:34 | 12 no involvement whatsoever in the -- in either the |
| 11:20:38 | 13 selling or the implementation of policy 144? |
| 11:20:41 | 14   A.   Other than that letter, no. |
| 11:20:43 | 15   Q.   Nothing of any kind? |
| 11:20:44 | 16   A.   No. |
| 11:20:45 | 17   Q.   Okay.  Showing you what's been marked |
| 11:21:08 | 18 as Exhibit 18, and I'll ask you if you're familiar |
| 11:21:12 | 19 with that document. |
| 11:21:14 | 20   A.   I haven't seen this before, but ... |
| 11:21:26 | 21   Q.   Okay.  That's fine.  I'm going to show |
| 11:21:33 | 22 you what's been marked as Exhibit 19. |
| 11:21:44 | 23   A.   Okay. |

JACK W. HUNT & ASSOCIATES, INC.
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

47

| | |
|---|---|
| 11:21:45 | 1    Q.   And can you tell me are you familiar |
| 11:21:47 | 2  with this letter? |
| 11:21:48 | 3    A.   Yes. |
| 11:21:48 | 4    Q.   And is this a letter from you to |
| 11:21:55 | 5  Dr. Repicci and his wife? |
| 11:21:56 | 6    A.   It is. |
| 11:21:56 | 7    Q.   Okay.  And can you tell me what this |
| 11:21:58 | 8  involves? |
| 11:21:58 | 9    A.   Sure.  So, at this time in 2007, John |
| 11:22:09 | 10 has purchased the policy that was the previous |
| 11:22:14 | 11 exhibit. |
| 11:22:14 | 12   Q.   144? |
| 11:22:16 | 13   A.   The 144 policy, correct.  Yes, John has |
| 11:22:19 | 14 purchased 144, the company that he worked with -- |
| 11:22:25 | 15 the company that administered this plan appears to |
| 11:22:29 | 16 be going out of business. |
| 11:22:31 | 17      So John has a policy that he's |
| 11:22:40 | 18 illustrated -- he's illustrated paying premiums and |
| 11:22:43 | 19 working with this -- this company in the Virgin |
| 11:22:45 | 20 Islands. |
| 11:22:49 | 21      They appear to be going out of business, |
| 11:22:51 | 22 John's left with a policy that's not going to be |
| 11:22:55 | 23 able to pay the estimated premium and he's asking |

JACK W. HUNT & ASSOCIATES, INC.
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

48

| | |
|---|---|
| 11:22:58 | 1  me to figure out, how do I manage this policy and |
| 11:23:02 | 2  keep it enforced? |
| 11:23:05 | 3      So they're running -- the company they |
| 11:23:10 | 4  worked with ran into some tax trouble and some |
| 11:23:14 | 5  business trouble, and he's has asked me to look |
| 11:23:14 | 6  into what are the options with this insurance |
| 11:23:14 | 7  policy. |
| 11:23:19 | 8    Q.   Okay.  Let's leave it at that for now, |
| 11:23:22 | 9  but we can come back to that. |
| 11:23:25 | 10   A.   Okay. |
| 11:23:33 | 11   Q.   So I'm showing you what's been marked |
| 11:23:44 | 12 as Exhibit 20, and I'll ask you if you're familiar |
| 11:23:47 | 13 with this document. |
| 11:23:49 | 14   A.   Yes. |
| 11:23:58 | 15   Q.   And did you have -- can you tell me |
| 11:24:05 | 16 what the letter is to and from? |
| 11:24:07 | 17   A.   It's from John Repicci to me. |
| 11:24:09 | 18   Q.   Okay.  Can you briefly describe what |
| 11:24:17 | 19 the letter covers? |
| 11:24:17 | 20   A.   The letter says:  As you're well aware, |
| 11:24:22 | 21 I'm having great difficulties with the IRS over |
| 11:24:26 | 22 insurance policies, and I'm actually not sure what |
| 11:24:29 | 23 that's about. |

JACK W. HUNT & ASSOCIATES, INC.
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

49

11:24:30 1      Q.   Strike that.  Chris, I'll let the
11:24:33 2  letter speak for itself since it didn't come from
11:24:36 3  you.  That's fine.  Just saving time.
11:24:41 4      A.   Sure.
11:24:41 5      Q.   Did you have any discussion with
11:24:45 6  Dr. Repicci after seeing this letter?
11:24:47 7      A.   Yes.
11:24:53 8      Q.   And how frequently would you say you
11:24:55 9  spoke with him after this?
11:24:56 10     A.   I don't remember the timing of -- there
11:24:59 11  was a window of time where we were spending a lot
11:25:01 12  of time looking at his policies, looking at his
11:25:05 13  Lincoln policies.  I'm not 100 percent sure what
11:25:08 14  that -- what that window was, but there was a lot
11:25:11 15  of interaction back and forth with Lincoln and with
11:25:14 16  John over a period of a couple of years.
11:25:16 17     Q.   Okay.  Let me show you what's been
11:25:19 18  marked as Exhibit 21.  Again, I'll ask you if
11:25:32 19  you're familiar with the document.
11:25:33 20     A.   Yes.
11:25:33 21     Q.   Okay.  And is this a document from you
11:25:37 22  to Hy Polakoff?
11:25:41 23     A.   Yes, it is.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

50

11:25:42 1      Q.   Okay.  Do you recall sending this
11:25:45 2  document?
11:25:45 3      A.   I do.
11:25:46 4      Q.   The last sentence -- the last
11:25:52 5  paragraph, the first sentence says:  I'm doing all
11:25:53 6  I can to fix the situation.
11:25:55 7           Can you tell me what needed fixing?
11:25:58 8      A.   Well, John's unhappy with how Lincoln
11:26:03 9  is handling the conversion, and quite frankly, so
11:26:09 10  am I.
11:26:11 11     Q.   When you say handling the conversion,
11:26:14 12  can you tell me what you mean by that?
11:26:16 13     A.   Yes, the -- the challenge of making the
11:26:20 14  conversion -- John received a letter that I can't
11:26:25 15  seem to find, but I know it exists, on
11:26:28 16  February 23rd or so, 2003, that states that they
11:26:35 17  will exchange the policies for no surrender
11:26:38 18  charges, and John insists on having that letter and
11:26:42 19  the previous exhibits demonstrate that was
11:26:46 20  important and it's coming, and then there's a fax,
11:26:50 21  and I can't seem to find the fax.
11:26:52 22           When we went back to Lincoln to do exchanges
11:26:55 23  and I had numerous people and their advanced team

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

51

11:26:58 1  working on hundreds of illustrations, the problem
11:27:00 2  was they would exchange policies for a guaranteed
11:27:06 3  policy, but Lincoln had an internal rule that if
11:27:13 4  they go to exchange from policy A to policy B, they
11:27:17 5  can't have the surrender charge be less.
11:27:22 6           So what a surrender charge is is if there's
11:27:26 7  $1 million in cash in a policy, and there's a
11:27:29 8  $200,000 surrender charge, the million dollars will
11:27:32 9  continue to operate from inside the policy, or you
11:27:36 10  can walk away with $800,000.  That's the difference
11:27:39 11  between the account value and the surrender value;
11:27:40 12  it's the penalty for leaving.
11:27:41 13          The problem was the guaranteed products
11:27:44 14  Lincoln had had small surrender charges in the --
11:27:47 15  relative to cash value, which is the same problem
11:27:52 16  we'd run into when we bought the policies in the
11:27:55 17  beginning.  So they said the problem was they
11:28:00 18  couldn't move to a guaranteed product and waive the
11:28:04 19  surrender charge.
11:28:06 20          So every illustration we saw was wiping out
11:28:12 21  John's cash and -- the problem was they were
11:28:19 22  applying -- Lincoln was applying charges that were
11:28:23 23  not consistent with the letter from October 23rd,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

52

11:28:27 1  2003, and the fact that I couldn't find the letter
11:28:32 2  made it very hard for me to get the people at
11:28:35 3  Lincoln to -- to make good on that particular -- on
11:28:41 4  that transfer.
11:28:42 5           So it was getting very difficult, and with
11:28:47 6  those surrender fees, the problem we had was
11:28:51 7  guaranteed products are so expensive here in 2015
11:28:55 8  because interest rates have become so low.
11:28:57 9           So fixing the situation was, the product
11:29:01 10  John wants is much more expensive, and Lincoln is
11:29:05 11  not, in my opinion, is not honoring the deal that
11:29:13 12  we will allow you to move without surrender
11:29:13 13  charges.
11:29:14 14          If they would have moved cash accounts to
11:29:15 15  cash accounts into a guaranteed product, we'd have
11:29:17 16  a great product, and they just didn't do it.
11:29:19 17          And we had numerous people in their advanced
11:29:23 18  planning do hundreds and hundreds of illustrations,
11:29:26 19  tried different products, tried all kinds of stuff.
11:29:28 20  I probably have hundreds of -- I shouldn't say
11:29:31 21  hundreds, but dozens and dozens of conversations
11:29:34 22  and e-mails with people at Lincoln trying to get
11:29:37 23  John what he wants.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

53

| | |
|---|---|
| 11:29:39 | 1     **Q.**  And talking right now about just the |
| 11:29:45 | 2  026 policy -- |
| 11:29:46 | 3     **A.**  **The first policy.** |
| 11:29:47 | 4     **Q.**  -- strike that. |
| 11:29:48 | 5     Is your response relative to both policies, |
| 11:29:51 | 6  or were you speaking to just one of the Lincoln |
| 11:29:55 | 7  policies in the previous answer? |
| 11:29:58 | 8     **A.**  **The answer about them not doing what** |
| 11:30:03 | 9  **they said they would do applies to the 026 policy.** |
| 11:30:08 | 10     **Q.**  Okay.  And with regard to the 026 |
| 11:30:12 | 11  policy, is it fair to say that Dr. Repicci's |
| 11:30:15 | 12  concern is that he has a policy that unless -- in |
| 11:30:21 | 13  2014 at least -- unless he contributes significant |
| 11:30:25 | 14  additional funds, that that policy will lapse? |
| 11:30:27 | 15     **A.**  **He is concerned that -- he is concerned** |
| 11:30:30 | 16  **that the policy here required a future premium,** |
| 11:30:33 | 17  **yes.  That's -- the concern is he may have to pay** |
| 11:30:37 | 18  **future premiums depending on how long he lives,** |
| 11:30:39 | 19  **yes.** |
| 11:30:40 | 20     **Q.**  Right.  And I believe you said that the |
| 11:30:42 | 21  original intent of the policies was to have |
| 11:30:46 | 22  policies in place to age 100? |
| 11:30:48 | 23     **A.**  **The intent was twofold:  Get the money** |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

54

| | |
|---|---|
| 11:30:52 | 1  **out of the retirement plan at a significant tax** |
| 11:30:56 | 2  **saving, and to have a policy in place at his time** |
| 11:30:59 | 3  **of passing, whenever that would be.** |
| 11:31:00 | 4     **Q.**  Okay. |
| 11:31:00 | 5     **A.**  **He had two goals, for sure.** |
| 11:31:01 | 6     **Q.**  But the policy in place at the time of |
| 11:31:04 | 7  passing up to the age of 100; is that correct? |
| 11:31:08 | 8     **A.**  **100 -- John never expressed to me that** |
| 11:31:12 | 9  **he thought he would live to 100, it just happened** |
| 11:31:16 | 10  **that the insurance policy guarantee at Mass went to** |
| 11:31:19 | 11  **100 under guarantees, and the Lincoln product at** |
| 11:31:21 | 12  **the time under current assumptions went to 100, and** |
| 11:31:26 | 13  **at the time, both companies said if you make it to** |
| 11:31:28 | 14  **100, we will no longer charge fees, so if you live** |
| 11:31:31 | 15  **to be 125, you still have coverage.** |
| 11:31:36 | 16  **So that -- that came up based on the** |
| 11:31:38 | 17  **illustrations of the products, not around John** |
| 11:31:41 | 18  **giving guidance that he needed insurance to age** |
| 11:31:42 | 19  **100.** |
| 11:31:42 | 20     **Q.**  Is it fair to say that Dr. Repicci |
| 11:31:44 | 21  expected the policies to have value -- face value |
| 11:31:51 | 22  to be reduced at a certain point, to have that |
| 11:31:54 | 23  value in place until age 100? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

55

| | |
|---|---|
| 11:31:57 | 1     **MR. TRACY:**  Object to the form. |
| 11:31:58 | 2     **THE WITNESS:**  Can you repeat the question? |
| 11:32:01 | 3     **BY MR. MOORE:** |
| 11:32:01 | 4     **Q.**  By value, I'm talking about the |
| 11:32:04 | 5  insurance value.  Is it fair to say that |
| 11:32:06 | 6  Dr. Repicci expected the 026 policy to have an |
| 11:32:14 | 7  insurance value to age 100 without additional |
| 11:32:18 | 8  payments at the time he purchased the policies? |
| 11:32:22 | 9     **A.**  **Did he expect to have -- what did John** |
| 11:32:30 | 10  **think?  I can't possibly know.  Was the plan to --** |
| 11:32:37 | 11  **was the plan to have insurance enforced till death?** |
| 11:32:41 | 12  **Yes, that was obviously the plan.** |
| 11:32:44 | 13     **Q.**  And so in 2014, is it fair to say he's |
| 11:32:48 | 14  upset because his policy will not last anywhere |
| 11:32:52 | 15  close to 100 years? |
| 11:32:55 | 16     **MR. TRACY:**  Object to the form. |
| 11:32:56 | 17     **THE WITNESS:**  In 20 -- I don't know what |
| 11:33:00 | 18  John was thinking, but in our conversations, John |
| 11:33:03 | 19  made it clear in 2014 that he wants to make -- that |
| 11:33:08 | 20  he would like -- he would like to convert to a |
| 11:33:11 | 21  guaranteed product, which we understand, we tried |
| 11:33:17 | 22  to do. |
| 11:33:17 | 23     The problem was twofold:  One, the products |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

56

| | |
|---|---|
| 11:33:21 | 1  became extremely expensive with low interest rates, |
| 11:33:24 | 2  and two, Lincoln wasn't giving us the cash -- they |
| 11:33:28 | 3  were not waiving the surrender charges to make that |
| 11:33:30 | 4  happen. |
| 11:33:30 | 5     So a combination of things happening made |
| 11:33:34 | 6  this very difficult to give John what he wants, and |
| 11:33:38 | 7  it was sad, it was disappointing. |
| 11:33:40 | 8     **Q.**  Did Dr. Repicci express to you his |
| 11:33:43 | 9  concern that he had understood if he would have |
| 11:33:47 | 10  insurance under the 026 policy without further |
| 11:33:52 | 11  premiums being paid subsequent to the initial |
| 11:33:55 | 12  premiums that would allow the policy to be enforced |
| 11:34:00 | 13  to age 100? |
| 11:34:02 | 14     **A.**  **I don't recall a conversation where he** |
| 11:34:06 | 15  **expressed that, no.** |
| 11:34:06 | 16     **Q.**  And he never expressed being |
| 11:34:12 | 17  disappointed or upset that the policy might lapse |
| 11:34:17 | 18  before age 100? |
| 11:34:18 | 19     **A.**  **Those are two different questions.  So,** |
| 11:34:20 | 20  **yes, he was disappointed, but we had had** |
| 11:34:24 | 21  **conversations about a non-guaranteed product for** |
| 11:34:27 | 22  **years previous that given that interest rates are** |
| 11:34:29 | 23  **low, given that you may not have paid all the** |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

57

11:34:32  1  premiums that we originally anticipated.

11:34:34  2      In 2014, this wasn't a complete surprise to

11:34:38  3  John, we had numerous conversations about the fact

11:34:41  4  that there might be more cash needed to make this

11:34:44  5  policy work.

11:34:44  6      Q.  Did you ever put that in writing to

11:34:47  7  Dr. Repicci?

11:34:48  8      A.  I did.

11:34:48  9      Q.  Can you -- would you be able to provide

11:34:53  10  me with copies of that correspondence?

11:34:55  11      MR. TRACY:  We have.

11:34:57  12      BY MR. MOORE:

11:34:59  13      Q.  Can you recall anything specifically

11:35:01  14  where that's discussed?

11:35:03  15      A.  I had sent -- there's -- there's

11:35:06  16  definitely a letter in the evidence saying, these

11:35:10  17  are your options having talked to Lincoln, these

11:35:13  18  are your options of how you can pay $200,000 a

11:35:18  19  year, you can pay a lump sum, you can pay a number

11:35:__  20  of different ways to give yourself the guarantees

11:35:21  21  in these products, and I actually did that for both

11:35:25  22  the 026 and the 144 policies and gave him options,

11:35:28  23  I think, all the way back to maybe 2007 or

58

11:35:29  1  somewhere well before 2014.

11:35:30  2      So we had -- I had advised him long before

11:35:34  3  2014 that the policies and the interest rate

11:35:38  4  environment that would require additional cash --

11:35:41  5  additional premiums, which to the best of my

11:35:43  6  knowledge, he did not pay.

11:35:57  7      MR. MOORE:  For the record, we would like,

11:35:59  8  to the extent it's an outstanding document, to see

11:36:03  9  the correspondence with Dr. Repicci in any manner

11:36:08  10  regarding that issue.

11:36:10  11      BY MR. MOORE:

11:36:34  12      Q.  I'll show you what's been marked as

11:36:36  13  Exhibit 22.  Please let me know if you're familiar

11:36:47  14  with this document.

11:37:12  15      A.  Okay.  Yes, I've read it.

11:37:16  16      Q.  Okay.  And this -- is this a document

11:37:19  17  from you to Hy Polakoff?

11:37:21  18      A.  Yes, it is.

11:37:22  19      Q.  Okay.  Dated July 9th, 2015.  At the

11:37:28  20  end of the second paragraph, there's a sentence

11:37:31  21  that states:  We never sold a guaranteed death

11:37:35  22  benefit product of Lincoln because it wasn't

11:37:38  23  available in New York with the particular benefits

59

11:37:45  1  he was looking for at the time.

11:37:48  2      What -- and what were the particular

11:37:51  3  benefits he was looking for?

11:37:52  4      A.  New York has different -- products in

11:37:56  5  New York are different from almost every other

11:37:59  6  state that they have different -- they have

11:38:05  7  different requirements and it's the combination

11:38:12  8  of -- two things would be the guaranteed death

11:38:14  9  benefit and the low cash value, and those were two

11:38:18  10  things that were not available -- we couldn't

11:38:20  11  combine those two things in a product for John at

11:38:24  12  that time.  It wasn't available.

11:38:25  13      Q.  And was it available in any other

11:38:30  14  insurance company?

11:38:30  15      A.  Sure, but it's a MassMutual policy.

11:38:35  16      Q.  And why didn't you simply purchase

11:38:39  17  additional coverage under the MassMutual policy so

11:38:41  18  that could be guaranteed?

11:38:41  19      A.  MassMutual, because of the

11:38:45  20  underwriting, they actually rated wary.  They would

11:38:48  21  not go higher than 17.5.  They gave us the maximum

11:38:50  22  amount of insurance they could give us.  That's as

11:38:52  23  high as they would go.

60

11:38:53  1      Q.  Okay.

11:38:55  2      A.  I was a career agent at MassMutual at

11:39:00  3  the time, so I had every intent to try and place as

11:39:04  4  much business as possible, and that's as much as I

11:39:08  5  could get.

11:39:08  6      Q.  And were there other producers --

11:39:16  7  insurance companies in New York at the time that

11:39:20  8  were offering guaranteed policies?

11:39:21  9      A.  Other companies, I'm sure.  Guaranteed

11:39:23  10  product -- guaranteed product with low cash value,

11:39:28  11  I have no idea.

11:39:29  12      Q.  Did you make inquiry with any other

11:39:32  13  companies?

11:39:32  14      A.  Absolutely.  So I worked through two

11:39:35  15  companies -- three companies.  I went through

11:39:__  16  Visys, Millennium --

11:39:__  17      Q.  Can you spell --

11:39:40  18      A.  V-I-S-Y-S.  I went though Visys, I went

11:39:46  19  through Millennium Brokerage Group, and I went

11:39:48  20  through a third company, I can't remember, out of

11:39:51  21  Sherman Oaks, California, who were brokerage

11:39:55  22  companies and asked them for products that would

11:39:57  23  serve this purpose, and these were the ones that

61

1  were recommended.

2  Q.   And you said these were the ones that

3  were recommended?

4  A.   Lincoln and MassMutual were the two

5  companies that had products that matched.

6  Q.   Meaning guaranteed?

7  A.   Meaning low cash value, low value for

8  tax purposes early on.  The taxation was the

9  driving factor in the decision; it certainly

10  appeared that way.

11  Q.   Okay.  Let me show you what's been

12  marked as Exhibit 23, and then I'll ask you to

13  review it, please, and ask if you can identify it.

14  A.   Okay.

15  Q.   Are you familiar with this --

16  A.   I am.

17  Q.   -- correspondence?

18  And can you describe the correspondence,

19  please?

20  A.   It's a letter from me to his

21  accountant, Hy Polakoff, October 2002 before John

22  purchases the insurance, and I'm explaining --

23  Q.   And by the insurance, do you mean the

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

62

1  Lincoln 026 policy.

2  A.   Yes, this is regarding the Lincoln 026

3  policy.  There's also some commentary about the

4  MassMutual policy, as well.

5  Q.   Okay.  Is it fair to say that some

6  concerns were raised with regard to the Lincoln

7  policy that showed potential lapse of the policy

8  before age 100?

9  A.   There was concern about the guaranteed

10  page or columns of the illustration in the Lincoln

11  policy that showed that under a guaranteed

12  scenario, the policy would lapse in 15 years and

13  John wanted some explanation on what that was and

14  what it would take for that to happen.

15  Q.   And wasn't the concern that there be a

16  policy in place enforced at age 100?

17  A.   At this time, the conversation is about

18  the guaranteed.  We're talking specifically about

19  the guaranteed policy and what it would take for

20  this thing to blow up in 15 years.

21  Q.   When you -- just -- do you mean for the

22  policy to lapse in 15 years, or are you talking

23  about lapsing after 15 years?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

63

1  A.   This memo looks to be in response to

2  John's concerns about the guaranteed -- the two

3  numbers given in the illustration are the current

4  assumptions and the guaranteed.

5  Current showed to age 100, assuming

6  maintaining current interest crediting and current

7  mortality, and then separately there was a column

8  or separate columns that were under the guaranteed

9  scenario, which showed this policy lapsing in

10  around 15, 16 years, and that was -- I remember a

11  great deal of conversation about the guarantees and

12  this letter looks to be my commentary to Hy to

13  explain to him what I had just spoken to John about

14  with regard to the guarantees.

15  Q.   And the intent still is for the policy

16  to not lapse before age 100, correct?

17  MR. TRACY:  Objection.

18  THE WITNESS:  I don't know what John's

19  intent was.  My plan was to purchase a policy that

20  would meet the needs for tax -- for tax efficiency

21  in the short-term, and then later potentially shift

22  the policy to a guaranteed policy if one were

23  available and it made sense.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

64

1  BY MR. MOORE:

2  Q.   And didn't you say that the intent of

3  the policies was for it to last until age 100?

4  MR. TRACY:  Objection.

5  THE WITNESS:  I don't know if that's what I

6  said, but I believe what I said was the goal was to

7  have insurance when they died, whenever that might

8  be.

9  BY MR. MOORE:

10  Q.   Up to age 100, correct?

11  A.   I don't have a -- remember that being

12  John's explicit intent, it was just the numbers in

13  illustrations.

14  Q.   So is it simply random that age 100 was

15  picked out?

16  A.   It's not random, but that's when the

17  insurance company stops paying -- stops charging

18  mortality costs.

19  So if you can make it to 100 and you happen

20  to live to 110, the policy would illustrate to

21  continue to cover.  So the goal was to have a

22  policy that would pay out the death benefits.

23  Q.   Would continue to pay out death

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

65

11:46:09 1   benefits to what age?

11:46:11 2       A.   In a perfect world, until he dies --
11:46:15 3   until he and Lori died.

11:46:15 4       Q.   Can you look again at Exhibit 4,
11:46:18 5   please?  Can you take a look at the first
11:46:57 6   paragraph?

11:46:57 7       (A recess was then taken at 11:50 a.m.)

11:51:01 8       THE WITNESS:  Yes.

11:51:01 9       BY MR. MOORE:

11:51:01 10      Q.   Okay.  And didn't you previously
11:51:05 11  testify that these policies are designed to last to
11:51:09 12  age 100?

11:51:09 13      A.   Yeah, I did -- I did testify that
11:51:13 14  that -- the case and the policies -- the policies
11:51:16 15  were illustrated to last to age 100, yes.

11:51:21 16      Q.   And would you expect a client to
11:51:24 17  understand the policies were designed to last to
11:51:26 18  age 100?

11:51:27 19      A.   Under current assumptions, yes, but the
11:51:31 20  Mass policy, that's guaranteed; for the Lincoln,
11:51:34 21  that would require a certain set of circumstances
11:51:36 22  to continue.

11:51:37 23      Q.   Okay.  Looking now -- continuing with

66

11:51:43 1   Exhibit 23.

11:52:03 2       MR. TRACY:  Okay.  23.  There we go.

11:52:06 3       BY MR. MOORE:

11:52:07 4       Q.   And on the second page of that document
11:52:11 5   under the section of legal disclosures, is it fair
11:52:16 6   to say that you're making a more precise
11:52:20 7   distinction between a guaranteed portion of the
11:52:22 8   illustration versus the general -- the -- strike
11:52:30 9   that.  Let me rephrase that.

11:52:31 10      You are -- is it fair to say that you're
11:52:34 11  responding to concerns about an illustration
11:52:38 12  showing that the policy would lapse within
11:52:42 13  15 years?

11:52:42 14      A.   I'm addressing the concern of the
11:52:45 15  guarantee, yes.

11:52:46 16      Q.   Okay.  So -- and the last paragraph on
11:52:50 17  that page states that it would be impossible for 15
11:52:55 18  years of minimum crediting and a maximum mortality
11:52:59 19  charges to sneak up on us.  We see what happens
11:53:02 20  every year.  John, Lorraine, and I will know each
11:53:06 21  and every year what their policy is being credited.
11:53:10 22  If we see two or three bad years in a row, then we
11:53:14 23  will address the problem immediately so no major

67

11:53:17 1   problem arises for them or their children.

11:53:21 2       A.   I see that.

11:53:21 3       Q.   Okay.  And then the next paragraph is
11:53:24 4   options, and could you read that paragraph for us,
11:53:27 5   please?

11:53:27 6       A.   If we notice bad returns for a few
11:53:33 7   years, we would look at a number of options:
11:53:37 8   Option 1, change insurance companies; Option 2,
11:53:39 9   reduce the face amount of insurance to reduce
11:53:44 10  mortality expenses, however unlikely, even if the
11:53:49 11  policy had to be reduced significantly to, for
11:53:52 12  example, $7 million, the strategy would still be a
11:53:57 13  windfall for John's family because the proceeds
11:54:00 14  would pay out through the insurance trust income
11:54:02 15  and estate tax-free rather than be hit with both
11:54:06 16  sets of onerous taxes; Option 3, calculate how much
11:54:10 17  additional premium would have to be paid to
11:54:14 18  continue with 10-plus million of death benefit to
11:54:17 19  offset the bad year we had, or 4, see how many
11:54:21 20  years we are losing from two or three bad years.
11:54:26 21  It is impossible that two or three bad years -- it
11:54:29 22  is possible that two or three bad years only reduce
11:54:34 23  the coverage to end at age 95.  We can recalculate

68

11:54:37 1   how we're doing every year.  In fact, every annual
11:54:41 2   statement shows you where you are relative to your
11:54:45 3   initial purchase and projects what you might expect
11:54:47 4   given the conditions at that time.

11:54:48 5       Q.   Then in the following paragraph that's
11:54:51 6   titled conclusions, you state:  I am comfortable
11:54:56 7   that the illustrations based on current assumptions
11:54:59 8   that show John and Lorraine's policies lasting
11:55:03 9   beyond age 100 are a very accurate depiction of
11:55:06 10  what is likely to happen in this policy.

11:55:09 11      Now, given that statement, is it -- do I
11:55:13 12  understand that the options that you're discussing
11:55:19 13  in this letter mean that if the -- something should
11:55:26 14  happen to the policy that might potentially make it
11:55:31 15  lapse before age 100, if you could undertake the
11:55:34 16  steps to correct the situation; is that right?

11:55:37 17      A.   Yes.

11:55:37 18      Q.   Okay.  So, in other words, these things
11:55:43 19  can be done in order to make sure that the policy
11:55:45 20  is going to last to age 100?

11:55:47 21      A.   Correct.

11:55:47 22      Q.   And so is it fair to say that age 100
11:55:50 23  is important to the policy holder?

69

| | |
|---|---|
| 11:55:55 | 1 MR. TRACY: Objection. |
| 11:55:57 | 2 MR. MOORE: Strike that question. |
| 11:56:00 | 3 BY MR. MOORE: |
| 11:56:03 | 4 Q. Okay. Now, did you see what happened |
| 11:56:13 | 5 every year with regard to the 026 policy? |
| 11:56:17 | 6 A. We did receive statements, yes. |
| 11:56:22 | 7 Q. And can you tell me the first year that |
| 11:56:25 | 8 you noticed anything sneaking up that might be a |
| 11:56:29 | 9 problem with the policies? |
| 11:56:30 | 10 A. We had a conversation in 2000 -- we had |
| 11:56:41 | 11 conversations in 2006 about the Lincoln policy and |
| 11:56:48 | 12 John seemed very comfortable with where we were in |
| 11:56:51 | 13 2006 because he went and bought a second policy |
| 11:56:55 | 14 that looked very similar. |
| 11:56:59 | 15 So it would seem -- I can't imagine John |
| 11:57:05 | 16 would buy a similar policy from David when he's |
| 11:57:09 | 17 unhappy with where he was with his -- with the 144 |
| 11:57:12 | 18 policy. |
| 11:57:13 | 19 I'd say it was a couple of years after that, |
| 11:57:23 | 20 2007-2008, I can't remember when the letter was |
| 11:57:30 | 21 when we realized that we may have to pay more |
| 11:57:33 | 22 premium, which was the solution in Option 3 from |
| 11:57:42 | 23 Exhibit 23. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

70

| | |
|---|---|
| 11:57:45 | 1 Q. Mr. Jarvis, let me show you what's been |
| 11:58:46 | 2 marked as Exhibit 41, and these are two annual |
| 11:58:53 | 3 statements from Lincoln with regard to the 026 |
| 11:58:57 | 4 policy, the 2005 statement, a page from 2009, as |
| 11:59:06 | 5 well. Are you familiar with these documents? |
| 11:59:09 | 6 A. I don't recall them, but I know this is |
| 11:59:12 | 7 the annual statement. |
| 11:59:12 | 8 Q. Did you receive these annually? |
| 11:59:14 | 9 A. Yes. |
| 11:59:14 | 10 Q. Okay. And I note on the first page |
| 11:59:19 | 11 you're listed as a financial representative -- |
| 11:59:21 | 12 A. Yes. |
| 11:59:22 | 13 Q. -- of this policy? |
| 11:59:27 | 14 Page 2 of these statements -- of this |
| 11:59:31 | 15 statement, I'm looking at Bates number 381, in the |
| 11:59:39 | 16 first half of the page, it states: If planned |
| 11:59:44 | 17 premiums are paid using guaranteed rates based on |
| 11:59:47 | 18 your premium pattern, your policy will lapse as of |
| 11:59:53 | 19 April 2016. |
| 11:59:53 | 20 Then it goes on, the next section is: If no |
| 11:59:56 | 21 additional premiums are paid using the guaranteed |
| 12:00:00 | 22 rate, again, the policy will lapse as of |
| 12:00:04 | 23 April 2016. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

71

| | |
|---|---|
| 12:00:06 | 1 Did you have any conversations with |
| 12:00:08 | 2 Dr. Repicci reflecting that fact? |
| 12:00:13 | 3 A. No, I don't believe we had any further |
| 12:00:16 | 4 conversations. This is consistent with the |
| 12:00:18 | 5 original -- with the original illustration |
| 12:00:22 | 6 language, and I'm still not concerned about the |
| 12:00:25 | 7 guaranteed being an issue. |
| 12:00:25 | 8 Q. Are you concerned about the policy |
| 12:00:29 | 9 lapsing at all? |
| 12:00:30 | 10 A. At this point, we're crediting well |
| 12:00:39 | 11 above the minimum and the expenses have not gone up |
| 12:00:44 | 12 so we're not on track -- we're well above the |
| 12:00:51 | 13 minimums. So I wouldn't say there was a great deal |
| 12:00:56 | 14 of concern by either one of us. |
| 12:00:57 | 15 Q. What was the first year that you |
| 12:00:59 | 16 noticed any problem with the policy lasting to age |
| 12:01:04 | 17 100? |
| 12:01:04 | 18 A. I don't remember. |
| 12:01:05 | 19 Q. Did you ever determine that there was a |
| 12:01:10 | 20 potential problem with the policy lasting until age |
| 12:01:14 | 21 100? |
| 12:01:14 | 22 A. Sure. |
| 12:01:15 | 23 Q. When? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

72

| | |
|---|---|
| 12:01:15 | 1 A. I don't recall. |
| 12:01:16 | 2 Q. Any sense of within a couple of years, |
| 12:01:22 | 3 within -- was it more than five years after the |
| 12:01:25 | 4 policy was purchased? |
| 12:01:26 | 5 A. Probably more than five. |
| 12:01:32 | 6 Q. And what was the nature of the concern? |
| 12:01:36 | 7 A. Well, the nature of the concern was the |
| 12:01:43 | 8 interest rates had dropped and the policy's current |
| 12:01:46 | 9 assumption illustrations aren't looking like what |
| 12:01:49 | 10 we had originally hoped they would be. |
| 12:01:51 | 11 So at that point, we've gone from 5.25 |
| 12:01:57 | 12 annual crediting down to 4, and it looks like we |
| 12:02:01 | 13 might need some more cash. |
| 12:02:03 | 14 Q. And did you send anything to |
| 12:02:08 | 15 Dr. Repicci reflecting that concern? |
| 12:02:10 | 16 A. Yes. |
| 12:02:10 | 17 Q. And what did you send? |
| 12:02:12 | 18 A. We had conversations and I -- we had |
| 12:02:15 | 19 new illustrations, and I sent John premium |
| 12:02:18 | 20 schedules to cover what he'd have to pay to cover |
| 12:02:23 | 21 these policies. |
| 12:02:24 | 22 MR. MOORE: And for the record, could you |
| 12:02:26 | 23 produce a copy of those, please, all that |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

73

| | |
|---|---|
| 12:02:29 | 1 documentation, please? |
| 12:02:31 | 2 MR. TRACY: Just put that writing. We'll |
| 12:02:33 | 3 take that under advisement. |
| 12:02:38 | 4 BY MR. MOORE: |
| 12:02:39 | 5 Q. Can you state for me again what it was |
| 12:02:44 | 6 you provided Dr. Repicci? |
| 12:02:44 | 7 A. In-force illustrations -- well, a |
| 12:02:46 | 8 letter -- I forwarded him a letter from Lincoln |
| 12:02:52 | 9 where a Lincoln representative had come up with |
| 12:02:55 | 10 different options for John to pay premiums to cover |
| 12:02:59 | 11 the death benefit, to extend that death benefit for |
| 12:03:04 | 12 a longer period of time, and those were forwarded |
| 12:03:07 | 13 to John. |
| 12:03:07 | 14 Q. And do you know approximately, vaguely, |
| 12:03:10 | 15 what year that might have been? Was it -- let me |
| 12:03:14 | 16 ask you this, was it after 2010? |
| 12:03:18 | 17 A. I think it was before. |
| 12:03:19 | 18 Q. Okay. |
| 12:03:28 | 19 A. It may not have been. Honestly, I'd |
| 12:03:30 | 20 have to go back and look. |
| 12:03:32 | 21 Q. And how would you typically communicate |
| 12:03:34 | 22 with Dr. Repicci? |
| 12:03:35 | 23 A. Phone calls typically. John liked to |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

74

| | |
|---|---|
| 12:03:39 | 1 talk. |
| 12:03:40 | 2 Q. Did you follow-up with a letter or |
| 12:03:43 | 3 e-mails sometimes? |
| 12:03:43 | 4 A. John wasn't big in e-mail, but |
| 12:03:48 | 5 sometimes we'd fax. His fax number was his home |
| 12:03:48 | 6 phone number so sometimes it rang and sometimes it |
| 12:03:51 | 7 wouldn't. |
| 12:03:52 | 8 So sometimes it was fax, sometimes it was |
| 12:03:54 | 9 letter, sometimes it was -- or something like that. |
| 12:03:59 | 10 I definitely forwarded an e-mail and potentially |
| 12:04:05 | 11 sent an e-mail to Hy so Hy has it. |
| 12:04:07 | 12 Q. Do you have the same recollection of |
| 12:04:10 | 13 having sent him in-force illustrations and other |
| 12:04:14 | 14 materials that relate to your concern about the |
| 12:04:16 | 15 policy lapsing before age 100? |
| 12:04:19 | 16 MR. TRACY: Object to the form. |
| 12:04:20 | 17 THE WITNESS: We had conversations about the |
| 12:04:22 | 18 policies not -- not projecting to last to age 100 |
| 12:04:27 | 19 because of the lower interest rates and had |
| 12:04:32 | 20 numerous conversations with Lincoln, and I |
| 12:04:36 | 21 forwarded to John premium options on how much it |
| 12:04:39 | 22 was cost with recommendations on how to protect the |
| 12:04:43 | 23 long-term death benefit of the 026 and the 144 |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

75

| | |
|---|---|
| 12:04:48 | 1 policies. |
| 12:04:48 | 2 BY MR. MOORE: |
| 12:04:49 | 3 Q. Did you look into changing insurance |
| 12:04:52 | 4 companies? |
| 12:04:52 | 5 A. Yes. |
| 12:04:52 | 6 Q. When did that occur? |
| 12:04:57 | 7 A. Changing insurance company |
| 12:05:06 | 8 conversation, '11-'12, and subsequent years after |
| 12:05:10 | 9 that, and the surrender charges were too big of a |
| 12:05:17 | 10 problem. |
| 12:05:17 | 11 Q. And what about reduction in face |
| 12:05:21 | 12 amounts of insurance? |
| 12:05:24 | 13 A. I'm sure we looked at that, too, and I |
| 12:05:32 | 14 cannot remember what the answer was to that one, |
| 12:05:35 | 15 whether it was possible or might -- I vaguely |
| 12:05:43 | 16 recall the challenge of that is it would have |
| 12:05:47 | 17 caused possible surrender charges, which would have |
| 12:05:50 | 18 been eating up more cash and wasn't a desire. |
| 12:05:53 | 19 Q. Okay. And looking at option number |
| 12:05:55 | 20 three, calculating how much additional premium |
| 12:05:58 | 21 would have to be paid to continue with 10 million |
| 12:06:01 | 22 plus a death benefit to offset the bad years, was |
| 12:06:04 | 23 that done? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

76

| | |
|---|---|
| 12:06:04 | 1 A. Yes. |
| 12:06:05 | 2 Q. When was that done? |
| 12:06:07 | 3 A. I don't remember. |
| 12:06:07 | 4 Q. Do you recall whether it was prior to |
| 12:06:11 | 5 2010? |
| 12:06:12 | 6 A. I don't remember. |
| 12:06:13 | 7 Q. Do you have any recollection of doing |
| 12:06:17 | 8 that within a few years of purchase of the 026 |
| 12:06:22 | 9 policy? |
| 12:06:23 | 10 A. Definitely not within a few years of |
| 12:06:27 | 11 the 026 policy. |
| 12:06:27 | 12 Q. Do you think it would have been within |
| 12:06:29 | 13 five years after the purchase of the policy? |
| 12:06:31 | 14 A. Yes. |
| 12:06:31 | 15 Q. And do you think it might have been in |
| 12:06:34 | 16 2014? |
| 12:06:34 | 17 A. I don't remember. |
| 12:06:37 | 18 Q. Okay. Would you have sent any |
| 12:06:40 | 19 documentation relaying that to Dr. Repicci? |
| 12:06:44 | 20 A. Yes. |
| 12:06:45 | 21 MR. MOORE: And for the record, I'd like to |
| 12:06:47 | 22 request any such documentation. |
| 12:06:50 | 23 MR. TRACY: Send it in writing and we'll |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

77

| | |
|---|---|
| 12:06:53 | 1 take it under advisement. |
| 12:06:56 | 2 **BY MR. MOORE**: |
| 12:07:02 | 3 **Q.** Number 4, see how many years we are |
| 12:07:04 | 4 losing from two or three bad years. It is possible |
| 12:07:06 | 5 that two or three bad years will reduce the |
| 12:07:08 | 6 coverage to end at age 95. We can recalculate how |
| 12:07:12 | 7 you're doing every year. |
| 12:07:14 | 8 Was that done every year? |
| 12:07:15 | 9 **A.** Not that I can recall. |
| 12:07:19 | 10 **Q.** Did you have any kind of formal review |
| 12:07:28 | 11 of the policies at the end of every year? |
| 12:07:31 | 12 **A.** We did not. |
| 12:07:32 | 13 **Q.** Is it fair to say that this letter |
| 12:07:37 | 14 leaves a clear impression now if there were any |
| 12:07:41 | 15 issues that arose with the non-guaranteed Lincoln |
| 12:07:52 | 16 policy that they could be corrected? |
| 12:07:54 | 17 **MR. TRACY:** Objection. |
| 12:07:57 | 18 **THE WITNESS:** The letter clearly states that |
| 12:08:00 | 19 there are options and I'm happy to help them pursue |
| 12:08:04 | 20 and look at any one of those or any combination of |
| 12:08:22 | 21 those four options. |
| 12:08:25 | 22 There's no claim that every problem can be |
| 12:08:29 | 23 fixed, there's an explanation that there are |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

78

| | |
|---|---|
| 12:08:32 | 1 options we can pursue. |
| 12:08:35 | 2 **MR. MOORE:** Can we go off the record here? |
| 12:08:37 | 3 **MR. TRACY:** Sure. |
| 12:18:19 | 4 (A recess was then taken at 12:08 p.m.) |
| 12:29:37 | 5 **BY MR. MOORE**: |
| 12:30:06 | 6 **Q.** Before we get to Exhibit 24, let me ask |
| 12:30:12 | 7 you again, looking at -- Mr. Jarvis, looking at |
| 12:30:40 | 8 Exhibit 23 again, and I think you testified that |
| 12:30:48 | 9 you did receive annual statements with regard to |
| 12:30:52 | 10 the policies? |
| 12:30:52 | 11 **A.** Yes, I did. |
| 12:30:53 | 12 **Q.** And I did ask if you have any |
| 12:30:56 | 13 recollection of when the first time is you felt |
| 12:31:00 | 14 that there were any problems with the policy, and I |
| 12:31:04 | 15 believe you indicated you don't recall. Can you |
| 12:31:08 | 16 tell me if you believe that there were any problems |
| 12:31:12 | 17 with the policies before five years out? |
| 12:31:16 | 18 **A.** I don't remember. |
| 12:31:16 | 19 **Q.** Okay. Okay. So you don't have any |
| 12:31:20 | 20 recollection of when you may have seen anything |
| 12:31:28 | 21 with regard to the policies not performing? |
| 12:31:29 | 22 **A.** I don't recall, no. I don't recall |
| 12:31:31 | 23 when that first happened. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

79

| | |
|---|---|
| 12:31:32 | 1 **Q.** Okay. Are you familiar with this |
| 12:31:56 | 2 document, Exhibit 24? |
| 12:31:58 | 3 **A.** Give me one sec. |
| 12:32:00 | 4 **Q.** Sure. |
| 12:32:10 | 5 **A.** Yes. |
| 12:32:11 | 6 **Q.** Okay. And it appears this is a letter |
| 12:32:18 | 7 that follows your letter of October 9th, 2002, to |
| 12:32:23 | 8 Hy Polakoff? |
| 12:32:24 | 9 **A.** This is to John and Lori on |
| 12:32:30 | 10 October 9th, so I don't know which one was first, |
| 12:32:33 | 11 but ... |
| 12:32:33 | 12 **Q.** Okay. All right. From you, correct? |
| 12:32:34 | 13 **A.** Yes. |
| 12:32:35 | 14 **Q.** All right. And the -- in the first |
| 12:32:39 | 15 paragraph, you talked about guaranteed versus |
| 12:32:43 | 16 projected insurance illustration. |
| 12:32:44 | 17 And number five there, it says you assume |
| 12:32:47 | 18 similar rationale for the Lincoln policy, as well, |
| 12:32:50 | 19 correct? |
| 12:32:50 | 20 **A.** That's what it says in number five, |
| 12:32:54 | 21 yes. |
| 12:32:54 | 22 **Q.** Did that rationale hold up through the |
| 12:32:57 | 23 entire length of the policy, the Lincoln policy? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

80

| | |
|---|---|
| 12:32:59 | 1 **A.** Let me read this to see what -- that |
| 12:33:04 | 2 rationale paragraph. |
| 12:33:06 | 3 The fact that number one, the guaranteed |
| 12:33:09 | 4 illustration pages assume higher mortality and a |
| 12:33:13 | 5 minimum crediting, generally speaking, that's the |
| 12:33:16 | 6 same for both policies. |
| 12:33:22 | 7 Mass has not raised its mortality charges -- |
| 12:33:37 | 8 to assume 3 percent every single year would be |
| 12:33:40 | 9 prudent. Obviously Lincoln had a higher minimum, |
| 12:33:44 | 10 so that would make sense. |
| 12:34:01 | 11 Yeah, the fact that crediting rates dropped, |
| 12:34:05 | 12 he may not get as far as he wants, but he'd get |
| 12:34:09 | 13 pretty far, I think that's generally the case. |
| 12:34:13 | 14 I mean, similar rationale, but it has |
| 12:34:16 | 15 different crediting rates, different illustrations, |
| 12:34:18 | 16 but the idea that changes may come, sure. |
| 12:34:24 | 17 **Q.** And then you make the statement in |
| 12:34:28 | 18 number 4: I don't think this option is very |
| 12:34:31 | 19 likely, but it should be very comforting that a |
| 12:34:34 | 20 likely worst case scenario still gets you and |
| 12:34:37 | 21 Lorraine coverage into your 90s; is that correct? |
| 12:34:39 | 22 **A.** I wrote that. |
| 12:34:40 | 23 **Q.** At any point did you feel that |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

81

12:34:42 1 conclusion change?

12:34:44 2      A.    Yeah, at some point the current
12:34:48 3 assumption showed they were getting into their late
12:34:52 4 80s to around 90, that did change.

12:34:55 5      Q.    And you don't have any recollection of
12:34:58 6 when?

12:34:59 7      A.    I couldn't tell you when the
12:35:02 8 conversation took place, but after some period of
12:35:18 9 time of extremely low interest rates, it did become
12:35:23 10 obvious that the projections were not going to be
12:35:27 11 met.  I just don't know when exactly that happened.

12:35:29 12      Q.    And did you make any recommendations --
12:35:31 13 written recommendations to Dr. Repicci when things
12:35:34 14 began to change?

12:35:35 15      A.    We had many conversations about paying
12:35:39 16 more premium in, and I'm sure I sent him some
12:35:47 17 numbers.  Again, the date, you asked me earlier, I
12:35:48 18 can't remember when 100 percent.

12:35:49 19      Q.    Let me show you what's been marked as
12:35:58 20 Exhibit 25, and I'm going to ask you to review and
12:36:01 21 identify if you're able to.

12:36:17 22      A.    Okay.

12:36:36 23      Q.    Are you familiar with this document?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

82

12:36:40 1      A.    I am.

12:36:41 2      Q.    And can you tell us did you write this
12:36:46 3 letter?

12:36:46 4      A.    I did.

12:36:47 5      Q.    And who was it to?

12:36:48 6      It was to John.

12:36:49 7      Q.    Can you describe generally what the
12:36:51 8 letter entails?

12:36:52 9      A.    So we're discussing John's interest in
12:36:57 10 a guaranteed product with the understanding that
12:37:00 11 the current -- that he's not going to be able to
12:37:05 12 buy that product now and get the tax benefits he
12:37:09 13 desires.

12:37:09 14      So we're looking at what options may exist
12:37:12 15 in the future, assuming all things stay the same,
12:37:16 16 what options we would have, what it might look
12:37:19 17 like, what we might be able to expect if we make an
12:37:26 18 exchange in the future.

12:37:28 19      Q.    And this is an exchange to a guaranteed
12:37:30 20 product of Lincoln's, correct?

12:37:33 21      A.    Correct.

12:37:33 22      Q.    Okay.  And so that product existed in
12:37:36 23 November 2002, correct?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

83

12:37:36 1      A.    Correct.

12:37:38 2      Q.    Okay.  And that product could have been
12:37:40 3 purchased in November 2002?

12:37:42 4      A.    If John didn't want tax benefits, yes,
12:37:48 5 but he opted for the tax benefits.

12:37:51 6      Q.    Okay.  And -- but you state that the --
12:37:53 7 towards the end of that letter, you state in the
12:37:57 8 third last paragraph:  I think this is a very
12:38:03 9 desirable position for you and it should alleviate
12:38:03 10 some of your fears.

12:38:03 11      What were his fears?

12:38:05 12      A.    Well, John was concerned about the
12:38:10 13 guaranteed illustration column and he preferred
12:38:14 14 something that was -- nothing has changed in the
12:38:18 15 situation.

12:38:18 16      John would rather have guarantees than not
12:38:22 17 having guarantees, but ultimately, he wanted to
12:38:25 18 figure out how to have his cake and eat it, too.

12:38:28 19      So he wanted the deduction and he wanted the
12:38:30 20 guarantees, and the challenge was we had to wait a
12:38:34 21 couple of years, you know, as I previously
12:38:37 22 testified, and waited a couple of years, situation
12:38:41 23 changed with the carrier and --

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

84

12:38:43 1      Q.    When you say a couple of years, at what
12:38:46 2 point did things change with the carrier?

12:38:49 3      A.    When we tried to do internal exchanges,
12:38:53 4 they wouldn't allow it without surrender charges.

12:38:56 5      Q.    Okay.  Now, I haven't seen any
12:38:59 6 documents prior to 2014 where there was discussions
12:39:01 7 with the carrier about internal exchanges.  Were
12:39:03 8 there any before that date?

12:39:04 9      A.    I don't know if there were or not.

12:39:06 10      Q.    Do you know for sure that there were?

12:39:08 11      A.    No, I don't.

12:39:09 12      Q.    So it's possible that the first time
12:39:11 13 that discussion occurred was in 2014 or later?

12:39:14 14      A.    I think it was probably more in 2011,
12:39:18 15 worst case scenario, but is it possible?  Sure.

12:39:21 16      Q.    The last sentence, fair to say, you
12:39:24 17 state:  Of course we don't have to decide about the
12:39:29 18 conversion for another two or three years.

12:39:32 19      Why don't you have to decide for another two
12:39:36 20 or three years?

12:39:36 21      A.    Well, a few reasons:  One, Lincoln
12:39:39 22 didn't allow conversions for at least two years,
12:39:43 23 that was one, and John had to fund the policy and

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

85

12:39:45 1 move it, so we had to wait that long, anyway.

12:39:49 2       Q.    Is there any -- is there any

12:39:52 3 documentation that they would not allow the

12:39:54 4 conversion for two or three years -- or two years?

12:39:56 5       A.    It was somewhere in the earlier

12:39:59 6 conversations.  I actually saw it in one of the

12:40:01 7 exhibits that it was written.

12:40:01 8       So my guess is I had asked before when could

12:40:06 9 we do this.  Prior to -- in October of 2002,

12:40:11 10 there's conversations with Lincoln because John

12:40:14 11 wants to know when he could do this, and I recall

12:40:16 12 one of the earlier exhibits saying that they won't

12:40:20 13 allow exchanges for at least 24 months.

12:40:23 14       Q.    So, hypothetically, if an exchange had

12:40:27 15 happened after two years, that you're saying was

12:40:33 16 the policy of Lincoln's, would the tax benefits

12:40:36 17 have been the same for Dr. Repicci?

12:40:41 18       A.    The tax benefits had already taken

12:40:45 19 place by year two.  So anything after year two, he

12:40:53 20 could have possibly had both.

12:40:53 21       Q.    And did you have any correspondence

12:41:02 22 with Dr. Repicci after year two to make this

12:41:05 23 internal exchange?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

86

12:41:07 1       A.    I don't remember.

12:41:08 2       Q.    No recollection at all?

12:41:11 3       A.    No.

12:41:11 4       Q.    So it's possible you didn't have any

12:41:14 5 further correspondence about the issue?

12:41:16 6       A.    It's highly unlikely, but ...

12:41:22 7       Q.    But in your view, this would be a very

12:41:25 8 desirable position for the client to have a

12:41:27 9 guaranteed policy in place, correct?

12:41:29 10       A.    Plus the tax benefits, yes, that would

12:41:32 11 be a good situation.

12:41:34 12       Q.    Let me show you what's been marked as

12:41:51 13 Exhibit 26.  I'll ask you to review and ask if you

12:42:02 14 can identify the document.

12:42:38 15       A.    Okay.

12:42:39 16       Q.    And can you -- is this a letter from

12:42:48 17 you to Dr. and Mrs. Repicci?

12:42:51 18       A.    Yes.

12:42:51 19       Q.    Okay.  And can you briefly describe

12:42:55 20 what it is?

12:42:56 21       A.    Before the last document, and this is a

12:43:00 22 conversation about giving him -- explaining to John

12:43:06 23 what his options are with the policy and

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

87

12:43:12 1 explaining -- giving him an option for securing

12:43:16 2 guaranteed death benefit in the future.

12:43:20 3       Q.    Okay.  Now, this is in October 2003.

12:43:26 4 Now, in 2002 -- the end of 2002, we had previously

12:43:31 5 noted that there was discussions about a guaranteed

12:43:35 6 product by Lincoln.

12:43:38 7       Now you state in the third paragraph:  To

12:43:40 8 begin with, we were able to find the Lincoln policy

12:43:43 9 that would guarantee over 6 million if you do an

12:43:47 10 internal exchange.

12:43:48 11       Is that a different guaranteed product than

12:43:50 12 the one that was described at the end of 2002?

12:43:53 13       A.    I don't recall.  It was 20 years ago,

12:44:01 14 but given that the death benefit number is

12:44:03 15 different, then I would think -- either it's a

12:44:06 16 different product or the illustration just looks

12:44:09 17 different.  When I say, got an updated

12:44:13 18 illustration, that we must have got from Lincoln

12:44:16 19 because I can see it in the back.

12:44:21 20       Q.    I'm looking at page 36, somewhere

12:44:26 21 randomly here, and it's --

12:44:28 22       A.    Actually, can I answer the previous

12:44:__ 23 question?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

88

12:44:29 1       Yes, it is a different product.  The

12:44:31 2 previous -- in November 2002, we ran an

12:44:33 3 illustration for the SULLPR2, and the one that I'm

12:44:38 4 sending John is the SULLPR3.

12:44:41 5       So Lincoln has a new product available so

12:44:44 6 I'm letting John know there's a new product that

12:44:47 7 actually is different from the one I had mentioned

12:44:50 8 11 months previously.

12:44:50 9       Q.    And it sounds like both products were

12:44:53 10 recommended by you?

12:44:54 11       A.    Recommended we look at them, you know,

12:44:57 12 when the period comes up.  I can't get them now so

12:45:02 13 I can't recommend them, but I'm pointing out

12:45:06 14 there's something here that we should have on our

12:45:09 15 radar in the future.

12:45:10 16       Q.    In the November 12th, 2002, letter,

12:45:14 17 which is Exhibit 25, you state that this -- I think

12:45:15 18 this is a very desirable position.

12:45:18 19       Would it also be your belief that the

12:45:22 20 product described in Exhibit 26 would also be a

12:45:25 21 very desirable position?

12:45:28 22       A.    Yes.

12:45:30 23       Q.    Okay.  And do you know if this internal

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

89

12:45:37   1   exchange took place?

12:45:38   2       A.   It did not.

12:45:39   3       Q.   Do you know why?

12:45:40   4       A.   I'm not sure John made the premium

12:45:45   5   payments that I recommended, first of all.

12:45:48   6       Q.   Can you tell me what premium

12:45:51   7   recommendations you made?

12:45:52   8       A.   I recommended that he pay a total of

12:45:55   9   1.8 million, and I don't know if all 1.8 was

12:45:59  10   actually paid or if it was 1.2.

12:46:07  11       And I could just may be getting confused

12:46:11  12   with the 1.2 that was paid with the Mass, or that

12:46:14  13   John didn't pay the full.  I can't recall, so that

12:46:15  14   could be part of the reason for the reduced

12:46:18  15   performance.

12:46:19  16       Q.   Did you follow up with the client

12:46:23  17   routinely to see where they were on payment

12:46:26  18   premiums?

12:46:26  19       A.   Once this year was -- we did talk about

12:46:30  20   this, but the program got cut short because the tax

12:46:36  21   law changed, and I can't remember if John got the

12:46:41  22   money in on time or not.

12:46:42  23       Q.   Now, it's my understanding that the --

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

90

12:47:00   1   the amount for premiums paid with Lincoln was --

12:47:05   2   total premiums was 1.2 million, and what you're

12:47:10   3   saying, if I understand you correctly, is that

12:47:11   4   you're not certain but that may be the case?

12:47:14   5       A.   I believe that to be the case as I'm

12:47:18   6   looking at this, and if he pays 1.2 million and not

12:47:23   7   1.8 million, you couldn't make same -- you couldn't

12:47:26   8   make an exchange for something that was only worth

12:47:28   9   two-thirds as much.

12:47:29  10       So the original assumptions are never going

12:47:32  11   to work when the policy has 33 percent less premium

12:47:36  12   in it.  So that was a big reason for the challenge

12:47:41  13   of it since the exact things that were said -- the

12:47:41  14   cash wasn't the same, so you'd have to put money

12:47:42  15   going in.

12:47:42  16       Q.   So you would have had approximately

12:47:46  17   two-thirds less cash going in since -- if he paid

12:47:50  18   1.2 million in premiums and you had originally

12:47:54  19   anticipated 1.8, you'd have approximately

12:47:57  20   two-thirds of the value of that to work with.

12:48:01  21       So is it a fair assumption, looking at

12:48:05  22   Exhibit 26, third paragraph where you talk about a

12:48:08  23   Lincoln policy with the guaranteed 6 million, is it

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

91

12:48:11   1   fair to assume that you would have been able to get

12:48:15   2   a guaranteed policy at 4 million at that point?

12:48:17   3       A.   No, because it's more heavy expenses

12:48:20   4   towards the front end.  So if he had done -- if he

12:48:24   5   asked me to prepare 600,000 times three to a

12:48:28   6   400,000 times three, then your assumption is

12:48:30   7   correct, it'd be about two-thirds, because he would

12:48:32   8   have started with a lower death benefit amount.

12:48:49   9       If you asked me to compare an illustration

12:48:56  10   with $600,000 a year for three years and 25 million

12:49:04  11   of death benefit against a policy with $400,000 a

12:49:09  12   year times three and a death benefit of

12:49:14  13   18 thousand 5, I would say the cash value -- I

12:49:19  14   would say the numbers are comparable in that you'd

12:49:22  15   expect two-thirds as much long-term guaranteed

12:49:27  16   death benefit, but because of -- because the client

12:49:33  17   paid two years at 600,000 instead of three and had

12:49:39  18   a death benefit at 25 million, there'd be some

12:49:45  19   additional -- I'm trying to find the right word --

12:49:53  20   shrinkage.  It would not be as efficient.

12:49:58  21       So 600,000 times two -- 600,000 a premium

12:50:03  22   times two years is not the same as 400,000 times

12:50:08  23   three.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

92

12:50:08   1       So super longwindedly, I'm answering

12:50:12   2   counsel's question to say 600 times two does not

12:50:16   3   necessarily mean we could guarantee two-thirds of

12:50:19   4   the 6 million that's in the letter.  Sorry that's

12:50:22   5   so long.

12:50:22   6       Q.   Okay.  So I understand it then, in

12:50:33   7   October of 2003, even if something less than 1.8

12:50:40   8   million had been paid in premiums into Lincoln 026,

12:50:45   9   and I believe we're at the understanding it was

12:50:47  10   1.2 million total, there was still a guaranteed

12:50:50  11   policy in place that would have been available to

12:50:52  12   the client or --

12:50:55  13       A.   The fact that the client paid in less

12:50:59  14   does not mean that they couldn't make an exchange,

12:51:02  15   it just means that all the assumptions I made are

12:51:06  16   not valid.

12:51:08  17       All the predicates, or assumptions, or

12:51:10  18   illustrations I gave don't apply because the client

12:51:14  19   didn't do what I recommended.  We have less money

12:51:16  20   to play with.

12:51:17  21       Q.   And when -- can you tell me more about

12:51:22  22   the tax change that occurred?

12:51:24  23       A.   The valuation -- I can't remember the

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

93

12:51:30  1   notice, but there was a notice that the valuation
12:51:36  2   of policies was going to change 2002 dash something
12:51:43  3   or 2003 dash something, that the valuation of
12:51:46  4   policies would change.
12:51:47  5        So all the original illustrations, all the
12:51:51  6   discussions we threw out with numbers all ended up
12:51:54  7   getting tweaked, and you can tell by the premium
12:51:58  8   payment in the policies, MassMutual was originally
12:52:00  9   illustrated at 400,000 times three, John escalated
12:52:05 10   to 600,000 times two to get two premiums in and to
12:52:10 11   remove the policy in -- at the end of 2003.
12:52:12 12        With Lincoln, he did 600,000 times two
12:52:16 13   instead of what I recommended, which was -- later
12:52:20 14   was pay more money in.  Second year -- so this is
12:52:27 15   all about the tax law change.
12:52:29 16        The valuation of the policies, which John
12:52:31 17   ended up getting a massive tax savings, that was
12:52:35 18   the valuation of policies on both plans, that
12:52:41 19   changed.
12:52:42 20        Q.   So at what point did you learn that
12:52:51 21   Dr. Repicci did not make a third payment of 600,000
12:52:55 22   to the 026 policy?
12:52:57 23        A.   I don't remember.  Probably right after

94

12:52:59  1   the year it happened, right after the premium
12:53:02  2   notice came.
12:53:02  3        Q.   And would you have been in
12:53:05  4   communication with him about that?
12:53:06  5        A.   Definitely.
12:53:07  6        Q.   And what did you say?
12:53:08  7        A.   I can't remember.  It was 18 years ago.
12:53:12  8   The conversation would -- I can't remember at this
12:53:18  9   point.  My speculation on that one is John paid
12:53:28 10   less and said, we'll figure it out.
12:53:31 11        Q.   And is that something you would have
12:53:35 12   documented in writing?
12:53:36 13        A.   Obviously I didn't.
12:53:43 14        Q.   Would you normally have?
12:53:44 15        A.   In 2003, probably not.
12:53:48 16        Q.   Within the first five years of
12:54:00 17   ownership of the 026 policy, do you recall any
12:54:05 18   conversations other than those reflected in
12:54:09 19   Exhibits 25 and 26 about any concerns related to
12:54:12 20   the performance of the 026 policy?
12:54:15 21        A.   Not specifically, but when -- we had
12:54:24 22   conversations around the -- when we had
12:54:27 23   conversations around the previous exhibits with

95

12:54:31  1   relation to his estate planning and introducing him
12:54:35  2   to David for the license executive benefit, John
12:54:38  3   did bring up, I'm happy to do some more planning,
12:54:41  4   but I want to talk about this policy.
12:54:43  5        Q.   And what did you tell him about this
12:54:45  6   policy, the 026 policy?
12:54:46  7        A.   We had phone calls and talked about the
12:54:47  8   illustrations and what are we expecting and where
12:54:51  9   we are, and obviously the end result was to keep it
12:54:54 10   as is and see what happens.
12:54:55 11        Q.   And were there any written documents to
12:54:57 12   that effect?
12:54:58 13        A.   I don't have any in my records, so if
12:55:02 14   there were, I don't seem to have them.
12:55:02 15        Q.   Would you have been concerned that
12:55:04 16   Dr. Repicci contributed 1.2 million rather than the
12:55:09 17   1.8 into the 026?
12:55:12 18        A.   Sure, which was part of the discussion
12:55:15 19   we had with Hy, Celia, and David, and John about
12:55:18 20   his need for more insurance.  So he wasn't going to
12:55:21 21   have as much insurance because he put less money
12:55:22 22   in, so that also was part of the discussion of,
12:55:25 23   John, we need more money for estate planning, and

96

12:55:28  1   that initiated that conversation.
12:55:29  2        Q.   Now, we've seen this prior
12:55:33  3   documentation that showed that you gave fairly
12:55:34  4   explicit instruction about payment of premiums in
12:55:39  5   the MassMutual and the Lincoln 026 policy.
12:55:45  6        Was this the extent of the recommendation
12:55:49  7   about payment on the 026 policy and the records we
12:55:57  8   see now, Exhibit 26?
12:55:58  9        MR. TRACY:  Object to the form.
12:55:59 10        THE WITNESS:  I'm not sure what you're
12:55:59 11   saying.
12:56:00 12        BY MR. MOORE:
12:56:00 13        Q.   Well, do you follow up -- obviously,
12:56:02 14   earlier you were tracking what the client was doing
12:56:06 15   in terms of payment, you want to make sure the
12:56:09 16   policies are funded; that's fairly important I
12:56:12 17   would think from an insurance agent perspective or
12:56:14 18   a planning perspective.
12:56:16 19        You would want to make sure, I'm assuming,
12:56:20 20   that payments were paid pursuant to the plan that
12:56:22 21   was discussed and in place.  What steps did you
12:56:26 22   take, if any, to be sure that Dr. Repicci was going
12:56:29 23   to make the necessary premium payments?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

| | |
|---|---|
| 12:56:32 | 1 A. Beyond advising him to do so in 26? |
| 12:56:40 | 2 Q. Yes, was there any further follow up to |
| 12:56:42 | 3 this letter? |
| 12:56:43 | 4 A. Certainly -- |
| 12:56:49 | 5 MR. TRACY: Answer -- I'll leave that |
| 12:56:52 | 6 question. |

THE WITNESS: The following year, there was
discussion about removing the policy, how to remove
it, setting up the trust with Celia Clark.

There was communication in the earlier
exhibits between me and Hy Polakoff, between me and
John, and at that time period in time, I'm certain
John and I were talking and the options were, are
we going to put more money in the policy now, or
are we going to leave it where it is?  I'm sure we
had that conversation.

We planned on putting in so much, you didn't
put it in.  Should we put more in or should we put
less in?  And at the end of the day, my
recollection on this is we thought that policy was
going to have a 700,000 valuation upon withdrawal,
I think it ended up having a 200,000 valuation upon
withdrawal, which -- I put in six, but it cost me

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

planning with John and Hy and Celia who all said
John needs more insurance, and John saying, I'm
happy to talk about more insurance, but let's look
at the policy that I have.

Q. And when you say, let's look at the
policy I have, you're talking about the 026 policy?

A. I am talking about the 026 policy.

Q. Okay.  All right.  Now I think I
understand.

So wouldn't it have been normal to have some
kind of follow-up communication in writing about
the need to -- or at least the recommendation to do
the internal exchange for a guaranteed product?

I mean, it does get mentioned in 2002, it
gets mentioned in 2003.  Wouldn't it have been
normal for there to be follow up on that in
writing?

MR. TRACY: Object to the form.

THE WITNESS: Normal?  I don't think there's
anything normal about this case, so I don't -- we
talked about things when John wanted to talk about
them.

BY MR. MOORE:

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

five more, I'm not getting a lot of compression,
I'll just skip it.  That's my recollection of how
that conversation probably went.

BY MR. MOORE:

Q. What about following up with converting
into a guaranteed policy?

A. We certainly -- I shouldn't say
certainly.  I'd imagine we had conversations.  I
can recall the estate planning conversation with
the previous exhibit, and I recall John saying,
let's talk about this policy and get comfortable
with it first.  I don't want to buy more policies
until I'm comfortable with where we are.

Q. Just for my clarification, which
policies are you talking about now?

A. So when I sent the estate planning
e-mail earlier where you had asked me -- I can't
remember what exhibit it was, what is this memo,
and did he ever do this, and I said no.  I can't
remember if it was 14, or one of the previous
exhibits.

I said, no, we didn't do that estate plan.
I can remember having a conversation about estate

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

Q. Well, do you think it's in the best
interest of the client to let them know that as
things stand, let's say, in 2005, that the policy
as written and as funded is going to lapse well
before age 100, it would be helpful for the client
to be aware of that?

A. So what's the question?

Q. Would it be helpful for the client to
be aware of that fact?

A. Yes, the client was aware of that fact.

Q. Was that information given to the
client in writing?

A. From Lincoln in writing, verbally with
conversations with me.

Q. Was there anything in writing from you
to that effect?

A. Not that I seen.

Q. Was there anything in writing from you
checking on the status of the internal exchange of
the Lincoln policy to a guaranteed policy?

A. I haven't seen anything in my searches.
I recall having a conversation with John at some
point in '05-'06 about what we could do and him

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

101

13:01:04 1  deciding to stay where he was.

13:01:07 2       I don't remember why, but I can't imagine he

13:01:09 3  would have bought a policy from David that wasn't

13:01:13 4  guaranteed if he wasn't comfortable with the

13:01:19 5  current assumption product, meaning a

13:01:22 6  non-guaranteed product.

13:01:23 7       Q.   Was there anything further in writing

13:01:30 8  after October 14th, 2003, and I'm referencing

13:01:34 9  Exhibit 26 right now, checking on the status of

13:01:38 10 Dr. Repicci's determination with regard to the two

13:01:42 11 options presented by you?

13:01:44 12      A.   Not that I can recall.

13:01:47 13      Q.   So isn't it a fairly important duty of

13:01:54 14 the planner, the financial planner, to make sure

13:01:58 15 that the plan is implemented?

13:02:00 16      MR. TRACY:  Object to the form.

13:02:01 17      THE WITNESS:  Well, two things:  One, I

13:02:06 18 wasn't in a financial planner capacity, I was in an

13:02:10 19 insurance agent capacity at the time, and John paid

13:02:14 20 less premium than he was supposed to, I'm quite

13:02:19 21 certain we had a conversation about that, and

13:02:23 22 explained what that would do and John seemed happy

13:02:26 23 with that, otherwise he would have put more premium

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

102

13:02:29 1  in.

13:02:30 2       BY MR. MOORE:

13:02:30 3       Q.   Let's get back to something you just

13:02:32 4  said.  You said you were in a -- you were not in a

13:02:34 5  planning capacity, you were in an insurance agent

13:02:37 6  capacity.  Did Dr. Repicci first reach out to you

13:02:41 7  in the capacity of an insurance agent?

13:02:46 8       A.   I don't know what capacity he thought

13:02:50 9  it was.  He read an article and called me, so I

13:02:53 10 don't know what he was thinking.

13:02:54 11      Q.   And you wouldn't describe the plan that

13:02:58 12 you put forth with Dr. Repicci as some sort of

13:03:02 13 financial plan?

13:03:03 14      A.   When I think of financial plan, I think

13:03:05 15 of budgeting and a very holistic situation.  John

13:03:10 16 didn't -- I never looked at John's investments, I

13:03:14 17 never looked at John's retirement plan other than

13:03:18 18 looking at the tax issues.  He wanted me to look at

13:03:19 19 that specific thing, I looked at anything else.  At

13:03:22 20 that time --

13:03:22 21      Q.   Wait a minute.  If you're looking at

13:03:23 22 tax issues, do you view that as the role of an

13:03:26 23 insurance agent, or the role of financial

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

103

13:03:29 1  advisement or financial planning?

13:03:32 2       A.   In this specific situation, I mean, in

13:03:37 3  general, planning taxes are covered in financial

13:03:40 4  planning, in this specific situation, John seemed

13:03:43 5  to be very interested in the pension, the solution

13:03:46 6  happened to be insurance, and when asked how we get

13:03:49 7  paid, we get paid as the insurance agent.  So I

13:03:52 8  think that was relatively --

13:03:54 9       Q.   Okay.

13:03:55 10      A.   -- maybe it wasn't.

13:03:56 11      Q.   When I'm using the word financial

13:03:59 12 planning, I'm using financial planning, financial

13:04:03 13 advisor interchangable and speaking in the broadest

13:04:07 14 terms.

13:04:07 15      Isn't it fair to say that the context in

13:04:12 16 which this insurance product was purchased was in

13:04:17 17 the context of financial advisement to Dr. Repicci

13:04:20 18 with regard to concern about taxes?

13:04:25 19      A.   I think the overall plan was, but

13:04:29 20 different people handled different components.  So

13:04:30 21 Hy handled tax, Celia handled legal, Mandell

13:04:35 22 handled legal, I handled insurance.

13:04:36 23      So I think he got that advice, but you can

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

104

13:04:39 1  use the two terms interchangeably, but they have a

13:04:43 2  very different meaning to someone who is now a

13:04:45 3  certified financial planner.  At the time, it was

13:04:46 4  very different than what I was doing at the time

13:04:49 5  then.  So he got financial advice from a variety of

13:04:51 6  people, but I wasn't opining on the tax issues.

13:04:54 7       Q.   But you were opining on the original

13:04:59 8  form or proposal of the plan, correct?

13:05:02 9       A.   The insurance piece of it, sure, how

13:05:06 10 the insurance would fit into it.

13:05:07 11      Q.   How the insurance would fit into a

13:05:09 12 plan --

13:05:10 13      A.   Yes.

13:05:10 14      Q.   -- however, but the plan was something

13:05:13 15 that was put forth by you initially, correct?

13:05:16 16      A.   We discussed it originally, but I

13:05:20 17 wouldn't say I gave him tax advice.  I deferred

13:05:23 18 that to other people.

13:05:25 19      Q.   Correct, but you put together a

13:05:28 20 proposal whereby insurance was a component of a

13:05:33 21 larger financial plan?  You did not -- strike that.

13:05:39 22      Did Dr. Repicci come to you and simply ask

13:05:42 23 to purchase insurance from you?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

### Page 105

1  A.  No.

2  Q.  Did Dr. Repicci approach you and ask

3  for advice with regard to reducing tax burden?

4  **A.  Relative to his retirement plan, yes.**

5  Q.  Okay.  So in order to facilitate that

6  plan, putting insurance in place was an important

7  component, correct?

8  A.  Yes.

9  Q.  So in order for the plan to be valid

10  and be effectual, it was important that the

11  insurance be put in place correctly; is that a

12  correct statement?

13  A.  Yes.

14  Q.  Okay.  So would it have been normal for

15  an advisor in that situation that was handling the

16  insurance component to make sure that the premiums

17  were paid as recommended to make the plan work?

18  **A.  I can't make the client -- I would say,**

19  **no, it's not normal to make the client do anything.**

20  **I don't have a single financial plan I've ever done**

21  **that a client followed --**

22  Q.  Is it normal --

23  **A.  -- completely.**

### Page 106

1  Q.  Is it normal to advise a client --

2  **A.  Sure.**

3  Q.  -- if steps are not being taken?

4  **A.  It's normal to advise the client of the**

5  **possible ramifications of their actions, and you**

6  **can take option A or option B, this is going to**

7  **happen, that's normal for sure, and I'm confident**

8  **we had those conversations.**

9  Q.  And would it be normal to put something

10  in writing about concerns with any deficiency on

11  the part of the client in terms of what they were

12  required to do?

13  **A.  What was normal with John was things he**

14  **wanted to think about, he wanted something in**

15  **writing, and I would give him things he could share**

16  **with Hy, or he could share with Lori, or he could**

17  **look at and get back to me.  When we came to a**

18  **conclusion about the accounts, we would just do it.**

19  **It was not normal for me to have summary**

20  **e-mails that we just talked orally, or we just**

21  **talked about this, here's all we just talked about.**

22  **That wasn't done.**

23  Q.  But if you had concerns about

### Page 107

1  implementation, proper implementation of the

2  policy, would there not be written follow-up about

3  those concerns?

4  **A.  In 2003, there weren't any concerns**

5  **about -- in 2003, the -- my big recollection of**

6  **this was he paid less, why did you pay less?**

7  **You're going to end up with a less death benefit.**

8  **Okay, fine, that's fine.  It's not a guaranteed**

9  **product, we'll figure it out later.  Okay.  He's**

10  **the client.**

11  Q.  So it's your position that he

12  unilaterally made a decision not to make additional

13  payments, and -- is that correct?

14  A.  Yes.

15  Q.  Okay.  And did you follow up with him

16  at all about whether or not to proceed on an

17  internal exchange to a guaranteed product?

18  **A.  I can't find anything in writing, as I**

19  **testified earlier.  I'm confident we revisited this**

20  **in 2005-2006, and obviously --**

21  Q.  Would it have been in the client's best

22  interest to be in a guaranteed product at that

23  point after two years?

### Page 108

1  **A.  Maybe.**

2  Q.  And so did you have any follow-up

3  discussion -- correspondence with the client about

4  that possibility?

5  **A.  As I said earlier --**

6  Q.  After 2003.

7  **A.  I'm certain we talked about it in**

8  **2005-2006.**

9  Q.  But you don't recall any

10  correspondence; is that fair?

11  **A.  I don't recall any correspondence about**

12  **it.**

13  Q.  And do you believe Dr. Repicci was

14  fully away that this policy was likely to lapse

15  well before age 100?

16  **A.  I don't -- I don't know what he was**

17  **thinking at that time.  I can't believe that we**

18  **didn't discuss an internal exchange to a guaranteed**

19  **product with the number that he liked.**

20  **My guess on this one is the death benefit**

21  **wasn't enough and the numbers weren't looking the**

22  **way they were, interest rates had dropped.  That**

23  **had to be my -- I'd be surprised if that weren't**

109

```
13:10:22  1   what happened, because why else would I not make an
13:10:24  2   internal exchange?
13:10:24  3          I'm an agent.  I get paid again if he does
13:10:27  4   an internal exchange.  I have financial insensitive
13:10:31  5   to actually exchange him and I didn't.  So if he
13:10:35  6   wants it and if I get paid if he does it, I don't
13:10:39  7   get paid if he doesn't, why wouldn't we do it?
13:10:40  8      Q.   Do you always get paid if there's an
13:10:42  9   external exchange?
13:10:43 10      A.   Normally.
13:10:44 11      Q.   What's a charge back?
13:10:46 12      A.   A charge back is in the first 12 months
13:10:49 13   if you -- in the first 12 months of buying a policy
13:10:52 14   the client makes -- either cancels the policy or
13:10:57 15   shortens the policy or does a 1035, and it's
13:11:00 16   usually within the first 12 months.
13:11:01 17      Q.   And what does that mean, what is a
13:11:03 18   charge back?
13:11:03 19      A.   The agent has to pay back the
13:11:06 20   commission -- actually, if the client dies in the
13:11:10 21   first year or cancels the policy, then they charge
13:11:13 22   you back.
13:11:13 23          Some companies will charge it back in the
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

110

```
13:11:34  1   first 12 months, some companies don't have any
13:11:38  2   charge back period.
13:11:39  3      Q.   Do you recall if in fact the Lincoln
13:11:47  4   charge back period was 24 months?
13:11:49  5      A.   I don't recall.
13:11:49  6      Q.   Is it possible?
13:11:51  7      A.   It's possible.
13:11:53  8      Q.   I'm going to show you what's been
13:12:28  9   marked as Exhibit 29.  And in particular, I'll
13:13:08 10   point your attention to the first half of the first
13:13:12 11   page.
13:13:12 12      A.   Sure.
13:13:13 13      Q.   Are you familiar with this document?
13:13:16 14      A.   I mean, it's obviously been e-mailed to
13:13:24 15   me, I don't recall it.
13:13:24 16      Q.   Can you tell me who Lindsey Ober is?
13:13:30 17      A.   Lindsey Ober, looks like she worked
13:13:34 18   with Michael Scott in Connecticut and handled a
13:13:38 19   bunch of underwriting and administration work, and
13:13:41 20   this looks like this was in 2014 trying to get her
13:13:44 21   to help with the 144 policy and I'm asking her to
13:13:50 22   go ahead and see what are our options with this
13:13:54 23   policy.
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

111

```
13:13:54  1          And this is about a bunch of different
13:13:56  2   options and she's telling me that we cannot reduce
13:14:00  3   the death benefit, which was one of the options in
13:14:03  4   the previous e-mail to -- letter to Dr. Repicci,
13:14:05  5   that there's some tax guidelines that they can't
13:14:10  6   reduce the death benefit to the number we want to
13:14:14  7   to carry to 95, so that option is off the table.
13:14:18  8      Q.   Okay.  Let me interject if you don't
13:14:21  9   mind.
13:14:21 10      A.   Sure.
13:14:22 11      Q.   The question I have for you is she
13:14:24 12   appears to be -- Lindsey Ober appears to be with
13:14:29 13   MSF Advisors; is that correct?
13:14:29 14      A.   Yes.
13:14:30 15      Q.   Can you tell me what MSF Advisors is?
13:14:32 16      A.   It's a financial firm that a colleague
13:14:35 17   of mine started and he said Lindsey was great at
13:14:40 18   working with insurance companies and I had
13:14:42 19   mentioned I was trying to solve a problem, and he
13:14:45 20   said, let's see if Lindsey can help you.  He
13:14:49 21   thought she could help me, so I asked her look at
13:14:50 22   some stuff.
13:14:51 23      Q.   Can you be a little more explicit about
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

112

```
13:14:54  1   the nature of what MSF does?  How would you
13:14:57  2   classify them as a company?
13:14:57  3      A.   Insurance agent, investment advisory
13:15:01  4   firm, works for clients.
13:15:03  5      Q.   And it looks like you had made a
13:15:06  6   question -- this was within context of the 144
13:15:10  7   policy?
13:15:10  8      A.   This is the second policy, correct.
13:15:11  9      Q.   The second policy.  But you ask if
13:15:13 10   there's a charge back if you do a face reduction?
13:15:17 11      A.   Correct.
13:15:17 12      Q.   And we're how many years past the
13:15:19 13   original date there?  So we're some --
13:15:22 14      A.   Eight.
13:15:23 15      Q.   Eight years or so.  Okay.  And the
13:15:25 16   response to you, this appears to say that Lincoln's
13:15:28 17   policy is there's a charge in the first two years?
13:15:32 18      A.   This particular product, yes.
13:15:34 19      Q.   So it's -- is it possible that there
13:15:37 20   may have been a two-year charge back policy with
13:15:40 21   regard to the 026 policy?
13:15:42 22      A.   It's possible.
13:15:42 23      Q.   It's possible.  Okay.  So it wouldn't
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

113

```
13:15:44  1   be out of line if that were the case?  It wouldn't
13:15:48  2   be unusual, let me say, if that were the case?
13:15:51  3        A.  I think one is usual, so I guess it
13:15:54  4   would be a little unusual, but ...
13:15:57  5        Q.  I'd like to show you what's been marked
13:16:33  6   as Exhibit 27.  I'll ask you to review and see if
13:16:37  7   you can identify that document for me.
13:16:39  8        A.  Okay.
13:17:20  9        Q.  Now, is this -- is there anything
13:17:22 10   different in this document in terms of the --
         11   strike that.
13:17:27 12        Is the guaranteed policy being discussed in
13:17:31 13   this document the same as we previously talked
13:17:35 14   about with regard to Exhibit 26, I believe?
13:17:43 15        A.  It's a different product.
13:17:45 16        Q.  Okay.  Can you describe this product?
13:17:50 17        A.  Well, this is -- so they have an SUL4
13:17:58 18   and this is going back to the first -- this is
13:18:05 19   the -- this is showing a hypothetical exchange in
13:18:07 20   the future to the SULLPR3.
13:18:11 21        We refer to SPLR -- we refer to the LPR3 and
13:18:18 22   the LPR4 in two different previous exhibits, and
13:18:22 23   this refers to one of them, but not the more -- not
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

114

```
13:18:25  1   the more recent.
13:18:26  2        Q.  Okay.  So this would have been the
13:18:30  3   SUL3, I believe, is the policy that you looked at
13:18:33  4   back in 2002?
13:18:35  5        A.  The SULLPR3, correct.
13:18:40  6        Q.  Okay.
13:18:45  7        A.  And this assumes that he pays
13:18:47  8   1.2 million more in premium, which he didn't do,
13:18:50  9   which means all bets are off on -- you know, on the
13:18:53 10   numbers.
13:19:04 11        Q.  I'll note just for the record that
13:19:13 12   page 2 of this document is a different document it
13:19:17 13   appears than is attached to the fax at the time.
13:19:30 14        A.  That's the letter we referenced
13:19:32 15   earlier.
13:19:33 16        Q.  Yeah.  Okay.  So is there any time in
13:19:52 17   which you began to feel uncomfortable about doing
13:19:56 18   an internal exchange to a guaranteed benefit?
13:19:59 19        A.  No, we -- we tried and not succeeded
13:20:09 20   along the way, so it's been --
13:20:11 21        Q.  Well, did you try at all before 2014?
13:20:13 22        A.  We certainly looked at it because it
13:20:18 23   would have happened in 2005-2006, and it didn't
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

115

```
13:20:21  1   happen and I don't know why.
13:20:24  2        Q.  But you have no documentation to that
13:20:27  3   effect?
13:20:27  4        A.  I don't, no.
13:20:28  5        Q.  Is that a no?
13:20:29  6        A.  That's a no.  No, I do not.
13:20:35  7        Q.  Would it have been in the best interest
13:20:38  8   of the client to have a guaranteed policy put in
13:20:42  9   place after the two-year period had elapsed?
13:20:44 10        A.  I can't say.
13:20:45 11        Q.  And let me ask you this:  The -- the
13:21:00 12   policy that's described herein, the SUL-3, which
13:21:05 13   you discover in 2002, was available to be purchased
13:21:12 14   in 2002.
13:21:18 15        You had already had an application in place
13:21:20 16   for the dash 4 product, which is what was
13:21:25 17   purchased, but you became aware of the dash 3
13:21:29 18   product, which was the guaranteed product.
13:21:31 19        So it's possible that product could have
13:21:34 20   been put in place in place of the dash 4 product;
13:21:40 21   is that correct?
13:21:40 22        A.  It's possible.
13:21:45 23        Q.  And why was that not done?
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

116

```
13:21:47  1        A.  As I testified earlier, the cash -- the
13:21:52  2   cash surrender value, the valuation for tax
13:21:55  3   purposes, would have been too high, otherwise, why
13:21:59  4   wouldn't I have done that?
13:22:00  5        So we had to look at this for John, and
13:22:03  6   ultimately, the decision was -- we had two
13:22:06  7   products.  We had a Mass product which had
13:22:09  8   guarantees and had very low valuation for tax
13:22:09  9   purposes.
13:22:12 10        On the Lincoln side, we picked something
13:22:13 11   that didn't have guarantees, but had really low
13:22:16 12   value for tax purposes, and they had a guaranteed
13:22:18 13   product at the same time.  The reason we chose the
13:22:21 14   product we had is because John chose tax savings
13:22:25 15   over guarantees.  That was -- that was the
13:22:27 16   conversation.
13:22:27 17        Q.  After the two-year period, he's got all
13:22:30 18   the tax savings that he needed?
13:22:33 19        A.  Correct.
13:22:33 20        Q.  So he'd be in a far better position to
13:22:37 21   be in a guaranteed product at that point; is that
13:22:38 22   correct?
13:22:38 23        A.  After -- after year three, the taxes
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

117

1 are no longer part of the situation, it's just the
2 performance.
3      Q.   Just the performance?
4      A.   Correct, and given that John has paid
5 less cash, he's paid less in, so we don't have the
6 same numbers to work with, so all our original
7 estimates and projections are off the table since
8 he hasn't paid the premium that was recommended,
9 now we have to look at what the options are.
10     Q.   So if I understand what you're saying,
11 after 2005, the end of 2005, tax is no longer the
12 issue --
13     A.   Correct.
14     Q.   -- it's the insurance benefit?
15     A.   Yes.
16     Q.   And there's a question of in a
17 guaranteed policy, or even non-guaranteed for that
18 matter, what that number would be on the face
19 amount because, to date, only 1.2 million has been
20 invested as opposed to the 1.8 upon the original
21 assumptions were made?
22     A.   Correct.
23     Q.   That being said, was there no warning

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

118

1 to you -- to the client saying we know that this
2 policy is going to lapse well before 100, we can
3 get you into a guaranteed policy now, it may be a
4 lesser amount, but we need to do it?  Was there any
5 kind of warning given to the client about that?
6      MR. TRACY:  Objection.
7      THE WITNESS:  There were -- I don't remember
8 any warnings with John, it was always giving John
9 the information and options.
10     And, again, doing an internal exchange would
11 benefit him and me if we could make it happen.  So
12 what happened between 2005 and 2012, '13, '14, we
13 didn't get it done not for a lack of looking at it,
14 so we had options, but we didn't -- maybe it wasn't
15 available in New York.  I honestly don't remember.
16     John made it clear that he wanted
17 guarantees.  I would have loved to do an internal
18 exchange for him and got paid again if I could have
19 made that happen.  It didn't get done.
20     Go back 15, 16 years, either the product
21 wasn't available or the numbers just didn't look
22 very good.  I can't imagine -- again, John bought a
23 very similar product again in 2006.  How did he buy

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

119

1 that product in 2006 if he's not comfortable with
2 the 026 policy the way it is.
3      BY MR. MOORE:
4      Q.   Didn't he intend to purchase a
5 guaranteed product in 2006?
6      A.   Intend?  I don't know that's the --
7      Q.   Wasn't the application for a guaranteed
8 product in 2006?
9      A.   I didn't get the application, so I
10 don't know.
11     Q.   So it's your testimony that because he
12 bought another product in 2006, he must have been
13 okay with the performance of the prior policy; is
14 that correct?
15     MR. TRACY:  Objection.
16     THE WITNESS:  It would seem -- it would seem
17 strange for John to move forward on something that
18 looks a lot like something else he already had if
19 he had a problem with it.
20     So it seems to me he got pretty comfortable
21 with the product in 2006 or '05 and then after
22 the -- the illustrations in 2004 and '05 look
23 nothing like the illustrations in 2013 because you

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

120

1 then had a very long history of low credit.
2      So the situation in 2014 is a whole lot
3 different from the 2006 situation.  '06 is not
4 quite as great as 2002, '14 was a whole lot worse.
5 So --
6      BY MR. MOORE:
7      Q.   But yet you're advising him in 2002 and
8 in 2003 to get into a guaranteed product?
9      A.   I'm not advising him, I'm telling John
10 that if he wants guarantees and he wants tax
11 savings, it looks like this is a path, and he
12 wanted -- can I really do that?  And in the
13 previous exhibit we have the letter from Lincoln
14 that says, yes, we'll let you do this.  So there
15 are options and I'm trying to give him the
16 information to let him make decisions.
17     Q.   I'll put it out if necessary, but I
18 believe in some of your prior correspondence in
19 2002, you recommended a certain course of action;
20 do you recall doing that or not?
21     A.   From time to time would I recommend
22 things?  Sure.  I can't recommend something in the
23 future that I can't -- there's always restrictions

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

121

13:27:10 1   on -- I don't think I ever said --

13:27:11 2       Q.   No, but you're -- I'm sorry.  Finish

13:27:14 3   your statement.

13:27:15 4       A.   I can't recommend something in the

13:27:17 5   future.  I can recommend things that I think you

13:27:21 6   should do or consider today.  I can't recommend

13:27:26 7   things you're going to do in two years.  I can only

13:27:26 8   recommend we'll look at this, I recommend you look

13:27:26 9   at this.  So I couldn't make the exchange --

13:27:29 10      Q.   Let me --

13:27:29 11      A.   -- today for the future.

13:27:31 12      Q.   Let me put it this way:  In 2005, the

13:27:34 13  end of 2005 when tax was no longer an issue, would

13:27:39 14  it be in the client's best interest to be in a

13:27:42 15  guaranteed policy --

13:27:43 16      MR. TRACY:  Objection.

13:27:44 17      BY MR. MOORE:

13:27:45 18      Q.   -- if the intent is for the policy to

13:27:47 19  last until age 100?

13:27:49 20      A.   Maybe there's -- if it's 4 million

13:27:54 21  projected or 1 million 5 guaranteed, who is to

13:27:52 22  say -- what if John died the next year?  If he made

13:28:00 23  the change and then he and Lori died in a plane

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

122

13:28:05 1   crash the next year, instead he gets 1.6 guaranteed

13:28:07 2   instead of 4.6, that wouldn't have been better.

13:28:09 3       Q.   And according to your calculations at

13:28:13 4   the time, would they have been better off than the

13:28:15 5   guaranteed policy?

13:28:18 6       A.   I can't say that they would have or

13:28:21 7   wouldn't have.

13:28:21 8       Q.   Okay.  Let me show you what's been

13:28:47 9   marked as Exhibit 28.

13:29:18 10      A.   Is there a specific page --

13:29:22 11      MR. MOORE:  For the record -- okay.  For the

13:29:33 12  record, in my files, I have what appears to be one

13:29:39 13  page of a multi-page correspondence.

13:29:43 14      MR. TRACY:  And for the record, that appears

13:29:44 15  to be what we had on file at that time.  I will

13:29:49 16  double-check and see if we can find the missing

13:29:53 17  pages, but I don't think we can.

13:29:55 18      BY MR. MOORE:

13:30:04 19      Q.   And to the extent you're able to review

13:30:07 20  this, do you recognize this letter?

13:30:08 21      A.   Sure, yeah.

13:30:09 22      Q.   And do you believe it to be a letter

13:30:11 23  from you?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

123

13:30:12 1       A.   Yes.

13:30:13 2       Q.   Okay.  And if I understand this

13:30:16 3   correctly, this is -- you're seeking authorization

13:30:19 4   to make the reduction in face values, which will

13:30:26 5   allow you to no longer need to make future payments

13:30:30 6   for those policies; is that correct?

13:30:32 7       A.   Yes.

13:30:32 8       Q.   Okay.  At that time, you say if you

13:30:41 9   wish to make no futures payments to these policies,

13:30:45 10  we can reduce the benefits to 4.95 million for

13:30:50 11  Lincoln and 4 million for MassMautual; is that

13:30:54 12  correct?

13:30:54 13      A.   4.595 for Lincoln --

13:30:58 14      Yes.

15      A.   For Lincoln's policy.

13:30:58 16      Q.   But you make no indication, you make no

13:31:01 17  statement about an additional payment being

13:31:04 18  necessary in the Lincoln policy?

13:31:06 19      A.   There's no -- there's no estimation of

13:31:09 20  future premiums, there's also no -- there's no talk

13:31:13 21  of guarantees or how long it'll last, either.

13:31:19 22      Q.   Correct, but there's no notice to the

13:31:19 23  client that there's -- that there's a benefit to

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

124

13:31:24 1   any additional payment?

13:31:26 2       A.   No, there's no talk about that.

13:31:33 3       Q.   From a client perspective in reading

13:31:35 4   this, would you have any reason to believe that you

13:31:37 5   needed to make additional payments?

13:31:40 6       A.   There's certainly -- there's no

13:31:43 7   discussion about payments.  So ...

13:31:44 8       Q.   Okay.  I should just -- for the record,

13:31:52 9   you say there's no discussion of payments, so was

13:31:57 10  there a conclusion you made from that, or is it

13:32:01 11  just there was no discussion about payments

13:32:03 12  necessary?

13:32:03 13      A.   There was no discussion about payments

13:32:06 14  necessary.

13:32:06 15      Q.   I just didn't know if there was

13:32:09 16  something you wanted to add.

13:32:42 17      MR. MOORE:  The time is 12:30.  I've got --

13:32:47 18  if it's good with you, it might be a good time to

13:32:50 19  break for lunch.

13:32:50 20      MR. TRACY:  That's fine.

13:32:51 21      MR. MOORE:  And then -- well, I'm not going

13:32:56 22  to -- can we go off the record.

13:32:58 23      (Off the record: 1:32 p.m.)

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

125

14:42:31  1    BY MR. MOORE:
14:42:36  2        Q.    Mr. Jarvis, can you look again at
14:42:39  3    Exhibit 26, and in conjunction with Exhibit 40 --
14:43:09  4    off the record again for a minute.
14:44:36  5        (Off the record: 2:43 p.m.)
14:44:36  6    MR. MOORE:  Okay.  Back on the record.
14:44:39  7    BY MR. MOORE:
14:44:41  8        Q.    So previously with regard to
14:44:44  9    Exhibit 26, I asked you a question about an
14:44:50  10   approximation on the amount of guaranteed insurance
14:45:00  11   that could be purchased at that time.
14:45:07  12       And then I had indicated -- I said, well, if
14:45:13  13   only 1.2 in premiums had been paid as opposed to
14:45:18  14   the 1.8 originally paid, that's roughly
14:45:20  15   two-thirds, can you make a rough approximation, and
14:45:23  16   I was told, no, you can't really do that for
14:45:27  17   various reasons, that the cash value is -- that's
14:45:30  18   the significant determining factor or the premium
14:45:34  19   payment with the new policy. Excuse me if I may be
14:45:42  20   slightly misconstruing it.  I don't mean for that
14:45:45  21   to be definitive in terms of the explanation at
14:45:47  22   all.
14:45:47  23       But, in any event, in looking at that, can

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

126

14:45:50  1    we not accurately calculate what in fact the amount
14:45:56  2    of guaranteed insurance would have been?
14:45:59  3        My understanding is that according to your
14:46:06  4    October 14th, 2003, letter, Exhibit 26, that you
14:46:10  5    indicated that the cash value of the policy could
14:46:15  6    then be used in effect as a premium for the
14:46:19  7    guaranteed policy to be purchased, and that if you
14:46:23  8    did that, you would end up with a policy that was
14:46:28  9    worth over $6 million; did I understand that
14:46:31  10   correctly?
14:46:32  11       A.    You said a lot of things there.  So
14:46:36  12   what's the question?
14:46:37  13       Q.    Well, does the cash value determine --
14:46:42  14   if you were to do an internal exchange, does the
14:46:46  15   cash value determine and effect how much a
14:46:50  16   guaranteed policy you could purchase?  In other
14:46:54  17   words --
14:46:55  18       A.    If you're asking me if more cash
14:46:58  19   provides more death benefit, yes.  That's all I've
14:47:04  20   got for you.
14:47:05  21       Q.    So let's -- let me say it
14:47:11  22   hypothetically.  If -- let's say -- let's say
14:47:18  23   $1 million will purchase $10 million of guaranteed

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

127

14:47:22  1    as a premium payment --
14:47:23  2        A.    Sure.
14:47:24  3        Q.    -- is it -- is it fair to say that a
14:47:28  4    $500,000 premium payment will allow you to purchase
14:47:36  5    5 million?
14:47:38  6        A.    If you do that -- if you were to buy
14:47:41  7    two policies today on the same day, it would be
14:47:45  8    roughly -- we're not exact, but once you paid money
14:47:51  9    into a policy, you have expenses and mortality cost
14:47:55  10   and you would have bought less insurance --
14:47:58  11   generally speaking -- if you were to buy a new
14:48:11  12   policy today -- if you spent $1 on the policy or $2
14:48:18  13   on the policy, you would expect to get twice as
14:48:22  14   much generally speaking if you were to purchase the
14:48:24  15   exact same thing on the same day.  That's directly
14:48:27  16   in the policy.
14:48:29  17       What I said -- that statement you made is
14:48:32  18   correct, and I'm going to put $2 into policy A and
14:48:38  19   $1 into policy A and then exchange from policy A to
14:48:39  20   policy B, I can't make the same assertion you'd get
14:48:43  21   the same amount.
14:48:43  22       Q.    Okay.  And in -- in your calculations
14:48:50  23   when you were -- and now I'm looking at Exhibit 27,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

128

14:48:55  1    October 23rd, 2003, letter.
14:49:04  2        A.    Okay.
14:49:04  3        Q.    In the fourth paragraph to the last
14:49:08  4    sentence, you indicate that if you wish to do the
14:49:15  5    exchange that the surrender charge -- there will be
14:49:20  6    no surrender charges and your entire cash account
14:49:23  7    value will be applied to the new policy and that
14:49:28  8    the cash value was 1.625 million approximately and
14:49:40  9    it would generate a guaranteed death benefit of
14:49:43  10   6.3 million, approximately; is that accurate?
14:49:45  11       A.    That's what I'm saying in this letter,
14:49:47  12   yes.
14:49:47  13       Q.    Okay.  Now, if we look at the --
14:49:49  14   Exhibit 41 in the 2005 annual statement, I believe
14:49:54  15   it's page 3, it has a gross fund value of $976,000,
14:50:07  16   approximately.
14:50:19  17       A.    I'm sorry.
14:50:20  18       Q.    It was page 3.
14:50:21  19       A.    I got it.  I got it.  You're fine.
14:50:25  20   I've got --
14:50:26  21   MR. TRACY:  What's the update number?
14:50:31  22   MR. MOORE:  71.
14:50:32  23   THE WITNESS:  Here?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

129

| | |
|---|---|
| 14:50:34 | 1     **MR. TRACY:** Same thing. |
| 14:50:37 | 2     **THE WITNESS:** That was -- |
| | 3     (Off the record: 2:51 p.m.) |
| 14:51:58 | 4     **THE WITNESS:** So I understand the question |
| 14:51:59 | 5 correctly, you're asking me -- |
| 14:52:00 | 6     BY MR. MOORE: |
| 14:52:00 | 7     **Q.** Let me rephrase.  I'm sorry.  I just |
| 14:52:04 | 8 note the -- I intended to be working off the 2005 |
| 14:52:08 | 9 annual statement.  There should have been a third |
| 14:52:14 | 10 page, 382.  It would have been the third page of |
| 14:52:21 | 11 the annual statement. |
| 14:52:21 | 12     **A.** Oh, okay. |
| 14:52:13 | 13     **Q.** That is not here for some reason. |
| 14:52:24 | 14     **A.** Okay. |
| 14:52:25 | 15     **Q.** So now I'm going to switch to a |
| 14:52:28 | 16 somewhat hypothetical question using 2008, okay, |
| 14:52:17 | 17 using the form and the information provided on the |
| 14:52:34 | 18 annual statement. |
| 14:52:34 | 19     **A.** Okay. |
| 14:52:34 | 20     **Q.** So if we look to the third page of the |
| 14:52:37 | 21 annual statement -- |
| 14:52:40 | 22     **A.** And what's the page number? |
| 14:52:42 | 23     **Q.** In fact, it's the 2009 annual |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

130

| | |
|---|---|
| 14:52:44 | 1 statement.  Yeah, 071.  Okay.  That's the Bates. |
| 14:52:58 | 2     So 071, 2008, and it has a gross fund value |
| 14:53:03 | 3 of 976,000. |
| 14:53:07 | 4     Now, for hypothetical purposes, let's say |
| 14:53:11 | 5 the fund value was 976,000 -- |
| 14:53:14 | 6     **A.** Yes. |
| 14:53:14 | 7     **Q.** -- in 2005. |
| | 8     **A.** Correct. |
| 14:53:15 | 9     **Q.** Okay.  Now, would you be able to |
| 14:53:17 | 10 calculate that that -- 976,000 is approximately |
| 14:53:22 | 11 60 percent of 1.623 million? |
| 14:53:28 | 12     **A.** Approximately. |
| 14:53:28 | 13     **Q.** Approximately.  So given this gross |
| 14:53:32 | 14 fund value, if that were converted, applied to the |
| 14:53:37 | 15 new policy without surrender charges, would it be |
| 14:53:42 | 16 fair to say that the guaranteed benefit would be |
| 14:53:44 | 17 approximately 60 percent of the 6.3 million that |
| 14:53:49 | 18 would have been anticipated originally? |
| 14:53:51 | 19     **A.** Yeah.  Hypothetically, on this |
| 14:53:56 | 20 **Bates 46, if you put 60 percent of the money in for** |
| 14:54:00 | 21 **the premium, you would expect 60 percent of the** |
| 14:54:02 | 22 **guaranteed death benefit.  I would agree with that,** |
| 14:54:04 | 23 **of course the hypothetical is, is this product even** |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

131

| | |
|---|---|
| 14:54:09 | 1 available, which we've already figured out it |
| 14:54:11 | 2 probably wasn't. |
| 14:54:13 | 3     **Q.** Why do you say that? |
| 14:54:15 | 4     **A.** Because there's a 2004 or later -- 2004 |
| 14:54:19 | 5 or a month later in 2003 for -- in the exhibits |
| 14:54:25 | 6 you've given me which shows the SULLPR4, which |
| 14:54:29 | 7 means Lincoln has already moved on to a new |
| 14:54:31 | 8 product. |
| 14:54:31 | 9     So we've got a fair change in products |
| 14:54:35 | 10 annually or how often they're changing.  So I don't |
| 14:54:38 | 11 know if this product -- at this time, that would be |
| 14:54:39 | 12 true, but it doesn't mean that that product was |
| 14:54:42 | 13 available the following year. |
| 14:54:43 | 14     **Q.** Was there ever any discussion with the |
| 14:54:47 | 15 client that there's a possibility that the policy |
| 14:54:51 | 16 opportunities could be changing down the line and |
| 14:54:54 | 17 the options that were described in your |
| 14:54:58 | 18 October 9th, 2002, letter to Hy Polakoff might not |
| 14:55:02 | 19 be applicable going forward in a worst case |
| 14:55:05 | 20 scenario? |
| 14:55:06 | 21     **A.** There was certainly no discussion that |
| 14:55:08 | 22 **there was any guarantee that the products would be** |
| 14:55:12 | 23 **available.  We look at the products that are there,** |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

132

| | |
|---|---|
| 14:55:13 | 1 and then we have to wait. |
| 14:55:15 | 2     I do recall the language in one of the |
| 14:55:16 | 3 letters that we went through today said, we'll |
| 14:55:19 | 4 check in two years and see what's available. |
| 14:55:22 | 5     So was it explicitly stated?  No, it also |
| 14:55:26 | 6 wasn't explicitly stated that these would be |
| 14:55:27 | 7 available forever.  So I don't know what they're |
| 14:55:34 | 8 thinking, but if we have two letters saying there's |
| 14:55:39 | 9 going to be a new product to look at, I think at |
| 14:55:39 | 10 that point the idea that products were changing is |
| 14:55:40 | 11 probably obvious, but I can't remember any explicit |
| 14:55:44 | 12 conversation saying they would be available or that |
| 14:55:47 | 13 I have reason to believe that they wouldn't. |
| 14:55:50 | 14     **Q.** Now, I believe you testified earlier |
| 14:55:52 | 15 this morning that in 2002, you presented to |
| 14:55:55 | 16 Dr. Repicci both a non-guaranteed and a guaranteed |
| 14:55:59 | 17 alternative and that he chose the non-guaranteed |
| 14:56:06 | 18 alternative? |
| 14:56:07 | 19     **A.** Correct. |
| 14:56:08 | 20     **Q.** Do you have any documentation to that |
| 14:56:10 | 21 effect? |
| 14:56:10 | 22     **A.** Nothing that's -- I don't have anything |
| 14:56:14 | 23 for that, no. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

133

14:56:15 1    Q.   Do you have any documentation other
14:56:18 2  than what's been -- that we have in our possession
14:56:20 3  currently?
14:56:20 4    A.   No, we've given you everything that we
14:56:23 5  have.
14:56:23 6    Q.   Are you specifically aware of anything
14:56:25 7  that you provided to Dr. Repicci?
14:56:30 8    A.   Nothing other than perhaps the Lincoln
14:56:43 9  brochure.  I may have sent him a brochure.  I know
14:56:49 10 Lincoln Financial Group had a brochure around their
14:56:50 11 products and how they're used for this purpose, and
14:56:52 12 I may have sent that to him.
14:56:54 13    Q.   And just for the record, if it hasn't
14:57:00 14 been clear, when we refer to Lincoln, we're
14:57:04 15 referring to Lincoln Financial --
14:57:07 16    A.   Group.
14:57:07 17    Q.   -- Group.
14:57:14 18  Okay.  I don't think there was any confusion
14:57:17 19 about that.
14:57:17 20    A.   Not Abraham Lincoln.  He was never
14:57:17 21 involved.
14:57:17 22    Q.   Now, I believe you indicated that
14:57:21 23 Dr. Repicci chose the non-guaranteed for tax

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

134

14:57:25 1  purposes?
14:57:26 2    A.   Correct.
14:57:26 3    Q.   Can you give more detail about what
14:57:30 4  that would be?
14:57:30 5    A.   The main motivation for this
14:57:34 6  transaction was to remove dollars from John's
14:57:40 7  retirement plan and not have to pay income tax on
14:57:43 8  the withdrawals, on all of the value.
14:57:47 9    So by spending $3 million on premiums, he
14:57:50 10 could remove those values and only pay taxes on
14:57:54 11 1.1.  So John's plan was to save income taxes in
14:57:56 12 New York, 50 percent of about $950,000, which he
14:58:01 13 successfully did.
14:58:02 14    So the primary purpose was to, how do I buy
14:58:06 15 something in my plan that I can reduce -- I can get
14:58:09 16 out of the plan and pay less tax and then
14:58:12 17 subsequently add value to my family?
14:58:15 18    Q.   What was the difference with the
14:58:17 19 guaranteed product?
14:58:17 20    A.   I don't remember what the difference
14:58:19 21 was other than there wasn't as much compression.
14:58:23 22 This was the product that worked best to reduce the
14:58:26 23 taxes by 60 percent.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

135

14:58:30 1    Q.   Now, I may well have this incorrect,
14:59:04 2  but -- or not clear, anyway, can you give me any
14:59:07 3  more explanation -- you testified previously, and I
14:59:11 4  believe we were talking about the internal exchange
14:59:14 5  to a guaranteed product somewhere in the 2004-2005
14:59:18 6  range, and I believe you indicated that the
14:59:23 7  guaranteed product wouldn't work with the tax
14:59:26 8  structure at the time?
14:59:28 9    A.   Not the -- I don't believe I said
14:59:31 10 anything about the tax structure in 2004 or '05.
14:59:34 11    Q.   And I'm probably misconstruing that.
14:59:43 12 Were you talking about the 2002 product as -- for
14:59:48 13 tax purposes having a higher cash surrender value
14:59:52 14 and that's why it was less attractive than the
14:59:56 15 non-guaranteed policy?
14:59:56 16    A.   Yes, correct.
14:59:57 17    Q.   And I think you testified early in this
15:00:01 18 deposition that as a general rule, guaranteed
15:00:04 19 products had a much lower cash surrender value and,
15:00:08 20 hence, one of the reasons why sometimes someone
15:00:13 21 might not want a guaranteed policy?
15:00:16 22    A.   I think --
15:00:16 23    MR. TRACY:   Objection, but you can answer.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

136

15:00:18 1    THE WITNESS:   Yeah.  I'm not sure what I
15:00:21 2  said exactly earlier, I'm sure it's in the record.
15:00:24 3  Over the long haul, the guaranteed products
15:00:28 4  typically don't have as much cash available because
15:00:32 5  they don't have as much cash -- they don't have as
15:00:34 6  much long-term cash accumulation because they take
15:00:36 7  more money out, generally speaking, over the life
15:00:39 8  of a policy, that's true.
15:00:40 9    In this particular situation in the early
15:00:42 10 years, this product just happened to work well.  So
15:00:46 11 I don't know if it's a universal statement of one
15:00:50 12 is always better than the other, but --
15:00:50 13    BY MR. MOORE:
15:00:51 14    Q.   Okay.  I'm sorry.  I didn't mean to --
15:00:52 15    A.   So I don't -- it's not a universal
15:00:55 16 statement, one is always better.  People who want
15:00:58 17 secondary guarantees from the insurer often give up
15:01:03 18 access to cash.  That is true in general, but for
15:01:06 19 this specific product for this purpose, it's an
15:01:09 20 unusual product that has such a low value.  It's
15:01:13 21 just not typical.  Not very many policies have this
15:01:17 22 type of compression opportunity.
15:01:18 23    Q.   And do we have any backup documentation

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

137

1  of that?

2      A.   Of?

3      Q.   Of --

4      A.   The fact that these are unusual?

5      Q.   The backup of the compression component

6  of this compared to, let's say, the MassMutual

7  policy that was purchased.

8      A.   What type of backup would you like?

9      Q.   Well, what would you have run -- what

10 did you provide to Dr. Repicci to make this

11 argument that this, the non-guaranteed policy, was

12 better than the guaranteed policy?

13     A.   So earlier you asked me where could we

14 get these policy illustrations.  Did we shop

15 around?  Did we ask other people?  And I mentioned

16 we talked to Visys, V-I-S-Y-S, we talked to

17 Millennium Brokerage Group, we talked to a couple

18 of different groups and said, show us policies

19 that'll work, and the ones that came back were this

20 Lincoln product and this MassMutual product.

21     John obviously loved one, and then the

22 conversation with them is, what works with

23 guarantees?  And everybody comes back and says,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

138

1  nothing.  We've got nothing that can give you the

2  guarantee that will give you compression like this.

3  So I don't have the -- I obviously would

4  have looked for it.  I didn't work for Lincoln, I

5  didn't care whether we used Lincoln.  That was the

6  best product from a tax standpoint.

7      Q.   And would you have any copies of

8  documentation that you just described with the --

9      A.   A -- I have no conversation -- I have

10 no records from 2002 with Visys or Paul Panzer or

11 John White, Millennium.  I don't have any of those.

12 No, I wouldn't have any of that.

13     Q.   Now, for tax purposes, you indicated

14 previously that -- and I believe you said after

15 three years, the tax implications are complete and

16 at that point going forward, you are interested

17 only in the insurance aspect of it.

18     And I'm trying to understand whether -- if

19 that -- year three was important or was year two

20 the critical period for tax purposes, if you have

21 any recollection of that.

22     A.   The period of time that would matter

23 for this is -- originally, it was three years of

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

139

1  premium payments, fourth year take the policy out,

2  file a tax return in year five, and then move on

3  from there.

4      The law changed so you pay two premiums,

5  review the policy either in year two or three, file

6  a tax return in three or four, and then you could

7  start looking at everything.  So, in this case, it

8  was -- it moved up a year faster.

9      Q.   Okay.  So it went down to two years?

10     A.   Two years of funding, but you still

11 have to withdraw the policies, and I can't remember

12 when that was done.

13     Q.   All right.  And so that would explain

14 why in Exhibit 26 you made the point you can pay by

15 month 25?

16     A.   You could remove it in month 25.

17     Q.   Right.  Okay.  That makes sense now.

18 On Exhibit 29, which was the exhibit about the

19 charge backs, we don't need to look at it --

20     A.   Okay.

21     Q.   -- it was in relation to the issues

22 with the 144 policy.

23     A.   The 2016 -- 2014 e-mail exchange with

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

140

1  Lindsey Ober.

2      Q.   That policy was purchased in 2006,

3  eight years earlier.  Why was the issue of charge

4  backs even raised?

5      A.   I had just received a charge back the

6  week before for some other policy, and I never had

7  a charge back in my career, and somebody changed

8  the policy, surrendered something and all of a

9  sudden I got a statement that was, hey, by the way,

10 Merry Christmas, you owe us $25,000, or something

11 along those lines.

12     Q.   And how long was it after the policy

13 had been purchased that --

14     A.   I don't remember.

15     Q.   Because you had testified earlier that

16 typically charge backs happened within year one?

17     A.   Within year one, and I think that

18 policy -- it was something uncharacteristically

19 long that I had never seen before, so I said, oh,

20 is there something in here I need to know about for

21 informational purposes?

22     Q.   Were you concerned at any time that if

23 you did an internal exchange with the Lincoln

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

141

15:05:47 1 policy, 026 policy, that you might be subject to a
15:05:51 2 charge back?
15:05:51 3     A.   No, quite the contrary.  I thought I --
15:05:53 4 they told me they would apply full surrender --
15:06:00 5 full cash value and pay me again.  So I had the
15:06:00 6 other alternative was, wow, I'm actually going to
15:06:04 7 make money again to do this.
15:06:05 8     Q.   Let me -- let me move to Exhibit 8
15:06:18 9 again.
15:06:34 10     A.   The big policy?
15:06:35 11     Q.   That's the 026.  Yeah, Lincoln 026.  I
15:06:49 12 may have pulled the wrong exhibit.  Just a minute.
15:07:08 13 No, I didn't.
15:07:10 14     If we look at Bates Page Number 1641, which
15:07:16 15 is the initial page, so we have 25 million
15:07:21 16 insurance issued, correct?
15:07:23 17     A.   Correct.
15:07:23 18     Q.   If you turn to 1643, in the middle of
15:07:31 19 the page, it says there's a minimum premium --
15:07:35 20     A.   Yes.
15:07:35 21     Q.   -- $7,079 and some cents.  Now, do I
15:07:42 22 understand that correctly to mean that in order to
15:07:46 23 maintain the guaranteed portion of that -- well,

142

15:07:54 1 before I ask that question, let me move on to
15:07:57 2 another page here.
15:07:58 3     Now, we'll stick with that.
15:08:14 4     Okay.  Page 1643, it says, minimum payment,
15:08:18 5 $7,079.70 is the minimum amount due on or before
15:08:23 6 each monthly anniversary date during the first
15:08:24 7 three policy years.
15:08:25 8     So am I correct to understand that if you
15:08:30 9 pay that amount monthly for the first three years,
15:08:34 10 that the full face value of that policy would
15:08:37 11 remain in effect?
15:08:37 12     A.   Only for three years.
15:08:39 13     Q.   Only for three years, correct, yes.
15:08:43 14 And my math, quick calculation shows that 7,079.70
15:08:50 15 for 12 months a year times three years is $254,869,
15:08:59 16 if I can read my own writing, but approximately
15:09:02 17 that number.
15:09:02 18     A.   I'll take your word for it.
15:09:03 19     Q.   Okay.  So when it had been possible --
15:09:09 20 because I understand you wanted a high face value
15:09:12 21 on the Lincoln initially.  You had X amount of
15:09:17 22 dollars that you needed to move out of the IRA
15:09:19 23 within three years.

143

15:09:21 1     Could you not have purchased the 026 policy
15:09:28 2 and paid on a monthly basis for three years with an
15:09:33 3 ultimate total of $254,000?
15:09:38 4     At the point when you're doing the reduction
15:09:41 5 in values, move the remainder of the 1.2 million
15:09:48 6 that would have been set aside to be paid on the
15:09:52 7 026 policy, couldn't those funds have been moved
15:09:55 8 into MassMutual policy at the same time as you're
15:09:58 9 doing the reduction in value of that policy?
15:10:02 10     And let me -- before you answer that, I'll
15:10:06 11 ask another question that might make it clearer.
15:10:09 12     With regard to the MassMutual policy, when
15:10:14 13 you reduce the face value, you could not -- you
15:10:18 14 said they would not exceed 17.5 million.  That's as
15:10:22 15 high as they would go.
15:10:23 16     A.   Correct.
15:10:24 17     Q.   They're willing to ensure any level
15:10:27 18 there or below, correct?
15:10:28 19     A.   That's correct.
15:10:28 20     Q.   So you could have paid more premium at
15:10:31 21 some point?
15:10:31 22     A.   Into the Mass policy.
15:10:32 23     Q.   Into the Mass policy.  And gotten a

144

15:10:34 1 higher value on the --
15:10:36 2     A.   Yes.
15:10:36 3     Q.   -- on the -- on the insurance value of
15:10:39 4 it?
15:10:40 5     A.   Could John have made gifts to his kids
15:10:47 6 of after-tax dollars subject to gift taxes and then
15:10:52 7 had them pay future premiums to keep that death
15:10:55 8 benefit higher?  The answer is yes.
15:10:56 9     Q.   Well, the question is, he had money in
15:10:59 10 the IRA and we know there was 1.2 million spent
15:11:04 11 from that into the 026 policy?
15:11:05 12     A.   Yes.
15:11:05 13     Q.   Could 254,000 have been spent from the
15:11:11 14 IRA to maintain the 026 policy, which would leave
15:11:14 15 you approximately, what, $955,000, something like
15:11:20 16 that, that could have been added to the MassMutual
15:11:24 17 policy at the point you reduced the face value on
15:11:28 18 that policy, so that instead of reducing it down to
15:11:33 19 four, you probably would have reduced it down to
15:11:36 20 about seven, if you had been able to pay the
15:11:39 21 additional premium at that time?  Wasn't that a
15:11:42 22 possibility?
15:11:43 23     A.   Terrible possibility.

145

15:11:46  1    Q.    Why?

15:11:46  2    A.    Well, if you don't plan to put the

15:11:50  3  money into Lincoln policy, why waste the 25¢?

15:11:54  4         He couldn't put any more cash into the

15:11:58  5  policy inside of the retirement plan with pre-tax

15:12:01  6  dollars that wasn't available.

15:12:04  7         He couldn't go beyond the number he paid.

15:12:04  8  He max funded with the retirement plan, he couldn't

15:12:06  9  put any more money in, and the tax change

15:12:06 10  necessitated us moving it out.

15:12:10 11         So if John wanted to pay $900,000, he could

15:12:14 12  have.  It's not what you suggested, but he would

15:12:16 13  have had to distribute the 900,000 out of his

15:12:23 14  retirement plan, he would have been required to pay

15:12:29 15  450,000 in taxes, he would have gifted the net 450

15:12:33 16  to a trust for his kid, which is the new owner of

15:12:36 17  the Mass policy, and subjected himself at the time

15:12:39 18  to a 50 percent estate tax, which would have

15:12:42 19  been -- let him put $225,000 into the Mass policy,

15:12:48 20  which may have increased the death benefit 200 over

15:12:54 21  1.216.  So it may have increased that policy by

15:13:01 22  $600,000.

15:13:01 23         So if he had done that, he would have had a

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

146

15:13:04  1  way underfunded Lincoln product and he would have

15:13:08  2  had 4.6 million and then he would have really been

15:13:12  3  in a terrible spot.

15:13:13  4    Q.    Explain to me again why he couldn't put

15:13:17  5  more of the pre-tax dollars from the IRA into the

15:13:21  6  MassMutual policy --

       7    A.    So --

15:13:22  8    Q.    -- to the point when -- you know, at

15:13:22  9  that later time?

15:13:23 10    A.    So in the previously aforementioned

15:13:32 11  exhibit with Lindsey Ober and I had asked her to

15:13:36 12  reduce the face of the other policy, the challenge

15:13:40 13  you have are the DEFRA and TEFRA limitations is

15:13:48 14  there's only so much premium you can put into a

15:13:51 15  policy relative to death benefits, and John maxed

15:13:53 16  it.

15:13:53 17         So I couldn't put any more -- it wouldn't

15:13:56 18  take any more premium.  I can't put 15 million in

15:13:59 19  premium in a $17 million policy.  There's limits of

15:14:04 20  how much they'll take, and so he couldn't put more,

15:14:06 21  and we are stuck having to take money out of the

15:14:09 22  plan because of the timing, so we were stuck.

15:14:10 23         We could have kept going with annual

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

147

15:14:13  1  premiums, but the longer we wait, we run the risk

15:14:16  2  of running out of the opportunity for compression.

15:14:18  3  So we couldn't do that and if -- if he did put the

15:14:25  4  money -- if you did max out the policy at Lincoln

15:14:28  5  and pulled it out and then wanted to do an

15:14:30  6  exchange, you can only exchange the cash surrender

15:14:34  7  value of that, you can't exchange the cash account

15:14:36  8  value.

15:14:36  9         So that becomes a challenge that we don't

15:14:40 10  have that money, and the letter that we talked

15:14:45 11  about earlier that we don't have the second page,

15:14:48 12  we're talking -- it looks like I'm about to say,

15:14:51 13  what are you going to do with the money in the IRA

15:14:53 14  you don't need?  And it's going to be take it out,

15:14:56 15  pay the tax, pay the gift, fund the policy.

15:14:58 16  Obviously that didn't happen.

15:15:00 17         So back to your original question, no, that

15:15:03 18  idea of funding more than that wasn't possible.  We

15:15:07 19  could not put more in.

15:15:09 20    Q.    At any point?

15:15:09 21    A.    No, in the first two years you

15:15:11 22  couldn't.  From the retirement plan we had no

15:15:13 23  opportunity to put more in.  We maxed what we

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

148

15:15:16  1  could.

15:15:16  2    Q.    Okay.  Do you have any documentation

15:16:58  3  where -- that supports the position that you could

15:17:03  4  not make the internal exchange within Lincoln

15:17:08  5  without waiting 24 months?

15:17:10  6    A.    In the exhibits actually.  It was

15:17:18  7  something from Lincoln.  It's not this one.  I

15:17:35  8  think in the earlier exhibit there was something

15:17:39  9  that I sent John a letter from Lincoln that said

15:17:42 10  you could make internal exchanges without surrender

15:17:45 11  charges within two years but that -- wasn't that in

15:17:48 12  the earlier exhibits?

15:18:21 13    Q.    I'm showing you -- this is Exhibit 27

15:18:25 14  we looked at previously, and looking at Bates

15:18:30 15  number 043.

15:18:33 16    A.    Yes.

15:18:33 17    Q.    And this appears to be a letter from

15:18:35 18  Lincoln to Dr. Repicci, and in the first paragraph

15:18:40 19  it says it allows -- current rules for internal

15:18:44 20  exchanges to another Lincoln Life policy allow for

15:18:49 21  waiving surrender charges of the existing contract

15:18:52 22  at the time of the internal exchange.

15:18:57 23         So these are the current Lincoln Life rules

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

149

15:19:00 1 and they're subject to change, but it doesn't say
15:19:04 2 anything about a 24-month limitation.
15:19:08 3     A.   In this letter it doesn't.  I believe
15:19:10 4 there's another letter that -- where it does
15:19:13 5 reference this.
15:19:15 6     Q.   Let's see if we can find it for
15:19:18 7 clarification purposes.
15:20:44 8     And, again, I'm looking at Exhibit 27, Bates
15:20:50 9 page 142, which is the letter from you to John, and
15:20:55 10 in the third paragraph it states --
15:20:58 11     MR. TRACY:  Let me get it.  That's where I
15:21:01 12 think we're all --
15:21:13 13     THE WITNESS:  Yep.
15:21:02 14     MR. MOORE:  Okay.
15:21:03 15     MR. TRACY:  October 23?
15:21:06 16     MR. MOORE:  Yes.
15:21:08 17     BY MR. MOORE:
15:21:09 18     Q.   And you note in that letter that
15:21:11 19 without any partial surrender charges after holding
15:21:14 20 the policy for 24 months, and you append this
15:21:20 21 December 2nd of '02 letter from Lincoln to
15:21:21 22 Dr. Repicci, but in the December 2nd letter, I'm
15:21:27 23 looking at page 043 right now --

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

150

15:21:29 1     A.   Correct, I'm with you.
15:21:30 2     Q.   -- there's no reference to a 24-month
15:21:38 3 limit.
15:21:43 4     A.   Right.  Yeah, so that -- I mean, it's
15:21:46 5 also referenced in 26.  26 and 27 I've made the
15:21:53 6 same statement, and my -- my recollection is that
15:21:58 7 was the conversation with Kaye who then wanted to
15:22:02 8 put it in writing and then did not put that point
15:22:04 9 in there, just that these are our current rules.
15:22:08 10 So I believe that was the rule, she just didn't
15:22:11 11 mention 24 months in the letter.
15:22:12 12     Q.   Okay.  So it's --
15:22:13 13     A.   I don't have --
15:22:14 14     Q.   Okay.  So you're not aware of any
15:22:17 15 written documentation of that point currently?
15:22:20 16     A.   No --
15:22:21 17     Q.   Okay.
15:22:22 18     A.   -- I'm not.
15:22:24 19     Q.   Now, looking at Exhibit 25, which is
15:23:41 20 the November 12th, 2002, letter from you to
15:23:49 21 Mr. Repicci, this is the first time, at least in
15:23:54 22 writing, where we see a document that talks about
15:23:57 23 how to guarantee a death penalty -- death benefit

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

151

15:24:05 1 with Lincoln and talking about a guaranteed policy.
15:24:08 2     Now, this letter comes after you've already
15:24:12 3 even made application for the non-guaranteed
15:24:18 4 policy.  You had indicated previously that you had
15:24:23 5 presented both a guaranteed and a non-guaranteed
15:24:27 6 option to Dr. Repicci before application; does this
15:24:33 7 change your recollection on that at all?
15:24:34 8     A.   We had looked at both, that much I know
15:24:39 9 to be true that we had looked at both, and whether
15:24:42 10 he saw an illustration or not, I can't remember,
15:24:46 11 but certainly -- I'm quite confident given all the
15:24:55 12 dialog we had in writing and the phone
15:24:58 13 conversations included, hey, why can't we get a
15:25:00 14 product like this, I like this one, and they just
15:25:04 15 didn't have it.
15:25:05 16     Q.   Is there any reason why a guaranteed
15:25:08 17 policy should not have been put in place --
15:25:11 18     A.   Yes.
15:25:11 19     Q.   -- two to three years after?
15:25:14 20     A.   Yeah, I'm glad you showed me 25 because
15:25:17 21 this essentially makes the point.  So in 25, if you
15:25:20 22 look at Bates 027 and you look at the difference
15:25:25 23 between current basis fund, which is circled, and

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

152

15:25:29 1 current basis surrender, you're going to see in the
15:25:31 2 second year, if you pay the million 59, 1,059,000,
15:25:38 3 you have a surrender value of 118, which is a very
15:25:42 4 substantial 90 percent compression between cash
15:25:45 5 value and surrender value.
15:25:46 6     The product that I'm illustrating that John
15:25:49 7 is going to exchange into is the SULLPR2.  So we
15:25:54 8 previously looked at LPR2, LPR3, LPR4, they appear
15:25:59 9 to change every year, that this guaranteed cash
15:26:03 10 value is 1.5 and the second year is 1 point -- I
15:26:08 11 can't read that -- 672.
15:26:10 12     Q.   What page --
15:26:10 13     A.   I'm sorry.  028.  So on 028, if we go
15:26:14 14 to the second year, previously we had a 90 percent
15:26:18 15 compression, this goes from 16 -- 1.6 something to
15:26:23 16 1.35.  We're talking about a very, very modest
15:26:28 17 15 percent, not even -- you know, maybe a
15:26:31 18 20 percent compression.
15:26:33 19     So this product here, he could buy it, but
15:26:36 20 he spent taxes on all of it that comes out.  So
15:26:41 21 just in showing him this, if this is the apples to
15:26:44 22 apples comparison, sure, the guaranteed, but you're
15:26:47 23 going to pay taxes on 20 percent, not 90 percent.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

153

| | |
|---|---|
| 15:26:50 1 | **Q.** In that letter, your cover letter, you |
| 15:26:53 2 | state, I think this is a very desirable solution |
| 15:26:55 3 | for you. Why? |
| 15:26:57 4 | **A. Well, the idea that having your cake** |
| 15:27:00 5 | **and eating it, too, that if you make this change,** |
| 15:27:03 6 | **make -- buy the policy you have, you're going to** |
| 15:27:05 7 | **buy, you get the 60 to 90 percent compression for** |
| 15:27:09 8 | **taxes, then you later do an exchange, if this is** |
| 15:27:15 9 | **available, I didn't know it would be available,** |
| 15:27:18 10 | **then you get to have a guaranteed product on the** |
| 15:27:21 11 | **other side of the low taxes. So the desirable** |
| 15:27:24 12 | **position is to have both.** |
| 15:27:25 13 | **Q.** And you say of course we wouldn't have |
| 15:27:28 14 | to decide about the conversion for another two to |
| 15:27:30 15 | three years? |
| 15:27:31 16 | **A. Right.** |
| 15:27:32 17 | **Q.** And after the two to three-year period, |
| 15:27:33 18 | the tax issue would no longer be an issue, correct? |
| 15:27:36 19 | **A. Correct.** |
| 15:27:37 20 | **Q.** Would it have been in the client's best |
| 15:27:40 21 | interest regardless of how it was done or |
| 15:27:43 22 | implemented to have been moved into a guaranteed |
| 15:27:48 23 | product at the end of two or three years? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

154

| | |
|---|---|
| 15:27:51 1 | **MR. TRACY:** Objection. |
| 15:27:52 2 | **THE WITNESS:** Now that I've looked at this |
| 15:27:56 3 | and I see in less than a two-year period Lincoln's |
| 15:28:02 4 | run through three products, SULLPR2, SULLPR3, |
| 15:28:04 5 | SULLPR4, they're changing products every nine |
| 15:28:08 6 | months, that if one of these products had been |
| 15:28:10 7 | available at that time, that may have been a good |
| 15:28:13 8 | move for them. I don't know if these products were |
| 15:28:16 9 | available. |
| 15:28:16 10 | **BY MR. MOORE:** |
| 15:28:25 11 | **Q.** Did you make an investigation at the |
| 15:28:27 12 | end of two or three years about the availability of |
| 15:28:30 13 | the products? |
| 15:28:31 14 | **A. I believe I -- I believe I probably** |
| 15:28:34 15 | **did. I have no documentation to that, so I** |
| 15:28:38 16 | **don't -- my guess is he looked at it and the new** |
| 15:28:42 17 | **products just weren't as good. That's my -- that's** |
| 15:28:44 18 | **a guess. I don't have any documentation to state** |
| 15:28:47 19 | **that I did or I didn't.** |
| 15:28:49 20 | **Q.** Do you recall the exhibit -- do you |
| 15:28:59 21 | recall Dr. Repicci's first communication to you in |
| 15:29:01 22 | 2014 whereby he raised his -- I don't mean to |
| 15:29:08 23 | unfairly characterize, but his dismay with the |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

155

| | |
|---|---|
| 15:29:12 1 | performance -- |
| 15:29:12 2 | **MR. TRACY:** IRS and everything else. |
| 15:29:19 3 | **BY MR. MOORE:** |
| 15:29:20 4 | **Q.** Right. And in any event, were you |
| 15:29:24 5 | surprised that Dr. Repicci felt that his policies |
| 15:29:29 6 | should be guaranteed or at least not lapse before |
| 15:29:34 7 | age 100? |
| 15:29:35 8 | **MR. TRACY:** Objection. |
| 15:29:36 9 | **THE WITNESS:** I think you asked two |
| 15:29:41 10 | questions in there. |
| 15:29:42 11 | **MR. MOORE:** I did. |
| 15:29:42 12 | **MR. TRACY:** Note my objection. |
| 15:29:45 13 | **THE WITNESS:** Could you do one question at a |
| 15:29:48 14 | time and I'll answer -- |
| 15:29:50 15 | **MR. MOORE:** We'll do one question at a time. |
| 15:29:52 16 | **BY MR. MOORE:** |
| 15:29:54 17 | **Q.** Were you surprised that Dr. Repicci |
| 15:29:56 18 | indicated that he had understood that he had |
| 15:29:59 19 | guaranteed policies? |
| 15:30:01 20 | **A. I was very surprised that he thought he** |
| 15:30:04 21 | **had guaranteed policies.** |
| 15:30:05 22 | **Q.** In your view, were his policies in good |
| 15:30:10 23 | financial shape at that point? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

156

| | |
|---|---|
| 15:30:11 1 | **A. Describe good financial shape.** |
| 15:30:15 2 | **Q.** Well, I'll use the characteristics you |
| 15:30:17 3 | used in your October 9th, 2002, letter to Hy |
| 15:30:21 4 | Polakoff. |
| 15:30:21 5 | **A. All right.** |
| 15:30:21 6 | **Q.** If you want to pull out that |
| 15:30:25 7 | description, basically the -- it was a poor |
| 15:30:32 8 | performance. Had you seen poor performance in any |
| 15:30:35 9 | way of the policies prior to 2014? |
| 15:30:37 10 | **A. Yes. Well, not -- it wouldn't be poor** |
| 15:30:42 11 | **performing, I would say lower than originally** |
| 15:30:45 12 | **illustrated.** |
| 15:30:46 13 | **So I was not -- in 2014, I was not surprised** |
| 15:30:50 14 | **that in a low interest rate environment, he wasn't** |
| 15:30:55 15 | **getting the return he thought he was going to get.** |
| 15:30:57 16 | **That didn't surprise me at all.** |
| 15:31:01 17 | **We had looked at options and couldn't find** |
| 15:31:04 18 | **things that were -- we had talked about putting** |
| 15:31:07 19 | **more premium in and he hadn't done that, so I** |
| 15:31:10 20 | **wasn't surprised that it wasn't illustrating to** |
| 15:31:15 21 | **100, but we had conversations about that fact that** |
| 15:31:17 22 | **these policies are current assumptions, we don't** |
| 15:31:18 23 | **have guaranteed products, they're getting more** |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

15:31:19  1  expensive.
15:31:21  2      This is a situation where we're going to
15:31:24  3  spend a lot of money or are we comfortable without
15:31:26  4  the guarantee.  So the tone surprised me and the
15:31:29  5  idea that -- are these term or permanent completely
15:31:32  6  surprised me because we had had a lot of
15:31:34  7  conversations about this.
15:31:34  8      Q.  You indicated previously you thought
15:31:36  9  Dr. Repicci was one of your smartest clients?
15:31:39  10     A.  Yes.
15:31:39  11     Q.  And do you think Dr. Repicci would make
15:31:42  12  a claim like that with -- without an understanding
15:31:47  13  of the situation?
15:31:51  14     MR. TRACY:  Objection.
15:31:54  15     THE WITNESS:  I got the letter and had a
15:32:00  16  conversation with John and said, hey, I'm trying to
15:32:04  17  help you, where are we?  And he said, Chris, you've
15:32:07  18  been great to us, I love the work you do, we're
15:32:10  19  just trying to get this thing fixed at the
15:32:13  20  insurance company level, I'm not interested in
15:32:15  21  suing you, we're just trying to get the insurance
15:32:17  22  company to move and do something we want them to
        23  do.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

15:32:21  1      Okay.  I appreciate you not suing me in the
15:32:23  2  process, but fit yourself however you can, and that
15:32:26  3  was the situation.  It seemed like he was being
15:32:29  4  coached to put something in writing, but our
15:32:32  5  conversation seemed very different where he wasn't
15:32:34  6  angry, he wasn't disappointed, he was just matter
15:32:38  7  of fact, let's just get these things to guarantees.
15:32:41  8  I'll keep trying.
15:32:42  9      BY MR. MOORE:
15:32:43  10     Q.  And based on your letter of
15:32:45  11  October 9th, 2002, to Hy Polakoff, wouldn't it be
15:32:48  12  his expectation that if -- if there were problems
15:32:52  13  down the road financially that there could be steps
15:32:57  14  taken to preserve the policies?  Is that not a
15:33:02  15  reasonable assumption on his part?
15:33:02  16     A.  Sure, and we tried numerous times.
15:33:05  17     Q.  Is there any documentation of those
15:33:08  18  numerous times other than what we've seen here
15:33:11  19  today?
15:33:11  20     A.  Not that -- we've produced everything
15:33:14  21  so you should have everything.
15:33:15  22     Q.  All right.  I'm going to change focus
15:33:21  23  here just a little bit, and we're going to go to

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

15:33:24  1  the 144 policy, the second Lincoln policy.
15:33:27  2      A.  Okay.
15:33:28  3      Q.  Now, my understanding is you testified
15:33:31  4  you really had no involvement in that whatsoever?
15:33:35  5      A.  Correct.
15:33:36  6      Q.  So -- and so I'm just going to get a
15:33:40  7  little clarification on a few things first.
15:33:42  8      A.  I had no involvement in the sale of it,
15:33:45  9  I had involvement in servicing it later after 2011,
15:33:50  10  I believe.
15:33:50  11     Q.  Correct.  I think that's what you
15:33:52  12  indicated.
15:33:53  13     Okay.  Please look at Exhibit 19 again.
15:35:36  14     A.  Sure.
15:35:37  15     Q.  Now, I think you had testified
15:35:51  16  previously as to this letter that it was in fact
15:35:57  17  with regard to the 144 policy.  So my question
15:36:03  18  simply is, why is the letter coming from you?
15:36:06  19     A.  Because -- why is the letter coming
15:36:10  20  from me?  These policies are not -- these plans pay
15:36:15  21  one year -- they pay five years, I think he paid
15:36:17  22  one, and now this doesn't look so great, and Celia
15:36:22  23  Clark, Dave Mandell said to me, I need help

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

15:36:26  1  figuring out what to do with this, I don't know
15:36:26  2  what to do with this.  Sure, okay.  Let's see if I
15:36:29  3  can help.
15:36:30  4      Q.  So you were approached by Celia Clark
15:36:33  5  and Dave Mandell to see if you could help on this
15:36:35  6  one?
15:36:36  7      A.  Yes.
15:36:36  8      Q.  Okay.  Were you ever listed as the
15:36:40  9  representative agent on the 144 policy?
15:36:43  10     A.  Subsequently to servicing it at some
15:36:46  11  point, I think I was.  It might have been in '11.
15:36:48  12  I don't know when I took over to do that.
15:36:50  13     Q.  We definitely have that document and
15:36:53  14  can -- we can view it later, but ...
15:37:29  15     Okay.  This is Plaintiff's Exhibit
15:37:54  16  Number 43.  These appear to be communications
15:37:57  17  between you and Celia Clark with Hy Polakoff
15:38:06  18  copied, and I'm looking at the second page of that.
15:38:12  19  They were produced as exhibits, I believe, at Hy
15:38:25  20  Polakoff's deposition.
15:38:27  21     And the -- I'm really interested in the last
15:38:36  22  paragraph on page 2 where you state, why do I
15:38:41  23  always have to clean up other people's poor client

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 -  (716) 853-5600*

161

```
15:38:45  1   service?
15:38:45  2        Can you tell me what was going on with this
15:38:48  3   policy, to the extent you knew?
15:38:50  4        A.   Well, the fact that there -- it's 2012,
15:38:57  5   they had Dave Mandell as the original agent, plus
15:39:02  6   the policy was funded with premium financing and
15:39:06  7   EBI, and so they worked together, they split the
15:39:29  8   case, they got the commission.
15:39:29  9        I stopped working with Dave Mandell in 2009,
15:39:33 10   and here I am three years later realizing the
15:39:38 11   clients haven't had any service on this case and
15:39:41 12   the policy is not performing well, and I'm just
15:39:46 13   commiserating with Celia that I get to clean up
15:39:50 14   somebody else's mess.  That's it.
15:39:52 15        Q.   All right.  Look at what's been marked
15:39:59 16   as Exhibit 45.
15:40:02 17        A.   Okay.
15:40:02 18        Q.   And do you recognize this document?
15:40:05 19        A.   Looks like e-mails between Celia's --
15:40:19 20   Christine Edwards is the assistant to Celia Clark.
15:40:28 21   Yep.
15:40:28 22        Q.   And do you have a recollection of these
15:40:31 23   correspondence?
```

162

```
15:40:31  1        A.   Sure.
15:40:32  2        Q.   Okay.  Let me ask you, the response
15:40:40  3   from you -- the top of the page on Exhibit 45,
15:40:45  4   first page, you note that Dave Wright was the
15:40:50  5   original and then state -- and I believe you mean
15:40:52  6   representative at that point; is that correct?
15:40:56  7        A.   They said it's an orphan.  So Dave
15:41:00  8   Mandell, Dale Edwards, David Wright are all
15:41:04  9   involved, somehow none of them are on there, and
15:41:06 10   now it's blank and it shouldn't -- let me take care
15:41:09 11   of this and fix it.
15:41:11 12        Q.   You say it should have been me --
15:41:14 13        A.   If they all dropped their licenses, why
15:41:16 14   did this not go to me so I could get the forms?
15:41:19 15   Why not give it to me or give it to somebody --
         16        Q.   So --
15:41:20 17        A.   -- but nobody got any notification,
15:41:22 18   nobody -- they all just dropped the case.  How do
15:41:24 19   they just leave somebody and not --
15:41:27 20        Q.   If you had nothing to do with the
15:41:29 21   policy in the beginning, why would they -- why
15:41:33 22   should it have been you?
15:41:34 23        A.   These guys were always good, Dale and
```

163

```
15:41:37  1   Dave, at service.  Mandell should have given it to
15:41:42  2   me.  He dropped his license.  Why would he not give
15:41:45  3   it to me?  They know I know the client, so let me
15:41:47  4   service it.
15:41:49  5        I can't change it for somebody else so let
15:41:52  6   me have it so I can service the thing, but to walk
15:41:57  7   away and just permanently drop the thing, it makes
15:41:59  8   no sense.  It's just bad customer service.  I
15:42:10  9   should have left it.  They were done.
15:42:12 10        When they dropped it, it should have gone to
15:42:15 11   me.  Somebody should have made sure I got it to
15:42:18 12   take care of it.  They didn't care what happened to
15:42:21 13   the client after the fact -- years after they were
15:42:25 14   paid.
15:42:25 15        Q.   So you did not write the policy, you're
15:42:30 16   not the writing agent or the selling agent?
15:42:31 17        A.   Correct, nor did I get paid, correct.
15:42:34 18        Q.   Okay.  And what -- to the best of your
15:42:37 19   knowledge, what did occur with regard to that
15:42:39 20   policy?
15:42:40 21        A.   Other than what's in the notes here?
15:42:47 22        Q.   Yes.  Have you had any conversations
15:42:50 23   with any other persons as to what may have happened
```

164

```
15:42:55  1   on the 144 policy?
15:42:55  2        A.   In what timeframe?
15:42:57  3        Q.   Post purchase.
15:43:00  4        So let me ask you this:  Are you aware that
15:43:04  5   the 144 policy was purchased as a no lapse policy?
15:43:09  6        A.   No, I wasn't aware of that.
15:43:11  7        Q.   And is it true that no lapse policy
15:43:14  8   means the same thing as a guaranteed policy?
15:43:16  9        A.   If you meet the expectations, correct.
15:43:18 10        Q.   Which it would be the same as a
15:43:20 11   guaranteed policy?
15:43:21 12        A.   Correct.
15:43:21 13        Q.   So the policy was applied for as a no
15:43:28 14   lapse policy, that was the understanding of what
15:43:32 15   the policy was.  Obviously that did not occur
15:43:36 16   because --
15:43:36 17        A.   They didn't pay their premiums.
15:43:39 18        Q.   -- premiums were not met.
         19        A.   Right.
15:43:41 20        Q.   Do you know anything about who's
15:43:43 21   handling this?  Can you give me a little bit of
15:43:47 22   background why the policy was put in place at all?
15:43:50 23        A.   No, I'm not sure what you're asking.
```

165

15:43:58 1    Q.   Did Celia Clark ever have any
15:44:02 2  conversation with you about putting that 144 policy
15:44:04 3  in place?
15:44:04 4    A.   Other way around, I sent -- I had John
15:44:10 5  talk to -- John and Marcus talk to David and Celia
15:44:15 6  about this and this was a very complicated
15:44:22 7  transaction, so I sent it that way, not the other
15:44:25 8  way around.  So I don't know what happened other
15:44:28 9  than I know the EBI people went out of business in
15:44:33 10  2007, end of 2007 -- that policy was purchased,
15:44:37 11  what, in '06?
15:44:39 12    Q.   '06, yes.
15:44:40 13    A.   One premium payment made?
15:44:41 14    Q.   That's my understanding.
15:44:43 15    A.   So I know traditionally they would do
15:44:48 16  five-year payments, that was their usual structure.
15:44:51 17  I don't know if that's what this one was.  We could
15:44:51 18  look at the illustration, but they paid one out of
15:44:55 19  five, and then the last would go away because you
15:44:58 20  didn't meet the obligation.
15:44:59 21    Q.   Okay.  Now, when you say you passed it
15:45:02 22  onto them originally, are you talking about back in
15:45:05 23  2006 or at its inception?

166

15:45:26 1    A.   It was before that.
15:45:31 2    Q.   And what -- what led to that?  What was
15:45:39 3  your first introduction to the possibility of
15:45:44 4  whatever plan it was that utilized that insurance?
15:45:49 5    A.   I'm not sure what you're asking me,
15:45:52 6  Richard.
15:45:53 7    MR. MOORE:   Could we go off the record here
15:45:55 8  for a minute.
15:45:56 9    MR. TRACY:   Yeah, sure.
15:48:04 10    (Off the record: 3:45 p.m.)
15:56:18 11    MR. MOORE:   Let's go back on the record
15:56:22 12  here.
13    THE WITNESS:   Could we take a bathroom
14  break?
16:10:14 15    (A recess was then taken at 3:56 p.m.)
16:10:14 16    BY MR. MOORE:
16:10:16 17    Q.   If we could look back at Exhibit 5,
16:10:20 18  which is the MassMutual policy.  The -- previously,
16:11:07 19  you testified with regard to further funding of the
16:11:12 20  MassMutual policy that there were limitations
16:11:15 21  tax-wise on what you could do, if I understand you
16:11:19 22  correctly, that you had funded the MassMutual
16:11:23 23  policy to the maximum extent possible?

167

16:11:26 1    A.   From the retirement plan in the first
16:11:31 2  two years.
16:11:31 3    Q.   And to the maximum allowable amount?
16:11:35 4    A.   That was my understanding, yes, in the
16:11:39 5  first two years, yes.
16:11:39 6    Q.   And can you explain to me on Exhibit 5,
16:11:43 7  page 9 -- page 2 of 9, it says, but it's about the
16:11:58 8  seventh page in, at the top of the -- it says
16:12:03 9  page 2 of 9 at the bottom.
16:12:04 10    A.   Yes.  Got it.
16:12:04 11    Q.   And it says there's a limit on total
16:12:09 12  premium payments, and it shows B is -- my
16:12:16 13  understanding is that's actually the maximum amount
16:12:16 14  that the -- that -- under the federal regulations,
16:12:24 15  including tax, is the maximum amount that could be
16:12:28 16  paid in premiums on that account; is that an
16:12:31 17  accurate understanding?
16:12:32 18    A.   I don't remember seeing this page
16:12:35 19  before, so that's new to me.  This is one plus the
16:12:43 20  number of years -- sum of premiums.
16:13:04 21    MR. TRACY:   I'm going to object.  Do not
16:13:07 22  guess.
16:13:07 23    THE WITNESS:   I don't know.  I don't know.

168

16:13:09 1    BY MR. MOORE:
16:13:10 2    Q.   Is it possible that's actually the
16:13:11 3  maximum amount allowed for premiums per year for
16:13:16 4  this policy?
16:13:17 5    MR. TRACY:   Objection.  If you know.
16:13:19 6    THE WITNESS:   I don't know.
16:13:19 7    BY MR. MOORE:
16:13:24 8    Q.   Okay.  Do you have a copy of the
16:13:26 9  MassMutual policy other than what we provided to
16:13:28 10  you?
16:13:28 11    A.   No, I don't believe I do.
16:13:31 12    Q.   Did you retain a copy of the policy?
16:13:35 13    A.   I would normally get a copy of the
16:13:37 14  policy.  The original is sent to the client only,
16:13:40 15  so normally I wouldn't get one.  The clients would
16:13:42 16  get a copy of the client policy, unless they sent
16:13:45 17  me one.
16:13:46 18    Q.   Okay.  Okay.  Did you ever get
16:13:53 19  information from MassMutual about what the maximum
16:13:57 20  premium payment per year was on that policy?
16:14:00 21    A.   The instructions with Mass were -- they
16:14:12 22  knew what we were trying to accomplish in their
16:14:16 23  advance case design and it was -- it was given to

169

```
16:14:18   1   me as this is what we've got, this is the best way
16:14:21   2   to do this, and that was the -- that was how it was
16:14:25   3   given to me.  So I was under the understanding that
16:14:28   4   was the max you could put in.
16:14:30   5        Q.   But it's possible that there may have
16:14:32   6   been a higher max?
16:14:33   7        A.   It's possible, which I assume would
16:14:41   8   have brought the -- if you put more premium in, the
16:14:44   9   cash surrender value would have gone up, I assume,
16:14:47   10  so the tax leverage wouldn't -- you would have lost
16:14:49   11  some with the leverage, I assume.
16:14:51   12       Q.   Just another point of clarification,
16:15:11   13  with regard to Exhibit 26, if you have that, I
16:15:31   14  believe you indicated in this exhibit that you
16:15:35   15  reduced the face value beginning in January 2004,
16:15:41   16  and yet the reduction did not go over until
16:15:46   17  February 2005; do you have a recollection of why
16:15:48   18  that was the case?
16:15:48   19       A.   I don't.
16:15:49   20       Q.   Okay.  Can you tell me a little bit
16:16:33   21  about how the commission structure works with
16:16:41   22  companies generally, and MassMutual and Lincoln in
16:16:44   23  particular if they're different?  And by that, I
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

170

```
16:16:48   1   mean the commission structure -- let me tell you
16:16:51   2   what my understanding is.
16:16:53   3        My understanding is that the commission
16:16:58   4   that's paid to the agents is typically between 100
16:17:02   5   and -- between 80 and 120 percent of what's
16:17:06   6   typically referred to as a target amount, and that
16:17:17   7   target amount is some percentage of the total
16:17:22   8   amount of premiums that are anticipated to be paid,
16:17:26   9   and that in year -- if payments are made within
16:17:32   10  year one equaling the target amount, you would get
16:17:38   11  80 to 100 percent of that, and that payments made
16:17:41   12  after year one go down to a very small percentage
16:17:44   13  of what the premium payment is annually; is that a
16:17:50   14  fair statement?
16:17:50   15       A.   You're close.  There's --
16:17:52   16       Q.   Can you -- can you make it a little
16:17:55   17  clearer for us?
16:17:56   18       A.   Target premiums are -- commissions are
16:18:01   19  paid as a percentage of target, generally speaking.
16:18:06   20  Your numbers are right for brokered premiums,
16:18:12   21  career agents typically get much lower payouts so
16:18:14   22  it's not usually 80 to 120.  It's probably 50 to --
16:18:19   23  it might be less.
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

171

```
16:18:22   1        The target premium is based on age, health,
16:18:26   2   and -- the older you are, the higher the target.
16:18:31   3   So if you sold $1 million policy to a 25 year old,
16:18:35   4   the commission is way less than if you sold to an
16:18:39   5   80 year old.
16:18:40   6        So the older you get -- the greater the
16:18:42   7   risk, the greater the target, the greater the
16:18:45   8   commission.  So the older you are, the higher the
16:18:48   9   death benefit, the worse your health, the more you
16:18:50   10  get paid.  That part is all true.
16:18:53   11       Some companies spread target premium over --
16:18:59   12  they pay you over seven years, some put it all in
16:19:03   13  year one, it varies company to company, product to
16:19:07   14  product.
16:19:07   15       Q.   With regard to Lincoln in 2002 and
16:19:12   16  2003, was the target -- was the target paid out,
16:19:20   17  whatever the percentage of the target was, was it
16:19:23   18  paid out in year one at a higher rate than in
16:19:26   19  following years?
16:19:27   20       A.   To the best of my knowledge, both those
16:19:33   21  policies were paid out in year one.  I believe that
16:19:35   22  to be true.
16:19:36   23       Q.   Do you recollect if you met the target
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

172

```
16:19:38   1   in each case for both the Mass --
16:19:40   2        A.   We were way beyond target, way beyond.
16:19:44   3        Q.   So if I understand what you're saying,
16:19:46   4   you're saying that premiums paid in year one
16:19:49   5   exceeded the target in each case?
16:19:51   6        A.   You only get paid off the target so --
16:19:54   7        Q.   Exactly.
16:19:54   8        A.   So if the target was 200 and you paid
16:19:58   9   300 -- there's usually target premium percentage
16:20:01   10  and then there's an excess, and that excess is
16:20:04   11  usually the same as what the excess premium is on
16:20:07   12  future years.
16:20:07   13       So whether you paid 600 in year one and you
16:20:11   14  kept 200 in target and 400 of excess, or you paid
16:20:17   15  200, 200, 200, you'd get the same money, you'd just
16:20:18   16  wait a year for that.  So that general
16:20:20   17  understanding, I'd say, you have a good handle.
16:20:22   18       Q.   Okay.  And in this case, your
16:20:24   19  recollection is you did meet target in each case
16:20:27   20  and so you earned your highest possible amount in
16:20:31   21  year one for both of those policies?
16:20:33   22       A.   That's my recollection --
16:20:35   23       Q.   Okay.
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

173

| | |
|---|---|
| 16:20:36 | 1 A. -- but that could be ... |
| 16:20:37 | 2 Q. Can you explain what a general agent |
| 16:20:47 | 3 is? |
| 16:20:47 | 4 A. General agent, somebody who gets an |
| 16:20:52 | 5 override -- so general agent owns an agency, that |
| 16:20:56 | 6 agency employs agents, insurance company pays the |
| 16:20:59 | 7 general agents, general agent then keeps some of |
| 16:21:04 | 8 that money for themselves and pays the rest of the |
| 16:21:07 | 9 agents. |
| 16:21:07 | 10 Q. So with regard to the Lincoln policy or |
| 16:21:10 | 11 the MassMutual policy, was there a general agent |
| 16:21:12 | 12 involved at all? |
| 16:21:12 | 13 A. MassMutual was Kim Michel, M-I-C-H-E-L, |
| 16:21:18 | 14 so it was the Los Angeles office, the Michel Agency |
| 16:21:19 | 15 of MassMutual was the general agent. |
| 16:21:20 | 16 For Lincoln, I think it was -- I think it |
| 16:21:26 | 17 was John White in Millennium Brokerage Group, but |
| | 18 it might have been Paul Panzer, P-A-N-Z-E-R. I |
| 16:21:31 | 19 can't remember. It might be have been Visys, too. |
| 16:21:33 | 20 I honestly can't remember. |
| 16:21:35 | 21 Q. And does the -- does the general agent |
| 16:21:37 | 22 also receive a percentage of the premium paid in |
| 16:21:41 | 23 the first year? |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

174

| | |
|---|---|
| 16:21:42 | 1 A. I have no idea. I've never been a |
| 16:21:46 | 2 general agent. |
| 16:21:46 | 3 Q. Okay. Let's look at Exhibit Number 38. |
| 16:22:08 | 4 By the way, is the target amount for Lincoln often |
| 16:22:13 | 5 referred to as the break point? |
| 16:22:15 | 6 A. I don't know that to be true. I've |
| 16:22:19 | 7 never heard that term, break point, used. |
| 16:22:21 | 8 Q. I'm referring to Bates page -- |
| 16:22:36 | 9 and for the record, Exhibit 38 is titled Lincoln |
| 16:22:43 | 10 SUL-4 Premium Life, Life Insurance Illustration, |
| 16:22:50 | 11 upper right corner says Prepared By Christopher R. |
| 16:22:55 | 12 Jarvis. |
| 16:22:55 | 13 Okay. And I'm looking at Bates 282, and |
| 16:23:09 | 14 midway through that last page there's a number |
| 16:23:14 | 15 above the word software version that says, |
| 16:23:20 | 16 B427,250.00. I've been advised that that is often |
| 16:23:26 | 17 referred to as a break point number; do you know if |
| 16:23:29 | 18 that's the case? |
| 16:23:31 | 19 A. I've never heard the term break point |
| 16:23:34 | 20 ever. |
| 16:23:34 | 21 Q. And I've been advised that that |
| 16:23:37 | 22 basically represents what otherwise you call the |
| 16:23:40 | 23 target amount for the policy. Does that number |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

175

| | |
|---|---|
| 16:23:43 | 1 reflect or refresh your recollection at all as to |
| 16:23:46 | 2 what your commission may have been? |
| 16:23:48 | 3 A. That looks really high so I would say |
| 16:23:51 | 4 no, it doesn't look right to me. It seems much |
| 16:23:57 | 5 higher than I thought the case was -- |
| 16:23:57 | 6 Q. What's your best recollection of a |
| 16:23:59 | 7 range that the commission may have been? |
| 16:24:01 | 8 A. I think earlier I said 2, 300, |
| 16:24:05 | 9 somewhere in that range. That was in my mind. |
| 16:24:07 | 10 Q. All right. Okay. And I believe you |
| 16:24:11 | 11 testified that for both Lincoln and MassMutual, you |
| 16:24:15 | 12 had reached that target amount and you couldn't |
| 16:24:18 | 13 make additional commission on the product at that |
| 16:24:22 | 14 point? |
| 16:24:22 | 15 A. Well, not at the -- not at the |
| 16:24:27 | 16 80 percent rate or whatever that number was. |
| 16:24:28 | 17 Q. Okay. So if -- if there were a |
| 16:24:34 | 18 possibility to have transferred more monies into |
| 16:24:38 | 19 MassMutual, would you -- you wouldn't have received |
| 16:24:42 | 20 any additional commission for doing so, would you, |
| 16:24:45 | 21 from MassMutual? |
| 16:24:46 | 22 A. In the first year we put more cash in, |
| 16:24:50 | 23 we would have bought more death benefit, I believe. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

176

| | |
|---|---|
| 16:25:00 | 1 If he put another $1 million in, I might have made |
| 16:25:05 | 2 another 30,000, it's possible, or whatever the |
| 16:25:06 | 3 bonus would have been. |
| 16:25:07 | 4 Q. But that would be significantly less |
| 16:25:09 | 5 than what the original commission amount was? |
| 16:25:12 | 6 A. Significantly less? Sure. Well, per |
| 16:25:16 | 7 dollar amount, but it's still more money. |
| 16:25:18 | 8 Q. Sure. And what's your best |
| 16:25:21 | 9 recollection of the amount that was involved from |
| 16:25:24 | 10 MassMutual as a commission? |
| 16:25:25 | 11 A. 200-ish. |
| 16:25:27 | 12 Q. Okay. Let me just see if you can |
| 16:25:59 | 13 identify that document for us, Exhibit 31. |
| 16:26:24 | 14 A. Yes. |
| 16:26:25 | 15 Q. Okay. And is this correspondence from |
| 16:26:29 | 16 you with regard to -- did this involve all three |
| 16:26:36 | 17 policies? |
| 16:26:37 | 18 A. This e-mail did, yes. |
| 16:26:39 | 19 Q. Okay. And by all three policies, I |
| 16:26:41 | 20 mean Lincoln 026, Lincoln 144, and MassMutual -- |
| 16:26:46 | 21 A. Yes. |
| 16:26:47 | 22 Q. -- is that correct? |
| 16:26:48 | 23 A. Yes. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

**177**

16:26:48 1    Q.   Okay.  And you're noting in this
16:26:53 2    correspondence that the two Lincoln policies are
16:26:56 3    not guaranteed?
16:26:57 4        A.   Correct.
16:26:57 5        Q.   Mr. Jarvis, I'll have you look at
16:28:39 6    what's been marked as Exhibit 47.  Exhibit 47
16:28:46 7    purports to be a database printout with regard to
16:28:52 8    certain policies that were available in New York in
16:28:59 9    2002 time period that had guaranteed policies.  Are
16:29:02 10   you familiar with databases such as this?
16:29:05 11       A.   No.
16:29:05 12       Q.   Okay.  Did your -- did your company
16:29:08 13   ever utilize such databases?
16:29:11 14       A.   No.
16:29:12 15       Q.   Okay.  Do you know if you had specific
16:29:16 16   contact with any of those other providers other
16:29:17 17   than Lincoln and MassMutual?
16:29:23 18       A.   No, I went through the broker Visys and
16:29:26 19   Millennium, so whatever they found, that's what I
16:29:31 20   used.
16:29:40 21       What database was this again, did you say?
16:29:42 22       Q.   Whatever it's titled PEP and
16:29:50 23   Competition.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

**178**

16:29:57 1        MR. TRACY:  PEP and Competition.
16:29:57 2        BY MR. MOORE:
16:30:16 3        Q.   When you were -- going back over your
16:30:19 4    testimony briefly about your professional history,
16:30:33 5    you -- I believe you indicated you were with
16:30:36 6    Jarvis & Mandell beginning in 1997 --
16:30:39 7        A.   Yes.
16:30:39 8        Q.   -- is that correct?
16:30:40 9        And then you were -- joined with OJM in
16:30:48 10   2007?
16:30:48 11       A.   Yes.
16:30:48 12       Q.   And you left approximately 2010?
16:30:55 13       And when did you start Jade Risk?
16:30:58 14       A.   '11.
16:30:59 15       Q.   And you indicated you sold Jade Risk in
16:31:03 16   2016?
16:31:03 17       A.   Correct.
16:31:03 18       Q.   And did you sell Jade Risk for -- was
16:31:17 19   it $3 million?
16:31:17 20       A.   Yes.
16:31:17 21       Q.   What was the reason you left Jarvis &
16:31:21 22   Mandell?
16:31:21 23       A.   Disagreement with my partners.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

**179**

16:31:24 1        Q.   About what?
16:31:24 2        A.   Ethics.
16:31:26 3        Q.   Okay.  And what were your concerns?
16:31:30 4        A.   I felt that client needs were secondary
16:31:36 5    to income opportunities and we were not on the same
16:31:40 6    page, so I was voted out and had some ugly
16:31:48 7    litigation for a couple of years and was on the
16:31:50 8    sidelines not talking to people waiting for my day
16:31:54 9    in court.
16:31:56 10       Q.   Okay.  And did that litigation reach
16:31:56 11   resolution?
16:31:57 12       A.   We reached resolution.
16:31:59 13       Q.   Was it settled or did it go to trial?
16:32:00 14       A.   It mediated.
16:32:01 15       Q.   It mediated.  Okay.  Is the settlement
16:32:06 16   confidential?
16:32:06 17       A.   It is.
16:32:11 18       Q.   Okay.  I'm not going to ask you for it
16:32:11 19   then.
16:32:12 20       Are there any provisions within that
16:32:21 21   settlement about confidentiality of -- or
16:32:26 22   non-discouragement clauses or anything to that
16:32:28 23   effect that you recall?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

**180**

16:32:29 1        A.   I don't recall.  I don't recall.
16:32:32 2        Q.   And can you -- now, when you joined
16:32:40 3    OJM, though, that also included Mr. Mandell; is
16:32:47 4    that correct?
16:32:47 5        A.   Mm-hmm.
16:32:48 6        Q.   And I presume from your previous
16:32:50 7    statement that Mr. Mandell is the individual you
16:32:53 8    had issues with Jarvis & Mandell?
16:32:55 9        A.   The -- the O and the M no longer
16:33:02 10   needed -- no longer wanted the J around in OJM.  So
16:33:05 11   when we merged Jarvis & Mandell with the O'Dell
16:33:07 12   Group, created O'Dell, Jarvis, Mandell, OJM, that
16:33:12 13   led to a minority share in the company, so I was --
16:33:34 14   I was voted out.
16:33:35 15       Q.   Were there -- there were three
16:33:38 16   principals in that?
16:33:39 17       A.   There were.
16:33:42 18       Q.   Okay.  All right.  I also understand
16:33:48 19   you have an -- I don't believe you testified to
16:33:50 20   this, but I could be wrong, but you -- I believe
16:33:55 21   you said you had a degree in applied mathematics.
16:33:59 22   Do you have a background in actuarial science, as
16:34:02 23   well?

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

181

16:34:02 1      A.   Yes, I do.

16:34:02 2      Q.   And what --

16:34:04 3      A.   Property and casualty actuarial

16:34:08 4   science, not life.

16:34:08 5      Q.   And is that a degree, or is that a work

16:34:11 6   experience, or how -- is it a certification?

16:34:13 7      A.   I was an actuarial analyst.  I took --

16:34:17 8   I passed tests 1, 2, 3A, 3B, 3C, and then 4A, 4B,

16:34:30 9   5A and 5B.  So I did not reach an associate or a

16:34:37 10  fellow accreditation, there was another exam that

16:34:41 11  would.

16:34:41 12     Q.   And when were you involved in the

16:34:44 13  actuarial work?

16:34:45 14     A.   1992 through 1995.

16:35:01 15     MR. MOORE:  All right.  Let's go off the

16:35:05 16  record here for a minute.

16:55:55 17     (A recess was then taken at 4:35 p.m.)

16:55:55 18     MR. MOORE:  Okay.  We're back on the record.

16:56:12 19  BY MR. MOORE:

16:56:13 20     Q.   Okay.  All right.  Mr. Jarvis, just for

16:56:15 21  clarification purposes, I had asked you previously

16:56:18 22  about the option to put more of the monies into the

16:56:24 23  MassMutual fund initially, in either year one or

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

182

16:56:28 1   year two at the early stages.

16:56:30 2      And I believe you had indicated that there

16:56:33 3   were -- well, can you reiterate for me what the

16:56:36 4   reason is why you didn't believe that could be

16:56:39 5   done?

16:56:39 6      MR. TRACY:  Objection, but you can answer.

16:56:41 7      THE WITNESS:  Previously, I stated that it

16:56:43 8   was the max premium, but what I believe to be true

16:56:49 9   is that we were looking for the right balance of

16:56:56 10  compression for tax purposes with cash available

16:57:05 11  to -- the right balance of compression and

16:57:08 12  long-term death benefit.

16:57:14 13     And we ended on -- we came to spending

16:57:23 14  1.2 million to buy 17.5 million in death benefit at

16:57:28 15  the ideal spot to do that, and that's where --

16:57:31 16  that's where we ended.

16:57:32 17  BY MR. MOORE:

16:57:32 18     Q.   So it's possible that more monies could

16:57:37 19  have been invested initially in the MassMutual

16:57:39 20  policy even though it may not have been at the

16:57:43 21  ideal optimal spot, in your opinion?

16:57:46 22     A.   In my opinion, we could have put more

16:57:48 23  in, but if we did, you would have paid -- put

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

183

16:57:53 1   another 500,000 in, we'd have another 500,000 of

16:57:58 2   taxable value, so it wouldn't get the leverage John

16:58:01 3   was looking for.

16:58:02 4      Q.   And when we looked -- no.  Strike that.

16:58:11 5      Previously, you referred to the guaranteed

16:58:16 6   Lincoln policies that you did illustrations on or

16:58:18 7   had illustrations run, and there was SUL-2 in 2002,

16:58:25 8   and then in 2003, there was an illustration for the

16:58:30 9   SUL-3, and then you gave some testimony about an

16:58:38 10  SULLPR-4.  Did you have any documentation as to

16:58:45 11  that policy?

16:58:48 12     A.   Other than the illustrations that you

16:58:50 13  showed me as --

16:58:53 14     Q.   Okay.  Do you recall which exhibit that

16:58:55 15  would have been if we can figure it out?

16:59:00 16     MR. TRACY:  It was definitely --

16:59:02 17     THE WITNESS:  So what I do recall is today's

16:59:05 18  testimony there were three different exhibits

16:59:08 19  between 2002 and 2003 -- or 2002 and 2004 where we

16:59:11 20  showed -- where I showed John hypothetical 1035,

16:59:20 21  it's the internal exchanges, and Lincoln had a

16:59:22 22  different product every time that I sent that.

16:59:32 23     So the company -- the company is releasing

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

184

16:59:33 1   new products and changing what they're offering

16:59:35 2   so --

16:59:36 3      BY MR. MOORE:

16:59:36 4      Q.   What I'm trying to clarify is whether

16:59:39 5   we -- whether we're going from your memory of the

16:59:43 6   dash four or whether in fact -- off the record.

17:00:44 7      (Off the record: 5:00 p.m.)

17:05:14 8      BY MR. MOORE:

17:05:15 9      Q.   Mr. Jarvis, in preparing for this

17:05:16 10  deposition, did you review any documents?

17:05:18 11     A.   I did.

17:05:18 12     Q.   And can you tell me what you reviewed?

17:05:20 13     A.   I reviewed some of the documents with

17:05:25 14  counsel yesterday, exhibits that we provided in

17:05:28 15  discovery.

17:05:28 16     Q.   And were there any other documents that

17:05:32 17  have been produced that you have?

17:05:33 18     A.   No, sir.

17:05:40 19     MR. MOORE:  Matthew, I'll put my document

17:05:43 20  requests in writing to you.

17:05:45 21     MR. TRACY:  Sure, that'd be great.

17:05:46 22     MR. MOORE:  My understanding currently is

17:05:49 23  the representation there's no further documents

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

185

17:05:50  1   you're aware of that have not been produced?
17:05:53  2       MR. TRACY:  That is my understanding.
17:05:54  3       MR. MOORE:  Okay.
        4       MR. TRACY:  That is correct.
17:05:54  5       MR. MOORE:  Then I have nothing further for
17:05:56  6   today.  Thank you, Mr. Jarvis.
17:05:58  7       MR. TRACY:  Thank you.
        8       THE WITNESS:  Thank you.
        9   The following were marked for Identification:
       10   EXH. 1        Amazon printout
       11   EXH. 2        letter dated October 1, 2002
       12   EXH. 3        Outline of Plan For IRA
       13                 Assets
       14   EXH. 4        letter dated October 2, 2002
       15   EXH. 5        MassMutual policy
       16   EXH. 6        Inforce Basic Life Insurance
       17                 Policy Illustration
       18   EXH. 7        Premium History
       19   EXH. 8        Lincoln policy
       20   EXH. 9        letter dated October 24,
       21                 2002
       22   EXH. 10       letter dated October 24,
       23                 2002

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

186

        1   EXH. 11       letter dated October 17,
        2                 2003
        3   EXH. 12       Dealing With Insurance in
        4                 Qualified Plans
        5   EXH. 13       step-by-step instructions
        6   EXH. 14       Comparison of Traditional
        7                 Gifting vs. Preferred LLC
        8                 Estate Transfer
        9   EXH. 15       letter dated April 14, 2006
       10   EXH. 16       e-mail chain
       11   EXH. 17       Lincoln policy
       12   EXH. 18       Notice of Amount Due
       13   EXH. 19       letter dated December 21,
       14                 2007
       15   EXH. 20       letter dated January 7, 2014
       16   EXH. 21       e-mail dated July 8, 2015
       17   EXH. 22       e-mail dated July 9, 2015
       18   EXH. 23       letter dated October 9, 2002
       19   EXH. 24       letter dated October 9, 2002
       20   EXH. 25       letter dated November 12,
       21                 2002
       22   EXH. 26       letter dated October 14,
       23                 2003

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

187

        1   EXH. 27       letter dated October 23,
        2                 2003
        3   EXH. 28       letter dated December 7,
        4                 2004
        5   EXH. 29       e-mail dated February 26,
        6                 2014
        7   EXH. 30       Insurance Illustration
        8   EXH. 31       e-mail dated March 5, 2014
        9   EXH. 32       e-mail chain
       10   EXH. 33       letter dated April 28, 2015
       11   EXH. 34       letter dated May 6, 2015
       12   EXH. 35       Insurance Illustration
       13   EXH. 36       Inforce Basic Life Insurance
       14                 Policy Illustration
       15   EXH. 37       Insurance Illustration
       16   EXH. 38       Insurance Illustration
       17   EXH. 38b      Insurance Illustration
       18   EXH. 38c      Insurance Illustration
       19   EXH. 39       Request For Policy
       20                 Information
       21   EXH. 40       2003 Annual Statement
       22   EXH. 41       2005 Annual Statement
       23   EXH. 42       Insurance Illustration

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

188

        1   EXH. 43       e-mail chain
        2   EXH. 44-46    e-mail chain
        3   EXH. 47       PEP and Competition -
        4                 Technical Information
        5   EXH. 48       2009 Annual Statement
        6   EXH. 49       2007 Annual Statement
        7   EXH. 50       Lincoln Financial Group Life
        8                 Servicing Agent Change
        9       (Deposition concluded at 5:05 p.m.)
       10              *   *   *
       11
       12
       13
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

**189**

```
 1   STATE OF NEW YORK )
 2              ss:
 3   COUNTY OF ERIE   )
 4
 5       I DO HEREBY CERTIFY as a Notary Public in and
 6   for the State of New York, that I did attend and
 7   report the foregoing proceedings, which were taken
 8   down by me in a verbatim manner by means of machine
 9   shorthand.  Further, that the proceedings were then
10   reduced to writing in my presence and under my
11   direction.  That the proceedings were taken to be
12   used in the foregoing entitled action.
13
14
15
16
17              DANIELLE FETZER,
                  Notary Public.
18
19
20
21
22
23
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

**191**

```
 1   EXH. 16    e-mail chain                186
 2   EXH. 17    Lincoln policy              186
 3   EXH. 18    Notice of Amount Due        186
 4   EXH. 19    letter dated December 21,   186
                2007
 5
 6   EXH. 20    letter dated January 7,     186
                2014
 7   EXH. 21    e-mail dated July 8, 2015   186
 8   EXH. 22    e-mail dated July 9, 2015   186
 9   EXH. 23    letter dated October 9,     186
                2002
10
11   EXH. 24    letter dated October 9,     186
                2002
12   EXH. 25    letter dated November 12,   186
                2002
13
14   EXH. 26    letter dated October 14,    186
                2003
15   EXH. 27    letter dated October 23,    187
                2003
16
17   EXH. 28    letter dated December 7,    187
                2004
18   EXH. 29    e-mail dated February 26,   187
                2014
19
20   EXH. 30    Insurance Illustration      187
21   EXH. 31    e-mail dated March 5, 2014  187
22   EXH. 32    e-mail chain                187
23   EXH. 33    letter dated April 28, 2015 187
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

**190**

```
 1              INDEX TO EXHIBITS
 2   Exhibit    Description       Page
```

```
 3   EXH. 1     Amazon printout             185
 4   EXH. 2     letter dated October 1,     185
                2002
 5
 6   EXH. 3     Outline of Plan For IRA     185
                Assets
 7   EXH. 4     letter dated October 2,     185
                2002
 8
 9   EXH. 5     MassMutual policy           185
10   EXH. 6     Inforce Basic Life          185
                Insurance Policy
11              Illustration
12   EXH. 7     Premium History             185
13   EXH. 8     Lincoln policy              185
14   EXH. 9     letter dated October 24,    185
                2002
15   EXH. 10    letter dated October 24,    185
                2002
16
17   EXH. 11    letter dated October 17,    186
                2003
18   EXH. 12    Dealing With Insurance in   186
                Qualified Plans
19
20   EXH. 13    step-by-step instructions   186
     EXH. 14    Comparison of Traditional   186
21              Gifting vs. Preferred LLC
                Estate Transfer
22
23   EXH. 15    letter dated April 14, 2006 186
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

---

**192**

```
 1   EXH. 34    letter dated May 6, 2015    187
 2   EXH. 35    Insurance Illustration      187
 3   EXH. 36    Inforce Basic Life          187
                Insurance Policy
 4              Illustration
 5   EXH. 37    Insurance Illustration      187
 6   EXH. 38    Insurance Illustration      187
 7   EXH. 38b   Insurance Illustration      187
 8   EXH. 38c   Insurance Illustration      187
 9   EXH. 39    Request For Policy          187
                Information
10   EXH. 40    2003 Annual Statement       187
11   EXH. 41    2005 Annual Statement       187
12   EXH. 42    Insurance Illustration      187
13   EXH. 43    e-mail chain                188
14   EXH. 44-46 e-mail chain                188
15   EXH. 47    PEP and Competition -       188
                Technical Information
16
17   EXH. 48    2009 Annual Statement       188
18   EXH. 49    2007 Annual Statement       188
19   EXH. 50    Lincoln Financial Group     188
                Life Servicing Agent Change
20
21
22   *Copies of exhibits supplied to all counsel.
23
```

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202 - (716) 853-5600*

193

**INDEX TO WITNESSES**

Witness          Examination          Page

CHRISTOPHER      BY MR. MOORE              3
RAYMOND JARVIS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

194

1    **MR. MOORE**:  For the record, we would like, 58
2    to the extent it's an outstanding
3    document, to see the correspondence with
4    Dr. Repicci in any manner regarding that
5    issue.
6    **MR. MOORE**:  And for the record, could you  72
7    produce a copy of those, please, all that
8    documentation, please?
9    **MR. MOORE**:  And for the record, I'd like      76
10   to request any such documentation.
11
12
13
14
15
16
17
18
19
20
21
22
23

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

## $

**$10** [1] - 126:23
**$17** [2] - 22:1, 146:19
**$200,000** [2] - 51:8, 57:18
**$225,000** [1] - 145:19
**$25,000** [1] - 140:10
**$254,000** [1] - 143:3
**$254,869** [1] - 142:15
**$300,000** [2] - 31:6, 33:9
**$400,000** [5] - 19:22, 20:23, 31:3, 33:7, 91:11
**$500,000** [2] - 33:5, 127:4
**$600,000** [4] - 17:1, 19:23, 91:10, 145:22
**$7,079** [1] - 141:21
**$7,079.70** [1] - 142:5
**$800,000** [1] - 51:10
**$900,000** [1] - 145:11
**$950,000** [1] - 134:12
**$955,000** [1] - 144:15
**$976,000** [1] - 128:15

## '

**'02** [1] - 149:21
**'05** [3] - 119:21, 119:22, 135:10
**'05-'06** [1] - 100:23
**'06** [3] - 120:3, 165:11, 165:12
**'11** [2] - 160:11, 178:14
**'11-'12** [1] - 75:8
**'13** [1] - 118:12
**'14** [2] - 118:12, 120:4

## 0

**026** [34] - 45:6, 53:2, 53:9, 53:10, 55:6, 56:10, 57:22, 62:1, 62:2, 69:5, 70:3, 74:23, 76:8, 76:11, 92:8, 93:22, 94:17, 94:20, 95:6, 95:17, 96:5, 96:7, 99:6, 99:7, 112:21, 119:2, 141:1, 141:11, 143:1, 143:7, 144:11, 144:14, 176:20
**027** [1] - 151:22
**028** [2] - 152:13
**043** [2] - 148:15, 149:23

## 1

**071** [2] - 130:1, 130:2

## 1

**1** [21] - 7:4, 17:12, 17:13, 18:18, 18:19, 28:22, 51:7, 67:8, 121:21, 126:23, 127:12, 127:19, 152:10, 171:3, 176:1, 181:8, 185:10, 185:11, 190:3, 190:4
**1,059,000** [1] - 152:2
**1.1** [1] - 134:11
**1.2** [13] - 89:10, 89:12, 90:2, 90:6, 90:18, 92:10, 95:16, 114:8, 117:19, 125:13, 143:5, 144:10, 182:14
**1.216** [1] - 145:21
**1.35** [1] - 152:16
**1.5** [1] - 152:10
**1.6** [2] - 122:1, 152:15
**1.623** [1] - 130:11
**1.625** [1] - 128:8
**1.8** [8] - 89:9, 90:7, 90:19, 92:7, 95:17, 117:20, 125:14
**10** [6] - 10:11, 10:12, 37:15, 75:21, 185:22, 190:15
**10-plus** [1] - 67:18
**100** [48] - 10:10, 12:16, 23:14, 23:16, 23:19, 24:2, 49:13, 53:22, 54:7, 54:8, 54:9, 54:11, 54:12, 54:14, 54:19, 54:23, 55:7, 55:15, 56:13, 56:18, 62:8, 62:16, 63:5, 63:16, 64:3, 64:10, 64:14, 64:19, 65:12, 65:15, 65:18, 68:9, 68:15, 68:20, 68:22, 71:17, 71:21, 74:15, 74:18, 81:18, 100:5, 108:15, 118:2, 121:19, 155:7, 156:21, 170:4, 170:11
**10006** [1] - 2:7
**1035** [2] - 109:15, 183:20
**10:20** [1] - 1:21
**11** [5] - 17:2, 38:2, 88:8, 186:1, 190:16
**110** [1] - 64:20
**1100** [1] - 2:2
**118** [1] - 152:3

**11:50** [1] - 65:7
**12** [10] - 39:21, 109:12, 109:13, 109:16, 110:1, 142:15, 186:3, 186:20, 190:18, 191:12
**12-year** [1] - 10:12
**120** [2] - 170:5, 170:22
**125** [1] - 54:15
**12:08** [1] - 78:4
**12:30** [1] - 124:17
**12th** [2] - 88:16, 150:20
**13** [3] - 40:13, 186:5, 190:19
**14** [9] - 2:2, 41:5, 98:20, 186:6, 186:9, 186:22, 190:20, 190:22, 191:13
**142** [1] - 149:9
**14203** [1] - 2:3
**144** [20] - 44:16, 45:7, 46:6, 46:13, 47:12, 47:13, 47:14, 57:22, 69:17, 74:23, 110:21, 112:6, 139:22, 159:1, 159:17, 160:9, 164:1, 164:5, 165:2, 176:20
**14th** [2] - 101:8, 126:4
**15** [17] - 32:20, 42:10, 42:12, 46:5, 46:7, 62:12, 62:20, 62:22, 62:23, 63:10, 66:13, 66:17, 118:20, 146:18, 152:17, 186:9, 190:22
**15-year** [1] - 10:11
**16** [7] - 32:21, 43:23, 63:10, 118:20, 152:15, 186:10, 191:1
**1641** [1] - 141:14
**1643** [2] - 141:18, 142:4
**17** [5] - 44:11, 186:1, 186:11, 190:16, 191:2
**17,500,000** [4] - 19:4, 19:6, 20:21, 21:2
**17-CV-132-WMS-MJR** [1] - 1:11
**17.5** [3] - 59:21, 143:14, 182:14
**18** [5] - 46:18, 91:13, 94:7, 186:12, 191:3
**185** [10] - 190:3, 190:4, 190:5, 190:7, 190:8, 190:9, 190:11,

**190:12, 190:13, 190:15**
**186** [16] - 190:16, 190:18, 190:19, 190:20, 190:22, 191:1, 191:2, 191:3, 191:4, 191:5, 191:7, 191:8, 191:9, 191:10, 191:12, 191:13
**187** [18] - 191:15, 191:16, 191:18, 191:19, 191:20, 191:21, 191:22, 192:1, 192:2, 192:3, 192:5, 192:6, 192:7, 192:8, 192:9, 192:10, 192:11, 192:12
**188** [6] - 192:13, 192:14, 192:15, 192:17, 192:18, 192:19
**19** [4] - 46:22, 159:13, 186:13, 191:4
**1992** [1] - 181:14
**1995** [1] - 181:14
**1997** [2] - 6:4, 178:6
**1:32** [1] - 124:23

## 2

**2** [15] - 14:19, 67:8, 70:14, 114:12, 127:12, 127:18, 160:22, 167:7, 167:9, 175:8, 181:8, 185:11, 185:14, 190:4, 190:7
**20** [7] - 48:12, 55:17, 87:13, 152:18, 152:23, 186:15, 191:5
**200** [6] - 145:20, 172:8, 172:14, 172:15
**200,000** [2] - 31:10, 97:22
**200-ish** [1] - 176:11
**2000** [1] - 69:10
**2002** [46] - 8:9, 27:10, 61:21, 79:7, 82:23, 83:3, 85:9, 87:4, 87:12, 88:2, 88:16, 93:2, 99:14, 114:4, 115:13, 115:14, 120:4, 120:7, 120:19, 131:18, 132:15, 135:12, 138:10, 150:20, 156:3, 158:11, 171:15, 177:9, 183:7, 183:19, 185:11, 185:14, 185:21, 185:23, 186:18,

**2003** [28] - 40:4, 50:16, 52:1, 87:3, 92:7, 93:3, 93:11, 94:15, 99:15, 101:8, 107:4, 107:5, 108:6, 120:8, 126:4, 128:1, 131:5, 171:16, 183:8, 183:19, 186:2, 186:23, 187:2, 187:21, 190:17, 191:14, 191:15, 192:10
**2004** [8] - 119:22, 131:4, 135:10, 169:15, 183:19, 187:4, 191:17
**2004-2005** [1] - 135:5
**2005** [13] - 70:4, 100:3, 117:11, 118:12, 121:12, 121:13, 128:14, 129:8, 130:7, 169:17, 187:22, 192:11
**2005-2006** [3] - 107:20, 108:8, 114:23
**2006** [18] - 8:2, 8:3, 8:6, 8:11, 41:10, 69:11, 69:13, 118:23, 119:1, 119:5, 119:8, 119:12, 119:21, 120:3, 140:2, 165:23, 186:9, 190:22
**2007** [10] - 5:18, 47:9, 57:23, 165:10, 178:10, 186:14, 188:6, 191:4, 192:18
**2007-2008** [1] - 69:20
**2008** [2] - 129:16, 130:2
**2009** [6] - 5:19, 70:4, 129:23, 161:9, 188:5, 192:17
**2010** [4] - 5:19, 73:16, 76:5, 178:12
**2011** [4] - 5:21, 6:23, 84:14, 159:9
**2012** [2] - 118:12, 161:4
**2013** [1] - 119:23
**2014** [22] - 53:13, 55:13, 55:19, 57:2, 58:1, 58:3, 76:16, 84:6, 84:13, 110:20, 114:21, 120:2, 139:23, 154:22, 156:9, 156:13,

186:15, 187:6, 187:8, 191:6, 191:18, 191:20
**2015** [10] - 52:7, 58:19, 186:16, 186:17, 187:10, 187:11, 191:7, 191:8, 191:22, 192:1
**2016** [5] - 5:22, 70:19, 70:23, 139:23, 178:16
**2017** [1] - 5:23
**2021** [1] - 1:20
**21** [6] - 19:2, 49:18, 186:13, 186:16, 191:4, 191:7
**212** [1] - 2:8
**22** [3] - 58:13, 186:17, 191:8
**221-6900** [1] - 2:8
**23** [10] - 61:12, 66:1, 66:2, 69:23, 78:8, 149:15, 186:18, 187:1, 191:9, 191:15
**2350** [1] - 1:18
**23rd** [4] - 39:6, 50:16, 51:23, 128:1
**24** [14] - 41:14, 78:6, 79:2, 85:13, 110:4, 148:5, 149:20, 150:11, 185:20, 185:22, 186:19, 190:13, 190:15, 191:10
**24-month** [2] - 149:2, 150:2
**24th** [1] - 40:4
**25** [16] - 19:9, 39:13, 81:20, 88:17, 91:10, 91:18, 94:19, 139:15, 139:16, 141:15, 150:19, 151:20, 151:21, 171:3, 186:20, 191:12
**254** [1] - 145:3
**254,000** [1] - 144:13
**26** [19] - 86:13, 88:20, 90:22, 94:19, 96:8, 97:1, 101:9, 113:14, 125:3, 125:9, 126:4, 139:14, 150:5, 169:13, 186:22, 187:5, 191:13, 191:18
**27** [7] - 113:6, 127:23, 148:13, 149:8, 150:5, 187:1, 191:15
**28** [5] - 122:9, 187:3, 187:10, 191:16, 191:22
**282** [1] - 174:13

**289** [1] - 3:14
**29** [4] - 110:9, 139:18, 187:5, 191:18
**2:43** [1] - 125:5
**2:51** [1] - 129:3
**2nd** [2] - 149:21, 149:22

### 3

**3** [14] - 16:9, 27:4, 27:6, 67:16, 69:22, 80:8, 115:17, 128:15, 128:18, 134:9, 178:19, 185:12, 190:5, 193:3
**30** [2] - 187:7, 191:19
**30,000** [1] - 176:2
**300** [2] - 172:9, 175:8
**31** [3] - 176:13, 187:8, 191:20
**3113(d** [2] - 3:3, 3:16
**32** [2] - 187:9, 191:21
**32nd** [1] - 2:7
**33** [3] - 90:11, 187:10, 191:22
**34** [2] - 187:11, 192:1
**35** [2] - 187:12, 192:2
**36** [3] - 87:20, 187:13, 192:3
**37** [2] - 187:15, 192:5
**38** [4] - 174:3, 174:9, 187:16, 192:6
**381** [1] - 70:15
**382** [1] - 129:10
**38b** [2] - 187:17, 192:7
**38c** [2] - 187:18, 192:8
**39** [2] - 187:19, 192:9
**3:45** [1] - 166:10
**3:56** [1] - 166:15
**3A** [1] - 181:8
**3B** [1] - 181:8
**3C** [1] - 181:8

### 4

**4** [20] - 16:18, 17:21, 22:2, 22:4, 22:6, 23:5, 27:6, 65:4, 67:19, 72:12, 77:3, 80:18, 91:2, 115:16, 115:20, 121:20, 123:11, 185:14, 190:7
**4.595** [1] - 123:13
**4.6** [2] - 122:2, 146:2
**4.95** [1] - 123:10
**40** [4] - 17:18, 125:3, 187:21, 192:10

**400** [1] - 172:14
**400,000** [4] - 21:5, 91:6, 91:22, 93:9
**41** [4] - 70:2, 128:14, 187:22, 192:11
**42** [2] - 187:23, 192:12
**43** [3] - 160:16, 188:1, 192:13
**44-46** [2] - 188:2, 192:14
**45** [3] - 2:7, 161:16, 162:3
**450** [1] - 145:15
**450,000** [1] - 145:15
**46** [1] - 130:20
**47** [4] - 177:6, 188:3, 192:15
**48** [2] - 188:5, 192:17
**49** [2] - 188:6, 192:18
**4:35** [1] - 181:17
**4A** [1] - 181:8
**4B** [1] - 181:8

### 5

**5** [12] - 24:5, 24:9, 24:11, 91:13, 121:21, 127:5, 166:17, 167:6, 185:15, 187:8, 190:8, 191:20
**5.25** [1] - 72:11
**50** [5] - 134:12, 145:18, 170:22, 188:7, 192:19
**500,000** [2] - 183:1
**58** [1] - 194:1
**59** [1] - 152:2
**5:00** [1] - 184:7
**5:05** [1] - 188:9
**5A** [1] - 181:9
**5B** [1] - 181:9

### 6

**6** [13] - 7:18, 24:5, 24:9, 24:12, 27:3, 87:9, 90:23, 92:4, 126:9, 185:16, 187:11, 190:9, 192:1
**6.3** [2] - 128:10, 130:17
**60** [8] - 17:21, 27:20, 130:11, 130:17, 130:20, 130:21, 134:23, 153:7
**600** [2] - 92:2, 172:13
**600,000** [7] - 91:5, 91:17, 91:21, 93:10, 93:12, 93:21

**672** [1] - 152:11

### 7

**7** [9] - 1:20, 24:5, 67:12, 185:18, 186:15, 187:3, 190:11, 191:5, 191:16
**7,079.70** [1] - 142:14
**700,000** [1] - 97:21
**71** [1] - 128:22
**716** [1] - 2:3
**72** [1] - 194:6
**7317144** [1] - 44:14
**76** [1] - 194:9
**76092** [1] - 3:15

### 8

**8** [8] - 31:14, 45:3, 45:5, 141:8, 185:19, 186:16, 190:12, 191:7
**80** [6] - 17:5, 170:5, 170:11, 170:22, 171:5, 175:16
**80s** [1] - 81:4
**856-3500** [1] - 2:3

### 9

**9** [12] - 33:15, 167:7, 167:9, 185:20, 186:17, 186:18, 186:19, 190:13, 191:8, 191:9, 191:10
**90** [5] - 81:4, 152:4, 152:14, 152:23, 153:7
**900,000** [1] - 145:13
**90s** [1] - 80:21
**95** [3] - 67:23, 77:6, 111:7
**976,000** [3] - 130:3, 130:5, 130:10
**9th** [6] - 58:19, 79:7, 79:10, 131:18, 156:3, 158:11

### A

**a.m** [2] - 1:21, 65:7
**able** [15] - 7:13, 20:6, 34:5, 38:17, 40:18, 47:23, 57:9, 81:21, 82:11, 82:17, 87:8, 91:1, 122:19, 130:9, 144:20
**Abraham** [1] - 133:20
**absolutely** [2] - 14:14, 60:14

**access** [1] - 136:18
**accomplish** [2] - 16:3, 168:22
**according** [2] - 122:3, 126:3
**account** [4] - 51:11, 128:6, 147:7, 167:16
**accountant** [3] - 15:5, 36:4, 61:21
**accounts** [5] - 16:19, 17:20, 52:14, 52:15, 106:18
**accreditation** [1] - 181:10
**accumulation** [3] - 28:18, 29:10, 136:6
**accurate** [3] - 68:9, 128:10, 167:17
**accurately** [1] - 126:1
**act** [1] - 20:16
**action** [2] - 120:19, 189:12
**actions** [1] - 106:5
**active** [1] - 6:20
**activities** [1] - 8:20
**actuarial** [4] - 180:22, 181:3, 181:7, 181:13
**add** [2] - 124:16, 134:17
**added** [1] - 144:16
**addition** [1] - 3:5
**additional** [16] - 53:14, 55:7, 58:4, 58:5, 59:17, 67:17, 70:21, 75:20, 91:19, 107:12, 123:17, 124:1, 124:5, 144:21, 175:13, 175:20
**address** [1] - 66:23
**addressing** [1] - 66:14
**administer** [1] - 21:22
**administered** [1] - 47:15
**administration** [2] - 5:2, 110:19
**advance** [1] - 168:23
**advanced** [2] - 50:23, 52:17
**advice** [4] - 103:23, 104:5, 104:17, 105:3
**advise** [2] - 106:1, 106:4
**advised** [3] - 58:2, 174:16, 174:21
**advisement** [4] - 73:3, 77:1, 103:1,

103:17
**advising** [3] - 97:1, 120:7, 120:9
**advisor** [2] - 103:13, 105:15
**Advisors** [2] - 111:13, 111:15
**advisors** [1] - 35:2
**advisory** [2] - 6:8, 112:3
**Affluent** [1] - 7:7
**aforementioned** [1] - 146:10
**after-tax** [1] - 144:6
**age** [38] - 23:14, 23:16, 23:19, 24:2, 29:18, 53:22, 54:7, 54:18, 54:23, 55:7, 56:13, 56:18, 62:8, 62:16, 63:5, 63:16, 64:3, 64:10, 64:14, 65:1, 65:12, 65:15, 65:18, 67:23, 68:9, 68:15, 68:20, 68:22, 71:16, 71:20, 74:15, 74:18, 77:6, 100:5, 108:15, 121:19, 155:7, 171:1
**Agency** [1] - 173:14
**agency** [3] - 6:15, 173:5, 173:6
**Agent** [2] - 188:8, 192:19
**agent** [28] - 18:11, 18:20, 23:2, 45:8, 45:11, 45:19, 60:2, 96:17, 101:19, 102:5, 102:7, 102:23, 103:7, 109:3, 109:19, 112:3, 160:9, 161:5, 163:16, 173:2, 173:4, 173:5, 173:7, 173:11, 173:15, 173:21, 174:2
**agents** [5] - 170:4, 170:21, 173:6, 173:7, 173:9
**ago** [3] - 12:7, 87:13, 94:7
**agree** [1] - 130:22
**ahead** [3] - 32:13, 43:18, 110:22
**Airport** [1] - 1:18
**alleviate** [1] - 83:9
**allow** [10] - 25:23, 52:12, 56:12, 84:4, 84:22, 85:3, 85:13, 123:5, 127:4, 148:20
**allowable** [1] - 167:3
**allowed** [3] - 26:7, 34:16, 168:3

**allows** [1] - 148:19
**almost** [2] - 27:9, 59:5
**alternative** [4] - 15:8, 132:17, 132:18, 141:6
**Amazon** [2] - 185:10, 190:3
**America** [1] - 18:16
**amount** [31] - 16:23, 18:1, 21:15, 21:21, 59:22, 67:9, 90:1, 91:8, 117:19, 118:4, 125:10, 126:1, 127:21, 142:5, 142:9, 142:21, 167:3, 167:13, 167:15, 168:3, 170:6, 170:7, 170:8, 170:10, 172:20, 174:4, 174:23, 175:12, 176:5, 176:7, 176:9
**Amount** [2] - 186:12, 191:3
**amounts** [4] - 18:13, 19:14, 20:6, 75:12
**analyst** [1] - 181:7
**AND** [1] - 1:8
**Angeles** [1] - 173:14
**angry** [1] - 158:6
**anniversary** [1] - 142:6
**Annual** [8] - 187:21, 187:22, 188:5, 188:6, 192:10, 192:11, 192:17, 192:18
**annual** [13] - 33:23, 68:1, 70:2, 70:7, 72:12, 78:9, 128:14, 129:9, 129:11, 129:18, 129:21, 129:23, 146:23
**annually** [3] - 70:8, 131:10, 170:13
**Annuity** [1] - 44:13
**answer** [10] - 53:7, 53:8, 75:14, 87:22, 97:5, 135:23, 143:10, 144:8, 155:14, 182:6
**answering** [1] - 92:1
**answers** [1] - 35:9
**anticipated** [6] - 19:21, 57:1, 90:19, 125:14, 130:18, 170:8
**anyway** [2] - 85:1, 135:2
**apartment** [1] - 11:17
**appear** [3] - 47:21, 152:8, 160:16
**APPEARANCES** [1] -

2:1
**appeared** [1] - 61:10
**Appearing** [2] - 2:4, 2:9
**append** [1] - 149:20
**apples** [2] - 152:21, 152:22
**applicable** [1] - 131:19
**application** [6] - 35:5, 115:15, 119:7, 119:9, 151:3, 151:6
**applied** [6] - 4:23, 29:7, 128:7, 130:14, 164:13, 180:21
**applies** [1] - 53:9
**apply** [2] - 92:18, 141:4
**applying** [2] - 51:22
**appreciate** [2] - 4:11, 158:1
**approach** [1] - 105:2
**approached** [1] - 160:4
**approved** [3] - 26:2, 30:11, 33:21
**approximate** [1] - 27:11
**approximation** [2] - 125:10, 125:15
**April** [6] - 70:19, 70:23, 186:9, 187:10, 190:22, 191:22
**argument** [1] - 137:11
**arises** [1] - 67:1
**arose** [1] - 77:15
**Art** [1] - 7:23
**article** [4] - 12:6, 12:10, 12:12, 102:9
**aside** [1] - 143:6
**aspect** [1] - 138:17
**assertion** [1] - 127:20
**asset** [2] - 10:14, 29:12
**Assets** [2] - 185:13, 190:6
**assets** [1] - 17:19
**assistant** [1] - 161:20
**associate** [1] - 181:9
**assume** [7] - 79:17, 80:4, 80:8, 91:1, 169:7, 169:9, 169:11
**assumes** [1] - 114:7
**assuming** [3] - 63:5, 82:15, 96:19
**assumption** [8] - 25:19, 25:22, 72:9,

81:3, 90:21, 91:6, 101:5, 158:15
**assumptions** [10] - 23:18, 54:12, 63:4, 65:19, 68:7, 90:10, 92:15, 92:17, 117:21, 156:22
**attached** [1] - 114:13
**attend** [1] - 189:6
**attended** [1] - 12:23
**attending** [1] - 12:20
**attention** [1] - 110:10
**attorney** [2] - 15:6, 34:21
**attorneys** [1] - 34:21
**attractive** [1] - 135:14
**audience** [1] - 11:4
**author** [2] - 7:5, 7:6
**authorization** [1] - 123:3
**authors** [1] - 9:13
**availability** [1] - 154:12
**available** [25] - 25:12, 58:23, 59:10, 59:12, 59:13, 63:23, 88:5, 92:11, 115:13, 118:15, 118:21, 131:1, 131:13, 131:23, 132:4, 132:7, 132:12, 136:4, 145:6, 153:9, 154:7, 154:9, 177:8, 182:10
**average** [1] - 18:20
**aware** [11] - 44:19, 48:20, 100:6, 100:9, 100:10, 115:17, 133:6, 150:14, 164:4, 164:6, 185:1

## B

**B427,250.00** [1] - 174:16
**bachelor's** [1] - 4:23
**background** [4] - 4:21, 4:22, 164:22, 180:22
**backs** [3] - 139:19, 140:4, 140:16
**backup** [3] - 136:23, 137:5, 137:8
**bad** [10] - 66:22, 67:6, 67:19, 67:20, 67:21, 67:22, 75:22, 77:4, 77:5, 163:8
**balance** [2] - 182:9, 182:11
**balancing** [1] - 20:16

**bank** [1] - 37:3
**based** [8] - 10:13, 25:20, 25:21, 54:16, 68:7, 70:17, 158:10, 171:1
**basic** [1] - 45:17
**Basic** [4] - 185:16, 187:13, 190:9, 192:3
**basis** [3] - 143:2, 151:23, 152:1
**Bates** [10] - 19:2, 70:15, 130:1, 130:20, 141:14, 148:14, 149:8, 151:22, 174:8, 174:13
**bathroom** [1] - 166:13
**became** [2] - 56:1, 115:17
**become** [2] - 52:8, 81:9
**becomes** [1] - 147:9
**began** [2] - 81:14, 114:17
**begin** [1] - 87:8
**beginning** [4] - 51:17, 162:21, 169:15, 178:6
**belief** [1] - 88:19
**below** [1] - 143:18
**benefit** [54] - 19:13, 19:16, 20:6, 20:10, 20:13, 21:6, 21:9, 21:10, 21:21, 22:3, 23:22, 24:23, 25:3, 25:9, 26:16, 27:17, 29:4, 29:9, 30:18, 40:8, 58:22, 59:9, 67:18, 73:11, 74:23, 75:22, 87:2, 87:14, 91:8, 91:11, 91:12, 91:16, 91:18, 95:2, 107:7, 108:20, 111:3, 111:6, 114:18, 117:14, 118:11, 123:23, 126:19, 128:9, 130:16, 130:22, 144:8, 145:20, 150:23, 171:9, 175:23, 182:12, 182:14
**benefits** [12] - 58:23, 59:3, 64:22, 65:1, 82:12, 83:4, 83:5, 85:16, 85:18, 86:10, 123:10, 146:15
**best** [13] - 58:5, 100:1, 107:21, 115:7, 121:14, 134:22, 138:6, 153:20,

163:18, 169:1,
171:20, 175:6, 176:8
**bets** [1] - 114:9
**better** [7] - 30:21,
116:20, 122:2, 122:4,
136:12, 136:16,
137:12
**between** [13] - 9:17,
51:11, 66:7, 97:11,
118:12, 151:23,
152:4, 160:17,
161:19, 170:4, 170:5,
183:19
**beyond** [7] - 6:18,
18:16, 68:9, 97:1,
145:7, 172:2
**big** [6] - 30:9, 74:4,
75:9, 90:12, 107:5,
141:10
**bit** [5] - 9:4, 16:7,
158:23, 164:21,
169:20
**blank** [1] - 162:10
**blow** [1] - 62:20
**bonus** [1] - 176:3
**books** [6] - 8:1, 8:4,
8:10, 8:23, 9:13, 9:15
**bottom** [1] - 167:9
**bought** [11] - 13:15,
20:12, 22:4, 22:5,
51:16, 69:13, 101:3,
118:22, 119:12,
127:10, 175:23
**break** [8] - 4:15,
4:17, 124:19, 166:14,
174:5, 174:7, 174:17,
174:19
**brief** [1] - 45:20
**briefly** [10] - 4:21,
15:1, 33:18, 37:17,
38:5, 41:8, 45:13,
48:18, 86:19, 178:4
**bring** [1] - 95:3
**broadest** [1] - 103:13
**Broadway** [1] - 2:7
**brochure** [2] - 133:9,
133:10
**broker** [1] - 177:18
**Brokerage** [3] -
60:19, 137:17, 173:17
**brokerage** [2] - 18:9,
60:21
**brokered** [1] -
170:20
**brought** [1] - 169:8
**bucks** [1] - 36:7
**budgeting** [1] -
102:15
**Buffalo** [4] - 2:3,
3:23, 11:23, 15:16

**Building** [1] - 2:2
**built** [1] - 11:4
**bunch** [2] - 110:19,
111:1
**burden** [1] - 105:3
**business** [15] - 5:2,
5:9, 5:15, 6:6, 8:17,
8:20, 10:15, 10:19,
13:22, 25:10, 47:16,
47:21, 48:5, 60:4,
165:9
**buy** [17] - 21:6, 26:9,
29:22, 34:16, 34:18,
34:19, 69:16, 82:12,
98:12, 118:23, 127:6,
127:11, 134:14,
152:19, 153:6, 153:7,
182:14
**buying** [4] - 26:10,
27:9, 38:20, 109:13
**BY** [45] - 3:20, 11:10,
14:17, 22:12, 34:11,
36:9, 37:7, 55:3,
57:12, 58:11, 64:1,
64:9, 65:9, 66:3, 69:3,
73:4, 75:2, 77:2, 78:5,
96:12, 98:4, 99:23,
102:2, 119:3, 120:6,
121:17, 122:18,
125:1, 125:7, 129:6,
136:13, 149:17,
154:10, 155:3,
155:16, 158:9,
166:16, 168:1, 168:7,
178:2, 181:19,
182:17, 184:3, 184:8,
193:3

---

# C

**cake** [2] - 83:18,
153:4
**calculate** [3] - 67:16,
126:1, 130:10
**calculating** [1] -
75:20
**calculation** [1] -
142:14
**calculations** [2] -
122:3, 127:22
**California** [4] - 7:8,
8:4, 13:4, 60:21
**cancels** [2] - 109:14,
109:21
**cancer** [1] - 30:10
**cannot** [3] - 32:21,
75:14, 111:2
**cap** [1] - 26:5
**capacity** [6] - 101:18,
101:19, 102:5, 102:6,

102:7, 102:8
**Captive** [2] - 6:15,
6:16
**CAPTIVE** [1] - 6:16
**care** [4] - 138:5,
162:10, 163:12
**career** [3] - 60:2,
140:7, 170:21
**carrier** [3] - 83:23,
84:2, 84:7
**carry** [1] - 111:7
**case** [25] - 23:15,
31:4, 33:8, 65:14,
80:13, 80:20, 84:15,
90:4, 90:5, 99:20,
113:1, 113:2, 131:19,
139:7, 161:8, 161:11,
162:18, 168:23,
169:18, 172:1, 172:5,
172:18, 172:19,
174:18, 175:5
**CASEY** [1] - 2:11
**cash** [50] - 17:11,
20:18, 21:19, 25:6,
28:18, 29:1, 29:6,
29:10, 38:22, 51:7,
51:15, 51:21, 52:14,
52:15, 56:2, 57:4,
58:4, 59:9, 60:10,
61:7, 72:13, 75:18,
90:14, 90:17, 91:13,
116:1, 116:2, 117:5,
125:17, 126:5,
126:13, 126:15,
126:18, 128:6, 128:8,
135:13, 135:19,
136:4, 136:5, 136:6,
136:18, 141:5, 145:4,
147:6, 147:7, 152:4,
152:9, 169:9, 175:22,
182:10
**casualty** [1] - 181:3
**caused** [1] - 75:17
**CBIZ** [2] - 44:7
**Celia** [5] - 14:10,
15:6, 43:14, 43:16,
95:19, 97:9, 99:1,
103:21, 159:22,
160:4, 160:17,
161:13, 161:20,
165:1, 165:5
**CELIA** [1] - 15:7
**Celia's** [1] - 161:19
**cents** [1] - 141:21
**certain** [12] - 22:19,
29:18, 29:19, 32:4,
54:22, 65:21, 90:4,
97:12, 101:21, 108:7,
120:19, 177:8
**certainly** [10] - 11:9,

18:15, 61:9, 97:4,
98:7, 98:8, 114:22,
124:6, 131:21, 151:11
**certificant** [1] - 6:22
**certification** [1] -
181:6
**certifications** [1] -
6:18
**certified** [2] - 6:21,
104:3
**CERTIFY** [1] - 189:5
**chain** [8] - 186:10,
187:9, 188:1, 188:2,
191:1, 191:21,
192:13, 192:14
**challenge** [6] -
50:13, 75:16, 83:20,
90:12, 146:12, 147:9
**change** [21] - 26:15,
29:4, 67:8, 81:1, 81:4,
81:14, 84:2, 92:22,
93:2, 93:4, 93:15,
121:23, 131:9, 145:9,
149:1, 151:7, 152:9,
153:5, 158:22, 163:5
**Change** [2] - 188:8,
192:19
**changed** [6] - 83:14,
83:23, 89:21, 93:19,
139:4, 140:7
**changes** [1] - 80:16
**changing** [7] - 75:3,
75:7, 131:10, 131:16,
132:10, 154:5, 184:1
**characteristics** [1] -
156:2
**characterize** [1] -
154:23
**charge** [23] - 26:8,
51:5, 51:6, 51:8,
51:19, 54:14, 109:11,
109:12, 109:18,
109:21, 109:23,
110:2, 110:4, 112:10,
112:17, 112:20,
128:5, 139:19, 140:3,
140:5, 140:7, 140:16,
141:2
**charges** [18] - 21:7,
26:3, 38:18, 50:18,
51:14, 51:22, 52:13,
56:3, 66:19, 75:9,
75:17, 80:7, 84:4,
128:6, 130:15,
148:11, 148:21,
149:19
**charging** [1] - 64:17
**chart** [3] - 34:15,
40:3, 40:23
**check** [2] - 122:16,

132:4
**checking** [2] -
100:19, 101:9
**children** [1] - 67:1
**chose** [4] - 116:13,
116:14, 132:17,
133:23
**Chris** [3] - 11:20,
49:1, 157:17
**Christine** [1] -
161:20
**Christmas** [1] -
140:10
**Christopher** [3] -
2:9, 3:8, 174:11
**CHRISTOPHER** [5] -
1:1, 1:12, 1:17, 3:14,
193:3
**Cincinnati** [1] - 6:11
**circled** [1] - 151:23
**circumstances** [2] -
28:15, 65:21
**Civil** [1] - 1:19
**claim** [2] - 77:22,
157:12
**clarification** [6] -
45:6, 98:14, 149:7,
159:7, 169:12, 181:21
**clarify** [1] - 184:4
**Clark** [9] - 14:11,
15:7, 43:14, 97:9,
159:23, 160:4,
160:17, 161:20, 165:1
**CLARK** [1] - 15:7
**classify** [1] - 112:2
**clauses** [1] - 179:22
**clean** [2] - 160:23,
161:13
**clear** [5] - 55:19,
77:14, 118:16,
133:14, 135:2
**clearer** [2] - 143:11,
170:17
**clearly** [2] - 4:12,
77:18
**client** [44] - 28:12,
29:3, 30:5, 30:15,
30:18, 36:11, 36:14,
36:15, 37:8, 65:16,
86:8, 89:16, 91:16,
92:12, 92:13, 92:18,
96:14, 100:2, 100:5,
100:8, 100:10,
100:12, 105:18,
105:19, 105:21,
106:1, 106:4, 106:11,
107:10, 108:3,
109:14, 109:20,
115:8, 118:1, 118:5,
123:23, 124:3,

**JACK W. HUNT & ASSOCIATES, INC.**
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

03/22/2022 12:51:11 PM

131:15, 160:23,
163:3, 163:13,
168:14, 168:16, 179:4
  **client's** [3] - 107:21,
121:14, 153:20
  **clients** [12] - 5:16,
11:6, 11:8, 11:11,
11:12, 34:5, 35:13,
35:19, 112:4, 157:9,
161:11, 168:15
  **close** [2] - 55:15,
170:15
  **co** [1] - 7:6
  **co-author** [1] - 7:6
  **coached** [1] - 158:4
  **colleague** [1] -
111:16
  **college** [2] - 5:5, 5:6
  **column** [3] - 19:22,
63:7, 83:13
  **columns** [1] - 62:10,
63:8
  **combination** [3] -
56:5, 59:7, 77:20
  **combine** [1] - 59:11
  **comfortable** [8] -
68:6, 69:12, 98:11,
98:13, 101:4, 119:1,
119:20, 157:3
  **comforting** [1] -
80:19
  **coming** [3] - 50:20,
159:18, 159:19
  **commencing** [1] -
1:21
  **commentary** [2] -
62:3, 63:12
  **commiserating** [1] -
161:13
  **commission** [16] -
30:22, 33:2, 45:23,
109:20, 161:8,
169:21, 170:1, 170:3,
171:4, 171:8, 175:2,
175:7, 175:13,
175:20, 176:5, 176:10
  **commissions** [2] -
33:11, 170:18
  **commonly** [1] -
26:17
  **communicate** [1] -
73:21
  **communication** [4] -
94:4, 97:10, 99:11,
154:21
  **communications** [1]
- 160:16
  **companies** [17] -
6:17, 10:22, 54:13,
60:7, 60:9, 60:13,

60:15, 60:22, 61:5,
67:8, 75:4, 109:23,
110:1, 111:18,
169:22, 171:11
  **company** [26] - 5:8,
25:5, 25:10, 26:12,
27:1, 28:20, 29:5,
34:7, 47:14, 47:15,
47:19, 48:3, 59:14,
60:20, 64:17, 75:7,
112:2, 157:20,
157:22, 171:13,
173:6, 177:12,
180:13, 183:23
  **Company** [1] - 44:14
  **company's** [1] - 27:3
  **comparable** [1] -
91:14
  **compare** [1] - 91:9
  **compared** [2] -
26:20, 137:6
  **Comparison** [2] -
186:6, 190:20
  **comparison** [1] -
152:22
  **Competition** [4] -
177:23, 178:1, 188:3,
192:15
  **complete** [2] - 57:2,
138:15
  **completely** [2] -
105:23, 157:5
  **complicated** [3] -
42:22, 43:15, 165:6
  **component** [4] -
104:20, 105:7,
105:16, 137:5
  **components** [1] -
103:20
  **compression** [21] -
27:17, 27:21, 28:1,
28:5, 28:10, 30:7,
30:8, 30:12, 38:21,
98:1, 134:21, 136:22,
137:5, 138:2, 147:2,
152:4, 152:15,
152:18, 153:7,
182:10, 182:11
  **concept** [1] - 42:22
  **concern** [13] - 43:12,
53:12, 53:17, 56:9,
62:9, 62:15, 66:14,
71:14, 72:6, 72:7,
72:15, 74:14, 103:18
  **concerned** [7] -
53:15, 71:6, 71:8,
83:12, 95:15, 140:22
  **concerns** [9] - 62:6,
63:2, 66:11, 94:19,
106:10, 106:23,

107:3, 107:4, 179:3
  **concluded** [1] -
188:9
  **conclusion** [3] -
81:1, 106:18, 124:10
  **conclusions** [1] -
68:6
  **conditions** [1] - 68:4
  **conference** [3] -
3:18, 13:1, 13:4
  **conferences** [2] -
9:1, 12:21
  **confident** [1] - 106:7,
107:19, 151:11
  **confidential** [1] -
179:16
  **confidentiality** [1] -
179:21
  **confirm** [1] - 3:6
  **conflicts** [1] - 11:1
  **confused** [1] - 89:11
  **confusion** [1] -
133:18
  **conjunction** [2] -
31:17, 125:3
  **Connecticut** [1] -
110:18
  **connecting** [1] - 1:20
  **consider** [1] - 121:6
  **considerably** [1] -
20:14
  **consistent** [2] -
51:23, 71:4
  **consulting** [9] - 5:11,
5:12, 5:14, 5:15, 9:20,
9:21, 10:20, 14:5
  **contact** [4] - 11:12,
11:15, 177:16
  **context** [3] - 103:15,
103:17, 112:6
  **continue** [6] - 51:9,
64:21, 64:23, 65:22,
67:18, 75:21
  **continued** [1] - 21:1
  **continuing** [1] -
65:23
  **contract** [1] - 148:21
  **contrary** [1] - 141:3
  **contributed** [1] -
95:16
  **contributes** [1] -
53:13
  **conversation** [29] -
11:18, 13:20, 39:4,
41:10, 41:17, 43:11,
56:14, 62:17, 63:11,
69:10, 75:8, 81:8,
86:22, 94:8, 96:1,
97:16, 98:3, 98:9,
98:23, 100:22,

101:21, 116:16,
132:12, 137:22,
138:9, 150:7, 157:16,
158:5, 165:2
  **conversations** [26] -
12:19, 36:18, 42:6,
52:21, 55:18, 56:21,
57:3, 69:11, 71:1,
71:4, 72:18, 74:17,
74:20, 81:15, 85:6,
85:10, 94:18, 94:22,
94:23, 98:8, 100:14,
106:8, 151:13,
156:21, 157:7, 163:22
  **conversion** [6] -
50:9, 50:11, 50:14,
84:18, 85:4, 153:14
  **conversions** [1] -
84:22
  **convert** [1] - 55:20
  **converted** [2] -
39:13, 130:14
  **converting** [1] - 98:5
  **copied** [1] - 160:18
  **Copies** [1] - 192:21
  **copies** [2] - 57:10,
138:7
  **copy** [7] - 13:14,
72:23, 168:8, 168:12,
168:13, 168:16, 194:7
  **corner** [1] - 174:11
  **correct** [67] - 9:22,
19:14, 22:16, 23:16,
24:17, 25:1, 39:10,
46:6, 47:13, 54:7,
63:16, 64:10, 68:16,
79:12, 79:19, 80:21,
82:20, 82:21, 82:23,
83:1, 86:9, 91:7,
104:8, 104:15,
104:19, 105:7,
105:12, 107:13,
111:13, 112:8,
112:11, 114:5,
115:21, 116:19,
116:22, 117:13,
117:22, 119:14,
123:6, 123:12,
123:22, 127:18,
130:8, 132:19,
135:16, 141:16,
141:17, 142:8,
142:13, 143:16,
143:18, 143:19,
150:1, 153:18,
153:19, 159:5,
159:11, 162:6,
163:17, 164:9,
164:12, 176:22,
178:8, 178:17, 180:4,

185:4
  **Correct** [6] - 19:10,
22:20, 68:21, 117:4,
134:2, 177:4
  **corrected** [1] - 77:16
  **correctly** [7] - 90:3,
105:11, 123:3,
126:10, 129:5,
141:22, 166:22
  **correspondence** [16]
- 41:1, 57:10, 58:9,
61:17, 61:18, 85:21,
86:5, 108:3, 108:10,
108:11, 120:18,
122:13, 161:23,
176:15, 177:2, 194:3
  **cost** [7] - 21:21,
22:8, 27:11, 27:13,
74:22, 97:23, 127:9
  **costs** [3] - 22:1,
28:21, 64:18
  **Counsel** [1] - 3:1
  **counsel** [6] - 3:5,
3:17, 3:22, 3:23,
184:14, 192:21
  **counsel's** [1] - 92:2
  **counterintuitive** [1] -
20:12
  **country** [1] - 18:9
  **COUNTY** [1] - 189:3
  **couple** [10] - 19:19,
36:6, 49:16, 69:19,
72:2, 83:21, 83:22,
84:1, 137:17, 179:7
  **course** [4] - 84:17,
120:19, 130:23,
153:13
  **COURT** [1] - 1:4
  **court** [1] - 179:9
  **cover** [5] - 64:21,
72:20, 73:10, 153:1
  **coverage** [8] - 21:15,
24:2, 29:12, 54:15,
59:17, 67:23, 77:6,
80:21
  **covered** [1] - 103:3
  **covers** [1] - 48:19
  **CPLR** [2] - 3:3, 3:15
  **crash** [1] - 122:1
  **create** [1] - 21:7
  **created** [2] - 23:17,
180:12
  **credibility** [1] - 11:4
  **credit** [1] - 120:1
  **credited** [1] - 66:21
  **crediting** [12] -
25:20, 25:23, 26:5,
27:1, 27:3, 63:6,
66:18, 71:10, 72:12,
80:5, 80:11, 80:15

critical [1] - 138:20
current [19] - 23:18, 25:19, 54:12, 63:3, 63:5, 63:6, 65:19, 68:7, 72:8, 81:2, 82:11, 101:5, 148:19, 148:23, 150:9, 151:23, 152:1, 156:22
customer [1] - 163:8
cut [1] - 89:20

**D**

Dale [2] - 162:8, 162:23
DANIELLE [2] - 1:21, 189:17
dash [6] - 93:2, 93:3, 115:16, 115:17, 115:20, 184:6
database [2] - 177:7, 177:21
databases [2] - 177:10, 177:13
date [5] - 81:17, 84:8, 112:13, 117:19, 142:6
dated [42] - 40:4, 58:19, 185:11, 185:14, 185:20, 185:22, 186:1, 186:9, 186:13, 186:15, 186:16, 186:17, 186:18, 186:19, 186:20, 186:22, 187:1, 187:3, 187:5, 187:8, 187:10, 187:11, 190:4, 190:7, 190:13, 190:15, 190:16, 190:22, 191:4, 191:5, 191:7, 191:8, 191:9, 191:10, 191:12, 191:13, 191:15, 191:16, 191:18, 191:20, 191:22, 192:1
Dave [9] - 13:7, 14:11, 159:23, 160:5, 161:5, 161:9, 162:4, 162:7, 163:1
David [13] - 9:8, 11:20, 15:7, 43:14, 43:16, 45:12, 45:18, 69:16, 95:2, 95:19, 101:3, 162:8, 165:5
deal [5] - 10:23, 15:4, 52:11, 63:11, 71:13
Dealing [2] - 186:3, 190:18
death [53] - 15:10,

19:13, 19:15, 20:6, 20:10, 20:13, 21:6, 21:9, 21:10, 21:21, 22:3, 23:22, 24:23, 25:3, 25:8, 26:16, 27:17, 29:4, 29:9, 29:18, 55:11, 58:21, 59:8, 64:22, 64:23, 67:18, 73:11, 74:23, 75:22, 87:2, 87:14, 91:8, 91:11, 91:12, 91:16, 91:18, 107:7, 108:20, 111:3, 111:6, 126:19, 128:9, 130:22, 144:7, 145:20, 146:15, 150:23, 171:9, 175:23, 182:12, 182:14
December [6] - 149:21, 149:22, 186:13, 187:3, 191:4, 191:16
decide [3] - 84:17, 84:19, 153:14
deciding [1] - 101:1
decision [2] - 61:9, 107:12, 116:6
decisions [3] - 35:23, 120:16
decrease [1] - 21:8
deduction [1] - 83:19
Defendant [2] - 1:17, 2:9
Defendants [1] - 1:13
deferred [1] - 104:17
deficiency [1] - 106:10
definitely [13] - 8:8, 13:23, 14:6, 35:10, 36:7, 37:11, 57:16, 74:10, 76:10, 94:5, 160:13, 183:16
definitive [1] - 125:21
DEFRA [1] - 146:13
degree [2] - 180:21, 181:5
DeMatteo [1] - 14:11
demonstrate [1] - 50:19
department [2] - 26:2, 26:7
depiction [1] - 68:9
deposed [1] - 4:2
Deposition [1] - 188:9
DEPOSITION [1] - 1:1

deposition [6] - 1:16, 44:15, 45:14, 135:18, 160:20, 184:10
describe [15] - 15:2, 18:3, 33:18, 34:12, 37:17, 38:5, 40:1, 41:8, 48:18, 61:18, 82:7, 86:19, 102:11, 113:16, 156:1
described [5] - 87:12, 88:20, 115:12, 131:17, 138:8
describing [1] - 39:15
Description [1] - 190:2
description [1] - 156:7
design [2] - 22:9, 168:23
designed [5] - 23:13, 23:15, 28:7, 65:11, 65:17
desirable [6] - 83:9, 86:8, 88:18, 88:21, 153:2, 153:11
desire [3] - 22:10, 24:2, 75:18
desires [1] - 82:13
detail [4] - 4:8, 9:10, 45:15, 134:3
determination [1] - 101:10
determine [3] - 71:19, 126:13, 126:15
determining [1] - 125:18
DFW [1] - 1:18
dialog [1] - 151:12
died [4] - 64:7, 65:3, 121:22, 121:23
dies [2] - 65:2, 109:20
difference [4] - 51:10, 134:18, 134:20, 151:22
different [33] - 28:6, 44:4, 52:19, 56:19, 57:20, 59:4, 59:5, 59:6, 59:7, 73:10, 80:15, 87:11, 87:15, 87:16, 87:17, 88:1, 88:7, 103:20, 104:2, 104:4, 111:1, 113:10, 113:15, 113:22, 114:12, 120:3, 137:18, 138:5, 169:23, 183:18, 183:22
differently [1] - 28:8

difficult [3] - 16:7, 52:5, 56:6
difficulties [1] - 48:21
directing [1] - 36:23
direction [4] - 35:13, 36:11, 37:9, 189:11
directly [3] - 8:16, 44:8, 127:15
disagreement [1] - 178:23
disappointed [3] - 56:17, 56:20, 158:6
disappointing [1] - 56:7
disclosures [1] - 66:5
discouragement [1] - 179:22
discover [1] - 115:13
discovery [1] - 184:15
discuss [1] - 108:18
discussed [5] - 16:13, 57:14, 96:21, 104:16, 113:12
discussing [3] - 42:19, 68:12, 82:9
discussion [12] - 49:5, 84:13, 95:18, 95:22, 97:8, 108:3, 124:7, 124:9, 124:11, 124:13, 131:14, 131:21
discussions [4] - 42:2, 84:6, 87:5, 93:6
dismay [1] - 154:23
distinction [1] - 66:7
distribute [2] - 17:13, 145:13
distributed [1] - 17:9
distribution [4] - 20:11, 20:13, 21:8, 22:7
distributions [2] - 20:22, 21:4
DISTRICT [2] - 1:4, 1:4
DO [1] - 189:5
Doctor's [2] - 7:8, 8:3
Doctors [7] - 7:9, 7:11, 7:18, 8:5, 8:6
document [37] - 14:20, 33:16, 37:18, 38:3, 39:22, 40:1, 40:10, 40:13, 40:19, 41:8, 42:14, 44:1, 46:19, 48:13, 49:19, 49:21, 50:2, 58:8,

58:14, 58:16, 66:4, 79:2, 81:23, 86:14, 86:21, 110:13, 113:7, 113:10, 113:13, 114:12, 150:22, 160:13, 161:18, 176:13, 184:19, 194:3
documentation [18] - 73:1, 76:19, 76:22, 85:3, 96:3, 115:2, 132:20, 133:1, 136:23, 138:8, 148:2, 150:15, 154:15, 154:18, 158:17, 183:10, 194:8, 194:10
documented [1] - 94:12
documents [8] - 16:12, 70:5, 84:6, 95:11, 184:10, 184:13, 184:16, 184:23
dollar [1] - 176:7
dollars [8] - 15:15, 17:8, 51:8, 134:6, 142:22, 144:6, 145:6, 146:5
done [18] - 19:18, 68:19, 75:23, 76:2, 77:8, 91:4, 105:20, 106:22, 115:23, 116:4, 118:13, 118:19, 139:12, 145:23, 153:21, 156:19, 163:9, 182:5
double [1] - 122:16
double-check [1] - 122:16
doubt [1] - 33:6
down [10] - 21:13, 21:14, 72:12, 131:16, 139:9, 144:18, 144:19, 158:13, 170:12, 189:8
dozens [3] - 16:1, 52:21
Dr [50] - 11:15, 13:21, 14:5, 23:10, 24:1, 39:9, 42:3, 42:17, 43:1, 47:5, 49:6, 53:11, 54:20, 55:6, 56:8, 57:7, 58:9, 71:2, 72:15, 73:6, 73:22, 76:19, 81:13, 85:17, 85:22, 86:17, 93:21, 95:16, 96:22, 101:10, 102:6, 102:12, 103:17, 104:22, 105:2, 108:13, 111:4,

132:16, 133:7,
133:23, 137:10,
148:18, 149:22,
151:6, 154:21, 155:5,
155:17, 157:9,
157:11, 194:4
**DR** [1] - 1:6
**drifting** [1] - 17:17
**Drive** [2] - 1:18, 3:14
**driving** [1] - 61:9
**drop** [1] - 163:7
**dropped** [7] - 72:8,
80:11, 108:22,
162:13, 162:18,
163:2, 163:10
**due** [1] - 142:5
**Due** [2] - 186:12,
191:3
**duly** [1] - 3:16
**during** [3] - 8:12,
10:1, 142:6
**duty** [1] - 101:13

## E

**e-mail** [24] - 46:7,
74:4, 74:10, 74:11,
98:17, 111:4, 139:23,
176:18, 186:10,
186:16, 186:17,
187:5, 187:8, 187:9,
188:1, 188:2, 191:1,
191:7, 191:8, 191:18,
191:20, 191:21,
192:13, 192:14
**e-mailed** [1] - 110:14
**e-mails** [4] - 52:22,
74:3, 106:20, 161:19
**early** [6] - 5:19, 21:6,
61:8, 135:17, 136:9,
182:1
**earned** [1] - 172:20
**easy** [1] - 36:7
**eat** [1] - 83:18
**eating** [2] - 75:18,
153:5
**EBI** [2] - 161:7, 165:9
**educational** [6] -
4:21, 4:22, 5:3, 9:19,
11:3, 11:8
**educational-type** [1]
- 9:19
**Edwards** [2] -
161:20, 162:8
**effect** [8] - 95:12,
100:16, 115:3, 126:6,
126:15, 132:21,
142:11, 179:23
**effectual** [1] - 105:10
**efficiency** [1] - 63:20

**efficient** [1] - 91:20
**efficiently** [1] - 42:1
**eight** [3] - 112:14,
112:15, 140:3
**either** [9] - 33:8,
46:12, 71:14, 87:15,
109:14, 118:20,
123:21, 139:5, 181:23
**elaborate** [1] - 28:16
**elapsed** [1] - 115:9
**eliminate** [2] - 17:23,
20:17
**employs** [1] - 173:6
**encourage** [1] -
11:11
**end** [20] - 5:19, 22:5,
58:20, 67:23, 77:6,
77:11, 83:7, 87:4,
87:12, 91:4, 93:11,
95:9, 97:19, 107:7,
117:11, 121:13,
126:8, 153:23,
154:12, 165:10
**ended** [5] - 93:6,
93:17, 97:22, 182:13,
182:16
**enforced** [7] - 34:1,
34:6, 35:8, 48:2,
55:11, 56:12, 62:16
**engagement** [3] -
13:22, 14:1, 14:2
**engagements** [1] -
10:5
**engaging** [1] - 44:7
**enhancement** [1] -
30:15
**enormous** [1] -
28:10
**ensure** [1] - 143:17
**entails** [1] - 82:8
**entire** [2] - 79:23,
128:6
**entities** [1] - 9:17
**entitled** [1] - 189:12
**entity** [1] - 8:21
**environment** [2] -
58:4, 156:14
**equal** [3] - 29:21,
30:17, 30:19
**equaling** [1] - 170:10
**ERIE** [1] - 189:3
**escalated** [1] - 93:9
**ESQ** [2] - 2:1, 2:6
**essentially** [1] -
151:21
**estate** [14] - 41:11,
41:13, 41:14, 41:19,
41:22, 42:1, 67:15,
95:1, 95:23, 98:9,
98:16, 98:22, 98:23,

145:18
**Estate** [2] - 186:8,
190:21
**estimate** [1] - 26:20
**estimated** [1] - 47:23
**estimates** [1] - 117:7
**estimation** [1] -
123:19
**ethics** [1] - 179:2
**event** [2] - 125:23,
155:4
**events** [2] - 10:9,
12:21
**evidence** [1] - 57:16
**exact** [3] - 90:13,
127:8, 127:15
**exactly** [3] - 81:11,
136:2, 172:7
**exam** [1] - 181:10
**Examination** [1] -
193:2
**EXAMINATION** [1] -
3:19
**example** [2] - 22:4,
67:12
**exceed** [1] - 143:14
**exceeded** [1] - 172:5
**except** [1] - 37:19
**excess** [4] - 172:10,
172:11, 172:14
**exchange** [39] -
38:18, 38:23, 50:17,
51:2, 51:4, 82:18,
82:19, 85:14, 85:23,
87:10, 89:1, 90:8,
92:14, 99:13, 100:19,
107:17, 108:18,
109:2, 109:4, 109:5,
109:9, 113:19,
114:18, 118:10,
118:18, 121:9,
126:14, 127:19,
128:5, 135:4, 139:23,
140:23, 147:6, 147:7,
148:4, 148:22, 152:7,
153:8
**exchanges** [7] -
50:22, 84:3, 84:7,
85:13, 148:10,
148:20, 183:21
**excited** [1] - 17:10
**exclusively** [1] - 6:10
**excuse** [1] - 125:19
**executive** [1] - 95:2
**exemption** [1] -
16:23
**EXH** [100] - 185:10,
185:11, 185:12,
185:14, 185:15,
185:16, 185:18,

185:19, 185:20,
185:22, 186:1, 186:3,
186:5, 186:6, 186:9,
186:10, 186:11,
186:12, 186:13,
186:15, 186:16,
186:17, 186:18,
186:19, 186:20,
186:22, 187:1, 187:3,
187:5, 187:7, 187:8,
187:9, 187:10,
187:11, 187:12,
187:13, 187:15,
187:16, 187:17,
187:18, 187:19,
187:21, 187:22,
187:23, 188:1, 188:2,
188:3, 188:5, 188:6,
188:7, 190:3, 190:4,
190:5, 190:7, 190:8,
190:9, 190:11,
190:12, 190:13,
190:15, 190:16,
190:18, 190:19,
190:20, 190:22,
191:1, 191:2, 191:3,
191:4, 191:5, 191:7,
191:8, 191:9, 191:10,
191:12, 191:13,
191:15, 191:16,
191:18, 191:19,
191:20, 191:21,
191:22, 192:1, 192:2,
192:3, 192:5, 192:6,
192:7, 192:8, 192:9,
192:10, 192:11,
192:12, 192:13,
192:14, 192:15,
192:17, 192:18,
192:19
**exhibit** [12] - 19:1,
47:11, 98:10, 98:18,
120:13, 139:18,
141:12, 146:11,
148:8, 154:20,
169:14, 183:14
**Exhibit** [64] - 7:4,
14:19, 16:9, 23:5,
31:14, 33:15, 37:15,
39:21, 40:13, 41:5,
44:11, 45:3, 45:5,
46:5, 46:18, 46:22,
48:12, 49:18, 58:13,
61:12, 65:4, 66:1,
69:23, 70:2, 78:6,
78:8, 79:2, 81:20,
86:13, 88:17, 88:20,
90:22, 96:8, 101:9,
110:9, 113:6, 113:14,
122:9, 125:3, 125:9,
126:4, 127:23,

128:14, 139:14,
139:18, 141:8,
148:13, 149:8,
150:19, 159:13,
160:15, 161:16,
162:3, 166:17, 167:6,
169:13, 174:3, 174:9,
176:13, 177:6, 190:2
**exhibits** [17] - 24:4,
24:10, 34:15, 50:19,
85:7, 85:12, 94:23,
97:11, 98:21, 113:22,
131:5, 148:6, 148:12,
160:19, 183:18,
184:14, 192:21
**EXHIBITS** [1] - 190:1
**Exhibits** [2] - 24:9,
94:19
**exist** [1] - 82:14
**existed** [1] - 82:22
**existence** [1] - 29:17
**existing** [2] - 24:11,
148:21
**exists** [1] - 50:15
**expect** [12] - 18:10,
18:11, 18:20, 34:5,
34:7, 55:9, 65:16,
68:3, 82:17, 91:15,
127:13, 130:21
**expectation** [1] -
158:12
**expectations** [1] -
164:9
**expected** [2] - 54:21,
55:6
**expecting** [2] - 37:8,
95:8
**expense** [1] - 28:23
**expenses** [8] -
25:21, 26:6, 26:15,
29:10, 67:10, 71:11,
91:3, 127:9
**expensive** [9] -
26:10, 26:17, 26:19,
27:5, 27:8, 52:7,
52:10, 56:1, 157:1
**experience** [2] - 5:5,
181:6
**explain** [7] - 9:9,
16:16, 63:13, 139:13,
146:4, 167:6, 173:2
**explained** [2] -
34:17, 101:22
**explaining** [3] -
61:22, 86:22, 87:1
**explanation** [5] -
16:13, 62:13, 77:23,
125:21, 135:3
**explicit** [4] - 64:12,
96:4, 111:23, 132:11

**explicitly** [2] - 132:5, 132:6
**express** [1] - 56:8
**expressed** [6] - 24:1, 38:11, 43:12, 54:8, 56:15, 56:16
**extend** [1] - 73:11
**extent** [6] - 58:8, 96:6, 122:19, 161:3, 166:23, 194:2
**external** [1] - 109:9
**extremely** [2] - 56:1, 81:9

## F

**face** [17] - 19:11, 20:20, 22:17, 39:12, 39:16, 54:21, 67:9, 75:11, 112:10, 117:18, 123:4, 142:10, 142:20, 143:13, 144:17, 146:12, 169:15
**facilitate** [5] - 34:23, 40:5, 41:15, 41:23, 105:5
**facilitates** [1] - 40:23
**fact** [23] - 17:10, 22:21, 30:14, 38:13, 52:1, 57:3, 68:1, 71:2, 80:3, 80:11, 92:13, 100:9, 100:10, 110:3, 126:1, 129:23, 137:4, 156:21, 158:7, 159:16, 161:4, 163:13, 184:6
**factor** [2] - 61:9, 125:18
**fair** [23] - 21:16, 33:11, 35:12, 36:10, 42:19, 53:11, 54:20, 55:5, 55:13, 62:5, 66:5, 66:10, 68:22, 77:13, 84:16, 90:21, 91:1, 103:15, 108:10, 127:3, 130:16, 131:9, 170:14
**fairly** [4] - 33:12, 96:3, 96:16, 101:13
**familiar** [20] - 14:22, 16:10, 24:9, 39:22, 40:13, 41:6, 42:14, 44:1, 44:18, 46:18, 47:1, 48:12, 49:19, 58:13, 61:15, 70:5, 79:1, 81:23, 110:13, 177:10
**FAMILY** [1] - 1:8
**family** [3] - 17:1,

67:13, 134:17
**far** [7] - 12:22, 16:4, 18:16, 43:18, 80:12, 80:13, 116:20
**faster** [1] - 139:8
**fax** [6] - 50:20, 50:21, 74:5, 74:8, 114:13
**fears** [2] - 83:10, 83:11
**February** [4] - 50:16, 169:17, 187:5, 191:18
**federal** [1] - 167:14
**Federal** [1] - 1:19
**fees** [4] - 9:2, 9:15, 52:6, 54:14
**fellow** [1] - 181:10
**felt** [3] - 78:13, 155:5, 179:4
**FETZER** [2] - 1:22, 189:17
**few** [7] - 7:2, 36:20, 67:6, 76:8, 76:10, 84:21, 159:7
**figure** [6] - 34:21, 48:1, 83:18, 94:10, 107:9, 183:15
**figured** [1] - 131:1
**figures** [1] - 15:13
**figuring** [1] - 160:1
**file** [3] - 122:15, 139:2, 139:5
**files** [1] - 122:12
**finalize** [1] - 38:8
**financial** [29] - 5:14, 6:9, 6:21, 9:21, 10:16, 10:20, 14:4, 14:9, 14:15, 70:11, 101:14, 101:18, 102:13, 102:14, 102:23, 103:1, 103:3, 103:11, 103:12, 103:17, 104:3, 104:5, 104:21, 105:20, 109:4, 111:16, 155:23, 156:1
**Financial** [4] - 133:10, 133:15, 188:7, 192:19
**financially** [1] - 158:13
**financing** [1] - 161:6
**fine** [6] - 46:21, 49:3, 107:8, 124:20, 128:19
**finish** [1] - 121:2
**firm** [9] - 5:10, 5:11, 5:13, 5:17, 5:20, 5:22, 6:8, 111:16, 112:4
**first** [43] - 11:14, 12:16, 19:1, 20:23, 32:9, 50:5, 53:3, 65:5, 69:7, 70:10, 70:16,

71:15, 78:13, 78:23, 79:10, 79:14, 84:12, 89:5, 94:16, 98:12, 102:6, 109:12, 109:13, 109:16, 109:21, 110:1, 110:10, 112:17, 113:18, 142:6, 142:9, 147:21, 148:18, 150:21, 154:21, 159:7, 162:4, 166:3, 167:1, 167:5, 173:23, 175:22
**fit** [3] - 104:10, 104:11, 158:2
**five** [14] - 13:2, 36:19, 72:3, 72:5, 76:13, 78:17, 79:17, 79:20, 94:16, 98:1, 139:2, 159:21, 165:16, 165:19
**five-year** [1] - 165:16
**fix** [2] - 50:6, 162:11
**fixed** [2] - 77:23, 157:19
**fixing** [2] - 50:7, 52:9
**floor** [1] - 26:6
**Floor** [1] - 2:7
**flow** [1] - 40:3
**focus** [1] - 158:22
**focused** [1] - 10:6
**follow** [10] - 35:18, 74:2, 89:16, 96:13, 97:2, 99:11, 99:16, 107:2, 107:15, 108:2
**follow-up** [4] - 74:2, 99:11, 107:2, 108:2
**followed** [1] - 105:21
**following** [6] - 68:5, 97:7, 98:5, 131:13, 171:19, 185:9
**follows** [2] - 3:18, 79:7
**fool** [1] - 12:1
**force** [3] - 24:13, 73:7, 74:13
**foregoing** [2] - 189:7, 189:12
**forever** [1] - 132:7
**form** [14] - 14:7, 21:18, 34:8, 35:15, 36:13, 45:20, 55:1, 55:16, 74:16, 96:9, 99:18, 101:16, 104:8, 129:17
**formal** [1] - 77:10
**formed** [1] - 8:21
**forms** [1] - 162:14
**forth** [3] - 49:15, 102:12, 104:15

**forward** [3] - 119:17, 131:19, 138:16
**forwarded** [4] - 73:8, 73:12, 74:10, 74:21
**four** [6] - 8:4, 12:7, 77:21, 139:6, 144:19, 184:6
**fourth** [3] - 19:21, 128:3, 139:1
**frankly** [1] - 50:9
**free** [1] - 67:15
**frequently** [1] - 49:8
**front** [1] - 91:4
**full** [5] - 45:15, 89:13, 141:4, 141:5, 142:10
**fully** [1] - 108:14
**fun** [1] - 12:18
**fund** [9] - 38:15, 84:23, 128:15, 130:2, 130:5, 130:14, 147:15, 151:23, 181:23
**funded** [6] - 96:16, 100:4, 145:8, 161:6, 166:22
**funding** [3] - 139:10, 147:18, 166:19
**funds** [3] - 15:9, 53:14, 143:7
**funny** [1] - 12:1
**future** [16] - 15:20, 38:19, 53:16, 53:18, 82:15, 82:18, 87:2, 88:15, 113:20, 120:23, 121:5, 121:11, 123:5, 123:20, 144:7, 172:12
**futures** [1] - 123:9

## G

**general** [14] - 66:8, 103:3, 135:18, 136:18, 172:16, 173:2, 173:4, 173:5, 173:7, 173:11, 173:15, 173:21, 174:2
**generally** [9] - 39:14, 80:5, 80:13, 82:7, 127:11, 127:14, 136:7, 169:22, 170:19
**generate** [1] - 128:9
**gentleman** [2] - 5:17, 11:19
**Georgia** [2] - 7:18, 8:5
**gift** [2] - 144:6, 147:15
**gifted** [1] - 145:15

**Gifting** [2] - 186:7, 190:21
**gifts** [1] - 144:5
**Giraffe** [1] - 7:18
**given** [17] - 25:5, 56:22, 56:23, 63:3, 68:4, 68:11, 87:14, 100:11, 117:4, 118:5, 130:13, 131:6, 133:4, 151:11, 163:1, 168:23, 169:3
**glad** [1] - 151:20
**Global** [1] - 1:18
**goal** [4] - 11:7, 29:16, 64:6, 64:21
**goals** [2] - 41:23, 54:5
**God** [1] - 12:11
**gosh** [1] - 13:2
**grandkids** [1] - 15:20
**great** [17] - 10:23, 15:4, 30:7, 30:11, 30:13, 36:3, 41:18, 48:21, 52:16, 63:11, 71:13, 111:17, 120:4, 157:18, 159:22, 184:21
**greater** [3] - 171:6, 171:7
**GRIMM** [1] - 2:1
**Grimm** [1] - 3:23
**gross** [3] - 128:15, 130:2, 130:13
**Group** [11] - 5:18, 6:5, 6:7, 60:19, 133:10, 133:17, 137:17, 173:17, 180:12, 188:7, 192:19
**GROUP** [1] - 1:12
**group** [1] - 133:16
**groups** [1] - 137:18
**grow** [1] - 18:2
**guarantee** [17] - 25:5, 25:6, 26:13, 27:4, 28:19, 30:12, 30:14, 54:10, 66:15, 87:9, 92:3, 131:22, 138:2, 150:23, 157:4
**guaranteed** [150] - 24:17, 24:23, 25:3, 25:12, 25:15, 25:17, 25:18, 25:22, 26:9, 26:10, 26:11, 26:20, 26:21, 27:7, 27:9, 27:11, 27:16, 27:19, 28:10, 28:13, 28:14, 28:17, 29:1, 29:2, 29:4, 29:13, 29:14, 29:19, 29:20, 30:2, 30:20, 32:1, 32:3,

32:6, 32:7, 32:8, 32:16, 38:12, 38:13, 38:19, 38:21, 39:1, 51:2, 51:13, 51:18, 52:7, 52:15, 55:21, 56:21, 58:21, 59:8, 59:18, 60:8, 60:9, 60:10, 61:6, 62:9, 62:11, 62:18, 62:19, 63:2, 63:4, 63:8, 63:22, 65:20, 66:7, 70:17, 70:21, 71:7, 77:15, 79:15, 80:3, 82:10, 82:19, 83:13, 86:9, 87:2, 87:5, 87:11, 90:23, 91:2, 91:15, 92:10, 98:6, 99:13, 100:20, 101:4, 101:6, 107:8, 107:17, 107:22, 108:18, 113:12, 114:18, 115:8, 115:18, 116:12, 116:21, 117:17, 118:3, 119:5, 119:7, 120:8, 121:15, 121:21, 122:1, 122:5, 125:10, 126:2, 126:7, 126:16, 126:23, 128:9, 130:16, 130:22, 132:16, 132:17, 133:23, 134:19, 135:5, 135:7, 135:15, 135:18, 135:21, 136:3, 137:11, 137:12, 141:23, 151:1, 151:3, 151:5, 151:16, 152:9, 152:22, 153:10, 153:22, 155:6, 155:19, 155:21, 156:23, 164:8, 164:11, 177:3, 177:9, 183:5

**guarantees** [19] - 28:2, 32:21, 32:23, 54:11, 57:20, 63:11, 63:14, 83:16, 83:17, 83:20, 116:8, 116:11, 116:15, 118:17, 120:10, 123:21, 136:17, 137:23, 158:7

**Guard** [1] - 2:12

**Guardian** [8] - 5:9, 8:22, 8:23, 9:4, 9:10, 9:12, 9:18, 11:7

**guess** [7] - 18:5, 85:8, 108:20, 113:3, 154:16, 154:18, 167:22

**guidance** [1] - 54:18

**Guide** [2] - 7:8, 8:4

**guidelines** [1] - 111:5

**guy** [2] - 12:12, 35:17

**guys** [1] - 162:23

## H

**half** [4] - 33:22, 33:23, 70:16, 110:10

**handful** [1] - 7:12

**handing** [2] - 13:11, 13:13

**handle** [2] - 9:18, 172:17

**handled** [9] - 35:4, 35:5, 103:20, 103:21, 103:22, 110:18

**handling** [4] - 50:9, 50:11, 105:15, 164:21

**happy** [4] - 77:19, 95:3, 99:3, 101:22

**hard** [3] - 26:22, 32:5, 52:2

**haul** [1] - 136:3

**headquartered** [1] - 6:10

**health** [2] - 171:1, 171:9

**heard** [2] - 174:7, 174:19

**heavy** [1] - 91:3

**heck** [1] - 27:5

**heels** [1] - 36:17

**help** [14] - 12:9, 15:11, 34:7, 37:11, 40:5, 41:22, 77:19, 110:21, 111:20, 111:21, 157:17, 159:23, 160:3, 160:5

**helpful** [2] - 100:5, 100:8

**hence** [1] - 135:20

**HEREBY** [1] - 189:5

**herein** [1] - 115:12

**high** [8] - 20:9, 22:17, 33:12, 59:23, 116:3, 142:20, 143:15, 175:3

**higher** [19] - 20:9, 20:10, 20:14, 21:19, 21:20, 22:7, 28:21, 29:10, 59:21, 80:4, 80:9, 135:13, 144:1, 144:8, 169:6, 171:2, 171:8, 171:18, 175:5

**highest** [1] - 172:20

**highly** [2] - 33:6, 86:6

**himself** [1] - 145:17

**hired** [1] - 15:11

**history** [2] - 120:1, 178:4

**History** [2] - 185:18, 190:11

**hit** [1] - 67:15

**hmm** [1] - 180:5

**hold** [1] - 79:22

**holder** [1] - 68:23

**holding** [1] - 149:19

**holistic** [1] - 102:15

**home** [1] - 74:5

**honestly** [4] - 14:2, 73:19, 118:15, 173:20

**honoring** [1] - 52:11

**hoped** [1] - 72:10

**hospitals** [1] - 10:11

**hundreds** [5] - 51:1, 52:18, 52:20, 52:21

**Hy** [25] - 14:10, 15:5, 32:20, 34:20, 35:21, 36:4, 37:1, 43:14, 49:22, 58:17, 61:21, 63:12, 74:11, 79:8, 95:19, 97:11, 99:1, 103:21, 106:16, 131:18, 156:3, 158:11, 160:17, 160:19

**hypothetical** [5] - 113:19, 129:16, 130:4, 130:23, 183:20

**hypothetically** [3] - 85:14, 126:22, 130:19

## I

**idea** [11] - 17:4, 17:18, 41:22, 46:8, 60:11, 80:16, 132:10, 147:18, 153:4, 157:5, 174:1

**ideal** [2] - 182:15, 182:21

**Identification** [1] - 185:9

**identify** [7] - 3:7, 7:4, 61:13, 81:21, 86:14, 113:7, 176:13

**identity** [2] - 3:6, 3:8

**idiot** [1] - 12:1

**illustrate** [1] - 64:20

**illustrated** [5] - 47:18, 65:15, 93:9, 156:12

**illustrating** [2] - 152:6, 156:20

**illustration** [18] - 21:4, 32:5, 51:20,

62:10, 63:3, 66:8, 66:11, 71:5, 79:16, 80:4, 83:13, 87:16, 87:18, 88:3, 91:9, 151:10, 165:18, 183:8

**Illustration** [19] - 174:10, 185:17, 187:7, 187:12, 187:14, 187:15, 187:16, 187:17, 187:18, 187:23, 190:10, 191:19, 192:2, 192:4, 192:5, 192:6, 192:7, 192:8, 192:12

**illustrations** [19] - 51:1, 52:18, 54:17, 64:13, 68:7, 72:9, 72:19, 73:7, 74:13, 80:15, 92:18, 93:5, 95:8, 119:22, 119:23, 137:14, 183:6, 183:7, 183:12

**imagine** [5] - 32:22, 69:15, 98:8, 101:2, 118:22

**immediately** [1] - 66:23

**implement** [1] - 36:11

**implementation** [3] - 46:13, 107:1

**implemented** [6] - 37:10, 42:8, 43:7, 43:10, 101:15, 153:22

**implementing** [2] - 34:12, 35:14

**implications** [1] - 138:15

**important** [8] - 4:13, 50:20, 68:23, 96:16, 101:13, 105:6, 105:10, 138:19

**impossible** [2] - 66:17, 67:21

**impression** [1] - 77:14

**in-force** [3] - 24:13, 73:7, 74:13

**inception** [1] - 165:23

**included** [2] - 151:13, 180:3

**including** [1] - 167:15

**income** [6] - 15:15, 16:21, 67:14, 134:7, 134:11, 179:5

**incorrect** [1] - 135:1

**increased** [4] -

27:11, 27:13, 145:20, 145:21

**incur** [1] - 10:19

**independent** [1] - 8:20

**independently** [1] - 5:22

**Index** [1] - 1:10

**INDEX** [2] - 190:1, 193:1

**indicate** [1] - 128:4

**indicated** [14] - 78:15, 125:12, 126:5, 133:22, 135:6, 138:13, 151:4, 155:18, 157:8, 159:12, 169:14, 178:5, 178:15, 182:2

**indication** [1] - 123:16

**individual** [1] - 180:7

**Individually** [1] - 1:7

**inexpensive** [1] - 15:17

**Inforce** [4] - 185:16, 187:13, 190:9, 192:3

**information** [11] - 36:15, 36:21, 37:5, 43:4, 45:17, 100:11, 118:9, 120:16, 129:17, 168:19

**Information** [4] - 187:20, 188:4, 192:9, 192:16

**informational** [1] - 140:21

**initial** [4] - 45:2, 56:11, 68:3, 141:15

**initiated** [1] - 96:1

**inquiry** [1] - 60:12

**insensitive** [1] - 109:4

**inside** [5] - 17:19, 28:21, 29:22, 51:9, 145:5

**insists** [1] - 50:18

**instead** [7] - 4:12, 12:13, 91:17, 93:13, 122:1, 122:2, 144:18

**instruction** [1] - 96:4

**instructions** [7] - 34:1, 37:20, 37:21, 40:21, 168:21, 186:5, 190:19

**Insurance** [21] - 174:10, 185:16, 186:3, 187:7, 187:12, 187:13, 187:15, 187:16, 187:17, 187:18, 187:23,

190:10, 190:18,
191:19, 192:2, 192:3,
192:5, 192:6, 192:7,
192:8, 192:12
  **insurance** [87] -
6:14, 6:17, 6:20, 14:9,
14:12, 16:5, 17:6,
17:14, 18:9, 18:11,
18:20, 19:3, 22:1,
25:4, 25:9, 26:2, 26:4,
26:7, 26:12, 28:20,
29:12, 29:17, 29:18,
34:17, 34:18, 35:1,
35:4, 35:8, 35:11,
40:6, 45:20, 48:6,
48:22, 54:10, 54:18,
55:5, 55:7, 55:11,
56:10, 59:14, 59:22,
60:7, 61:22, 61:23,
64:7, 64:17, 67:8,
67:9, 67:14, 75:3,
75:7, 75:12, 79:16,
95:20, 95:21, 96:17,
99:2, 99:3, 101:19,
102:5, 102:7, 102:23,
103:6, 103:7, 103:16,
103:22, 104:9,
104:10, 104:11,
104:20, 104:23,
105:6, 105:11,
105:16, 111:18,
112:3, 117:14,
125:10, 126:2,
127:10, 138:17,
141:16, 144:3,
157:20, 157:21,
166:4, 173:6
  **INSURANCE** [1] -
1:8
  **insurances** [1] -
19:12
  **insurer** [1] - 136:17
  **intend** [2] - 119:4,
119:6
  **intended** [3] - 20:3,
20:22, 129:8
  **intent** [12] - 23:20,
23:22, 29:11, 39:15,
53:21, 53:23, 60:3,
63:15, 63:19, 64:2,
64:12, 121:18
  **intention** [3] - 21:12,
22:14, 22:18
  **interaction** [1] -
49:15
  **interchangable** [1] -
103:13
  **interchangeably** [1]
- 104:1
  **interest** [22] - 26:15,

26:23, 27:3, 27:8,
38:11, 43:12, 52:8,
56:1, 56:22, 58:3,
63:6, 72:8, 74:19,
81:9, 82:9, 100:2,
107:22, 108:22,
115:7, 121:14,
153:21, 156:14
  **interested** [7] -
10:14, 15:21, 45:16,
103:5, 138:16,
157:20, 160:21
  **interesting** [1] -
10:17
  **interject** [1] - 111:8
  **internal** [24] - 38:23,
51:3, 84:3, 84:7,
85:23, 87:10, 88:23,
99:13, 100:19,
107:17, 108:18,
109:2, 109:4, 114:18,
118:10, 118:17,
126:14, 135:4,
140:23, 148:4,
148:10, 148:19,
148:22, 183:21
  **introduced** [1] - 46:7
  **introducing** [2] -
42:21, 95:1
  **introduction** [2] -
41:21, 166:3
  **invented** [1] - 15:14
  **invest** [1] - 15:9
  **invested** [2] -
117:20, 182:19
  **investigation** [1] -
154:11
  **investment** [3] - 6:8,
26:14, 112:3
  **investments** [1] -
102:16
  **invite** [1] - 11:13
  **involve** [2] - 36:8,
176:16
  **involved** [12] - 8:11,
10:3, 14:12, 14:15,
15:6, 16:5, 35:3,
133:21, 162:9,
173:12, 176:9, 181:12
  **involvement** [5] -
6:13, 46:12, 159:4,
159:8, 159:9
  **involves** [1] - 47:8
  **IRA** [11] - 18:2, 19:2,
34:18, 34:22, 142:22,
144:10, 144:14,
146:5, 147:13,
185:12, 190:5
  **IRAs** [2] - 34:16
  **IRREVOCABLE** [2] -

1:7, 1:8
  **irrevocable** [1] - 40:7
  **IRS** [2] - 48:21, 155:2
  **Island** [1] - 5:1
  **Islands** [1] - 47:20
  **issue** [10] - 28:4,
58:10, 71:7, 86:5,
117:12, 121:13,
140:3, 153:18, 194:5
  **issued** [1] - 141:16
  **issues** [6] - 77:15,
102:18, 102:22,
104:6, 139:21, 180:8
  **it'd** [1] - 91:7
  **it'll** [1] - 123:21
  **itself** [2] - 24:12,
49:2

## J

  **Jade** [6] - 5:21, 6:13,
6:14, 178:13, 178:15,
178:18
  **JADE** [1] - 5:21
  **January** [3] - 169:15,
186:15, 191:5
  **JARVIS** [5] - 1:1,
1:12, 1:17, 3:14,
193:3
  **Jarvis** [28] - 2:9, 3:8,
3:21, 5:10, 6:2, 6:3,
8:12, 8:17, 8:21, 9:11,
9:19, 10:2, 10:4,
10:19, 11:20, 70:1,
78:7, 125:2, 174:12,
177:5, 178:6, 178:21,
180:8, 180:11,
180:12, 181:20,
184:9, 185:6
  **john** [1] - 66:20
  **John** [121] - 11:22,
12:3, 12:17, 12:22,
12:23, 13:2, 14:8,
14:12, 15:11, 16:18,
17:3, 17:10, 22:8,
24:12, 27:14, 30:10,
32:20, 33:20, 34:17,
35:23, 36:2, 36:6,
37:3, 38:10, 38:11,
38:12, 38:19, 38:20,
41:10, 41:11, 42:5,
43:11, 43:14, 43:16,
46:8, 47:9, 47:13,
47:17, 48:17, 49:16,
50:14, 50:18, 52:10,
52:23, 54:8, 54:17,
55:9, 55:18, 56:6,
57:3, 59:11, 61:21,
62:13, 63:13, 68:8,
69:12, 69:15, 72:19,

73:10, 73:13, 73:23,
74:4, 74:21, 79:9,
82:6, 83:4, 83:12,
83:16, 84:23, 85:10,
86:22, 88:4, 88:6,
89:4, 89:13, 89:21,
93:9, 93:16, 94:9,
95:2, 95:19, 95:23,
97:12, 97:13, 98:10,
99:1, 99:2, 99:21,
100:22, 101:19,
101:22, 102:15,
103:4, 106:13, 116:5,
116:14, 117:4, 118:8,
118:16, 118:22,
119:17, 120:9,
121:22, 137:21,
138:11, 144:5,
145:11, 146:15,
148:9, 149:9, 152:6,
157:16, 165:4, 165:5,
173:17, 183:2, 183:20
  **JOHN** [2] - 1:6, 1:7
  **John's** [17] - 12:6,
22:10, 35:17, 36:23,
40:3, 47:22, 50:8,
51:21, 63:2, 63:18,
64:12, 67:13, 82:9,
102:16, 102:17,
134:6, 134:11
  **joined** [2] - 178:9,
180:2
  **journal** [1] - 12:8
  **Julie** [2] - 14:13, 37:2
  **JULIE** [1] - 1:7
  **July** [5] - 58:19,
186:16, 186:17,
191:7, 191:8
  **jump** [1] - 43:18

## K

  **Kaye** [1] - 150:7
  **keep** [5] - 20:6, 48:2,
95:9, 144:7, 158:8
  **keeps** [1] - 173:7
  **kept** [5] - 20:7,
21:23, 22:6, 146:23,
172:14
  **kid** [1] - 145:16
  **kids** [7] - 15:19,
16:22, 17:4, 18:1,
40:8, 41:12, 144:5
  **Kim** [1] - 173:13
  **kind** [7] - 13:21,
45:23, 46:3, 46:15,
77:10, 99:11, 118:5
  **kinds** [1] - 52:19
  **knee** [1] - 15:14
  **knowledge** [3] -

58:6, 163:19, 171:20

## L

  **lack** [1] - 118:13
  **Lafayette** [1] - 2:2
  **language** [3] - 6:22,
71:6, 132:2
  **lapse** [17] - 53:14,
56:17, 62:7, 62:12,
62:22, 63:16, 66:12,
68:15, 70:18, 70:22,
100:4, 108:14, 118:2,
155:6, 164:5, 164:7,
164:14
  **lapsing** [4] - 62:23,
63:9, 71:9, 74:15
  **large** [1] - 39:16
  **larger** [4] - 21:6,
21:20, 21:21, 104:21
  **last** [24] - 23:13,
23:14, 23:16, 23:18,
24:13, 50:4, 55:14,
64:3, 65:11, 65:15,
65:17, 66:16, 68:20,
74:18, 83:8, 84:16,
86:21, 121:19,
123:21, 128:3,
160:21, 165:19,
174:14
  **lasting** [3] - 68:8,
71:16, 71:20
  **late** [1] - 81:3
  **law** [6] - 26:1, 44:5,
89:21, 93:15, 139:4
  **lead** [1] - 13:21
  **learn** [1] - 93:20
  **least** [7] - 24:2,
53:13, 84:22, 85:13,
99:12, 150:21, 155:6
  **leave** [7] - 15:19,
18:1, 48:8, 97:5,
97:15, 144:14, 162:19
  **leaves** [2] - 17:11,
77:14
  **leaving** [1] - 51:12
  **led** [3] - 21:1, 166:2,
180:13
  **ledger** [1] - 24:13
  **left** [5] - 5:19, 16:22,
47:22, 178:12, 178:21
  **legal** [5] - 10:16,
35:2, 66:5, 103:21,
103:22
  **length** [1] - 79:23
  **less** [31] - 17:16,
20:12, 27:16, 28:13,
28:18, 29:13, 29:19,
30:5, 51:5, 90:11,
90:17, 92:7, 92:13,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

92:19, 94:10, 95:21,
97:19, 101:20, 107:6,
107:7, 117:5, 127:10,
134:16, 135:14,
154:3, 170:23, 171:4,
176:4, 176:6
  **lesser** [1] - 118:4
  **letter** [108] - 14:21,
15:2, 16:2, 23:7, 23:9,
33:20, 33:22, 36:16,
36:19, 38:10, 38:16,
39:5, 39:7, 39:12,
42:16, 46:14, 47:2,
47:4, 48:16, 48:19,
48:20, 49:2, 49:6,
50:14, 50:18, 51:23,
52:1, 57:16, 61:20,
63:12, 68:13, 69:20,
73:8, 74:2, 74:9,
77:13, 77:18, 79:6,
79:7, 82:3, 82:8, 83:7,
86:16, 88:16, 92:4,
97:3, 111:4, 114:14,
120:13, 122:20,
122:22, 126:4, 128:1,
128:11, 131:18,
147:10, 148:9,
148:17, 149:3, 149:4,
149:9, 149:18,
149:21, 149:22,
150:11, 150:20,
151:2, 153:1, 156:3,
157:15, 158:10,
159:16, 159:18,
159:19, 185:11,
185:14, 185:20,
185:22, 186:1, 186:9,
186:13, 186:15,
186:18, 186:19,
186:20, 186:22,
187:1, 187:3, 187:10,
187:11, 190:4, 190:7,
190:13, 190:15,
190:16, 190:22,
191:4, 191:5, 191:9,
191:10, 191:12,
191:13, 191:15,
191:16, 191:22, 192:1
  **letters** [3] - 32:19,
132:3, 132:8
  **letting** [1] - 88:6
  **level** [3] - 20:7,
143:17, 157:20
  **leverage** [3] -
169:10, 169:11, 183:2
  **Leveraging** [1] - 7:19
  **levy** [1] - 26:3
  **license** [2] - 95:2,
163:2
  **licensed** [1] - 6:14

  **licenses** [2] - 6:20,
162:13
  **life** [6] - 17:6, 17:14,
19:3, 34:16, 136:7,
181:4
  **LIFE** [1] - 1:7
  **Life** [17] - 19:8,
43:20, 44:3, 44:13,
44:22, 44:23, 45:3,
148:20, 148:23,
174:10, 185:16,
187:13, 188:7, 190:9,
192:3, 192:19
  **lifetimes** [1] - 20:7
  **likely** [4] - 68:10,
80:19, 80:20, 108:14
  **limit** [2] - 150:3,
167:11
  **limitation** [1] - 149:2
  **limitations** [2] -
146:13, 166:20
  **limits** [1] - 146:19
  **Lincoln** [111] - 19:8,
20:1, 27:15, 31:19,
31:23, 37:20, 38:10,
38:16, 38:17, 38:23,
39:2, 43:20, 44:2,
44:13, 44:16, 44:22,
45:2, 46:6, 49:13,
49:15, 50:8, 50:22,
51:3, 51:14, 51:22,
52:3, 52:10, 52:22,
53:6, 54:11, 56:2,
57:17, 58:22, 61:4,
62:1, 62:2, 62:6,
62:10, 65:20, 69:11,
70:3, 73:8, 73:9,
74:20, 77:15, 79:18,
79:23, 80:9, 84:21,
85:10, 87:6, 87:8,
87:18, 88:5, 90:1,
90:23, 92:8, 93:12,
96:5, 100:13, 100:20,
110:3, 116:10,
120:13, 123:11,
123:13, 123:18,
131:7, 133:8, 133:10,
133:14, 133:15,
133:20, 137:20,
138:4, 138:5, 140:23,
141:11, 142:21,
145:3, 146:1, 147:4,
148:4, 148:7, 148:9,
148:18, 148:20,
148:23, 149:21,
151:1, 159:1, 169:22,
171:15, 173:10,
173:16, 174:4, 174:9,
175:11, 176:20,
177:2, 177:17, 183:6,

183:21, 185:19,
186:11, 188:7,
190:12, 191:2, 192:19
  **Lincoln's** [5] - 82:20,
85:16, 112:16,
123:15, 154:3
  **Lindsey** [7] - 110:16,
110:17, 111:12,
111:17, 111:20,
140:1, 146:11
  **line** [5] - 21:13,
21:14, 37:4, 113:1,
131:16
  **lines** [2] - 41:17,
140:11
  **list** [1] - 7:14
  **listed** [3] - 8:11,
70:11, 160:8
  **litigation** [2] - 179:7,
179:10
  **live** [6] - 15:17,
15:19, 18:17, 54:9,
54:14, 64:20
  **lived** [2] - 13:6, 15:16
  **lives** [1] - 53:18
  **LLC** [4] - 1:12, 2:12,
186:7, 190:21
  **LLP** [1] - 2:1
  **locations** [1] - 1:20
  **logistics** [1] - 37:12
  **long-term** [6] - 29:9,
29:11, 74:23, 91:15,
136:6, 182:12
  **longwindedly** [1] -
92:1
  **look** [39] - 15:22,
36:2, 48:5, 65:4, 65:5,
67:7, 73:20, 75:3,
77:20, 82:16, 88:11,
99:3, 99:5, 102:18,
106:17, 111:21,
116:5, 117:9, 118:21,
119:22, 121:8, 125:2,
128:13, 129:20,
131:23, 132:9,
139:19, 141:14,
151:22, 159:13,
159:22, 161:15,
165:18, 166:17,
174:3, 175:4, 177:5
  **looked** [16] - 69:14,
75:13, 102:16,
102:17, 102:19,
114:3, 114:22, 138:4,
148:14, 151:8, 151:9,
152:8, 154:2, 154:16,
156:17, 183:4
  **looking** [32] - 19:1,
37:11, 39:11, 49:12,
59:1, 59:3, 65:23,

70:15, 72:9, 75:19,
78:7, 82:14, 87:20,
90:6, 90:21, 102:18,
102:21, 108:21,
118:13, 125:23,
127:23, 139:7,
148:14, 149:8,
149:23, 150:19,
160:18, 174:13,
182:9, 183:3
  **looks** [18] - 24:11,
24:13, 33:21, 39:3,
40:3, 40:20, 63:1,
63:12, 72:12, 87:16,
110:17, 110:20,
112:5, 119:18,
120:11, 147:12,
161:19, 175:3
  **Lori** [8] - 14:12,
30:10, 33:20, 37:1,
65:3, 79:9, 106:16,
121:23
  **LORRAINE** [1] - 1:6
  **Lorraine** [2] - 66:20,
80:21
  **Lorraine's** [1] - 68:8
  **Los** [1] - 173:14
  **losing** [3] - 17:5,
67:20, 77:4
  **lost** [1] - 169:10
  **love** [1] - 157:18
  **loved** [2] - 118:17,
137:21
  **low** [15] - 27:8, 52:8,
56:1, 56:23, 59:9,
60:10, 61:7, 81:9,
116:8, 116:11, 120:1,
136:20, 153:11,
156:14
  **lower** [8] - 20:11,
21:9, 22:18, 74:19,
91:8, 135:19, 156:11,
170:21
  **LPR2** [1] - 152:8
  **LPR3** [2] - 113:21,
152:8
  **LPR4** [2] - 113:22,
152:8
  **lump** [1] - 57:19
  **lunch** [2] - 13:6,
124:19

## M

  **machine** [1] - 189:8
  **Magavern** [2] - 3:23
  **MAGAVERN** [2] - 2:1
  **mail** [24] - 46:7, 74:4,
74:10, 74:11, 98:17,
111:4, 139:23,

176:18, 186:10,
186:16, 186:17,
187:5, 187:8, 187:9,
188:1, 188:2, 191:1,
191:7, 191:8, 191:18,
191:20, 191:21,
192:13, 192:14
  **mailed** [1] - 110:14
  **mails** [4] - 52:22,
74:3, 106:20, 161:19
  **main** [1] - 134:5
  **maintain** [3] - 24:2,
141:23, 144:14
  **maintaining** [1] -
63:6
  **major** [1] - 66:23
  **majority** [1] - 18:15
  **manage** [2] - 11:1,
48:1
  **managed** [1] - 35:6
  **Management** [3] -
6:15, 6:16, 7:21
  **management** [1] -
42:4
  **Managing** [1] - 7:11
  **Mandell** [33] - 5:10,
6:2, 6:3, 8:12, 8:17,
8:21, 9:8, 9:11, 9:19,
10:3, 10:4, 10:19,
11:20, 13:7, 14:11,
15:7, 43:14, 45:12,
45:18, 103:21,
159:23, 160:5, 161:5,
161:9, 162:8, 163:1,
178:6, 178:22, 180:3,
180:7, 180:8, 180:11,
180:12
  **MANDELL** [1] - 5:11
  **manner** [3] - 58:9,
189:8, 194:4
  **manners** [1] - 4:13
  **Manual** [1] - 7:10
  **March** [2] - 187:8,
191:20
  **Marcus** [3] - 44:4,
44:5, 165:5
  **marked** [27] - 7:3,
14:19, 16:9, 23:5,
24:5, 31:13, 33:14,
37:14, 38:2, 39:21,
41:4, 44:11, 46:17,
46:22, 48:11, 49:18,
58:12, 61:12, 70:2,
81:19, 86:12, 110:9,
113:5, 122:9, 161:15,
177:6, 185:9
  **Mass** [14] - 28:6,
28:9, 30:6, 31:7,
54:10, 65:20, 89:12,
116:7, 143:22,

143:23, 145:17,
145:19, 168:21, 172:1
**mass** [1] - 80:7
**massive** [1] - 93:17
**MassMautual** [1] -
123:11
**MassMutual** [44] -
19:4, 19:23, 20:20,
24:12, 24:16, 28:4,
30:2, 30:23, 31:8,
31:18, 34:2, 59:15,
59:17, 59:19, 60:2,
61:4, 62:4, 93:8, 96:5,
137:6, 137:20, 143:8,
143:12, 144:16,
146:6, 166:18,
166:20, 166:22,
168:9, 168:19,
169:22, 173:11,
173:13, 173:15,
175:11, 175:19,
175:21, 176:10,
176:20, 177:17,
181:23, 182:19,
185:15, 190:8
**master's** [3] - 5:2,
5:7, 5:8
**Mastering** [1] - 7:23
**matched** [1] - 61:5
**materials** [1] - 74:14
**math** [1] - 142:14
**mathematics** [2] -
4:23, 180:21
**matter** [4] - 3:22,
117:18, 138:22, 158:6
**matters** [1] - 14:9
**MATTHEW** [1] - 2:6
**Matthew** [1] - 184:19
**max** [5] - 145:8,
147:4, 169:4, 169:6,
182:8
**maxed** [2] - 146:15,
147:23
**maximum** [9] - 26:3,
59:21, 66:18, 166:23,
167:3, 167:13,
167:15, 168:3, 168:19
**MBA** [1] - 6:19
**MD** [2] - 7:11, 8:9
**mean** [23] - 25:2,
34:9, 43:18, 50:12,
61:23, 62:21, 68:13,
80:14, 92:3, 92:14,
99:14, 103:2, 109:17,
110:14, 125:20,
131:12, 136:14,
141:22, 150:4,
154:22, 162:5, 170:1,
176:20
**meaning** [5] - 25:5,

61:6, 61:7, 101:5,
104:2
**means** [7] - 25:4,
29:3, 92:15, 114:9,
131:7, 164:8, 189:8
**meant** [1] - 20:14
**mediated** [2] -
179:14, 179:15
**medical** [5] - 10:10,
10:13, 10:21, 12:7,
44:6
**meet** [6] - 12:3, 13:2,
63:20, 164:9, 165:20,
172:19
**meeting** [1] - 22:10
**members** [1] - 10:14
**memo** [2] - 63:1,
98:18
**memory** [1] - 184:5
**mention** [1] - 150:11
**mentioned** [5] - 88:7,
99:14, 99:15, 111:19,
137:15
**mentions** [2] - 19:2,
19:3
**merged** [2] - 5:17,
180:11
**Merry** [1] - 140:10
**mess** [1] - 161:14
**met** [6] - 13:6, 13:7,
13:8, 81:11, 164:18,
171:23
**Michael** [1] - 110:18
**Michel** [2] - 173:13,
173:14
**MICHEL** [1] - 173:13
**middle** [1] - 141:18
**midway** [1] - 174:14
**might** [29] - 20:11,
25:17, 28:23, 31:5,
37:1, 37:2, 56:17,
57:4, 64:7, 68:3,
68:14, 69:8, 72:13,
73:15, 75:15, 76:15,
82:16, 82:17, 124:18,
131:18, 135:21,
141:1, 143:11,
160:11, 170:23,
173:18, 173:19, 176:1
**Millennium** [6] -
60:16, 60:19, 137:17,
138:11, 173:17,
177:19
**million** [61] - 16:18,
17:2, 17:12, 17:13,
17:21, 19:9, 22:1,
22:2, 22:4, 22:6,
28:22, 36:6, 41:14,
51:7, 51:8, 67:12,
67:18, 75:21, 87:9,

89:9, 90:2, 90:6, 90:7,
90:18, 90:23, 91:2,
91:10, 91:18, 92:4,
92:8, 92:10, 95:16,
114:8, 117:19,
121:20, 121:21,
123:10, 123:11,
126:9, 126:23, 127:5,
128:8, 128:10,
130:11, 130:17,
134:9, 141:15, 143:5,
143:14, 144:10,
146:2, 146:18,
146:19, 152:2, 171:3,
176:1, 178:19, 182:14
**millions** [1] - 15:15
**mind** [3] - 29:5,
111:9, 175:9
**mine** [1] - 111:17
**minimum** [11] -
25:22, 25:23, 27:2,
27:4, 66:18, 71:11,
80:5, 80:9, 141:19,
142:4, 142:5
**minimums** [1] -
71:13
**minority** [1] - 180:13
**minute** [5] - 102:21,
125:4, 141:12, 166:8,
181:16
**misconstruing** [2] -
125:20, 135:11
**missing** [2] - 7:17,
122:16
**modest** [1] - 152:16
**moment** [1] - 45:16
**money** [39] - 15:12,
15:18, 15:19, 15:21,
16:20, 17:3, 17:22,
18:14, 18:16, 34:16,
34:22, 37:12, 37:13,
41:12, 41:23, 53:23,
89:22, 90:14, 92:19,
93:14, 95:21, 95:23,
97:14, 127:8, 130:20,
136:7, 141:7, 144:9,
145:3, 145:9, 146:21,
147:4, 147:10,
147:13, 157:3,
172:15, 173:8, 176:7
**Money** [2] - 7:10,
7:18
**monies** [3] - 175:18,
181:22, 182:18
**month** [4] - 39:13,
131:5, 139:15, 139:16
**monthly** [3] - 142:6,
142:9, 143:2
**months** [12] - 85:13,
88:8, 109:12, 109:13,

109:16, 110:1, 110:4,
142:15, 148:5,
149:20, 150:11, 154:6
**Moore** [1] - 3:21
**MOORE** [72] - 2:1,
3:12, 3:20, 11:10,
14:17, 22:12, 34:11,
36:9, 37:7, 55:3,
57:12, 58:7, 58:11,
64:1, 64:9, 65:9, 66:3,
69:2, 69:3, 72:22,
73:4, 75:2, 76:21,
77:2, 78:2, 78:5,
96:12, 98:4, 99:23,
102:2, 119:3, 120:6,
121:17, 122:11,
122:18, 124:17,
124:21, 125:1, 125:6,
125:7, 128:21,
128:22, 129:1, 129:6,
135:23, 136:13,
149:11, 149:14,
149:15, 149:16,
149:17, 154:1,
154:10, 155:2, 155:3,
155:8, 155:11,
155:12, 155:15,
155:16, 157:14,
158:9, 166:7, 166:9,
166:11, 166:16,
167:21, 168:1, 168:5,
168:7, 178:1, 178:2,
181:15, 181:18,
181:19, 182:6,
182:17, 183:16,
184:3, 184:8, 184:19,
184:21, 184:22,
185:2, 185:3, 185:4,
185:5, 185:7, 193:3,
194:1, 194:6, 194:9
**morning** [1] - 132:15
**mortality** [7] - 63:7,
64:18, 66:18, 67:10,
80:4, 80:7, 127:9
**motivation** [1] -
134:5
**move** [12] - 34:22,
51:18, 52:12, 85:1,
119:17, 139:2, 141:8,
142:1, 142:22, 143:5,
154:8, 157:22
**moved** [5] - 52:14,
131:7, 139:8, 143:7,
153:22
**moving** [2] - 40:6,
145:10
**MR** [119] - 3:7, 3:11,
3:12, 3:20, 11:10,
14:7, 14:17, 21:18,
22:12, 34:8, 34:11,
35:15, 36:9, 36:13,
37:7, 55:1, 55:3,
55:16, 57:11, 57:12,
58:7, 58:11, 63:17,
64:1, 64:4, 64:9, 65:9,
66:2, 66:3, 69:1, 69:2,
69:3, 72:22, 73:2,
73:4, 74:16, 75:2,

76:21, 76:23, 77:2,
77:17, 78:2, 78:3,
78:5, 96:9, 96:12,
97:5, 98:4, 99:18,
99:23, 101:16, 102:2,
118:6, 119:3, 119:15,
120:6, 121:16,
121:17, 122:11,
122:14, 122:18,
124:17, 124:20,
124:21, 125:1, 125:6,
125:7, 128:21,
128:22, 129:1, 129:6,
135:23, 136:13,
149:11, 149:14,
149:15, 149:16,
149:17, 154:1,
154:10, 155:2, 155:3,
155:8, 155:11,
155:12, 155:15,
155:16, 157:14,
158:9, 166:7, 166:9,
166:11, 166:16,
167:21, 168:1, 168:5,
168:7, 178:1, 178:2,
181:15, 181:18,
181:19, 182:6,
182:17, 183:16,
184:3, 184:8, 184:19,
184:21, 184:22,
185:2, 185:3, 185:4,
185:5, 185:7, 193:3,
194:1, 194:6, 194:9
**MSF** [3] - 111:13,
111:15, 112:1
**multi** [1] - 122:13
**multi-page** [1] -
122:13
**multiple** [2] - 6:21,
36:18
**must** [2] - 87:18,
119:12

## N

**name** [2] - 3:21,
12:11
**nature** [4] - 10:9,
72:6, 72:7, 112:1
**necessarily** [1] -
92:3
**necessary** [5] -
96:23, 120:17,
123:18, 124:12,
124:14
**necessitated** [1] -
145:10
**need** [18] - 4:15,
15:18, 17:3, 17:23,
18:15, 18:16, 18:19,

35:13, 72:13, 95:20, 95:23, 99:12, 118:4, 123:5, 139:19, 140:20, 147:14, 159:23

**needed** [10] - 36:11, 36:14, 36:15, 50:7, 54:18, 57:4, 116:18, 124:5, 142:22, 180:10

**needs** [3] - 63:20, 99:2, 179:4

**negative** [1] - 12:2

**net** [1] - 145:15

**never** [15] - 12:23, 32:22, 36:1, 54:8, 56:16, 58:21, 90:10, 102:16, 102:17, 133:20, 140:6, 140:19, 174:1, 174:7, 174:19

**new** [14] - 5:20, 72:19, 88:5, 88:6, 125:19, 127:11, 128:7, 130:15, 131:7, 132:9, 145:16, 154:16, 167:19, 184:1

**New** [16] - 2:3, 2:7, 7:9, 8:5, 11:23, 15:6, 44:14, 58:23, 59:4, 59:5, 60:7, 118:15, 134:12, 177:8, 189:6

**NEW** [2] - 1:4, 189:1

**next** [5] - 43:13, 67:3, 70:20, 121:22, 122:1

**nice** [1] - 12:3

**Nick** [1] - 14:10

**nine** [1] - 154:5

**nobody** [3] - 27:9, 162:17, 162:18

**non** [21] - 25:15, 25:18, 26:11, 26:21, 28:14, 29:2, 29:14, 29:20, 30:20, 56:21, 77:15, 101:6, 117:17, 132:16, 132:17, 133:23, 135:15, 137:11, 151:3, 151:5, 179:22

**non-discouragement** [1] - 179:22

**non-guaranteed** [20] - 25:15, 25:18, 26:11, 26:21, 28:14, 29:2, 29:14, 29:20, 30:20, 56:21, 77:15, 101:6, 117:17, 132:16, 132:17, 133:23, 135:15, 137:11,

151:3, 151:5

**none** [1] - 162:9

**normal** [13] - 99:10, 99:16, 99:19, 99:20, 105:14, 105:19, 105:22, 106:1, 106:4, 106:7, 106:9, 106:13, 106:19

**normally** [4] - 94:14, 109:10, 168:13, 168:15

**nos** [1] - 4:12

**Notary** [3] - 1:22, 189:5, 189:17

**note** [6] - 70:10, 114:11, 129:8, 149:18, 155:12, 162:4

**noted** [1] - 87:5

**notes** [1] - 163:21

**nothing** [11] - 46:3, 46:4, 46:15, 83:14, 119:23, 132:22, 133:8, 138:1, 162:20, 185:5

**notice** [5] - 67:6, 93:1, 94:2, 123:22

**Notice** [2] - 186:12, 191:3

**noticed** [2] - 69:8, 71:16

**notification** [1] - 162:17

**noting** [1] - 177:1

**November** [7] - 82:23, 83:3, 88:2, 88:16, 150:20, 186:20, 191:12

**number** [36] - 14:1, 19:2, 20:9, 20:10, 23:12, 27:14, 32:4, 38:10, 39:11, 41:15, 57:19, 67:7, 70:15, 74:5, 74:6, 75:19, 77:3, 79:17, 79:20, 80:3, 80:18, 87:14, 108:19, 111:6, 117:18, 128:21, 129:22, 142:17, 145:7, 148:15, 167:20, 174:14, 174:17, 174:23, 175:16

**Number** [9] - 1:10, 14:19, 16:9, 38:2, 42:10, 42:12, 141:14, 160:16, 174:3

**numbers** [10] - 63:3, 64:12, 81:17, 91:14, 93:6, 108:21, 114:10, 117:6, 118:21, 170:20

numerous [6] - 50:23, 52:17, 57:3, 74:20, 158:16, 158:18

**NY** [2] - 3:2, 3:15

## O

**O'Dell** [2] - 180:11, 180:12

**Oaks** [1] - 60:21

**Ober** [5] - 110:16, 110:17, 111:12, 140:1, 146:11

**object** [12] - 14:7, 21:18, 34:8, 35:15, 36:13, 55:1, 55:16, 74:16, 96:9, 99:18, 101:16, 167:21

**objection** [14] - 63:17, 64:4, 69:1, 77:17, 118:6, 119:15, 121:16, 135:23, 154:1, 155:8, 155:12, 157:14, 168:5, 182:6

**obligation** [1] - 165:20

**obvious** [2] - 81:10, 132:11

**obviously** [12] - 30:13, 55:12, 80:9, 94:13, 95:9, 96:13, 107:20, 110:14, 137:21, 138:3, 147:16, 164:15

**occur** [3] - 75:6, 163:19, 164:15

**occurred** [2] - 84:13, 92:22

**October** [34] - 1:20, 40:4, 51:23, 61:21, 79:7, 79:10, 85:9, 87:3, 92:7, 101:8, 126:4, 128:1, 131:18, 149:15, 156:3, 158:11, 185:11, 185:14, 185:20, 185:22, 186:1, 186:18, 186:19, 186:22, 187:1, 190:4, 190:7, 190:13, 190:15, 190:16, 191:9, 191:10, 191:13, 191:15

**OF** [3] - 1:4, 189:1, 189:3

**offering** [2] - 60:8, 184:1

**office** [1] - 173:14

**offices** [1] - 11:16

**offset** [2] - 67:19,

75:22

**often** [6] - 11:5, 28:17, 131:10, 136:17, 174:4, 174:16

**Ohio** [2] - 7:9, 8:5

**OJM** [9] - 1:12, 5:18, 6:5, 6:7, 178:9, 180:3, 180:10, 180:12

**old** [2] - 171:3, 171:5

**older** [3] - 171:2, 171:6, 171:8

**once** [3] - 8:21, 89:19, 127:8

**one** [70] - 13:11, 13:13, 13:15, 14:2, 18:18, 18:22, 19:4, 19:5, 23:12, 32:19, 34:15, 35:18, 37:19, 40:14, 53:6, 55:23, 63:22, 71:14, 75:14, 77:20, 79:3, 79:10, 80:3, 84:21, 84:23, 85:6, 85:12, 87:12, 88:3, 88:7, 94:9, 98:20, 101:17, 108:20, 111:3, 113:3, 113:23, 122:12, 132:2, 135:20, 136:11, 136:16, 137:21, 140:16, 140:17, 148:7, 151:14, 154:6, 155:13, 155:15, 157:9, 159:21, 159:22, 160:6, 165:13, 165:17, 165:18, 167:19, 168:15, 168:17, 170:10, 170:12, 171:13, 171:18, 171:21, 172:4, 172:13, 172:21, 181:23

**one-tenth** [1] - 18:18

**onerous** [1] - 67:16

**ones** [6] - 7:17, 8:11, 36:17, 60:23, 61:2, 137:19

**operate** [1] - 51:9

**operating** [1] - 6:8

**opining** [1] - 104:6, 104:7

**opinion** [3] - 52:11, 182:21, 182:22

**opportunities** [2] - 131:16, 179:5

**opportunity** [4] - 45:15, 136:22, 147:2, 147:23

**opposed** [3] - 9:10,

117:20, 125:13

**opted** [2] - 27:23, 83:5

**optimal** [1] - 182:21

**option** [8] - 75:19, 80:18, 87:1, 106:6, 111:7, 151:6, 181:22

**Option** [4] - 67:8, 67:16, 69:22

**options** [26] - 48:6, 57:17, 57:18, 57:22, 67:4, 67:7, 68:12, 73:10, 74:21, 77:19, 77:21, 78:1, 82:14, 82:16, 86:23, 97:13, 101:11, 110:22, 111:2, 111:3, 117:9, 118:9, 118:14, 120:15, 131:17, 156:17

**orally** [1] - 106:20

**order** [5] - 37:9, 68:19, 105:5, 105:9, 141:22

**original** [20] - 19:13, 19:19, 19:20, 20:20, 21:4, 53:21, 71:5, 90:10, 93:5, 104:7, 112:13, 117:6, 117:20, 147:17, 161:5, 162:5, 168:14, 176:5

**originally** [13] - 19:11, 20:3, 20:22, 57:1, 72:10, 90:18, 93:8, 104:16, 125:14, 130:18, 138:23, 156:11, 165:22

**orphan** [1] - 162:7

**orthopedic** [2] - 11:22, 15:13

**otherwise** [3] - 101:23, 116:3, 174:22

**Outline** [2] - 185:12, 190:5

**outside** [1] - 9:13

**outstanding** [2] - 58:8, 194:2

**overall** [1] - 103:19

**overhead** [1] - 28:23

**override** [1] - 173:5

**owe** [1] - 140:10

**own** [1] - 142:16

**owner** [3] - 9:5, 10:16, 145:16

**owners** [1] - 9:7

**ownership** [1] - 94:17

**owns** [1] - 173:5

## P

**P-A-N-Z-E-R** [1] - 173:18
**p.m** [9] - 78:4, 124:23, 125:5, 129:3, 166:10, 166:15, 181:17, 184:7, 188:9
**Page** [3] - 141:14, 190:2, 193:2
**page** [40] - 19:1, 62:10, 66:4, 66:17, 70:4, 70:10, 70:14, 70:16, 87:20, 110:11, 114:12, 122:10, 122:13, 128:15, 128:18, 129:10, 129:20, 129:22, 141:15, 141:19, 142:2, 142:4, 147:11, 149:9, 149:23, 152:12, 160:18, 160:22, 162:3, 162:4, 167:7, 167:8, 167:9, 167:18, 174:8, 174:14, 179:6
**pages** [2] - 80:4, 122:17
**paid** [54] - 11:7, 56:11, 56:23, 67:17, 70:17, 70:21, 75:21, 89:10, 89:12, 90:1, 90:17, 91:17, 92:8, 92:13, 94:9, 96:20, 101:19, 103:7, 105:17, 107:6, 109:3, 109:6, 109:7, 109:8, 117:4, 117:5, 117:8, 118:18, 125:13, 127:8, 143:2, 143:6, 143:20, 145:7, 159:21, 163:14, 163:17, 165:18, 167:16, 170:4, 170:8, 170:19, 171:10, 171:16, 171:18, 171:21, 172:4, 172:6, 172:8, 172:13, 172:14, 173:22, 182:23
**Panzer** [2] - 138:10, 173:18
**paragraph** [16] - 50:5, 58:20, 65:6, 66:16, 67:3, 67:4, 68:5, 79:15, 80:2, 83:8, 87:7, 90:22, 128:3, 148:18, 149:10, 160:22
**part** [8] - 20:4, 89:14,

95:18, 95:22, 106:11, 117:1, 158:15, 171:10
**part's** [1] - 24:23
**partial** [1] - 149:19
**particular** [8] - 24:22, 52:3, 58:23, 59:2, 110:9, 112:18, 136:9, 169:23
**partner** [1] - 13:7
**partners** [2] - 9:14, 178:23
**passed** [2] - 165:21, 181:8
**passing** [2] - 54:3, 54:7
**past** [1] - 112:12
**patent** [1] - 15:15
**path** [1] - 120:11
**pattern** [1] - 70:18
**Paul** [2] - 138:10, 173:18
**pay** [40] - 21:9, 26:16, 33:22, 35:7, 47:23, 53:17, 57:18, 57:19, 58:6, 64:22, 64:23, 67:14, 69:21, 72:20, 73:10, 89:8, 89:13, 93:14, 107:6, 109:19, 134:7, 134:10, 134:16, 139:4, 139:14, 141:5, 142:9, 144:7, 144:20, 145:11, 145:14, 147:15, 152:2, 152:23, 159:20, 159:21, 164:17, 171:12
**paying** [3] - 47:18, 64:17, 81:15
**payment** [15] - 89:17, 93:8, 93:21, 96:4, 96:7, 96:15, 123:17, 124:1, 125:19, 127:1, 127:4, 142:4, 165:13, 168:20, 170:13
**payments** [17] - 55:8, 89:5, 96:20, 96:23, 107:13, 123:5, 123:9, 124:5, 124:7, 124:9, 124:11, 124:13, 139:1, 165:16, 167:12, 170:9, 170:11
**payouts** [1] - 170:21
**pays** [4] - 90:6, 114:7, 173:6, 173:8
**penalty** [3] - 29:7, 51:12, 150:23
**pension** [2] - 41:18, 103:5
**people** [21] - 11:4,

11:13, 12:9, 18:13, 18:15, 18:19, 35:20, 35:22, 36:2, 36:8, 50:23, 52:2, 52:17, 52:22, 103:20, 104:6, 104:18, 136:16, 137:15, 165:9, 179:8
**people's** [1] - 160:23
**PEP** [4] - 177:22, 178:1, 188:3, 192:15
**per** [5] - 17:2, 19:22, 168:3, 168:20, 176:6
**percent** [28] - 17:5, 17:18, 17:21, 18:18, 18:19, 27:3, 27:20, 49:13, 80:8, 81:18, 90:11, 130:11, 130:17, 130:20, 130:21, 134:12, 134:23, 145:18, 152:4, 152:14, 152:17, 152:18, 152:23, 153:7, 170:5, 170:11, 175:16
**percentage** [6] - 170:7, 170:12, 170:19, 171:17, 172:9, 173:22
**perfect** [1] - 65:2
**performance** [8] - 89:15, 94:20, 117:2, 117:3, 119:13, 155:1, 156:8
**performing** [3] - 78:21, 156:11, 161:12
**perhaps** [1] - 133:8
**period** [20] - 10:2, 10:12, 32:6, 32:7, 32:9, 49:16, 73:12, 81:8, 88:12, 97:12, 110:2, 110:4, 115:9, 116:17, 138:20, 138:22, 153:17, 154:3, 177:9
**periodic** [1] - 42:2
**permanent** [1] - 157:5
**permanently** [1] - 163:7
**person** [2] - 13:9, 17:2
**persons** [1] - 163:23
**perspective** [3] - 96:17, 96:18, 124:3
**pharmaceutical** [1] - 10:22
**phone** [11] - 11:17, 11:19, 12:16, 15:4, 36:20, 43:4, 73:23, 74:6, 95:7, 151:12

**physically** [1] - 3:2
**physician** [1] - 10:15
**Physician** [1] - 7:22
**Physician's** [1] - 7:10
**physicians** [3] - 5:16, 6:9, 10:6
**picked** [3] - 11:19, 64:15, 116:10
**piece** [2] - 35:3, 104:9
**pieces** [2] - 35:16, 36:5
**Pine** [1] - 3:14
**place** [24] - 15:17, 29:12, 31:17, 53:22, 54:2, 54:6, 54:23, 60:3, 62:16, 81:8, 85:19, 86:9, 89:1, 92:11, 96:21, 105:6, 105:11, 115:9, 115:15, 115:20, 151:17, 164:22, 165:3
**placing** [2] - 35:4, 35:11
**plaintiff** [1] - 11:15
**Plaintiff's** [3] - 14:19, 16:9, 160:15
**Plaintiffs** [2] - 1:9, 2:4
**plaintiffs** [1] - 3:22
**Plan** [2] - 185:12, 190:5
**plan** [67] - 15:12, 15:23, 16:13, 16:16, 16:19, 17:7, 17:11, 17:14, 17:22, 18:4, 18:10, 18:23, 29:22, 34:19, 34:22, 35:14, 36:12, 37:9, 38:7, 38:8, 39:5, 39:15, 40:4, 40:5, 40:7, 42:22, 42:23, 43:6, 43:13, 43:17, 43:19, 47:15, 54:1, 55:10, 55:11, 55:12, 63:19, 96:20, 98:22, 101:15, 102:11, 102:13, 102:14, 102:17, 103:19, 104:8, 104:12, 104:14, 104:21, 105:4, 105:6, 105:9, 105:17, 105:20, 134:7, 134:11, 134:15, 134:16, 145:2, 145:5, 145:8, 145:14, 146:22, 147:22, 166:4, 167:1
**plane** [1] - 121:23

**planned** [2] - 70:16, 97:17
**planner** [5] - 6:22, 101:14, 101:18, 104:3
**planning** [18] - 14:5, 41:11, 41:20, 41:22, 52:18, 95:1, 95:3, 95:23, 96:18, 98:9, 98:16, 99:1, 102:5, 103:1, 103:3, 103:4, 103:12
**Plans** [2] - 186:4, 190:18
**plans** [6] - 18:14, 42:3, 42:4, 42:20, 93:18, 159:20
**play** [1] - 92:20
**playful** [1] - 12:2
**playfully** [1] - 12:18
**plenty** [1] - 15:18
**plus** [5] - 15:14, 75:22, 86:10, 161:5, 167:19
**point** [46] - 7:14, 10:18, 13:8, 13:10, 18:22, 19:15, 21:13, 21:16, 22:19, 22:22, 29:18, 39:16, 54:22, 71:10, 72:11, 80:23, 81:2, 84:2, 91:2, 93:20, 94:9, 100:23, 107:23, 110:10, 116:21, 132:10, 138:16, 139:14, 143:4, 143:21, 144:17, 146:8, 147:20, 150:8, 150:15, 151:21, 152:10, 155:23, 160:11, 162:6, 169:12, 174:5, 174:7, 174:17, 174:19, 175:14
**pointing** [1] - 88:13
**Polakoff** [14] - 14:10, 15:5, 34:20, 36:4, 43:15, 49:22, 58:17, 61:21, 79:8, 97:11, 131:18, 156:4, 158:11, 160:17
**Polakoff's** [1] - 160:20
**policies** [83] - 17:6, 19:3, 19:14, 19:16, 20:5, 22:22, 23:2, 23:13, 23:15, 23:21, 25:12, 25:19, 25:21, 26:4, 33:12, 33:21, 34:1, 34:6, 34:13, 34:14, 39:18, 40:6,

48:22, 49:12, 49:13,
50:17, 51:2, 51:16,
53:5, 53:7, 53:21,
53:22, 54:21, 55:8,
57:22, 58:3, 60:8,
64:3, 65:11, 65:14,
65:17, 68:8, 69:9,
72:21, 74:18, 75:1,
77:11, 78:10, 78:17,
78:21, 80:6, 93:2,
93:4, 93:8, 93:16,
93:18, 96:16, 98:12,
98:15, 123:6, 123:9,
127:7, 136:21,
137:18, 139:11,
155:5, 155:19,
155:21, 155:22,
156:9, 156:22,
158:14, 159:20,
171:21, 172:21,
176:17, 176:19,
177:2, 177:8, 177:9,
183:6
    **Policy** [9] - 2:12,
44:14, 185:17,
187:14, 187:19,
190:10, 192:3, 192:9
    **policy** [315] - 17:14,
19:8, 19:23, 20:1,
20:6, 20:20, 21:1,
21:7, 21:15, 21:22,
21:23, 22:5, 22:9,
22:15, 24:11, 24:12,
24:16, 24:17, 24:18,
24:22, 25:7, 25:15,
26:1, 27:12, 28:4,
29:13, 29:14, 29:17,
29:22, 30:2, 30:3,
30:6, 30:11, 30:23,
31:7, 31:8, 31:16,
31:18, 31:19, 31:23,
32:1, 32:2, 32:3,
32:10, 32:16, 32:22,
32:23, 33:3, 37:20,
38:9, 38:15, 38:20,
38:23, 43:20, 44:3,
44:6, 44:9, 44:16,
44:18, 44:22, 44:23,
45:3, 45:6, 45:7, 45:8,
45:16, 45:17, 46:1,
46:6, 46:13, 47:10,
47:13, 47:17, 47:22,
48:1, 48:7, 51:3, 51:4,
51:7, 51:9, 53:2, 53:3,
53:9, 53:11, 53:12,
53:14, 53:16, 54:2,
54:6, 54:10, 55:6,
55:14, 56:10, 56:12,
56:17, 57:5, 59:15,
59:17, 62:1, 62:3,
62:4, 62:7, 62:11,

62:12, 62:16, 62:19,
62:22, 63:9, 63:15,
63:19, 63:22, 64:20,
64:22, 65:20, 66:12,
66:21, 67:11, 68:10,
68:14, 68:19, 68:23,
69:5, 69:11, 69:13,
69:16, 69:18, 70:4,
70:13, 70:18, 70:22,
71:8, 71:16, 71:20,
72:4, 74:15, 76:9,
76:11, 76:13, 77:16,
78:14, 79:18, 79:23,
84:23, 85:16, 86:9,
86:23, 87:8, 90:11,
90:23, 91:2, 91:11,
92:11, 93:11, 93:22,
94:17, 94:20, 95:4,
95:6, 96:5, 96:7, 97:8,
97:14, 97:20, 98:6,
98:11, 99:4, 99:6,
99:7, 100:3, 100:20,
101:3, 107:2, 108:14,
109:13, 109:14,
109:15, 109:21,
110:21, 110:23,
112:7, 112:8, 112:9,
112:17, 112:20,
112:21, 113:12,
114:3, 115:8, 115:12,
117:17, 118:2, 118:3,
119:2, 119:13,
121:15, 121:18,
122:5, 123:15,
123:18, 125:19,
126:5, 126:7, 126:8,
126:16, 127:9,
127:12, 127:13,
127:16, 127:18,
127:19, 127:20,
128:7, 130:15,
131:15, 135:15,
135:21, 136:8, 137:7,
137:11, 137:12,
137:14, 139:1, 139:5,
139:22, 140:2, 140:6,
140:8, 140:12,
140:18, 141:1,
141:10, 142:7,
142:10, 143:1, 143:7,
143:8, 143:9, 143:12,
143:22, 143:23,
144:11, 144:14,
144:17, 144:18,
145:3, 145:5, 145:17,
145:19, 145:21,
146:6, 146:12,
146:15, 146:19,
147:4, 147:15,
148:20, 149:20,
151:1, 151:4, 151:17,

153:6, 159:1, 159:17,
160:9, 161:3, 161:6,
161:12, 162:21,
163:15, 163:20,
164:1, 164:5, 164:7,
164:8, 164:11,
164:13, 164:14,
164:15, 164:22,
165:2, 165:10,
166:18, 166:20,
166:23, 168:4, 168:9,
168:12, 168:14,
168:16, 168:20,
171:3, 173:10,
173:11, 174:23,
182:20, 183:11,
185:15, 185:19,
186:11, 190:8,
190:12, 191:2
    **policy's** [2] - 38:22,
72:8
    **poor** [4] - 156:7,
156:8, 156:10, 160:23
    **portion** [2] - 66:7,
141:23
    **position** [8] - 83:9,
86:8, 88:18, 88:21,
107:11, 116:20,
148:3, 153:12
    **possession** [1] -
133:2
    **possibility** [6] -
108:4, 131:15,
144:22, 144:23,
166:3, 175:18
    **possible** [32] - 16:16,
20:17, 20:18, 21:11,
22:11, 23:23, 32:8,
60:4, 67:22, 75:15,
75:17, 77:4, 84:12,
84:15, 86:4, 106:5,
110:6, 110:7, 112:19,
112:22, 112:23,
115:19, 115:22,
142:19, 147:18,
166:23, 168:2, 169:5,
169:7, 172:20, 176:2,
182:18
    **possibly** [4] - 13:14,
31:11, 55:10, 85:20
    **post** [1] - 164:3
    **potential** [5] - 11:12,
42:3, 42:4, 62:7,
71:20
    **potentially** [3] -
63:21, 68:14, 74:10
    **practice** [2] - 34:23,
44:8
    **practices** [1] - 44:7
    **Practicing** [1] - 7:21

**pre** [4] - 17:8, 36:19,
145:5, 146:5
    **pre-tax** [3] - 17:8,
145:5, 146:5
    **precise** [1] - 66:6
    **predicates** [1] -
92:17
    **predominantly** [1] -
5:16
    **preferred** [1] - 83:13
    **Preferred** [2] - 186:7,
190:21
    **premium** [51] - 20:3,
21:3, 28:22, 33:23,
35:7, 47:23, 53:16,
67:17, 69:22, 70:18,
72:19, 74:21, 75:20,
81:16, 89:4, 89:6,
90:11, 91:21, 93:7,
94:1, 96:23, 101:20,
101:23, 114:8, 117:8,
125:18, 126:6, 127:1,
127:4, 130:21, 139:1,
141:19, 143:20,
144:21, 146:14,
146:18, 146:19,
156:19, 161:6,
165:13, 167:12,
168:20, 169:8,
170:13, 171:1,
171:11, 172:9,
172:11, 173:22, 182:8
    **Premium** [3] -
174:10, 185:18,
190:11
    **premiums** [37] -
19:21, 20:1, 21:5,
25:7, 38:8, 47:18,
53:18, 56:11, 56:12,
57:1, 58:5, 70:17,
70:21, 73:10, 89:18,
90:1, 90:2, 90:18,
92:8, 93:10, 96:4,
105:16, 123:20,
125:13, 134:9, 139:4,
144:7, 147:1, 164:17,
164:18, 167:16,
167:20, 168:3, 170:8,
170:18, 170:20, 172:4
    **prepare** [1] - 91:5
    **prepared** [1] - 40:9
    **Prepared** [1] -
174:11
    **preparing** [1] - 184:9
    **presence** [2] - 3:2,
189:10
    **present** [2] - 1:17,
13:18
    **PRESENT** [1] - 2:11
    **presented** [6] -

12:10, 16:5, 43:1,
101:11, 132:15, 151:5
    **preserve** [2] - 21:10,
158:14
    **preserved** [1] - 21:16
    **preserving** [1] -
20:18
    **presume** [1] - 180:6
    **pretty** [3] - 11:18,
80:13, 119:20
    **previous** [17] -
34:15, 37:19, 40:23,
44:21, 47:10, 50:19,
53:7, 56:22, 87:22,
88:2, 94:23, 98:10,
98:20, 111:4, 113:22,
120:13, 180:6
    **previously** [19] -
65:10, 83:21, 87:4,
88:8, 113:13, 125:8,
135:3, 138:14,
146:10, 148:14,
151:4, 152:8, 152:14,
157:8, 159:16,
166:18, 181:21,
182:7, 183:5
    **primarily** [2] - 10:5,
10:7
    **primary** [1] - 134:14
    **Principal** [1] - 2:12
    **principals** [1] -
180:16
    **printout** [3] - 177:7,
185:10, 190:3
    **problem** [19] - 12:9,
27:15, 27:20, 51:1,
51:13, 51:15, 51:17,
51:21, 52:6, 55:23,
66:23, 67:1, 69:9,
71:16, 71:20, 75:10,
77:22, 111:19, 119:19
    **problems** [3] - 78:14,
78:16, 158:12
    **Procedure** [1] - 1:19
    **proceed** [1] - 107:16
    **proceedings** [3] -
189:7, 189:9, 189:11
    **proceeds** [1] - 67:13
    **process** [2] - 35:6,
158:2
    **produce** [2] - 72:23,
194:7
    **produced** [4] -
158:20, 160:19,
184:17, 185:1
    **producers** [1] - 60:6
    **product** [100] -
24:22, 24:23, 26:9,
26:10, 26:11, 26:17,
26:20, 26:21, 27:16,

27:19, 27:22, 27:23, 28:1, 28:10, 28:13, 28:14, 28:21, 29:2, 29:19, 29:20, 38:12, 38:13, 51:18, 52:9, 52:15, 52:16, 54:11, 55:21, 56:21, 58:22, 59:11, 60:10, 82:10, 82:12, 82:20, 82:22, 83:2, 87:6, 87:11, 87:16, 88:1, 88:5, 88:6, 88:20, 99:13, 101:5, 101:16, 103:16, 107:9, 107:17, 107:22, 108:19, 112:18, 113:15, 113:16, 115:16, 115:18, 115:19, 115:20, 116:7, 116:13, 116:14, 116:21, 118:20, 118:23, 119:1, 119:5, 119:8, 119:12, 119:21, 120:8, 130:23, 131:8, 131:11, 131:12, 132:9, 134:19, 134:22, 135:5, 135:7, 135:12, 136:10, 136:19, 136:20, 137:20, 138:6, 146:1, 151:14, 152:6, 152:19, 153:10, 153:23, 171:13, 171:14, 175:13, 183:22

**production** [1] - 27:4
**products** [31] - 14:15, 27:7, 27:9, 28:7, 28:17, 51:13, 52:7, 52:19, 54:17, 55:23, 57:21, 59:4, 60:22, 61:5, 88:9, 116:7, 131:9, 131:22, 131:23, 132:10, 133:11, 135:19, 136:3, 154:4, 154:5, 154:6, 154:8, 154:13, 154:17, 156:23, 184:1
**professional** [1] - 178:4
**profit** [2] - 34:19, 34:22
**program** [2] - 44:7, 89:20
**projected** [3] - 23:18, 79:16, 121:21
**projecting** [1] - 74:18
**projections** [2] -

81:10, 117:7
**projects** [1] - 68:3
**promise** [1] - 26:13
**promote** [2] - 8:23, 9:13
**promoting** [1] - 11:2
**proper** [2] - 6:22, 107:1
**property** [1] - 181:3
**proposal** [2] - 104:8, 104:20
**protect** [1] - 74:22
**Protection** [7] - 7:8, 7:10, 7:11, 8:4, 8:7, 8:8, 8:9
**protection** [2] - 10:15, 42:20
**provide** [6] - 7:13, 16:12, 23:22, 29:17, 57:9, 137:10
**provided** [8] - 6:16, 9:20, 25:7, 73:6, 129:17, 133:7, 168:9, 184:14
**providers** [1] - 177:16
**provides** [1] - 126:19
**providing** [1] - 10:20
**provisions** [1] - 179:20
**prudent** [1] - 80:9
**Public** [3] - 1:22, 189:5, 189:17
**public** [1] - 8:23
**publications** [6] - 7:2, 7:5, 7:14, 8:16, 13:11, 13:12
**publish** [1] - 9:12
**published** [4] - 7:2, 8:2, 8:10, 8:13
**Publishing** [5] - 5:9, 8:22, 9:4, 9:10, 9:12
**pull** [1] - 156:6
**pulled** [2] - 141:12, 147:5
**purchase** [16] - 19:20, 34:23, 38:15, 59:16, 63:19, 68:3, 76:8, 76:13, 104:23, 119:4, 126:16, 126:23, 127:4, 127:14, 164:3
**purchased** [28] - 17:7, 17:9, 19:12, 22:22, 24:12, 26:18, 30:2, 30:6, 31:20, 43:20, 44:3, 47:10, 47:14, 55:8, 72:4, 83:3, 103:16, 115:13, 115:17, 125:11,

126:7, 137:7, 140:2, 140:13, 143:1, 164:5, 165:10
**purchases** [1] - 61:22
**purchasing** [1] - 23:1
**purports** [1] - 177:7
**purpose** [4] - 60:23, 133:11, 134:14, 136:19
**purposes** [21] - 8:16, 17:15, 22:7, 27:18, 27:21, 28:11, 44:15, 45:6, 61:8, 116:3, 116:9, 116:12, 130:4, 134:1, 135:13, 138:13, 138:20, 140:21, 149:7, 181:21, 182:10
**pursuant** [4] - 1:19, 3:2, 3:15, 96:20
**pursue** [2] - 77:19, 78:1
**put** [50] - 15:12, 18:7, 31:17, 57:6, 73:2, 90:14, 95:21, 97:14, 97:18, 97:23, 101:23, 102:12, 104:15, 104:19, 105:11, 106:9, 115:8, 115:20, 120:17, 121:12, 127:18, 130:20, 145:2, 145:4, 145:9, 145:19, 146:4, 146:14, 146:17, 146:18, 146:20, 147:3, 147:19, 147:23, 150:8, 151:17, 158:4, 164:22, 169:4, 169:8, 171:12, 175:22, 176:1, 181:22, 182:22, 182:23, 184:19
**putting** [5] - 35:3, 97:17, 105:6, 156:18, 165:2

**Q**

**Qualified** [2] - 186:4, 190:18
**questions** [7] - 4:9, 4:18, 34:10, 42:11, 44:21, 56:19, 155:10
**quick** [1] - 142:14
**quite** [7] - 7:2, 27:6, 50:9, 101:20, 120:4, 141:3, 151:11

126:7, 137:7, 140:2, 140:13, 143:1, 164:5, 165:10

**R**

**radar** [1] - 88:15
**raised** [4] - 62:6, 80:7, 140:4, 154:22
**ramifications** [1] - 106:5
**ran** [4] - 27:14, 32:7, 48:4, 88:2
**Rand** [1] - 2:2
**random** [2] - 64:14, 64:16
**randomly** [1] - 87:21
**rang** [2] - 11:17, 74:6
**range** [6] - 26:4, 26:6, 31:12, 135:6, 175:7, 175:9
**rate** [7] - 25:23, 26:23, 58:3, 70:22, 156:14, 171:18, 175:16
**rated** [1] - 59:20
**rates** [13] - 25:20, 26:15, 27:8, 52:8, 56:1, 56:22, 70:17, 72:8, 74:19, 80:11, 80:15, 81:9, 108:22
**rather** [4] - 12:18, 67:15, 83:16, 95:16
**rationale** [4] - 79:18, 79:22, 80:2, 80:14
**RAYMOND** [4] - 1:1, 1:17, 3:14, 193:3
**reach** [3] - 102:6, 179:10, 181:9
**reached** [2] - 175:12, 179:12
**read** [10] - 12:6, 12:14, 14:21, 40:14, 58:15, 67:4, 80:1, 102:9, 142:16, 152:11
**reading** [1] - 124:3
**real** [1] - 30:9
**realized** [1] - 69:21
**realizing** [1] - 161:10
**really** [10] - 24:8, 35:17, 41:18, 116:11, 120:12, 125:16, 146:2, 159:4, 160:21, 175:3
**reason** [12] - 4:15, 30:1, 30:4, 89:14, 90:12, 116:13, 124:4, 129:13, 132:13, 151:16, 178:21, 182:4
**reasonable** [1] - 158:15
**reasonably** [1] - 18:3
**reasons** [4] - 25:16, 84:21, 125:17, 135:20

**recalculate** [2] - 67:23, 77:6
**receive** [7] - 9:14, 9:15, 45:23, 69:6, 70:8, 78:9, 173:22
**received** [5] - 6:23, 39:3, 50:14, 140:5, 175:19
**recent** [1] - 114:1
**recently** [2] - 12:11, 12:19
**recess** [4] - 65:7, 78:4, 166:15, 181:17
**recharacterize** [1] - 17:19
**recognize** [2] - 33:16, 122:20, 161:18
**recollect** [2] - 31:5, 171:23
**recollection** [22] - 13:17, 27:10, 33:1, 74:12, 76:7, 78:13, 78:20, 81:5, 86:2, 97:20, 98:2, 107:5, 138:21, 150:6, 151:7, 161:22, 169:17, 172:19, 172:22, 175:1, 175:6, 176:9
**recommend** [8] - 88:13, 120:21, 120:22, 121:4, 121:5, 121:6, 121:8
**recommendation** [2] - 96:6, 99:12
**recommendations** [4] - 74:22, 81:12, 81:13, 89:7
**recommended** [11] - 61:1, 61:3, 88:10, 88:11, 89:5, 89:8, 92:19, 93:13, 105:17, 117:8, 120:19
**record** [29] - 45:2, 58:7, 72:22, 76:21, 78:2, 114:11, 122:11, 122:12, 122:14, 124:8, 124:22, 124:23, 125:4, 125:5, 125:6, 129:3, 133:13, 136:2, 166:7, 166:10, 166:11, 174:9, 181:16, 181:18, 184:6, 184:7, 194:1, 194:6, 194:9
**records** [3] - 95:13, 96:7, 138:10
**reduce** [20] - 15:10, 15:20, 15:22, 21:9, 21:15, 22:10, 22:14, 22:15, 39:16, 67:9,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

03/22/2022 12:51:11 PM

67:22, 77:5, 111:2, 111:6, 123:10, 134:15, 134:22, 143:13, 146:12
**reduced** [8] - 19:16, 54:22, 67:11, 89:14, 144:17, 144:19, 169:15, 189:10
**reducing** [3] - 22:3, 105:3, 144:18
**reduction** [6] - 75:11, 112:10, 123:4, 143:4, 143:9, 169:16
**refer** [6] - 39:14, 44:15, 45:5, 113:21, 133:14
**reference** [2] - 149:5, 150:2
**referenced** [2] - 114:14, 150:5
**referencing** [1] - 101:8
**referred** [4] - 170:6, 174:5, 174:17, 183:5
**referring** [3] - 24:8, 133:15, 174:8
**refers** [1] - 113:23
**reflect** [1] - 175:1
**reflected** [1] - 94:18
**reflecting** [2] - 71:2, 72:15
**refresh** [1] - 175:1
**regard** [28] - 20:19, 33:2, 42:12, 45:7, 45:19, 46:1, 53:10, 62:6, 63:14, 69:5, 70:3, 78:9, 78:21, 101:10, 103:18, 105:3, 112:21, 113:14, 125:8, 143:12, 159:17, 163:19, 166:19, 169:13, 171:15, 173:10, 176:16, 177:7
**regarding** [4] - 42:3, 58:10, 62:2, 194:4
**regardless** [3] - 26:14, 153:21
**regards** [1] - 40:19
**registered** [1] - 6:8
**regulations** [1] - 167:14
**reigning** [1] - 21:10
**reiterate** [1] - 182:3
**relate** [1] - 74:14
**related** [4] - 10:17, 43:19, 44:8, 94:19
**relates** [1] - 46:5
**relation** [2] - 95:1, 139:21

**relationship** [1] - 14:14
**relative** [8] - 18:5, 27:1, 44:2, 51:15, 53:5, 68:2, 105:4, 146:15
**relatively** [3] - 42:22, 43:15, 103:8
**relaying** [1] - 76:19
**releasing** [1] - 183:23
**remain** [1] - 142:11
**remainder** [1] - 143:5
**remember** [39] - 11:18, 13:13, 13:15, 14:3, 14:8, 14:10, 32:7, 49:10, 60:20, 63:10, 64:11, 69:20, 71:18, 75:14, 76:3, 76:6, 76:17, 78:18, 81:18, 86:1, 89:21, 92:23, 93:23, 94:7, 94:8, 98:18, 98:20, 98:23, 101:2, 118:7, 118:15, 132:11, 134:20, 139:11, 140:14, 151:10, 167:18, 173:19, 173:20
**remotely** [1] - 3:4
**remove** [6] - 17:20, 93:11, 97:8, 134:6, 134:10, 139:16
**removing** [2] - 41:23, 97:8
**repeat** [1] - 55:2
**rephrase** [3] - 29:15, 66:9, 129:7
**Repicci** [50] - 11:15, 11:22, 13:21, 14:5, 15:14, 23:10, 39:9, 42:3, 42:17, 43:1, 47:5, 48:17, 49:6, 54:20, 55:6, 56:8, 57:7, 58:9, 71:2, 72:15, 73:6, 73:22, 76:19, 81:13, 85:17, 85:22, 86:17, 93:21, 95:16, 96:22, 102:6, 102:12, 103:17, 104:22, 105:2, 108:13, 111:4, 132:16, 133:7, 133:23, 137:10, 148:18, 149:22, 150:21, 151:6, 155:5, 155:17, 157:9, 157:11, 194:4
**REPICCI** [1] - 1:6,

1:7, 1:8
**Repicci's** [4] - 24:1, 53:11, 101:10, 154:21
**report** [1] - 189:7
**REPORTER** [2] - 3:1, 3:9
**representation** [1] - 184:23
**representative** [4] - 70:11, 73:9, 160:9, 162:6
**representing** [1] - 3:5
**represents** [1] - 174:22
**request** [2] - 76:22, 194:10
**Request** [2] - 187:19, 192:9
**requests** [1] - 184:20
**require** [3] - 36:1, 58:4, 65:21
**required** [3] - 53:16, 106:12, 145:14
**requirements** [1] - 59:7
**resolution** [2] - 179:11, 179:12
**responding** [1] - 66:11
**response** [5] - 12:6, 53:5, 63:1, 112:16, 162:2
**responsible** [1] - 35:10
**rest** [1] - 173:8
**restrictions** [1] - 120:23
**result** [2] - 15:17, 95:9
**retain** [1] - 168:12
**retirement** [22] - 15:9, 15:12, 15:23, 16:19, 17:7, 17:11, 17:14, 17:19, 18:14, 29:22, 38:15, 40:7, 54:1, 102:17, 105:4, 134:7, 145:5, 145:8, 145:14, 147:22, 167:1
**return** [4] - 28:19, 139:2, 139:6, 156:15
**returns** [1] - 67:6
**review** [13] - 14:20, 24:5, 31:14, 33:15, 41:5, 61:13, 77:10, 81:20, 86:13, 113:6, 122:19, 139:5, 184:10
**reviewed** [4] - 23:6, 38:2, 184:12, 184:13
**revisited** [1] - 107:19

**REVKIN** [1] - 2:11
**Rhode** [1] - 5:1
**RICHARD** [1] - 2:1
**Richard** [2] - 3:21, 166:6
**risk** [5] - 28:12, 29:13, 30:5, 147:1, 171:7
**Risk** [7] - 5:21, 6:14, 7:12, 7:21, 178:13, 178:15, 178:18
**Risk's** [1] - 6:13
**risky** [3] - 28:13, 29:19
**rmoore@magavern .com** [1] - 2:4
**road** [1] - 158:13
**role** [5] - 34:12, 45:19, 45:21, 102:22, 102:23
**rough** [1] - 125:15
**roughly** [3] - 26:19, 125:14, 127:8
**routinely** [1] - 89:17
**row** [1] - 66:22
**royalties** [1] - 9:14
**rule** [3] - 51:3, 135:18, 150:10
**rules** [3] - 148:19, 148:23, 150:9
**Rules** [1] - 1:19
**run** [4] - 24:13, 51:16, 137:9, 147:1, 154:4, 183:7
**running** [2] - 48:3, 147:2

**S**

**sad** [1] - 56:7
**sale** [1] - 159:8
**save** [3] - 17:20, 36:3, 134:11
**saving** [3] - 36:6, 49:3, 54:2
**savings** [5] - 38:14, 93:17, 116:14, 116:18, 120:11
**saw** [4] - 12:11, 51:20, 85:6, 151:10
**scenario** [5] - 62:12, 63:9, 80:20, 84:15, 131:20
**schedules** [1] - 72:20
**school** [1] - 5:10
**SCHWARTZBERG** [1] - 2:6
**science** [3] - 4:23, 180:22, 181:4

**Scott** [1] - 110:18
**searches** [1] - 100:21
**sec** [1] - 79:3
**second** [19] - 19:5, 39:12, 40:14, 43:19, 44:2, 44:21, 44:22, 58:20, 66:4, 69:13, 93:14, 112:8, 112:9, 147:11, 152:2, 152:10, 152:14, 159:1, 160:18
**secondary** [5] - 25:5, 26:12, 28:19, 136:17, 179:4
**Secrets** [2] - 7:7, 7:18
**section** [2] - 66:5, 70:20
**securing** [1] - 87:1
**see** [29] - 8:8, 24:5, 24:18, 43:23, 58:8, 66:19, 66:22, 67:2, 67:19, 69:4, 77:3, 80:1, 87:19, 89:17, 95:10, 96:8, 110:22, 111:20, 113:6, 122:16, 132:4, 149:6, 150:22, 152:1, 154:3, 160:2, 160:5, 176:12, 194:3
**seeing** [3] - 13:5, 49:6, 167:18
**seek** [1] - 9:1
**seeking** [1] - 123:3
**seem** [7] - 20:12, 50:15, 50:21, 69:15, 95:14, 119:16
**sell** [1] - 178:18
**selling** [4] - 14:12, 23:2, 46:13, 163:16
**send** [7] - 36:21, 37:4, 37:5, 37:12, 72:14, 72:17, 76:23
**sending** [3] - 13:10, 50:1, 88:4
**sense** [5] - 63:23, 72:2, 80:10, 139:17, 163:8
**sent** [19] - 13:14, 23:9, 39:6, 43:4, 57:15, 72:19, 74:11, 74:13, 76:18, 81:16, 98:16, 133:9, 133:12, 148:9, 165:4, 165:7, 168:14, 168:16, 183:22
**sentence** [6] - 39:12, 50:4, 50:5, 58:20, 84:16, 128:4

separate [1] - 63:8
separately [1] - 63:7
separation [1] - 9:17
serve [1] - 60:23
service [6] - 161:1, 161:11, 163:1, 163:4, 163:6, 163:8
services [3] - 9:19, 9:22, 10:20
Servicing [2] - 188:8, 192:19
servicing [2] - 159:9, 160:10
set [2] - 65:21, 143:6
sets [1] - 67:16
setting [1] - 97:9
settled [1] - 179:13
settlement [2] - 179:15, 179:21
seven [5] - 13:3, 15:13, 39:11, 144:20, 171:12
seventh [1] - 167:8
shape [2] - 155:23, 156:1
share [3] - 106:15, 106:16, 180:13
sharing [2] - 34:19, 34:22
Sherman [1] - 60:21
shift [1] - 63:21
shop [1] - 137:14
short [2] - 63:21, 89:20
short-term [1] - 63:21
shortens [1] - 109:15
shorthand [1] - 189:9
show [21] - 7:3, 14:18, 16:8, 31:13, 37:14, 38:1, 39:20, 40:12, 44:10, 46:21, 49:17, 58:12, 61:11, 68:8, 70:1, 81:19, 86:12, 110:8, 113:5, 122:8, 137:18
showed [11] - 27:19, 62:7, 62:11, 63:5, 63:9, 81:3, 96:3, 151:20, 183:13, 183:20
showing [11] - 23:4, 33:14, 41:4, 42:10, 43:23, 46:17, 48:11, 66:12, 113:19, 148:13, 152:21
shown [2] - 38:19, 38:20
shows [4] - 68:2,

131:6, 142:14, 167:12
shrinkage [1] - 91:20
side [2] - 116:10, 153:11
sidelines [1] - 179:8
signatures [1] - 35:6
significant [6] - 21:7, 29:7, 41:14, 53:13, 54:1, 125:18
significantly [6] - 17:15, 21:14, 29:1, 67:11, 176:4, 176:6
silly [1] - 12:2
similar [6] - 37:19, 69:14, 69:16, 79:18, 80:14, 118:23
simplistic [1] - 16:15
simply [4] - 59:16, 64:14, 104:22, 159:18
single [2] - 80:8, 105:20
situation [19] - 28:9, 35:14, 50:6, 52:9, 68:16, 83:15, 83:22, 86:11, 102:15, 103:2, 103:4, 105:15, 117:1, 120:2, 120:3, 136:9, 157:2, 157:13, 158:3
six [1] - 97:23
skip [1] - 98:2
slightly [1] - 125:20
small [3] - 6:17, 51:14, 170:12
smart [2] - 35:17, 36:2
smartest [2] - 35:18, 157:9
sneak [1] - 66:19
sneaking [1] - 69:8
societies [3] - 10:11, 10:13, 10:22
software [1] - 174:15
sold [7] - 5:21, 27:22, 34:14, 58:21, 171:3, 171:4, 178:15
solution [5] - 12:15, 16:4, 69:22, 103:5, 153:2
solutions [2] - 6:9, 6:17
solve [2] - 12:9, 111:19
someone [3] - 37:9, 104:2, 135:20
sometimes [8] - 74:3, 74:5, 74:6, 74:8, 74:9, 135:20
somewhat [1] - 129:16
somewhere [6] - 6:3,

58:1, 85:5, 87:20, 135:5, 175:9
son [2] - 13:5, 44:5
son-in-law [1] - 44:5
sophisticated [1] - 18:4
sorry [11] - 21:20, 31:15, 31:22, 40:15, 45:4, 92:4, 121:2, 128:17, 129:7, 136:14, 152:13
sort [3] - 18:8, 35:13, 102:12
sounds [1] - 88:9
Southlake [1] - 3:15
SPADAFORA [1] - 2:6
speakers [3] - 9:1, 9:13, 9:14
speaking [13] - 9:2, 9:15, 9:18, 10:3, 10:4, 11:21, 53:6, 80:5, 103:13, 127:11, 127:14, 136:7, 170:19
specializing [2] - 6:9, 6:10
specific [8] - 8:18, 13:16, 102:19, 103:2, 103:4, 122:10, 136:19, 177:15
specifically [5] - 20:19, 57:13, 62:18, 94:21, 133:6
speculation [1] - 94:9
spell [1] - 60:17
spend [2] - 28:22, 157:3
spending [3] - 49:11, 134:9, 182:13
spent [7] - 35:21, 36:4, 127:12, 144:10, 144:13, 152:20
split [1] - 161:7
SPLR [1] - 113:21
spoken [1] - 63:13
sponsoring [1] - 10:23
spot [3] - 146:3, 182:15, 182:21
spread [1] - 171:11
Square [1] - 2:2
ss [1] - 189:2
stages [1] - 182:1
stand [1] - 100:3
standpoint [2] - 28:12, 138:6
start [2] - 139:7, 178:13
started [12] - 5:8,

5:10, 5:17, 5:20, 6:1, 6:3, 12:18, 13:3, 20:9, 91:8, 111:17
state [14] - 8:4, 16:21, 59:6, 68:6, 73:5, 83:6, 83:7, 84:17, 87:7, 88:17, 153:2, 154:18, 160:22, 162:5
STATE [1] - 189:1
State [1] - 189:6
statement [23] - 21:17, 68:2, 68:11, 70:4, 70:7, 70:15, 80:17, 105:12, 121:3, 123:17, 127:17, 128:14, 129:9, 129:11, 129:18, 129:21, 130:1, 136:11, 136:16, 140:9, 150:6, 170:14, 180:7
Statement [8] - 187:21, 187:22, 188:5, 188:6, 192:10, 192:11, 192:17, 192:18
statements [4] - 69:6, 70:3, 70:14, 78:9
STATES [1] - 1:4
states [7] - 6:21, 50:16, 58:21, 66:17, 70:16, 77:18, 149:10
stating [1] - 38:17
status [2] - 100:19, 101:9
stay [2] - 82:15, 101:1
step [7] - 40:21, 43:13, 186:5, 190:19
step-by-step [3] - 40:21, 186:5, 190:19
steps [5] - 40:23, 68:16, 96:21, 106:3, 158:13
stick [1] - 142:3
still [11] - 6:7, 25:10, 26:16, 54:15, 63:15, 67:12, 71:6, 80:20, 92:10, 139:10, 176:7
stipulate [1] - 3:3
stipulation [1] - 3:17
stipulations [1] - 3:10
STONE [1] - 1:7
stop [1] - 4:9
stopped [1] - 161:9
stops [2] - 64:17
strange [1] - 119:17

strategy [1] - 67:12
strike [9] - 18:23, 34:3, 49:1, 53:4, 66:8, 69:2, 104:21, 113:11, 183:4
structure [5] - 135:8, 135:10, 165:16, 169:21, 170:1
struggle [1] - 30:9
stuck [2] - 146:21, 146:22
stuff [2] - 52:19, 111:22
subject [3] - 141:1, 144:6, 149:1
subjected [1] - 145:17
subsequent [3] - 5:5, 56:11, 75:8
subsequently [5] - 5:16, 17:8, 39:6, 134:17, 160:10
substantial [3] - 18:1, 18:13, 152:4
succeeded [1] - 114:19
Success [2] - 7:19, 7:23
successfully [1] - 134:13
sudden [1] - 140:9
suggested [1] - 145:12
suggests [1] - 33:22
suing [2] - 157:21, 158:1
SUL-2 [1] - 183:7
SUL-3 [2] - 115:12, 183:9
SUL-4 [1] - 174:10
SUL3 [1] - 114:3
SUL4 [1] - 113:17
SULLPR-4 [1] - 183:10
SULLPR2 [3] - 88:3, 152:7, 154:4
SULLPR3 [4] - 88:4, 113:20, 114:5, 154:4
SULLPR4 [2] - 131:6, 154:5
sum [2] - 57:19, 167:20
summary [1] - 106:19
super [3] - 27:7, 27:8, 92:1
supplied [1] - 192:21
supports [1] - 148:3
supposed [1] - 101:20

**surgeon** [2] - 11:23, 15:13
**surprise** [3] - 28:11, 57:2, 156:16
**surprised** [8] - 108:23, 155:5, 155:17, 155:20, 156:13, 156:20, 157:4, 157:6
**surrender** [30] - 21:7, 38:18, 50:17, 51:5, 51:6, 51:8, 51:11, 51:14, 51:19, 52:6, 52:12, 56:3, 75:9, 75:17, 84:4, 116:2, 128:5, 128:6, 130:15, 135:13, 135:19, 141:4, 147:6, 148:10, 148:21, 149:19, 152:1, 152:3, 152:5, 169:9
**surrendered** [1] - 140:8
**swear** [1] - 3:3
**switch** [1] - 129:15
**sworn** [1] - 3:16

---

**T**

**table** [2] - 111:7, 117:7
**talks** [1] - 150:22
**target** [24] - 22:4, 170:6, 170:7, 170:10, 170:18, 170:19, 171:1, 171:2, 171:7, 171:11, 171:16, 171:17, 171:23, 172:2, 172:5, 172:6, 172:8, 172:9, 172:14, 172:19, 174:4, 174:23, 175:12
**tax** [75] - 14:9, 15:23, 17:5, 17:8, 17:15, 17:23, 20:15, 20:17, 21:9, 22:8, 22:10, 27:18, 27:21, 27:23, 28:10, 34:20, 35:2, 38:14, 42:1, 48:4, 54:1, 61:8, 63:20, 67:15, 82:12, 83:4, 83:5, 85:16, 85:18, 86:10, 89:20, 92:22, 93:15, 93:17, 102:18, 102:22, 103:21, 104:6, 104:17, 105:3, 111:5, 116:2, 116:8, 116:12, 116:14, 116:18, 117:11, 120:10, 121:13,

133:23, 134:7, 134:16, 135:7, 135:10, 135:13, 138:6, 138:13, 138:15, 138:20, 139:2, 139:6, 144:6, 145:5, 145:9, 145:18, 146:5, 147:15, 153:18, 166:21, 167:15, 169:10, 182:10
**tax-free** [1] - 67:15
**tax-wise** [1] - 166:21
**taxable** [2] - 41:14, 183:2
**taxation** [1] - 61:8
**taxed** [3] - 16:20, 16:21, 17:11
**taxes** [21] - 15:10, 15:21, 16:21, 17:13, 17:20, 36:3, 36:7, 67:16, 103:3, 103:18, 116:23, 134:10, 134:11, 134:23, 144:6, 145:15, 152:20, 152:23, 153:8, 153:11
**teach** [1] - 10:23
**team** [2] - 35:19, 50:23
**Technical** [2] - 188:4, 192:16
**TEFRA** [1] - 146:13
**TELECONFERENCE** [1] - 1:1
**teleconference** [1] - 1:16
**ten** [1] - 36:20
**tenth** [1] - 18:18
**term** [10] - 29:9, 29:11, 63:21, 74:23, 91:15, 136:6, 157:5, 174:7, 174:19, 182:12
**terms** [9] - 4:12, 16:15, 28:4, 96:15, 103:14, 104:1, 106:11, 113:10, 125:21
**terrible** [2] - 144:23, 146:3
**testified** [14] - 3:17, 78:8, 83:22, 107:19, 116:1, 132:14, 135:3, 135:17, 140:15, 159:3, 159:15, 166:19, 175:11, 180:19
**testify** [2] - 65:11, 65:13
**testimony** [4] -

119:11, 178:4, 183:9, 183:18
**tests** [1] - 181:8
**Texas** [2] - 1:18, 3:15
**that'd** [1] - 184:21
**that'll** [1] - 137:19
**THE** [37] - 1:7, 1:8, 3:1, 3:9, 14:8, 21:19, 34:9, 35:16, 36:14, 55:2, 55:17, 63:18, 64:5, 65:8, 74:17, 77:18, 96:10, 97:7, 99:19, 101:17, 118:7, 119:16, 128:23, 129:2, 129:4, 136:1, 149:13, 154:2, 155:9, 155:13, 157:15, 166:13, 167:23, 168:6, 182:7, 183:17, 185:8
**themselves** [2] - 34:6, 173:8
**there'd** [1] - 91:18
**thinking** [4] - 55:18, 102:10, 108:17, 132:8
**third** [9] - 60:20, 83:8, 87:7, 90:22, 93:21, 129:9, 129:10, 129:20, 149:10
**thirds** [7] - 90:9, 90:17, 90:20, 91:7, 91:15, 92:3, 125:15
**thousand** [1] - 91:13
**three** [57] - 4:6, 12:7, 12:8, 19:22, 19:23, 20:23, 21:14, 32:9, 32:11, 32:15, 32:17, 32:21, 32:22, 32:23, 38:10, 60:15, 66:22, 67:20, 67:21, 67:22, 75:20, 77:4, 77:5, 84:18, 84:20, 85:4, 91:5, 91:6, 91:10, 91:12, 91:17, 91:23, 93:9, 116:23, 138:15, 138:19, 138:23, 139:5, 139:6, 142:7, 142:9, 142:12, 142:13, 142:15, 142:23, 143:2, 151:19, 153:15, 153:17, 153:23, 154:4, 154:12, 161:10, 176:16, 176:19, 180:15, 183:18
**three-year** [2] - 32:23, 153:17
**threw** [1] - 93:6
**timeframe** [1] - 164:2

**timing** [2] - 49:10, 146:22
**titled** [3] - 68:6, 174:9, 177:22
**TO** [2] - 190:1, 193:1
**today** [10] - 17:1, 27:7, 27:9, 121:6, 121:11, 127:7, 127:12, 132:3, 158:19, 185:6
**today's** [3] - 25:20, 183:17
**together** [8] - 13:3, 13:8, 13:23, 14:16, 15:3, 35:3, 104:19, 161:7
**Tom** [1] - 13:5
**tone** [1] - 157:4
**took** [4] - 81:8, 89:1, 160:12, 181:7
**top** [3] - 19:2, 162:3, 167:8
**topics** [1] - 10:12
**total** [6] - 89:8, 90:2, 92:10, 143:3, 167:11, 170:7
**tours** [2] - 10:4, 10:5
**towards** [2] - 83:7, 91:4
**track** [1] - 71:12
**tracking** [1] - 96:14
**TRACY** [49] - 2:6, 3:7, 3:11, 14:7, 21:18, 34:8, 35:15, 36:13, 55:1, 55:16, 57:11, 63:17, 64:4, 66:2, 69:1, 73:2, 74:16, 76:23, 77:17, 78:3, 96:9, 97:5, 99:18, 101:16, 118:6, 119:15, 121:16, 122:14, 124:20, 128:21, 129:1, 135:23, 149:11, 149:15, 154:1, 155:2, 155:8, 155:12, 157:14, 166:9, 167:21, 168:5, 178:1, 182:6, 183:16, 184:21, 185:2, 185:4, 185:7
tracy.m@wssllp.com [1] - 2:8
**tradeoff** [1] - 29:8
**Traditional** [2] - 186:6, 190:20
**traditionally** [1] - 165:15
**transaction** [2] - 134:6, 165:7

**transfer** [1] - 38:22, 52:4
**Transfer** [2] - 186:8, 190:21
**transferred** [1] - 175:18
**trial** [1] - 179:13
**tried** [6] - 52:19, 55:21, 84:3, 114:19, 158:16
**trouble** [2] - 48:4, 48:5
**true** [9] - 131:12, 136:8, 136:18, 151:9, 164:7, 171:10, 171:22, 174:6, 182:8
**TRUST** [2] - 1:8, 1:8
**trust** [4] - 40:7, 67:14, 97:9, 145:16
**Trustee** [1] - 1:7
**try** [2] - 60:3, 114:21
**trying** [16] - 12:9, 12:13, 16:3, 29:21, 52:22, 91:19, 110:20, 111:19, 120:15, 138:18, 157:16, 157:19, 157:21, 158:8, 168:22, 184:4
**turn** [1] - 141:18
**tweaked** [1] - 93:7
**twice** [1] - 127:13
**two** [79] - 4:6, 5:20, 9:13, 9:17, 19:3, 19:14, 21:14, 34:21, 54:5, 56:2, 56:19, 59:8, 59:9, 59:11, 60:14, 61:4, 63:2, 66:22, 67:20, 67:21, 67:22, 70:2, 77:4, 77:5, 84:18, 84:19, 84:22, 85:4, 85:15, 85:19, 85:22, 90:9, 90:17, 90:20, 91:7, 91:15, 91:17, 91:21, 91:22, 92:2, 92:3, 93:10, 93:12, 101:10, 101:17, 104:1, 107:23, 112:17, 112:20, 113:22, 115:9, 116:6, 116:17, 121:7, 125:15, 127:7, 132:4, 132:8, 138:19, 139:10, 147:21, 148:11, 151:19, 153:14, 153:17, 153:23, 154:3, 154:12, 155:9, 167:2, 167:5, 177:2, 182:1
**two-thirds** [7] - 90:9,

90:17, 90:20, 91:7, 91:15, 92:3, 125:15

**two-year** [4] - 112:20, 115:9, 116:17, 154:3

**twofold** [2] - 53:23, 55:23

**type** [7] - 5:12, 6:6, 9:19, 18:10, 35:14, 136:22, 137:8

**typical** [1] - 136:21

**typically** [7] - 73:21, 73:23, 136:4, 140:16, 170:4, 170:6, 170:21

---

**U**

**UCLA** [1] - 5:2

**ugly** [1] - 179:6

**ultimate** [2] - 29:16, 143:3

**ultimately** [3] - 22:15, 83:17, 116:6

**uncharacteristically** [1] - 140:18

**uncomfortable** [1] - 114:17

**under** [17] - 23:17, 25:23, 31:17, 34:23, 54:11, 54:12, 56:10, 59:17, 62:11, 63:8, 65:19, 66:5, 73:3, 77:1, 167:14, 169:3, 189:10

**underfunded** [1] - 146:1

**understood** [2] - 56:9, 155:18

**undertake** [1] - 68:15

**underwriting** [7] - 16:4, 16:6, 28:7, 30:8, 35:6, 59:20, 110:19

**unfairly** [1] - 154:23

**unhappy** [2] - 50:8, 69:17

**unilaterally** [1] - 107:12

**UNITED** [1] - 1:4

**universal** [2] - 136:11, 136:15

**University** [1] - 5:1

**unless** [3] - 53:12, 53:13, 168:16

**unlikely** [2] - 67:10, 86:6

**unnecessary** [1] - 17:23

**unsurprisingly** [1] - 22:1

**unusual** [5] - 28:9,

---

113:2, 113:4, 136:20, 137:4

**up** [34] - 11:19, 54:7, 54:16, 62:20, 64:10, 66:19, 69:8, 71:11, 73:9, 74:2, 75:18, 79:22, 88:12, 89:16, 93:6, 93:17, 95:3, 96:13, 97:2, 97:9, 97:22, 98:5, 99:11, 99:16, 107:2, 107:7, 107:15, 108:2, 126:8, 136:17, 139:8, 160:23, 161:13, 169:9

**update** [3] - 16:3, 16:6, 128:21

**updated** [1] - 87:17

**upper** [1] - 174:11

**upset** [2] - 55:14, 56:17

**usual** [4] - 3:11, 3:12, 113:3, 165:16

**utilize** [1] - 177:13

**utilized** [1] - 166:4

---

**V**

**V-I-S-Y-S** [1] - 60:18

**vaguely** [2] - 73:14, 75:15

**valid** [2] - 92:16, 105:9

**valuation** [10] - 17:15, 92:23, 93:1, 93:3, 93:16, 93:18, 97:21, 97:22, 116:2, 116:8

**value** [59] - 20:11, 20:13, 20:18, 20:21, 21:1, 21:8, 21:20, 22:7, 22:15, 38:22, 51:11, 51:15, 54:21, 54:23, 55:4, 55:5, 55:7, 59:9, 60:10, 61:7, 90:20, 91:13, 116:2, 116:12, 125:17, 126:5, 126:13, 126:15, 128:7, 128:8, 128:15, 130:2, 130:5, 130:14, 134:8, 134:17, 135:13, 135:19, 136:20, 141:5, 142:10, 142:20, 143:9, 143:13, 144:1, 144:3, 144:17, 147:7, 147:8, 152:3, 152:5, 152:10, 169:9, 169:15, 183:2

**values** [7] - 19:11,

---

22:17, 39:12, 39:16, 123:4, 134:10, 143:5

**variance** [1] - 9:16

**varies** [1] - 171:13

**variety** [3] - 5:15, 25:16, 104:5

**various** [2] - 1:20, 125:17

**vary** [1] - 10:12

**verbally** [1] - 100:13

**verbatim** [1] - 189:8

**version** [1] - 174:15

**versus** [6] - 25:15, 25:17, 27:6, 30:20, 66:8, 79:15

**via** [3] - 2:5, 2:10, 3:17

**VIA** [1] - 2:11

**VIDEO** [1] - 1:1

**video** [1] - 3:17

**Video** [1] - 1:16

**view** [4] - 86:7, 102:22, 155:22, 160:14

**Virgin** [1] - 47:19

**visual** [1] - 40:5

**VISYS** [1] - 137:16

**Visys** [6] - 60:16, 60:18, 137:16, 138:10, 173:19, 177:18

**voted** [2] - 179:6, 180:14

**vs** [3] - 1:10, 186:7, 190:21

---

**W**

**wait** [6] - 83:20, 85:1, 102:21, 132:1, 147:1, 172:16

**waited** [1] - 83:22

**waiting** [2] - 148:5, 179:8

**waive** [1] - 51:18

**waiving** [2] - 56:3, 148:21

**walk** [3] - 18:8, 51:10, 163:6

**wants** [12] - 38:14, 39:1, 39:4, 52:10, 52:23, 55:19, 56:6, 80:12, 85:11, 109:6, 120:10

**warning** [2] - 117:23, 118:5

**warnings** [1] - 118:8

**wary** [1] - 59:20

**waste** [1] - 145:3

**wasting** [1] - 12:13

---

**ways** [5] - 15:8, 15:9, 15:22, 41:16, 57:20

**Wealth** [8] - 7:7, 7:8, 7:10, 7:11, 8:3, 8:7, 8:9

**wealth** [8] - 8:7, 42:4, 42:20

**week** [1] - 140:6

**WESTERN** [1] - 1:4

**Westwood** [1] - 11:16

**whatsoever** [3] - 4:16, 46:12, 159:4

**whereby** [2] - 104:20, 154:22

**White** [2] - 138:11, 173:17

**whole** [2] - 120:2, 120:4

**wife** [1] - 47:5

**willing** [1] - 143:17

**windfall** [1] - 67:13

**window** [2] - 49:11, 49:14

**WINGET** [1] - 2:6

**wipes** [1] - 28:23

**wiping** [1] - 51:20

**wire** [3] - 36:23, 37:4, 37:12

**wiring** [2] - 34:1, 37:20

**wise** [1] - 166:21

**wish** [2] - 123:9, 128:4

**withdraw** [1] - 139:11

**withdrawal** [3] - 38:14, 97:21, 97:23

**withdrawals** [2] - 25:8, 134:8

**Witness** [1] - 193:2

**WITNESS** [33] - 14:8, 21:19, 34:9, 35:16, 36:14, 55:2, 55:17, 63:18, 64:5, 65:8, 74:17, 77:18, 96:10, 97:7, 99:19, 101:17, 118:7, 119:16, 128:23, 129:2, 129:4, 136:1, 149:13, 154:2, 155:9, 155:13, 157:15, 166:13, 167:23, 168:6, 182:7, 183:17, 185:8

**witness** [5] - 3:1, 3:4, 3:6, 3:8

**WITNESSES** [1] - 193:1

**word** [4] - 91:19, 103:11, 142:18,

---

174:15

**words** [2] - 68:18, 126:17

**works** [3] - 112:4, 137:22, 169:21

**world** [1] - 65:2

**worse** [2] - 120:4, 171:9

**worst** [3] - 80:20, 84:15, 131:19

**worth** [2] - 90:8, 126:9

**wow** [1] - 141:6

**Wright** [2] - 162:4, 162:8

**write** [2] - 82:2, 163:15

**writing** [28] - 9:18, 39:1, 39:4, 45:8, 45:10, 45:18, 57:6, 73:2, 76:23, 94:12, 99:11, 99:17, 100:12, 100:13, 100:15, 100:18, 101:7, 106:10, 106:15, 107:18, 142:16, 150:8, 150:22, 151:12, 158:4, 163:16, 184:20, 189:10

**written** [6] - 81:13, 85:7, 95:11, 100:4, 107:2, 150:15

**wrote** [3] - 8:23, 12:12, 80:22

---

**Y**

**year** [71] - 19:22, 19:23, 21:5, 24:14, 29:19, 32:23, 57:19, 66:20, 66:21, 67:19, 68:1, 69:5, 69:7, 71:15, 73:15, 77:7, 77:8, 77:11, 80:8, 85:19, 85:22, 89:19, 91:10, 91:12, 93:14, 94:1, 97:7, 109:21, 112:20, 115:9, 116:17, 116:23, 121:22, 122:1, 131:13, 138:19, 139:1, 139:2, 139:5, 139:8, 140:16, 140:17, 142:15, 152:2, 152:9, 152:10, 152:14, 153:17, 154:3, 159:21, 165:16, 168:3, 168:20, 170:9,

**JACK W. HUNT & ASSOCIATES, INC.**
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

03/22/2022 12:51:11 PM

170:10, 170:12, 171:3, 171:5, 171:13, 171:18, 171:21, 172:4, 172:13, 172:16, 172:21, 173:23, 175:22, 181:23, 182:1

**years** [97] - 5:20, 12:7, 12:8, 12:13, 12:17, 13:3, 14:16, 19:22, 20:1, 20:23, 21:14, 32:4, 32:9, 32:11, 32:15, 32:17, 32:21, 32:22, 49:16, 55:15, 56:22, 62:12, 62:20, 62:22, 62:23, 63:10, 66:13, 66:18, 66:22, 67:7, 67:20, 67:21, 67:22, 69:19, 72:2, 72:3, 75:8, 75:22, 76:8, 76:10, 76:13, 77:3, 77:4, 77:5, 78:17, 83:21, 83:22, 84:1, 84:18, 84:20, 84:22, 85:4, 85:15, 87:13, 91:10, 91:17, 91:22, 94:7, 94:16, 107:23, 112:12, 112:15, 112:17, 118:20, 121:7, 132:4, 136:10, 138:15, 138:23, 139:9, 139:10, 140:3, 142:7, 142:9, 142:12, 142:13, 142:15, 142:23, 143:2, 147:21, 148:11, 151:19, 153:15, 153:23, 154:12, 159:21, 161:10, 163:13, 167:2, 167:5, 167:20, 171:12, 171:19, 172:12, 179:7

**yeses** [1] - 4:12

**yesterday** [1] - 184:14

**YORK** [2] - 1:4, 189:1

**York** [16] - 2:3, 2:7, 7:9, 8:5, 11:23, 15:6, 44:14, 58:23, 59:4, 59:5, 60:7, 118:15, 134:12, 177:8, 189:6

**yourself** [2] - 57:20, 158:2

## Z

**Zoom** [2] - 2:5, 2:10

**ZOOM** [1] - 2:11

**JACK W. HUNT & ASSOCIATES, INC.**

*1120 Liberty Building*

*Buffalo, New York  14202  -  (716) 853-5600*