# EXHIBIT O

1.      I am Casey Revkin-Maugér Ryan. I have expertise in life insurance policies, particularly the analysis and valuation of life insurance policies. I have held a life insurance agent license since 2002. Since 2013, I've been a principal in the highly esteemed firm Policy Guard, one of fewer than 50 licensed life and disability insurance analyst firms. Policy Guard was routinely engaged to conduct analysis or valuations for policies and transactions of the type reviewed in this report. My business address is 9100 Wilshire Blvd, Suite 720E, Beverly Hills CA 90212.

2.      ASSIGNMENT

2.1.    I have been retained by Magavern Magavern Grimm LLP to review and evaluate the 2002 sale of a life insurance policy on the lives of Dr. John Repicci and Lorraine Repicci and the subsequent servicing of the policy by Mr. Christopher Jarvis. I have reviewed the documentation produced by both Plaintiffs and Defendant in this matter and have observed and reviewed the deposition testimony of Mr. Jarvis. I have been retained on an hourly basis at the rate of Three Hundred and Twenty-five Dollars per hour.

3.      SUMMARY OF OPINION

3.1.    My overall opinion in this matter is that Mr. Jarvis failed his fiduciary responsibility in the sale and maintenance of the policies he sold. First, it was never appropriate to sell a such a high risk policy–without the necessary guarantees–to these clients. Second, he failed his fiduciary responsibility to adequately review the risks of the policy before he sold it. Third, he failed his fiduciary responsibility to follow through on the plan to exchange the policy for one with the necessary guarantees. Fourth, he failed his fiduciary responsibility to properly service, review, and maintain the policy. I will explain the bases of these opinions in the sections below.

3.2.    The policy at issue was purchased in 2002. A total of $1,200,000 in premiums were paid on the policy over the course of the first two policy years. The policy had an initial death benefit of $25,000,000. In 2005, the death benefit was reduced to $4,595,908. It was intended to last at least 35 years in order that the insureds would each reach at least 100 years of age before the policy lapsed. The policy did not last 35 years and would have lapsed after approximately 20 years (with no death benefit whatsoever) but for significant additional premium payments by the insureds. I am informed that beginning in year 20, the insureds are required to make additional annual premium payments of $149,880 in order to keep the policy in force.

4.      QUALIFICATIONS

4.1.    Since 2013 I have been a principal of the life insurance analyst firms, Policy Guard. Policy Guard was issued a life and disability insurance analyst license by the State of California Department of Insurance. The State of California Department of Insurance has issued fewer than 50 such licenses in its history.

4.2.    In a joint venture between Policy Guard and Andersen Tax, one of the top accounting an appraisal firms, I analyzed and appraised dozens of policies purchased similar to and purchased for the structure analyzed in this report.

4.3.    Over the course of career, I have analyzed life insurance policies with a total death benefit over 3 billion dollars.

4.4.    I have analyzed hundreds life insurance policies for some of the world's largest banks including Deutsche Bank, Credit Suisse, and American International Group.

4.5.    I have analyzed hundreds life insurance policies for sale and transfer transactions designed by some of the world's largest law firms, including Cifford Chance, Proskaur, and McDermott, Will, and Emery.

4.6.    I have held a life insurance agent license since 2002.

4.7.    I have a Bachelors of Arts in mathematics from Reed College.


5.      TAX STRATEGY INVOLVING INSURANCE

5.1.    As will be discussed in further detail in section 9, in 2002, Mr. Jarvis proposed a tax strategy involving the purchase of life insurance. This type of plan is commonly referred to as "pension rescue" as it is a series of steps to move funds or assets out of a pension plan, where they would be taxed heavily upon the death of the individual, and into a trust or entity outside of their estate.

5.2.    The basic steps are as follows.

5.2.1.  Use the funds in the pension plan, commonly a 401(k), to purchase a life insurance policy. For this example, I will say a million dollars of funds from the pension plan are used to buy a policy with a 5 million dollars death benefit.

5.2.2.  A key part of the plan is to transfer or "sell" the policy out of the 401(k) at a much lower value than that of the original cost of the insurance. This requires the purchase of a policy with high surrender charges that reduce the policy's value when it is eventually transferred out of the pension plan. A Surrender Charge is an amount retained by the issuer of a life insurance policy when a policy is canceled, typically assessed only during the first five to ten years of a policy. For this example, let's say the Surrender Charges are $800,000.

