# EXHIBIT P

1. I am Casey Revkin-Maugér Ryan. I have expertise in life insurance policies, particularly the analysis and valuation of life insurance policies. I have held a life insurance agent license since 2002. Since 2013, I've been a principal in the highly esteemed firm Policy Guard, one of fewer than 50 licensed life and disability insurance analyst firms. Policy Guard was routinely engaged to conduct analysis or valuations for policies and transactions of the type reviewed in this report. My business address is 9100 Wilshire Blvd, Suite 720E, Beverly Hills CA 90212.

2. ASSIGNMENT

2.1. I have been retained by Magavern Magavern Grimm LLP to review and evaluate the 2002 sale of a life insurance policy on the lives of Dr. John Repicci and Lorraine Repicci and the subsequent servicing of the policy by Mr. Christopher Jarvis. I have reviewed the documentation produced by both Plaintiffs and Defendant in this matter and have observed and reviewed the deposition testimony of Mr. Jarvis. I have been retained on an hourly basis at the rate of Three Hundred and Twenty-five Dollars per hour.

2.2. This is a rebuttal to the December 20, 2021 expert report of Gregory G. Wimmer, CLU, ChFC on the same matter.

3. SUMMARY OF OPINION

3.1. Mr. Wimmer states that this case involves "the performance of a joint universal life second to die life insurance policy". In fact, this case is not about the performance of the policy but rather about the lack of suitability of this type of policy for the wealth transfer plan proposed by Mr. Jarvis and his failure to adequately or appropriately maintain the policy once it was in place. My overall opinion in this matter remains the same, Mr. Jarvis failed his fiduciary responsibility in the sale and maintenance of the policy he sold.

   3.1.1. First, it was never appropriate to sell a such a high-risk policy–without the necessary guarantees–to these clients.

   3.1.2. Second, he failed his fiduciary responsibility to adequately review the risks of the policy before he sold it.

   3.1.3. Third, he failed his responsibility to follow through on the plan to exchange the policy for one with the necessary guarantees.

   3.1.4. Fourth, he failed his fiduciary responsibility to properly service, review, and maintain the policy.

3.2. Mr. Wimmer does not respond to the substance of my points.

3.2.1. I agree with Mr Wimmer in terms of his explanation of the Lincoln Policy and the technical factors affecting such policies.

3.2.2. However, while Mr. Wimmer explains that non-guaranteed policies have risks, he does not address how Mr. Jarvis failed to adequately review the risks of the policy before he sold it. Specifically, there was a risk that(as Mr. Jarvis claims happened). it might not be possible to exchange the policy for a guaranteed policy several years in the future. This risk does not seem to have been considered at all much less discussed with the client.

3.2.3. Mr.. Wimmer does not address why Mr. Jarvis did not instruct the Repiccis to reduce the death benefit and exchange the policy in November 2003. He doesn't provide any details or evidence that Mr. Jarvis ever tried to perform the internal exchange or even a time frame for when it may have happened.

3.2.4. Mr. Wimmer explains that the policy lost value because it was not properly maintained. This supports my fourth point that Mr. Jarvis failed his responsibility to properly service, review, and maintain the policy.

4. FAILURE TO REVIEW THE RISKS

4.1. Mr. Jarvis sold the Repiccis a non-guaranteed policy and told them the intention was to later exchange that policy for one with no-lapse guarantees. He did not properly disclose to them that there would be risks with such a plan. He did not properly disclose that involved risks such as (a) the carrier might not offer such a policy product in the future or (b) that the carrier may decide to charge prohibitively high surrender charges in the future on such exchanges. Mr. Jarvis has offered, without documentation, both reasons for why he did not follow through on the exchange, making it clear that these were not obscure but, in fact, very plausible risks.

4.2. In Section 9.9 of my original letter, outline how before he purchased the Lincoln policy, Dr. Repicci expressed his desire to have no-lapse guarantees and Mr. Jarvis responded in two letters, laying out a plan to exchange the policy for a guaranteed policy after the policy's 2nd anniversary.

4.3. In Section 10 of my original letter, I outline that there is no documentation that Mr. Jarvis attempted such an exchange after the policy's 2nd anniversary.

4.4. In his testimony, Mr. Jarvis said he most likely did not proceed with the exchange because he believes the carrier did not offer a policy with no-lapse guarantees at the time. He did not address when this happened or provide documentation.

4.5. On Page 5 Mr. Wimmer's letter, Mr. Wimmer offers a different explanation for why Mr. Jarvis did not move forward with the plan to exchange the policies. He writes, "when the time came to replace the policy internally with Lincoln, he discovered Lincoln would now not allow the internal replacement of the policy without significant surrender

charges due to a change in its internal replacement rules." He does not address when this happened or provide documentation that it occurred or that he informed Dr. Repicci at the time.

4.6. Neither of these risks were properly disclosed at the time of sale.

5. WHY DIDN'T MR. JARVIS ADVISE THE REPICCIS TO ECHANGE THE POLICY FOR ONE WITH NO-LAPSE GUARANTEES IN NOVEMBER 2003?

5.1. In Section 10 of my original letter, I outline how the initial wealth preservation plan was complete in November 2003 yet Mr. Jarvis did not advise the Repiccis to lower the death benefit until a year later.

   5.1.1. Continuing with a death benefit of $25,000,000 for an additional full year damaged the long-term financial viability of the policy.

5.2. In this section I also outline how there is no record that Mr. Jarvis looked into the Repiccis' options for exchanging the policy in 2003 or 2004.

5.3. Mr. Wimmer doesn't address either of these matters in his letter.

6. MR. JARVIS ADMITTED HE DID NOT PROPERLY MAINTAIN THE POLICIES.

6.1. Insurance policies require maintenance, and in his deposition, Mr. Jarvis admitted that he did not review the annual statements or maintain them. In his letter, Mr. Wimmer addresses that the additional premiums would have been beneficial to the financial viability of the policy.

6.2. Mr. Wimmer notes that the original plan was to pay three annual $600,000 premiums but that the policy owners only paid two $600,000 premiums. What he fails to mention is that three $600,000 premiums were projected to support a reduced death benefit of $10,000,000. After the policy's 2nd anniversary, policy's death benefit was reduced to $4,595,908, an amount well below two-thirds of $10,000,000.

6.3. Mr. Wimmer says that the trust could have paid additional premiums to keep the policy in force. This misses the entire point of the wealth transfer plan. The point was to <u>prepay, one time,</u> for insurance that would last to age 100, not to keep buying insurance. This litigation was initiated because Plaintiffs have been forced to now make additional annual payments of approximately $150,000 per year just to keep the policy in force.

6.4. Moreover, even if it had been an option, Mr. Jarvis did not regularly review the policies or advise his clients on what such required premiums would be.

7.     FIDUCIARY DUTY

Finally, I am currently licensed in the State of California, and in that state there is a Fiduciary Duty owed by a insurance agents/brokers to the client. I am not an attorney, but I understand that in New York there remains a common law fiduciary duty owed by insurance agents/brokers to their clients. Even if that were not the case, in this matter, Mr. Jarvis took on a special role far beyond that of an insurance agent/broker, acting as a form of financial or wealth consultant. In that capacity, he proposed the form of the wealth transfer plan and made explicit promises to his clients to oversee and maintain the plan. Mr. Jarvis failed in that duty.

8.     CONCLUSION

8.1.   In conclusion, my overall opinion in this matter is that Mr. Jarvis failed his fiduciary responsibility in the sale and maintenance of the policy.

*[signature]*

Casey Revkin-Maugér Ryan