UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DR. JOHN A. REPICCI, LORRAINE REPICCI,
JULIE STONE, *as Trustee of the John A.
Repicci Irrevocable Life Insurance Trust*, and
JULIE STONE, *as Trustee of the Repicci
Irrevocable Family Trust*,

                    Plaintiffs,

    v.

CHRISTOPHER R. JARVIS,

                    Defendant.

**DECISION AND ORDER**
17-CV-132S

## I.   INTRODUCTION

In this diversity action, plaintiffs Dr. John A. Repicci, his wife, Lorraine Repicci, and their daughter, Julie Stone, in her capacity as trustee of two Repicci family trusts (collectively, "Plaintiffs"), assert state-law claims against defendant Christopher R. Jarvis arising from wealth- and estate-planning services Jarvis provided the Repiccis beginning in the early 2000s.

Presently before this Court are Jarvis's motion for summary judgment (Docket No. 65) and Plaintiffs' cross-motion for partial summary judgment (Docket No. 76). For the following reasons, Jarvis's motion is granted, and Plaintiffs' motion is denied.

1

## II.   BACKGROUND

### A. Facts[1]

Dr. Repicci is an orthopedic surgeon and the inventor of a non-invasive knee procedure.  (Docket No. 65-1, ¶ 1; Docket No. 73, ¶ 1.)  In 2000, he called Jarvis for assistance in transferring his retirement assets to his heirs without incurring income or estate taxes.  (Docket No. 65-1, ¶ 5; Docket No. 73, ¶ 5.)  Jarvis and his firm specialized in providing consulting services to physicians in a variety of areas, including wealth management and insurance, and Jarvis agreed to work with Dr. Repicci.  (Docket No. 65-1, ¶ 4; Docket No. 73, ¶ 4.)

At the time, Dr. Repicci held individual retirement accounts (IRAs) worth approximately $4 million.  (Docket No. 65-1, ¶ 6; Docket No. 73, ¶ 6.)  It was determined that without development of a plan, the bulk of these assets would be subject to considerable estate, gift, and income taxes upon Dr. Repicci's death, which would leave a significantly reduced sum for his heirs.  (Docket No. 65-1, ¶ 6; Docket No. 73, ¶ 6.)  A plan was therefore developed to have Dr. Repicci transfer his IRAs into a newly-created Profit Sharing Plan, which would then use the pre-tax funds in the IRAs to purchase two high-value life insurance policies, which in turn would be transferred to a trust for the benefit of Dr. Repicci's family.[2]  (Docket No. 65-1, ¶¶ 6, 9; Docket No. 73, ¶¶ 6, 9; Docket

---

[1] The facts are taken from Jarvis's statement of undisputed facts (Docket No. 65-1), Plaintiffs' response to that statement (Docket No. 73), and the exhibits provided in support of the parties' respective motions.  Contrary to the local rules, Plaintiffs failed to file a separate statement of undisputed facts in support of their cross-motion, which serves as an independent basis for denial.  See L. R. Civ. P. 56 (a)(1).  Nonetheless, they included facts with some record citations in their memorandum (Docket No. 73-19, pp. 4-10), which this Court has considered.

[2] The parties dispute Dr. Repicci's level of involvement in formulating this plan.  Jarvis maintains that he formulated the plan jointly with Dr. Repicci, see Docket No. 65-1 ¶ 6; Docket Item 79 at 9 n.1, while Plaintiffs claim that Jarvis alone formulated the plan, with Dr. Repicci simply agreeing to it, see Docket No. 73, ¶ 6.

No. 73-3.)   It was estimated that execution of this plan would yield $2 million in tax savings.  (No. 65-1, ¶ 9; Docket No. 73, ¶ 9.)

According to Plaintiffs, Dr. Repicci agreed to this plan, but made clear to Jarvis that he wanted the insurance policies to be guaranteed and in force until he turned 100 years old.  (Docket No. 73, ¶ 12; Docket No. 73-14, at p. 24:1-3 (Jarvis stating that he was aware of "Dr. Repicci's expressed desire to maintain coverage to at least age 100[.]"); but see id. at 64:11-14 ("I don't have a—remember [it] being John's explicit intent [to have insurance up to age 100], it was just the numbers in illustrations.").)