5.2.3.   For the first 12 months of a policy, policies are generally valued at the cost of acquisition (premiums paid). After that time the cash surrender value, its liquidation value, is commonly utilized as a value. Thus, after at least 12 months, the pension plan transfers/sells the policy to another entity, typically a irrevocable life insurance trust (ILIT) outside the individual's estate. For this transaction a value must be assigned the policy. The ILIT will transfer an amount equal to the policy's cash surrender value (in this example $200,000) to the pension plan, and the pension plan will transfer ownership of the policy to the ILIT. And the pension plan will have to pay taxes on the income it received from the ILIT, let's say 50% of the $200,000 received.

5.2.4.   At the end of this transaction, there are few funds left in the pension plan (in this example $100,000), but the irrevocable life insurance trust has an asset (an insurance policy) that will pay a death benefit (in this example 5 million dollars) to the individual's heirs free of tax.

5.2.5.   If the insurance policy is not properly maintained throughout the life of the insured and lapses, the individual will have lost all the funds they paid into the insurance policy, plus the taxes they paid on the sale.

6.     LIFE INSURANCE POLICY TYPES AND FEATURES

6.1.   There are several different kinds of insurance policies on the market: term, whole life, and flexible premium adjustable life (generically universal life), and variable flexible premium universal life. Of these products, only flexible premium adjustable life had the feature of high accumulation values and low cash surrender values in the early years.

6.2.   Additionally, when there are two insurable individuals, there exists a product called survivorship flexible premium adjustable life, commonly referred to as second to die. These policies are generally cheaper as the company pays the death benefit only after both insured have died.

6.3.   Some survivorship flexible premium adjustable life products have what is called a No-Lapse Guarantee. A No-Lapse Guarantee protects the Death Benefit even if the Accumulation Value of the policy falls to zero or below. As long as the total amount of policy premiums paid satisfy the no-lapse guarantee provisions, including but not limited to timely receipt provisions, the policy will not lapse. For the purpose of this report we will use No-Lapse Guarantees to mean No-Lapse Guarantees that protects the Death Benefit through both insureds' 100th birthdays.

6.4.   In the present matter (as will be more fully described later) there were two types of policies recommended by Mr. Jarvis as part of the wealth preservation plan.

6.5.   The first, was a Mass Mutual policy. The Mass Mutual Policy is a Survivorship Flexible Premium Adjustable Life (generically, Universal Life) policy with a No-Lapse Guarantee that protected the death benefit through both insureds' 100th birthdays.

6.6.    The second was a Lincoln policy. The Lincoln Policy is a Survivorship Flexible Premium Adjustable Life (generically, Universal Life) policy without a No-Lapse Guarantee to protect the Death Benefit through the insureds' 100th birthdays.

6.7.    Policies without a No-Lapse Guarantee require frequent review and maintenance. Additional premiums may need to be paid over the life of the policy to maintain a positive Accumulation Value and prevent the policy from lapsing.

6.8.    When a pension rescue plan like the one reviewed in this report has a finite amount of funds available to pay premiums (funds in the pension plan) and a specific and short window in which they can be paid (while the policy is owned by the pension plan), a policy with a No-Lapse Guarantee is generally the only policy type appropriate.


7.      DEFINITIONS

7.1.    Accumulation Value: The cash accumulation in the policy based on the interest credited, or, in the case of a variable policy, the investment achieved in the separate accounts.

7.2.    Attained Age: Insured's age at a particular time. For example, many term life insurance policies allow an insured to convert to permanent insurance without a physical examination at the insured's then attained age. Upon conversion, the premium usually rises substantially to reflect the insured's age and diminished life expectancy.

7.3.    Cash Surrender Value: The amount available for distribution if the policy is surrendered to the issuer.

7.4.    Contestability Period: The two-year time period after the policy is put into effect during which any death benefit claim is contested by the Company to determine if there were any material misstatements in the application.

7.5.    Company: The issuing insurance company.

7.6.    Cost of Insurance: The company charges for mortality.

7.7.    Death Benefit: The limit of insurance or the amount of benefit that will be paid in the event of the death of a covered person.

7.8.    Illustration: An illustration provided by the Company. It is an illustration, not a contract. The illustration is intended to demonstrate the impact of policy charges and illustrated assumptions on the policy's Accumulated Value and Death Benefit and is not intended to predict actual performance. Interest rates and values in the illustration are not guaranteed, except for those items clearly labeled as guaranteed.