Having agreed on the plan, Jarvis proposed the purchase of two separate life insurance policies.   The first was issued by Massachusetts Mutual Life Insurance Company of New York ("Mass Mutual").  (Docket No. 65-1, ¶¶ 10, 12; Docket No. 73, ¶¶ 10, 12.)  It carried an initial death benefit of $17.5 million, with the policy illustrations contemplating a future reduction in death benefits.  (Docket No. 65-1, ¶ 10; Docket No. 73, ¶ 10.)  The ultimate death benefit was guaranteed.  (Docket No. 65-1, ¶ 10; Docket No. 73, ¶ 10.)

The second policy—the one at issue here—was issued by Lincoln Life & Annuity Company of New York ("Lincoln") (referred to as the "Policy" or "'026 Policy").  (Docket No. 65-1, ¶ 12; Docket No. 73, ¶ 12.)  It carried a $25 million death benefit, but unlike the Mass Mutual policy, was guaranteed for only 13 years.  (Docket No. 65-1, ¶ 12; Docket No. 73, ¶ 12.)  At the time, however, it was believed based on assumptions in the compliance-approved illustrations that the Policy would last till Dr. Repicci turned 100 years old.  (Docket No. 65-1, ¶ 12.)  Lincoln, however, would not guarantee it.  (Id.)

Jarvis proposed the purchase of these two policies to Dr. Repicci and his wife in a

letter dated October 1, 2002.  (Docket No. 73-2.)  After answering some of the Repiccis'

questions, see Docket No. 73-4, Jarvis also sent a letter of explanation, dated October 9,

2002, to the Repiccis' accountant, Hyman B. Polakoff.  (Docket No. 73-5.)  In that letter,

Jarvis addressed concerns about the non-guaranteed nature of the '026 Policy.   In a

section titled "Legal Disclosure," Jarvis stated:

> In the *Guaranteed* portions of the illustrations, the insurance
> companies have to, by law, show what the highest possible .
> . . expenses could be (under the law) AND they have to show
> the lowest interest crediting rate. . . . [I]t would be impossible
> for 15 years of minimum crediting and maximum . . .
> [expenses] to sneak up on us.  We see what happens every
> year.  John, Lorraine and I will know each and every year what
> their policy is being credited.  If we see two or three bad years
> in a row, then we will address the problem immediately so no
> major problem arises for them or their children."

(Id. p. 2.)

Jarvis further explained that there were options available to the Repiccis if the

value of the '026 Policy fell due to "bad returns for a few years."  (Id. p. 3.)  Those options

consisted of the following:

> 1.) Change insurance companies[;]
>
> 2.) Reduce the face amount of insurance to reduce mortality
> expenses . . .[;]
>
> 3.) Calculate how much additional premium would have to be
> paid to continue with the $10+ million of death benefit to
> offset the bad years we had[;]
>
> 4.) See how many years we are losing from 2 or 3 bad years.
> It is possible that 2 or 3 bad years only reduce the
> coverage to end at age 95.  We can recalculate how we
> are doing every year.   In fact, every annual policy
> statement shows you where you are relative to your initial
> purchase and projects what you might expect—given the
> conditions at that time.

(Id. p. 3.)

Jarvis concluded the letter as follows:

> I understand why you and John were concerned with an illustration that shows the policies running out in 12-15 years. I am comfortable that the illustrations based on current assumptions that show John and Lorraine's polices lasting beyond Age 100, are a very accurate depiction of what is likely to happen to this policy.  Further, in the unlikely event of minimum returns and maximum mortality and administrative expenses, there are options that can protect John and Lorraine's cash flow and their children's estate.

(Id.)

About one month later, on November 12, 2002, Jarvis followed up with a letter to Dr. Repicci explaining that a future "internal exchange" of the non-guaranteed '026 Policy to Lincoln's guaranteed product in two or three years would be advisable in order to secure a guaranteed death benefit.  (Docket No. 73-6.)  He maintained that this option would be "a very desirable position for [Dr. Repicci] and it should alleviate some of [Dr. Repicci's] concerns.  (Id.)