7.9.    Interest Crediting Rate: the interest rate the company credits to the policy. The policy provides a minimum interest rate guarantee and pays excess interest on the cash value in the policy.

7.10.   Life Expectancy: The time span in which there is a 50% chance of death for subjects in a given class according to a specific mortality table.

7.11.   Modified Endowment Contract (M.E.C): As defined in IRC Section 7702A, a life insurance policy becomes a Modified Endowment Contract (MEC) if the cumulative premium payments (less nontaxable Withdrawals) applicable to the Policy's Seven-Pay-Test Period exceed, at any time during that Seven-Pay-Test Period, the cumulative total of the Seven-Pay Premiums in that Period (the 7-pay test).

7.12.   No-Lapse Guarantee: A No-Lapse Guarantee protects the Death Benefit even if the Accumulation Value of the policy falls to zero or below. As long as the total amount of policy premiums paid satisfy the no-lapse guarantee provisions, including but not limited to timely receipt provisions, the policy will not lapse. For the purpose of this report we will use No-Lapse Guarantees to mean No-Lapse Guarantees that protects the Death Benefit through both insureds' 100th birthdays.

7.13.   Policy Charges: Loads, expenses and fees in the policy.

7.14.   Risk Class: Risk class, in insurance underwriting, is a grouping of insureds with a similar level of risk. Typical underwriting classifications are preferred, standard and substandard, smoking and nonsmoking, male and female.

7.15.   Surrender Charge: An amount retained by the issuer of a life insurance policy when a policy is canceled, typically assessed only during the first five to ten years of a policy.


8.      POLICY OVERVIEW

8.1.    Policy 7146026 issued by Lincoln Life and Annuity Company of New York in October 2002 will be referred to as the "Lincoln Policy."

8.2.    Policy No. 15535971 issued by Mass Mutual Life Insurance Company in October 2002 will be referred to as the "Mass Mutual Policy."

8.3.    The Lincoln Policy is a Survivorship Flexible Premium Adjustable Life (generically, Universal Life) policy (Bates pp. 271-282). Such policy is considered a fixed, not variable, product as it is not a security. Policy funds are not segregated in separate accounts and the Company is responsible for and provides the provisions stipulated in the Policy contract.

8.4.    As a Survivorship policy, also known as Second to Die, the Carrier will pay the Death Benefit at the death of the second Insured.

8.5.    The Mass Mutual Policy is also a Survivorship Flexible Premium Adjustable Life (generically Universal Life) policy.

8.6.    The Lincoln Policy issue date is October 10, 2002 (Bates p. 1641). The application was signed on October 22, 2002 (Bates p. 1679), the premium was paid after October 24th

(Bates p. 24), and the Policy Delivery Receipt was signed on November 17, 2002 (Bates p. 1671).

8.7.    The Lincoln Policy the policy may have been cancelled and returned to the Company within 45 days of the date the application is signed (October 22, 2002) or within 10 days after the receipt of the policy (November 17, 2002). This period is commonly referred to as the Free Look Period and is described on the issue illustration (Bates p. 272).

8.8.    The Lincoln Policy does not have a No-Lapse-Guarantee through age 100 supported by the premium history. If the Accumulation Value of the policy falls to zero or below, the policy will lapse.

8.9.    The Mass Mutual Policy does have a No-Lapse Guarantee supported by the premium history that protects the Death Benefit. The No-Lapse Guarantee continues through the insureds' 100th birthdays, and no more premiums are required. The Death Benefit is protected even if the Accumulation Value of the policy falls to zero or below.


9.      POLICIES APPROPRIATE FOR PENSION RESCUE PLANS

9.1.    In October 2002, Mr. Jarvis sold Dr. Repicci the Mass Mutual and the Lincoln Policies as the key part of a wealth preservation strategy. He called his plan the CTS strategy and laid out the details in a letter on October 1st (Bates pp. 2-12). The purpose of the sale was to execute the move funds out of Dr. Repicci's 401(k) and later, at the death of Dr. and Mrs. Repicci, to transfer wealth to the next generation. In his correspondence, Mr. Jarvis acknowledged that Dr Repicci wanted that wealth transfer to be guaranteed but the policy being sold did not have those guarantees. Mr. Jarvis presented a scenario where they could exchange the policy for one with guarantees at a later date. He failed to explain the risks involved in executing that scenario. It is my opinion it was inappropriate to sell the policy.