In late 2002, Dr. Repicci approved the plan and the purchase of the two insurance policies that Jarvis had proposed.  According to Jarvis, the Repiccis paid $600,000 in premiums for the Policy in both 2002 and 2003, but did not make the anticipated final $600,000 premium payment in 2004.  (Docket No. 65-1, ¶ 14; Docket No. 73, ¶ 14.)  This is significant because Jarvis's pre-purchase assumptions and projections were based on the Repiccis paying $1.8 million in premiums.  (Docket No. 65-1, ¶ 14.)  In addition, Jarvis maintains that, in 2005, Lincoln eliminated the "internal exchange" option that he had previously identified, thereby eliminating the possibility of exchanging the Policy for a guaranteed product.  (Docket No. 65-1, ¶ 15.)  Dr. Repicci must have been aware of this, maintains Jarvis, because he received annual statements showing that the guaranteed

provision would expire well before his 100th birthday.  (Id.)

Without citation to the record, Plaintiffs maintain that Jarvis never told them that failing to make the third $600,000 premium payment on the Policy would ever become a problem.  (Docket No. 73, ¶ 14.)  They also disagree that the Policy performed worse than projected because only two premium payments were made, and that they were aware of the status of the Policy through receipt of the annual statements.  (Id., ¶¶ 14, 15.)

Between 2003 and 2006, Jarvis continued to communicate with Dr. Repicci and proposed additional wealth- or estate-planning strategies unrelated to the '026 Policy.  (Docket No. 65-1, ¶ 16; Docket No. 73, ¶ 16; Docket No. 73-19, pp. 3, 8.)

Between 2007 and 2011, Jarvis had no contact with Dr. Repicci, due in part to prohibitions on contact arising out of a business dispute between Jarvis and his former partners.  (Docket No. 65-1, ¶ 17.)  Plaintiffs deny knowledge of the business dispute and are uncertain as to what, if any, contact Dr. Repicci had with Jarvis during this period.  (Docket No. 73, ¶ 17.)  They further contend that Jarvis never advised them that he could not contact them or that he would not be monitoring the Policy.  (Docket No. 73-19 at 9.)

By letter dated January 7, 2014, Dr. Repicci asked Jarvis to explain the status of the Mass Mutual and Lincoln policies because he was having difficulties with the IRS.  (Docket No. 73-11.)  In March 2014, Jarvis advised that the Mass Mutual policy was guaranteed but that the '026 Lincoln policy was not.  (Docket No. 65-1, ¶ 20; Docket No. 73, ¶ 20; Docket No. 73-12.)  Plaintiffs maintain that this is the first time they were advised that the Policy was at risk.  (Docket No. 73-19, pp. 4, 9.)

Plaintiffs insist that Jarvis assured them that the Policy was guaranteed, and that

he would monitor the Policy to ensure that it performed as anticipated, yet failed to do so. (Complaint, ¶¶ 14, 16, 33.)  They further aver that they paid a $150,000 premium payment for the Policy in October 2021, and must continue to pay $150,000 payments each October to keep the Policy in force.  (Docket No. 82 ¶ 2, Ex. A.)  Plaintiffs also claim that the Policy would now be worth $985,000 on the life-settlement market if it was guaranteed, but because it is not, it is worthless.  (Id. ¶ 4, Ex. B.)

### B. Procedural Background

Plaintiffs commenced this action on January 6, 2017, in New York State Supreme Court, County of Erie, against Jarvis and OJM Group, LLC ("OJM"), bringing negligence and breach-of-fiduciary-duty claims in relation to the management of their insurance policies.  (Docket No. 1-2.)   On February 13, 2017, the defendants removed the action to federal court based on diversity jurisdiction.  (Docket No. 1.)

On April 21, 2017, Jarvis moved to dismiss the complaint for failure to state a claim. (Docket No. 6.)  That same day, OJM answered the complaint and filed a cross-claim against Jarvis.  (Docket No. 8.)  On May 12, 2017, Jarvis moved to dismiss OJM's cross-claim.  (Docket No. 15.)  On May 26, 2017, OJM moved for judgment on the pleadings. (Docket No. 20.)