9.2.    Mr. Jarvis testified and the documentation shows that the purpose of purchasing the insurance was to transfer assets out of Dr. Repicci's 401(k) in a tax-advantageous way into an entity outside of Dr. Repicci's estate. The basics of the plan were as follows:

9.2.1.   Spend funds from the 401(k) on premiums on life insurance.

9.2.2.   Wait a period of time.

9.2.3.   Transfer the policy (or policies) from the 401(k) for their liquidation value (Cash Surrender Value) to an irrevocable life insurance trust (ILIT) outside of the estate.

9.2.4.   Modify and maintain the policies to provide that a significant Death Benefit will paid to heirs free of tax upon the death of the insureds.

9.3.    This "Pension Rescue Plan," as it is commonly called, is a wealth preservation strategy, not an investment. It involves purchasing assets, namely life insurance policies, that can

be transferred with less tax consequence than other assets. In addition, the heirs receive the death benefit free of tax.

9.4.   The Survivorship Flexible Premium Adjustable Life (generically, Universal Life) product purchased is considered a fixed, not variable, product as it is not a security. Policy funds are not segregated in separate accounts and the Company is responsible for and provides the provisions stipulated in the policy contract.

9.5.   The strategy involved paying a fixed amount of premiums only in the early years while it was still owned by the 401(k). Without the option to maintain the policy later by paying more premiums, the only way to ensure the premiums paid would result in a Death Benefit, paid at the eventual death of the second insured to die, was to purchase a policy with No-Lapse Guarantees.

9.6.   In October 2002, Mr. Jarvis identified two policies he recommended Dr. Repicci Purchase inside his 401(k) to execute the Pension Rescue Plan:

9.6.1.   The Mass Mutual policy with initial Death Benefit of $17,500,000 and a No-Lapse Guarantee.

9.6.2.   The Lincoln Policy with initial Death Benefit of $25,000,000 without a No-Lapse Guarantee.

9.7.   The Mass Mutual Policy with a No-Lapse Guarantee was an appropriate policy choice.

9.8.   The Lincoln Policy without the No-Lapse Guarantee was not an appropriate policy choice.

9.9.   Even before the policies were purchased and again during the Lincoln Policy's free look period when it could have been cancelled, Dr. Repicci expressed his objective to obtain policies that would be guaranteed to pay out at the second death of the insureds.

9.9.1.   On October 2, 2002, Mr. Jarvis wrote a letter to address Dr. Repicci's questions. The first question was, how long will the policies last, and Mr. Jarvis said, "The policies are designed to last to age 100." (Bates p. 12)

9.9.2.   November 12, 2002, Mr. Jarvis wrote a letter to Dr. and Mrs. Repicci with the subject, "how to guarantee death benefit with Lincoln." (Bates p. 25)

9.10.   On November 12, 2002, Mr. Jarvis presented Dr. Repicci with a page of an illustration of an insurance product from Lincoln Life and Annuity Company of New York available at that time that had No-Lapse Guarantees (Bates p. 27). Mr. Jarvis later testified that he did not recommend Dr. Repicci purchase that insurance product in 2002 as part of the Pension Rescue Plan as it did not have significant Surrender Charges.

9.11.   The issue illustration signed by the client as part of the sale of the Lincoln Policy (Bates p. 271), showed a scenario where the policy was guaranteed to stay in force for only 15 years.

9.12.  A key part of the Pension Rescue Plan structure is the surrender charges the carriers place on the policies in the early years. A Surrender Charge is an amount retained by the issuer of a life insurance policy when a policy is canceled, typically assessed only during the first five to ten years of a policy. The objective is to find a policy with high Surrender Charges, reducing the Cash Surrender Value which is used as the value of the policy when it is eventually transferred out of the 401(k).

9.13.  In my opinion, the Mass Mutual Policy was appropriate for the proposed plan as accomplished both wealth preservation goals: the high cash surrender charges on the policy allowed the client to transfer assets out of his 401(k) at a considerable tax discount; and the No-Lapse guarantee on the Mass Mutual policy guarantees a considerable Death Benefit will be paid to his heirs when both he and his wife pass.

9.14.  The Lincoln Policy had high surrender charges in the early years. A year after the policy was issued and the 401(k) transferred/sold the policy to a trust, the policy holder had paid $1,200,000 in premiums, and the Cash Surrender Value was only $85,181.12. Thus, there was a large tax savings to the 401(k).  While the tax savings was accomplished there was no protection whatsoever for the clients from the insurance side. It was a high risk policy which in fact failed to achieve its fundamental purpose.