On January 24, 2020, this Court dismissed Plaintiffs' negligence-based causes of action and denied as moot Jarvis's motion to dismiss OJM's cross-claim.  See Repicci v. Jarvis, 17-CV-132S, 2020 WL 13200595, at *13 (W.D.N.Y. Jan. 24, 2020).[3]  The only surviving causes of action were two breach-of-fiduciary-duty claims against Jarvis

---

[3] This decision is filed at Docket No. 30.

concerning the '026 Policy and a second Lincoln policy referred to as the '144 Policy.[4] (Id.)

After the parties concluded pretrial proceedings before the magistrate judge, Jarvis filed the instant motion for summary judgment on February 11, 2022.  (Docket No. 65.) Plaintiffs cross-moved for partial summary judgment on April 18, 2022.  (Docket No. 73.) Briefing, including supplemental briefing on standing and subject-matter jurisdiction, concluded on September 2, 2022, after which this Court took the motions under advisement without oral argument.

## III.   DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of

---

[4] Plaintiffs have withdrawn their sixth cause of action relating to the '144 policy, see Docket No. 65-11, p. 5 n.1; Docket No. 73-19, p. 10, leaving only a single surviving claim—Plaintiffs' third cause of action for breach of fiduciary duty as it relates to the '026 Policy.  Although Plaintiffs did not formally withdraw their sixth cause of action, this Court will deem it withdrawn by agreement.

evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which a factfinder could reasonably find for the nonmoving party.  Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

## B. Breach-of-Fiduciary-Duty Claim

In their only surviving cause of action, Plaintiffs allege that Jarvis breached his fiduciary duties by (1) misrepresenting that the '026 Policy was guaranteed, (2) failing to properly monitor the Policy and report on its status, and (3) failing to offer Plaintiffs any corrective measures to salvage the Policy's value.  (Docket No. 1-2, ¶¶ 14, 31-33.) Plaintiffs argue that Jarvis's fiduciary duties were ongoing throughout the Policy term, and

9

that Jarvis therefore continuously breached his fiduciary duties each time he failed to act. This, argues Plaintiffs, caused them damage in the form of unanticipated additional premium payments and significantly reduced Policy value.

Jarvis seeks summary judgment on the grounds that Plaintiffs lacked standing to bring their breach-of-fiduciary-duty claim, and that, in any event, the claim is both time-barred and fails for lack of fiduciary relationship between Plaintiffs and Jarvis.

As discussed more fully below, while this Court finds that Plaintiffs have sufficiently demonstrated an injury-in-fact for standing purposes, it further concludes that Plaintiffs' claim is barred by the applicable statute of limitations and that the proffered tolling provisions do not apply. Jarvis's motion for summary judgment will therefore be granted, and Plaintiffs' cross-motion for partial summary judgment will be denied.

### 1.  Plaintiffs have demonstrated constitutional standing.

"This Court, like all courts established under Article III of the United States Constitution, has jurisdiction only over 'cases and controversies.'" Kearns v. Cuomo, 415 F. Supp. 3d 319, 327 (W.D.N.Y. 2019) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 559, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Accordingly, this Court must consider as a threshold issue whether Plaintiffs have constitutional standing to assert their breach-of-fiduciary-duty claim. See Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 44 (2d Cir. 2015) (standing is a "threshold matter" in determining district court's jurisdiction to hear case); Cohen v. Rosicki, Rosicki & Assocs., P.C., 897 F.3d 75, 80 (2d Cir. 2018) ("[S]tanding is a 'threshold matter' in determining whether the district court had jurisdiction to hear and decide this case.") (quoting Anderson, 805 F.3d at 44).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or

controversy." Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016).  Article III standing requires a plaintiff to demonstrate injury-in-fact, a "causal connection" between that injury and the defendant's conduct, and a likelihood "that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotations omitted); see also TransUnion LLC v. Ramirez, __ U.S. __, 141 S. Ct. 2190, 2197, 210 L. Ed. 2d 568 (2021) ("to have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm"). The plaintiff bears the burden of demonstrating standing, see Lujan, 504 U.S. at 561, and "[i]t is axiomatic . . . that 'standing is to be determined as of the commencement of suit.'" Clarex Ltd. v. Natixis Sec. Am. LLC, No. 12 CIV. 0722 PAE, 2012 WL 4849146, at *4 (S.D.N.Y. Oct. 12, 2012) (quoting Fenstermaker v. Obama, 354 F. App'x 452, 455 (2d Cir. 2009)).