9.15.  Mr. Jarvis had a fiduciary responsibility to sell the client policies that would satisfy the both the client's objectives, of transferring funds out of his 401(k) in a tax-efficient manner and into an asset that was guaranteed to distribute funds to the clients' heirs at the latter of their two deaths. The Mass Mutual Policy fulfilled both objectives. The Lincoln Policy only fulfilled the first objective. It is my opinion that the fiduciarily responsible action was to sell the Mass Mutual Policy only. It is my opinion that it was fiduciarily irresponsible to sell the Lincoln Policy.


10.    TIMING

10.1.  After steps 1 to 3 of the Pension Rescue Plan were complete, the agent had a fiduciary responsibility to modify and maintain the policies to best meet the long term goals of the client. The documents show step 3 was executed in November of 2003, and yet the documents do not show Mr. Jarvis made any effort to modify or maintain the policy to best meet the client's long term goals until December 2004, and even then he did not advise to make the modifications he had promised in earlier correspondence or those that were warranted, specifically to immediately reduce the Death Benefit and exchange the product for a Lincoln Life and Annuity Company of New York policy with No-Lapse Guarantees.

10.2.  The issue illustration signed by the client as part of the sale of the Lincoln Policy (Bates p. 271), showed a scenario where the policy was guaranteed to stay in force for only15 years.

10.2.1. As the non-guaranteed sections of an illustration are not intended to predict actual performance, a policy without No-Lapse Guarantees must be regularly reviewed and maintained to stay in force until the Death Benefit is paid.

10.3.   As stated previously, a second key part of the Pension Rescue structure was to wait a period of time. For newly issued policies (which is generally considered to be the first 12 months) the fair market value is the cost of the policy, the premiums paid.

10.4.   Step 3, the transfer of the Lincoln Policy out of the 401(k) took place after that 12 month time frame had expired, on or around November 3, 2003 (Bates p. 56). The policy issue date is October 10, 2002 (Bates p. 1641). The application was signed on October 22, 2002 (Bates p. 1679) and the first premium was paid on October 24, 2002 (Bates p. 24).

10.4.1. The documents appear to show (Bates p. 56) that in the actual execution, they combined steps 3 and 4 and transferred/sold the policies directly from the 401(k) to the ILIT.

10.5.   On November 12, 2002, shortly after the policy was purchased, Mr. Jarvis wrote a letter to Dr. and Mrs. Repicci with the subject "how to guarantee death benefit with Lincoln" (Bates p. 25-29). In this letter, he explained that to guarantee death benefit, the policy owner should exchange the policy without the No-Lapse Guarantees for a policy with No-Lapse Guarantees after the Pension Rescue Plan steps had been completed.

10.6.   On December 2, 2002, Mr. Jarvis obtained a letter from Lincoln Financial Group to verify to Dr. Repicci that the company would waive Surrender Charges in the event of an internal exchange for a different product issued by Lincoln Life and Annuity Company of New York (Bates p. 43).

10.6.1. It is reasonable to assume that Mr. Jarvis obtained this letter because his client had expressed an intent to conduct such an exchange in the future.

10.6.2. This letter makes no mention of any time period when such an exchange was prohibited. In fact, it mentions that the policy of waiving Surrender Charges was subject to change, implying that, if one intended to execute one, they should do so as soon as possible.

10.7.   On October 10, 2003, Lincoln Life and Annuity Company of New York issued its first annual statement. The statement says (Bates p. 167) that if planned premiums are paid at the current rates, the coverage is expected to lapse on 12/10/2019. On a guaranteed basis, the coverage would lapse on 11/10/2013.

10.8.   On October 14, 2003, Mr. Jarvis wrote a memo to Dr. Repicci (Bates pp. 32-39). This memo implies that Dr. Repicci had again expressed his objectives to have a policy that would continue on a guaranteed basis for 50 years. The memo says (Bates p. 32) that the "Mass Mutual policy is 'Guaranteed'" so we have no issues there. What we have to deal with in this letter is the life insurance policy with Lincoln…"

10.9.    On October 23, 2003, Mr. Jarvis explained the same strategy he had explained in the fall of 2002, to exchange the policy for one with No-Lapse Guarantees. In this letter he includes an illustration for the product with the No-Lapse Guarantees dated October 8, 2003 (Bates p. 46). Therefore, we know that such a product with the No-Lapse Guarantees existed on October 8, 2003.