Standing is at issue here because Plaintiffs asserted that they "have not yet sustained actual damages or injury and will not sustain actual damages until an additional premium is paid."  (Docket No. 73-19, p. 20.)  This prompted supplemental briefing, wherein Plaintiffs claimed two injuries-in-fact: (1) a $150,000 premium payment for the '026 Policy paid in October 2021; and (2) the reduced value of the non-guaranteed '026 Policy.  (Docket No. 82, ¶¶ 2, 4.)

Because standing is determined at the commencement of suit, Plaintiffs' alleged $150,000 premium payment fails to establish an injury-in-fact conferring standing for their breach-of-fiduciary-duty claim filed in 2017.  See Fenstermaker, 354 F. App'x at 455. There is, however, a genuine dispute concerning whether the non-guaranteed Policy is

11

less valuable than if it had been guaranteed, as Plaintiffs allegedly were told.[5]  There is also the missed opportunity to salvage the '026 policy due to Jarvis's alleged failure to notify Plaintiffs that it was underperforming.  Accordingly, this Court finds that Plaintiffs have sufficiently demonstrated injury-in-fact to confer constitutional standing.

### 2.  Plaintiffs' claim is barred by the statute of limitations.

To establish a breach-of-fiduciary-duty claim under New York law,[6] a plaintiff must demonstrate "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) 'damages directly caused by [the defendant's] misconduct.'"  Murphy v. Morlitz, 751 F. App'x 28, 30 (2d Cir. 2018) (alteration in original and quoting Pokoik v. Pokoik, 115 A.D.3d 428, 430 (1st Dep't 2014)).  "[A]ctual injury—or damage—is an essential element of a breach of fiduciary duty claim under New York law."  Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 244 n.17 (2d Cir. 2020) (internal quotations omitted).

The statute of limitations for a breach-of-fiduciary-duty claim seeking monetary damages under New York law is three years.  See Repicci, 2020 WL 13200595, at *12 (citing Weiss v. T.D. Waterhouse, 847 N.Y.S.2d 94, 95 (2d Dep't 2007); Kaszirer v. Kaszirer, 730 N.Y.S.2d 87, 88 (1st Dep't 2001)).  The New York Court of Appeals has held that "[a] tort claim accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint."  IDT Corp. v. Morgan Stanley

---

[5] Although perhaps susceptible to evidentiary challenge, the Themis Capital Advisors report submitted during the supplemental briefing generally supports Plaintiffs' contention that their initial insurance investment may now be worthless or is at least less valuable than if the Policy had been guaranteed as allegedly promised.  (Docket No. 82-2.)  While the report does not expressly value the policy at the time of suit, this Court can reasonably infer that the non-guaranteed Policy was also less valuable than a guaranteed Policy in 2017.

[6] The parties have invoked this Court's diversity jurisdiction.  (Docket No. 1, ¶¶ 5-14.)  "Federal courts sitting in diversity cases will, of course, apply the substantive law of the forum State on outcome determinative issues."  Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994).

Dean Witter & Co., 12 N.Y.3d 132, 140 (N.Y. 2009) (internal quotations and citation omitted).

Here, Plaintiffs filed the instant action in state court on January 6, 2017. Consequently, for their breach-of-fiduciary-duty claim to be timely, it must have accrued on or after January 6, 2014.  It did not.  The statute of limitations therefore bars Plaintiffs' claim, and there is insufficient evidence in the record from which a reasonable jury could conclude otherwise.