10.10.    On November 3, 2003, Julie Stone, the insureds daughter, wrote a letter to the Mass Mutual Trust Company, trustee of John A Repicci Irrevocable Insurance Trust, with instructions to purchase both the Mass Mutual Policy and the Lincoln Policy from the John A. Reppici MD 401(k) (Bates p. 56).

10.11.    After the Lincoln Policy was purchased from the 401(k) on or after November 3, 2003, Mr. Jarvis had a fiduciary responsibility to execute, as soon as possible, the reduction of death benefit and the internal exchange for a policy with No-Lapse Guarantees. The restrictions of the Pension Rescue Plan to keep the Cash Surrender Value low were no longer a consideration.

10.12.    There is no documentation Mr. Jarvis advised his client Dr. Repicci to either reduce the Death Benefit on the Lincoln Policy or exchange his policy for product with No-Lapse Guarantees on November 4, 2003 once the policies had been sold from Dr. Repicci's 401(k) to a trust. (56)

10.13.    In both of his October 2003 letters, Mr. Jarvis states that it was Lincoln's policy that policy owners wait 24 months before they could execute an internal exchange. There is no documentation directly from the carrier that such a waiting period existed, and, as previously pointed out, they did not mention that waiting period in their December 2002 letter (43).

10.14.    If the waiting period did exist, Mr. Jarvis should have been prepared to help the policy owner execute that internal exchange for a policy with No-Lapse Guarantees on October 11, 2004, the moment the waiting period expired. There is no documentation that Mr. Jarvis even investigated such an option at that time.

10.15.    While there is ample documentation Mr. Jarvis corresponded with the Company in November 2004 (Bates 425-459) about different options on how to reduce the death benefit, there is no documentation that he asked the carrier to run any illustration for a product with No-Lapse Guarantees which the policy owner could obtain with an internal exchange.

10.16.    Mr. Jarvis testified that a product with No-Lapse Guarantees must not have existed in October 2004, but he provided not documentation of such an assertion.

10.17.    There is no record that Mr. Jarvis explained to Dr. Repicci that there was a risk a policy with No-Lapse Guarantees would not available in the future.

10.18.    There is no record that Mr. Jarvis properly explained to Dr. Repicci that there was a risk that either insured could have a change in health that would preclude them from executing an internal exchange.

10.18.1.     In their December 2, 2002 letter (Bates p. 43), Lincoln does specify that the "Policyholder would be required to submit Part 1 and 2a of the Life Insurance application," but Mr. Jarvis does not explain that this means health information.

10.19.   It is certain the policy owner could have reduced the Death Benefit in November 2003, after the policies were sold from the 401(k). Reducing the Death Benefit of a policy always demands due consideration, but there is no record of Mr. Jarvis advising the client to consider moving forward with this aspect of the original strategy until December 2004 (Bates p. 57).

10.19.1.     The Policy Charges and the Cost of Insurance are charged based on the Death Benefit. The higher the Death Benefit, the higher to charges to the Accumulation Value. Reducing the Death Benefit earlier would have led to better long term performance of the policies.

10.19.2.     Reducing the Death Benefit earlier in the Mass Mutual Policy could have meant they could have reduced the Death Benefit with the No-Lapse Guarantees to an amount higher than $4,000,000.

10.19.3.     Reducing the Death Benefit earlier in the Lincoln Policy would have meant higher Accumulation Values for the life of the policy, enabling them to reduce the Death Benefit Less or for the policy to last longer without further premium payments.

10.20.   The 2005 Annual Statement (Bates pp. 380-382) shows that the Death Benefit was reduced to $4,595,908 in February 2005 (Bates 381).

11.   COMMISSION

11.1.   It appears that Mr. Jarvis may have had economic reasons to want to keep the Lincoln Policy unchanged for at least 24 months. Insurance companies will charge the agent a proportional refund of their commission for any changes made to a policy in the first few years (usually the first 2 or 3 years), adjusting the commission to the commission of the new policy.

11.1.1. A later correspondence (Bates p. 83) establishes Lincoln's policy was to only apply this charge back if changes were made in the first 24 months.

11.2.   Mr. Jarvis received hundreds of thousands of dollars in commission in the sale of the Lincoln Policy, and he would have had return part of it had the Death Benefit been reduced in the first 24 months after it was issued.