Plaintiffs' claim is premised on their purchase of the non-guaranteed '026 Policy, which occurred in 2002 or early 2003.  They claim that Jarvis told them that the Policy was guaranteed, and that it would last through Dr. Repicci's 100th birthday.  They also claim that Jarvis told them that they would not need to provide additional funding to keep the '026 Policy in force.  And they further claim that Jarvis failed to monitor the Policy and never exchanged it for a guaranteed product, as he suggested he would.  But all of this conduct occurred well before January 6, 2014.  While Plaintiffs claim that they did not learn the true nature and status of the '026 Policy until March 2014, the record contains undisputed direct evidence from both Jarvis and Lincoln that Plaintiffs were plainly on notice from the beginning that the Policy was not guaranteed, that additional funding could be necessary, and that the exchange to a guaranteed product never occurred.  Put simply, Plaintiffs' breach-of-fiduciary-duty claim concerning the '026 Policy accrued well before January 6, 2014, and is therefore barred by the statute of limitations unless a tolling provision applies.

### 3.  No tolling doctrines save Plaintiffs' untimely claim.

Plaintiffs argue that their claim is timely under one or more tolling doctrines:

continuing-wrong; equitable-estoppel; and continuous-representation.  They further argue that their claim is timely because Jarvis never repudiated his fiduciary duty or terminated his relationship with the Repiccis.  None of these arguments have merit.

First, the continuing-wrong doctrine is inapplicable.  "[I]n New York, despite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act." Leonhard v. United States, 633 F.2d 599, 613 (2d Cir. 1980) (quotations omitted).  But this doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct."  Selkirk v. State, 249 A.D.2d 818, 819 (3rd Dep't 1998).

Here, the alleged wrongful acts occurred when Jarvis sold the Repiccis a non-guaranteed life insurance policy and later failed to exchange it for a guaranteed product.  These are not continuing acts.  Nonetheless, Plaintiffs argue that the continuing-wrong doctrine applies because Jarvis failed to monitor the Policy and report on its status.  But even assuming that Jarvis owed this obligation and failed to meet it, this is not the unlawful act from which Plaintiffs claim damages.  Their claim and damages emanate from the initial purchase of the non-guaranteed Policy.  So while failure to monitor the Policy may arguably have resulted in increased damages, that failure provides no basis to toll the statute of limitations under the continuing-wrong doctrine.  See Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp. 3d 221, 289 (S.D.N.Y. 2019) ("where a plaintiff asserts a single breach—with damages increasing as the breach continued—the continuing wrong theory does not apply"); Henry v. Bank of Am., 48 N.Y.S.3d 67, 70 (1st Dep't 2017) ("The

distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs.").

Plaintiffs' equitable-estoppel argument is equally unconvincing. "[A] defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Simcuski v. Saeli, 44 N.Y.2d 442, 448-49 (1978). "Where concealment without actual misrepresentation is claimed to have prevented a plaintiff from commencing a timely action, the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim." Gleason v. Spota, 194 A.D.2d 764, 765 (2d Dep't 1993). "Equitable estoppel will not toll a limitations statute, however, where a plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations.'" Id. (internal quotations omitted).

Here, whether or not a reasonable factfinder could conclude that Jarvis had a fiduciary relationship with the Repiccis, no reasonable factfinder could conclude that Plaintiffs lacked knowledge of all of the facts necessary to file a timely claim. Plaintiffs do not deny receiving Jarvis's correspondence or the annual statements from Lincoln. They further do not deny that the Repiccis had a team of professionals working together on their plan, including an accountant and a lawyer. Moreover the Repiccis specifically inquired about the non-guaranteed nature of the Policy and whether it would be in force through Dr. Repiccis 100th birthday without additional funding. The response confirmed the non-guaranteed nature of the Policy and offered multiple options to deal with underperformance, one of which explicitly involved additional funding. Plaintiffs thus

unequivocally had enough information to create a duty upon them to inquire into whether they had a claim, which forecloses the application of the equitable-estoppel doctrine. Gleason, 194 A.D.2d at 765.

Furthermore, "New York law is clear that the same act of non-disclosure cannot underlie both the argument for estoppel and the related cause of action." Tenamee v. Schmukler, 438 F. Supp. 2d 438, 444 (S.D.N.Y. 2006) (collecting cases). Rather, a plaintiff seeking to invoke the equitable-estoppel doctrine must "establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." Zumpano v. Quinn, 849 N.E.2d 926, 929 (N.Y. 2006). Plaintiffs have failed to identify any acts by Jarvis intended to conceal the alleged breach of fiduciary duty separate from the underlying breach of fiduciary duty.