11.3.   Insurance agents' commission is calculated off what is commonly called the "target premium" a number that is proportional to initial Death Benefit of the policy. The target premium is usually a number close to the first year premium, and the bulk of the

commission is paid in the policy's first year. The first year commission is usually between 80% to 120% of the target premium.

11.4.   Mr. Jarvis testified (Jarvis Deposition p. 33) that his commission on the Lincoln Policy was likely less than $400,000 and maybe more than $300,000.

11.5.   The signed issue illustration appears to show that the target premium for the Lincoln Policy was $427,250 (Bates p. 282).

11.6.   If the Death Benefit of the Lincoln Policy had been reduced 81% to $4,595,908 in November 2003, Mr. Jarvis would have likely had to repay 81% of the commission he had received the year before.

11.7.   Had the Lincoln Policy been exchanged in the first 24 months after purchase, Mr. Jarvis would have had to repay part of his commission on the original sale but earned a commission on the exchange. As the exchanged policy would have had a much reduced Death Benefit, it is reasonable to assume the target premium would have been equally reduced.


12.   MAINTENANCE

12.1.   As the plan advisor and even if he were he just an insurance agent, Mr. Jarvis had a fiduciary responsibility to review and maintain the insurance policies he sold. In the case of the Lincoln Policy, the policy demanded regular maintenance as it did not have No-Lapse Guarantees. Mr. Jarvis did not perform his fiduciary responsibility.

12.2.   Despite assurances to his clients at the time of sale that he would review the policies every year and make adjustments if necessary (Bates pp 13-15), Mr. Jarvis did not. Mr. Jarvis testified (Jarvis Deposition p. 77) that he did not perform annual reviews of the policies.

12.3.   An insurance policy is an asset like any other. Advisors who sell such policies have a fiduciary responsibility to review the policy each year and advise the client if any adjustments should be made. Such adjustments may include paying more premiums, reducing the face amount, surrendering the policy, or exchanging it for another product.

12.4.   Waiting to make a change like exchanging the policy carries inherent risk. An exchange may not be possible or may be too expensive if the insureds have gotten too old or had a significant change in health. The product may no longer exist.

12.5.   The amount of $1,200,000 was paid into the Lincoln Policy. The initial death benefit was $25,000,000 and was later dropped to $4,595,908. These are significant sums that warranted careful annual review.

12.6.   Mr. Jarvis had a fiduciary responsibility to review the policy's annual statements. The annual statements show that without additional premiums the policy is expected to lapse well before the insureds' 100th birthdays

    12.6.1. The first annual statement from October 10, 2003 said that if planned premiums are paid at the current rates, the coverage is expected to lapse on 12/10/2019. On a guaranteed basis, the coverage will lapse on 11/10/2013 (Bates p. 167).

    12.6.2. The October 10, 2005 annual statement said that if planned premiums are paid at the current rates, the coverage is expected to lapse on 3/12/2023. On a guaranteed basis, the coverage will lapse on 4/12/2016 (Bates p. 381).

    12.6.3. The October 10, 2008 annual statement said that if planned premiums are paid at the current rates, the coverage is expected to lapse on 11/10/2022. On a guaranteed basis, the coverage will lapse on 8/10/2016 (Bates p. 386).

    12.6.4. Despite these explicit statements of the likely failure of the policy, Mr. Jarvis took no steps to protect his clients' asset and protect the fundamental purpose of the wealth preservation plan he put in place.

13.   CONCLUSION

13.1.   In conclusion, my overall opinion in this matter is that Mr. Jarvis failed his fiduciary responsibility in the sale and maintenance of the policies he sold. First, it was never appropriate to sell a such a high risk policy–without the necessary guarantees–to these clients. He received hundreds of thousands of dollars in commission for the sale of the Lincoln Policy. If such policy product did not exist with Lincoln to meet all the goals of the wealth preservation plan, he should not have sold it. Second, he failed his fiduciary responsibility to adequately review the risks of the policy before he sold it. The most critical risk was that his client might not be able to exchange the policy in the future. That risk was not reviewed or disclosed. Third, he failed his fiduciary responsibility and his assurances at the time of sale to follow through on the plan to exchange the policy for one with the necessary guarantees. Fourth, he failed his fiduciary responsibility and his assurances at the time of sale to properly service, review, and maintain the policy.

Casey Revkin-Maugér Ryan