Finally, "[e]quitable estoppel is an extraordinary remedy . . . [that] should be invoked only sparingly and only under exceptional circumstances," which none are present here. Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) (internal citations and quotation marks omitted).

Moving to the continuous-representation doctrine, it too fails to toll the statute of limitations. Under New York law, "[c]ontinuous representation tolls the statute of limitations until [the professional] stops rendering professional services to his or her client on a particular matter." Anderson v. Greene, 14 Civ. 10249 (KPF), 2016 WL 4367960, at *23 (S.D.N.Y. Aug. 10, 2016). To apply, the continuous representation "must be in connection with the particular transaction which is the subject of the action and not merely during the continuation of a general professional relationship." Zaref v. Berk & Michaels, P.C., 595 N.Y.S.2d 772, 774 (1st Dep't 1993).

16

Here, even assuming that Jarvis is a "professional" to whom the continuous-representation doctrine could apply, see Repicci, 2020 WL 13200595, at *11-12, there is insufficient evidence from which a reasonable jury could find that Jarvis continued to provide services concerning the '026 Policy after it was purchased and into the limitations period.  Plaintiffs' position, in fact, is the direct opposite: that Jarvis failed to advise them about the Policy.  In any event, it is well established that a professional's failure to advise a client or to protect a client's interest cannot constitute continuing representation.  See Ashmead v. Groper, 251 A.D.2d 716, 717 (3rd Dep't 1998) ("a professional's failure to take action or provide services necessary to protect a patient or client's interests cannot of itself constitute a course of treatment or representation.")).)   The continuous-representation doctrine therefore does not apply.

Lastly,[7] Plaintiffs assert that their claim is not time barred because Jarvis allegedly never repudiated his fiduciary duty or terminated the relationship.  This is a nonstarter, however, because only breach-of-fiduciary-duty claims seeking equitable relief require open repudiation or termination.  See Horan v. Vieira, No. 18CV01286JMAST, 2021 WL 1200220, at *6 (E.D.N.Y. Mar. 12, 2021) (quoting Spinnato v. Unity of Omaha Life Ins. Co., 322 F. Supp. 3d 377, 398 (E.D.N.Y. 2018)).  Plaintiffs do not seek equitable relief here, only monetary damages.  (See Docket No. 1-2 at 9-10.)  This argument therefore fails.

Because Plaintiffs cannot demonstrate that they suffered an injury within three years of commencing this action, and because no tolling doctrines apply, this Court need not reach whether a fiduciary relationship existed between Jarvis and Plaintiffs.  Instead,

---

[7] Plaintiffs have withdrawn their fifth ground for tolling the statute of limitations, which was based on a purported absence of damages.  (Docket No. 82 ¶ 5.)

this Court concludes that Jarvis is entitled to summary judgment on Plaintiffs' remaining claim as barred by the statute of limitations.

## IV.    CONCLUSION

Having reviewed the record evidence, this Court finds that no reasonable jury could conclude that Plaintiffs' breach-of-fiduciary-duty claim (third cause of action) is timely or that any tolling provisions apply.  Jarvis is therefore entitled to summary judgment, and there is no need to examine whether sufficient evidence of a fiduciary relationship exists in the record.  Jarvis's motion for summary judgment will therefore be granted, and Plaintiffs' motion for partial summary judgment will be denied.

## V.    ORDERS

IT HEREBY IS ORDERED, that Jarvis's Motion for Summary Judgment (Docket No. 65) is GRANTED.

FURTHER, that Plaintiffs' Cross-Motion for Partial Summary Judgment (Docket No. 76) is DENIED.

FURTHER, that Plaintiffs' Sixth Cause of Action is deemed WITHDRAWN.

FURTHER, that the Clerk of Court is DIRECTED to CLOSE this case.

SO ORDERED.

Dated:      November 7, 2022
            Buffalo, New York


                                    s/William M. Skretny
                                    WILLIAM M. SKRETNY
                                    United States District Judge